IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | ) ) ) ) |
| | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| ALKEM LABORATORIES LTD., AUROBINDO PHARMA USA INC., AUROBINDO PHARMA LTD., BIOCON PHARMA LIMITED, BIOCON LIMITED, BIOCON PHARMA, INC., CRYSTAL PHARMACEUTICAL (SUZHOU) CO., LTD., LAURUS LABS LIMITED, LAURUS GENERICS INC., LUPIN ATLANTIS HOLDINGS, S.A., LUPIN LIMITED, LUPIN INC., LUPIN PHARMACEUTICALS, INC., NANJING NORATECH PHARMACEUTICAL CO., LIMITED, TEVA PHARMACEUTICALS USA, INC., TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| ALEMBIC PHARMACEUTICALS LIMITED, ALEMBIC PHARMACEUTICALS, INC., MACLEODS PHARMACEUTICALS LTD., MACLEODS PHARMA USA, INC., | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

C.A. No. 20-2930-RGA

**Redacted - Public Version**

C.A. No. 19-1979-RGA

C.A. No. 19-2021-RGA

|  |  |  |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., HETERO USA INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT III, MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED, NOVUGEN PHARMA (MALAYSIA) SDN. BHD., ZYDUS PHARMACEUTICALS (USA) INC., ZYDUS LIFESCIENCES LIMITED,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 19-2053-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ALEMBIC PHARMACEUTICALS LIMITED, ALEMBIC PHARMACEUTICALS, INC.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 20-74-RGA |

|  |  |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| MYLAN PHARMACEUTICALS, INC., | ) ) ) |
| Defendant. | ) ) |

C.A. No. 20-445-RGA

## OPPOSITION TO PLAINTIFF'S MOTION TO PRECLUDE DEFENDANTS' EXPERT DR. FINTEL FROM OFFERING CERTAIN TESTIMONY

David Ellis Moore (#3983)
Bindu Ann George Palapura (#5370)
POTTER ANDERSON & CORROON, LLP
1313 N. Market Street,
Hercules Plaza, 6th Floor
Wilmington, DE 19899-0951
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com

Dominick T. Gattuso (#3630)
HEYMAN ENERIO GATTUSO
  & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
STAMOULIS & WEINBLATT LLC
800 N West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com
weinblatt@swdelaw.com

Adam W. Poff (No. 3990)
YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com

Kenneth Laurence Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899-2306
(302) 888-6855
kdorsney@morrisjames.com

John M. Seaman (#3868)
April M. Ferraro (#6152)
ABRAMS & BAYLISS LLP
20 Montchanin Road
Suite 200
Wilmington, DE 19807
(302) 778-1000
seaman@abramsbayliss.com
ferraro@abramsbayliss.com

Neal C. Belgam (#2721)
Eve H. Ormerod (#5369)
SMITH, KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

Dated: July 15, 2022

## **TABLE OF CONTENTS**

Table of Authorities ........................................................................................................ ii

I.  Nature and Stage of the Proceedings ......................................................................1

II. Summary of Argument ...........................................................................................1

III. Statement of Facts .................................................................................................3

    A.  Dr. Fintel's Background..................................................................................3

    B.  The '659/'331 Patents and Prior Art ...............................................................4

    C.  Dr. Fintel's Testimony at Issue ......................................................................6

IV. Argument ..............................................................................................................7

    A.  Legal Standard ...............................................................................................7

        1.  The Expert Qualification Standard Under FRE 702 Is Liberal................7

        2.  The Perspective of a POSA Is Central to the Issues for Trial....................8

        3.  Experts Can Rely on Material Outside Their Fields ..................................9

    B.  Dr. Fintel Is Qualified to Testify About a POSA's Understanding of Prior-Art Animal Models..........................................................................................11

        1.  As a Clinical Cardiologist, Dr. Fintel Is Qualified to Opine on References Concerning the Treatment of Hypertension and Heart Failure, Even If Those References Discuss Animal Models............................................11

        2.  Dr. Fintel Has Experience with Animal Models........................................14

    C.  Dr. Fintel Is Qualified to Testify About a POSA's Understanding of Disclosures of Sacubitril/Sacubitrilat ...............................................................................15

    D.  Plaintiff's Cases Do Not Apply ....................................................................19

V.  Conclusion .........................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Labs. v. Teva Pharms. USA, Inc.*,
　　C.A. No. 02-1512, 2005 WL 6225546 (D. Del. May 6, 2005).....................................11, 14, 15

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
　　598 F.3d 1336 (Fed. Cir. 2010) (en banc) ........................................................................... 8, 9

*Daubert v Merrell Dow Pharms. Inc.*,
　　509 U.S. 579 (1993)............................................................................................................ 8, 18

*Evonik Degussa GmbH v. Materia Inc.*,
　　C.A. Nos. 09-cv-636, 10-cv-200, 2016 WL 337378 (D. Del. Jan. 26, 2016)...............10, 14, 17

*Graham v. John Deere Co.*,
　　383 U.S. 1 (1966).................................................................................................................. 8, 9

*Holbrook v. Lykes Bros. S.S. Co.*,
　　80 F.3d 777 (3d Cir. 1996) ..................................................................................................... 7

*In re Norris*,
　　179 F.2d 970 (C.C.P.A. 1950) .............................................................................................. 18

*In re Paoli R.R. Yard PCB Litig.*,
　　35 F.3d 717 (3d Cir. 1994) ...................................................................................................... 8

*Kannankeril v. Terminix Int'l*,
　　128 F.3d 802 (3d Cir. 1997) .................................................................................................... 8

*Pineda v. Ford Motor Co.*,
　　520 F.3d 237 (3d Cir. 2008) ................................................................................................ 7, 8

*Purdue Pharma L.P. v. Amneal Pharms., LLC*,
　　C.A. No. 15-1152, 2018 WL 11169583 (D. Del. July 6, 2018) ..................................10, 14, 15

*Schneider ex rel. Estate of Schneider v. Fried*,
　　320 F.3d 396 (3d Cir. 2003) .................................................................................................... 8

*Shire Viropharma Inc. v. CSL Behring* LLC,
　　C.A. No. 17-414, 2021 WL 1227097 (D. Del. Mar. 31, 2021) ......................................*passim*

*TASER Int'l, Inc. v. Karbon Arms, LLC*,
　　C.A. No. 11-426, 2013 WL 6705478 (D. Del. Dec. 18, 2013)............................................... 20

*Varela v. Walmart, Inc.*,
　　No. CV 20-4448, 2021 WL 2172827 (C.D. Cal. May 25, 2021) ........................................... 19

*Waldorf v. Shuta*,
　　142 F.3d 601 (3d Cir. 1998) .................................................................................................... 8

*Withrow v. Spears*,
　　967 F. Supp. 2d 982 (D. Del. 2013)....................................................................................... 19

**Statutes**

35 U.S.C. § 103 .................................................................................................................. 9

**Rules**

Fed. R. Evid. 201 .............................................................................................................. 18

Fed. R. Evid. 702 ...................................................................................................... 7, 8, 12

## I.   <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

In this Hatch-Waxman patent litigation relating to Defendants' respective applications to market generic versions of Entresto (sacubitril/valsartan) tablets, Plaintiff asserts the '659 and '331 patents, which claim pharmaceutical compositions and their use to treat hypertension or heart failure.  Trial is expected to begin in September 2022.

## II.   <u>SUMMARY OF ARGUMENT</u>

Dr. Fintel is a cardiologist with more than three decades of experience.  He has extensive experience treating patients with heart failure and hypertension and participating in clinical studies of pharmaceuticals (i.e., chemicals) for those conditions.  Like any physician, he necessarily understands the identities of the drugs that he has studied and given to his patients, as well as the scientific rationale for their use.  Indeed, it is frivolous to suggest otherwise, given that the structures of the active ingredients of Entresto appear in its prescribing information (label) directed to doctors.  The patent claims at issue relate to compositions comprising valsartan (an angiotensin receptor blocker, or ARB) and either sacubitril or sacubitrilat (each a neprilysin, or NEP, inhibitor)—and their use to treat hypertension or heart failure.

Against the background of Dr. Fintel's expertise, Plaintiff selectively cites a limited portion of his deposition in an attempt to exclude his testimony rather than engage on the merits.  Along the way, Plaintiff confuses admissibility of evidence with its persuasive weight.  Dr. Fintel is an undisputed expert in treating cardiology and hypertension, and undisputedly at least a POSA, and this case is about what these patents and prior art would convey to a POSA.  He is qualified to say that.  Indeed, Rule 702 is liberal, and rejection of testimony right out of the gate is the exception. The Court should reject Plaintiff's invitation to exclude wholesale much of Dr. Fintel's testimony.

Defendants offer Dr. Fintel as an expert in heart failure and hypertension who can opine on a POSA's understanding of the prior art's disclosures and the patent's purported disclosure of

1

compounds useful for treating those conditions.  Plaintiff seeks to stop Dr. Fintel from giving this testimony.  Of course, because this subject matter is clearly within Dr. Fintel's expertise, Plaintiff must resort to mischaracterizing swaths of Dr. Fintel's testimony as instead being about "chemistry" or "animal models."  But the simple fact that a disclosure *mentions* chemicals doesn't mean that only an expert chemist can read it, especially where those chemicals are well-known to doctors—just as it doesn't take a chemist to read a pill bottle and know that "acetylsalicylic acid" means aspirin.  Nor does the simple fact that a disclosure describes animal-model results for hypertension or heart failure mean that only an animal-model expert can understand and use the results—just as it doesn't take a veterinarian to understand that a promising study in one species signals hope for another.  At any rate, experts rely on results from related fields *all the time*.  Police experts rely on breathalyzers without being chemists.  Doctors rely on x-rays of broken bones without being specialists in radiological equipment.  And, here, Dr. Fintel is not explaining how to design an animal model or how to plan an elaborate organic synthesis.  As a medical-doctor expert in cardiology and hypertension, he is explaining how a POSA would have understood disclosures relating to drugs for treating such conditions, as the law not only allows but requires.

Plaintiff's vagueness in presenting the issues demonstrates the weakness of Plaintiff's argument.  Plaintiff does not disclose in its brief or its motion the specific testimony it seeks to exclude—tucking that critical information into a pair of cryptic footnotes in its proposed order, and there only pointing to dozens of paragraphs by number.  Nor does Plaintiff attempt to explain how all that testimony falls into one of its so-called forbidden categories.

Plaintiff's case law is thin and unsupportive.  Its brief pays lip service to *Daubert* and FRE 702 but ignores the repeated admonitions in this circuit that, under that standard, admissibility is liberal, and perceived quibbles with an expert's position are best addressed on cross-examination.

This is not junk science, nor personal opinion.  Plaintiff does not challenge reliability nor fit—only qualifications.  But this circuit's law interprets that standard liberally, requiring specialized knowledge that is higher than that of the average layman.  Dr. Fintel's education and experience meet that standard in spades.  Dr. Fintel's testimony will assist the Court to understand the issues in dispute.  Plaintiff's motion should be denied.

## III.    STATEMENT OF FACTS

### A.    Dr. Fintel's Background

Dr. Fintel is an expert in the relevant fields—treatment of hypertension and heart failure— and undisputedly meets any POSA definition provided in this case.  Moreover, his background includes using chemical (i.e., pharmaceutical) compounds and interpreting animal models.

Plaintiff admits that Dr. Fintel is an expert in "clinical cardiology."  (Pl. Br. 1.)[1]  He has extensive experience treating patients with heart failure and hypertension.  (D. Ex. 1, Fintel Dep. Tr., at 28:6-32:18.)[2]  Dr. Fintel testified, "[H]eart failure is one of the most common diagnoses I treat" (*id.* at 30:5-6), and "I consider myself an expert in managing hypertension" (*id.* at 30:22-23).  He has "published in the area of hypertension," "lectured extensively on the subject of hypertension internationally and locally," and "participated in clinical trials, documented in [his] CV like the ACCOMPLISH trial in hypertension."  (*Id.* at 30:12-23.)  He has also published in the area of heart failure, led the VALIANT clinical trial relating to heart failure, and led other trials evaluating drugs to prevent blood clots that enrolled patients with heart failure.  (*Id.* at 30:24-32:18.)

---

[1] Plaintiff's opening brief (D.I. 670) is cited as "Pl. Br."  Exhibits to the declaration (D.I. 671) accompanying Plaintiff's opening brief are cited as "P. Ex."  Exhibits to the present opposition brief are cited as "D. Ex."

[2] D. Ex. 1 contains excerpts from Dr. Fintel's deposition omitted from P. Ex. C.

In testimony ignored by Plaintiff, Dr. Fintel explains his experience with animal models. He testified that he has conducted research with animal models, including heart failure models:

> Q. Have you personally conducted research with animal models of hypertension or heart failure?
>
> A. When I was a fellow at Johns Hopkins in the 1980s I did a number of dog experiments evaluating myocardium blood flow and imaging in animals, some of whom had induced heart failure condition and others were normal dogs to evaluate disorders of myocardial blood flow. So I have done a number of dog experiments that ended in 1985 when I began my current employment at Northwestern.

(P. Ex. C at 34:13-35:4.) He further testified as to his understanding as to how animal models of heart failure are created: "In fact, a number of animal models of heart failure are created when a band is placed around the aorta to create hypertension in increased afterload causing failure of the left ventricle. That's one very common model of heart failure related to high pressure, hypertension." (D. Ex. 1 at 75:9-16.) Dr. Fintel's experience in animal models allowed him to testify, in the context of the EP'072 reference, as to how measurements are made in animal models:

> Q. What type of catheter would you use to measure LVEPD and LVSP?
>
> A. Very small catheter is put in by the experiment – by the technologist. … So whether it's a dog or a hamster, there has to be an intra left ventricular catheter which is advanced through the blood vessels or in certain experimental preps the chest is open and the catheter is inserted directly into the left ventricle.

(*Id.* at 137:22-138:10.)

**B.    The '659/'331 Patents and Prior Art**

As Plaintiff admits, the '659 and '331 patents (which share a specification and are part of the same family) cover "pharmaceutical compositions comprising valsartan and sacubitril or sacubitrilat and their use in treating hypertension or heart failure." (Pl. Br. 1.) The claims are not directed to "chemistry" or to "animal models." They are directed to pharmaceutical compositions and their use, i.e., the province of practicing physicians. For example, '659 patent, claim 1, recites:

1. A pharmaceutical composition comprising:

(i) the AT 1-antagonist valsartan or a pharmaceutically acceptable salt thereof;

(ii) the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or (2R,4S)-5-biphenyl-4-yl-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid or a pharmaceutically acceptable salt thereof; and

(iii) a pharmaceutically acceptable carrier;

wherein said (i) AT 1-antagonist valsartan or pharmaceutically acceptable salt thereof and said (ii) NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or (2R,4S)-5-biphenyl-4-yl-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid or pharmaceutically acceptable salt thereof, are administered in combination in about a 1:1 ratio.

(P. Ex. A at 16:17-34.)  As any high-school chemistry student knows, chemical compounds have both long names and short names.  Although the '659/'331 patents do not use the words "sacubitril" and "sacubitrilat," it is undisputed that the claimed compound "N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester" is also known as "sacubitril," and the claimed compound "(2R,4S)-5-biphenyl-4-yl-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid" is also known as "sacubitrilat."  (*E.g.*, D. Ex. 2, Spinale Rebuttal ¶ 294; D. Ex. 3, Klibanov Rebuttal ¶ 23; D. Ex. 4, Klibanov Surreply ¶ 12 (Drs. Spinale and Klibanov were retained by Plaintiff as expert witnesses).)

It also is undisputed that sacubitril and sacubitrilat were known in the prior art—in particular, Ksander 1995 and the '996 patent.  For example, as Plaintiff's expert, Dr. Spinale, stated, "[a]s of 2002, I understand that sacubitril and sacubitrilat were known only by their chemical names or as '19a' and '21a,' respectively.  Ksander 1995 at 1692-93; '996 patent at col. 9, ll. 6-12."  (D. Ex. 2 ¶ 294.)  Dr. Spinale formed such an understanding despite testifying that he is not an expert in chemistry.  (D. Ex. 5 at 19:18-20 ("Q. Do you hold your out – yourself out as

a[n] expert in chemistry?  A. No, sir.").)  Thus, although the labels may not have been used, the identification of prior-art compounds as "sacubitril" and "sacubitrilat" is straightforward and not in dispute.[3]  It is simple bookkeeping, not scientific opinion.  What *is* in dispute is the significance of the disclosure of those compounds to the invalidity of the '659/'331 patent claims, which the parties agree are directed not to substantive chemistry issues but to pharmaceutical compositions and their use to treat hypertension and heart failure.

### C.    Dr. Fintel's Testimony at Issue

Dr. Fintel's challenged testimony relates to how a POSA would understand the disclosures of the asserted patents and the prior art, as related to obviousness and written description.

Dr. Fintel opines, among other things, that the '659 and '331 patents would have been obvious over various combinations of prior-art references disclosing valsartan (or other ARBs), sacubitril/sacubitrilat (or other NEP inhibitors), and combinations of ARBs/NEP inhibitors, including for the treatment of heart failure or hypertension.  (*See, e.g.*, P. Ex. D ¶¶ 20, 142.)  In the process of expressing his opinions, Dr. Fintel takes the simple step of recognizing that certain prior-art references disclose, among other claim elements, sacubitril and sacubitrilat for treatment of hypertension and heart failure.  (*E.g.*, *id.* ¶¶ 143, 157-58, 163.)  These disclosures, and the assignment of the names "sacubitril" and "sacubitrilat" to the disclosures, are not, and cannot be, disputed.  (*See, e.g.*, D. Ex. 2 ¶¶ 134, 140, 294.)  What is disputed is Dr. Fintel's explanation that a POSA interested in treatment of heart failure or hypertension would have found it obvious to combine these well-known chemical compounds in such a treatment.

---

[3] Indeed, Defendants' expert Dr. Forrest also testified that Ksander 1995 and the '996 patent disclosed sacubitril and sacubitrilat.  D. Ex. 6 (Forrest Opening Report) ¶¶ 50-52 (valsartan, sacubitril, and sacubitrilat known in the art, including Ksander 1995 and the '996 patent); D. Ex. 7 (Forrest Dep. Tr.) at 14:7-11, 152:11-14 (confirming Ksander 1995 and '996 patent disclosures).

In expressing his obviousness opinions, Dr. Fintel also discusses references that disclose the use of ARBs or NEP inhibitors in animal models of heart failure or hypertension. The issue in dispute is, again, whether a POSA interested in treatment of heart failure or hypertension would have found it obvious from these disclosures to combine these well-known chemical compounds in such a treatment.

Dr. Fintel also explains that the claims of the '659 and '331 patent lack an adequate written description because they (1) do not adequately describe sacubitrilat and (2) do not adequately describe "amounts effective to treat hypertension or heart failure" and "therapeutically effective amount." Once again, the disputes do not relate to whether the prior art disclosed and identified by name the compounds recited in the claims of the '659 and '331 patents, but to whether, as Dr. Fintel explained, those disclosures and identifications of compounds would have demonstrated possession to a person of ordinary skill in the art (who, it should be noted, is not required to be a chemistry expert under any party's definition).

## IV.    ARGUMENT

### A.    Legal Standard

#### 1.    The Expert Qualification Standard Under FRE 702 Is Liberal

The Federal Rules of Evidence embody a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 780 (3d Cir. 1996) (citation omitted). A "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Rule 702 has "a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citation omitted). Thus, "the rejection of expert testimony is the exception rather than the rule." *Shire Viropharma Inc. v. CSL*

*Behring* LLC, C.A. No. 17-414, 2021 WL 1227097, at *2 (D. Del. Mar. 31, 2021) (quoting Fed. R. Evid. 702, Advisory Comm. Notes (2000)).  Instead, "cross-examination" and "presentation of contrary evidence" are the preferred tools to rebut an expert's views.  *See Daubert v Merrell Dow Pharms. Inc.*, 509 U.S. 579, 595 (1993).

Although the *Daubert* standard requires "qualification, reliability, and fit," *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003), Plaintiff does not challenge reliability or fit here—only qualification.  The "qualification" standard requires "that the witness possess specialized experience," *see Pineda*, 520 F.3d at 244, such as "skill or knowledge greater than the average layman." *Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998).

The Third Circuit has "eschewed imposing overly rigorous requirements of expertise." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).  Rather, the focus "is on whether the qualifications that an expert does have provide a foundation for the witness to testify meaningfully on a given matter." *Shire*, 2021 WL 1227097, at *3.  An expert's qualifications should be assessed "liberally," recognizing that "a broad range of knowledge, skills, and training qualify an expert as such." *Paoli*, 35 F.3d at 741.  And "[i]f the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 809 (3d Cir. 1997) (citing *Paoli*, 35 F.3d at 741).

### 2.  The Perspective of a POSA Is Central to the Issues for Trial

Plaintiff's patents are invalid for obviousness and lack of written description, as Defendants will show at trial.  Obviousness and written description are therefore "fact[s] at issue." Fed. R. Evid. 702(a).  And both obviousness and written description are viewed from the perspective of a POSA. *E.g., Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (written description is an inquiry into "the specification from the perspective of a person of

ordinary skill in the art"); *Graham v. John Deere Co.*, 383 U.S. 1, 3 (1966) (obviousness concerns whether "subject matter as a whole would have been obvious … to a person having ordinary skill in the art").

For written description, "the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351.  And so the "specification must describe an invention understandable to that skilled artisan." *Id.*  (If Plaintiff's argument is that its own disclosures are undecipherable to a POSA, that is *its* problem, not Dr. Fintel's.)

And for obviousness, the statute asks whether the invention would have been obvious "to a person having ordinary skill in the art to which the claimed invention pertains."  35 U.S.C. § 103; *see also Graham*, 383 U.S. at 3.

### 3.     Experts Can Rely on Material Outside Their Fields

Although Defendants disagree that Dr. Fintel did so here, an expert witness can rely on material, data, or disclosures about which he or she is not formally an expert.  This was fundamental to the drafters of the Federal Rules[4]—it should not come as a surprise to Plaintiff.

For instance, in *Shire*, an expert "expressly admitted" that he was "not a regulatory expert." 2021 WL 1227097, at *29.  The other side therefore sought to exclude testimony about why the FDA relied on certain data to grant orphan-drug exclusivity.  *Id.*  Unconvinced, the court observed that the expert was not offering "independent regulatory opinions" but instead his "understanding" based on various documents and other expert reports outside his expertise—a type of reliance that

---

[4] The notes to Rule 702's companion, Rule 703, explain, for instance, that "a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays."  Fed. R. Evid. 703, Advisory Comm. Notes (1972).

is "well settled." *Id.* The court therefore denied a motion to exclude that testimony. *Id.*

Another expert's "technical expertise" (i.e., qualification) was challenged in that same case. *Id.* at *34-35. That expert, a formulating chemist, was admittedly not a "medical expert." *Id.* But the court refused to exclude his testimony on qualification grounds. *Id.* at *35. To be sure, "the clinical/medical aspects" of bioavailability and tolerability were, in the expert's view, "reserved for a medical expert." *Id.* at *35. Still, the court found that, "whether a *formulator* of ordinary skill would have deemed the bioavailability and tolerability results surprising" was "within the bounds of his expertise." *Id.* at *35 (emphasis added). It was his opinion on the perspective of a POSA that mattered.

In another case, a party sought to preclude a technical expert from "offering any opinions on translation, grammatical usage or interpretation of the German language" as applied to two German patent applications identified as prior art. *Evonik Degussa GmbH v. Materia Inc.*, C.A. Nos. 09-cv-636, 10-cv-200, 2016 WL 337378, at *14 (D. Del. Jan. 26, 2016). The qualification-based attack was that the expert was not an expert *in the German language. Id.* The court did not bite—it found that the expert "should be able to testify about his understanding of the German patent application," as he would "not be testifying as a German expert" but "about *his own understanding*" of the disclosure. *Id.* (emphasis added).

And as another example, this Court denied an effort to preclude testimony involving HPLC where the expert admitted that he was "not an expert in HPLC." *Purdue Pharma L.P. v. Amneal Pharms., LLC*, C.A. No. 15-1152, 2018 WL 11169583, at *1-2 (D. Del. July 6, 2018). The other side called this testimony "outside his area of chemical expertise." *Id.* at *1. This Court disagreed, observing that the expert had experience "considering and interpreting HPLC results," and was therefore qualified—even if he were not "at the forefront of HPLC advances." *Id.* It denied the

motion to exclude. *See also Abbott Labs. v. Teva Pharms. USA, Inc.*, C.A. No. 02-1512, 2005 WL 6225546, at *8-11 (D. Del. May 6, 2005) (similarly denying motion to exclude witness's interpretation of Raman spectroscopy even though witness was not an expert in Raman spectroscopy, as witness was "not required to be an expert in each sub-specialty upon which his opinion is based").

The question, at bottom, is whether the proffered testimony is potentially helpful to the court. Where the expert testifies about his own understanding from the perspective of a POSA, helpfulness is clear.

### B. Dr. Fintel Is Qualified to Testify About a POSA's Understanding of Prior-Art Animal Models

Plaintiff attempts to preclude Dr. Fintel from testifying relating to at least six references because those references disclose "animal model" "data." (Pl. Br. 5.) Plaintiff's only basis for doing so is its broad-brush characterization of these references along with two ambiguous deposition questions of Dr. Fintel, in response to which Dr. Fintel testified that he was not "an expert on animal models of hypertension" or "on animal models of heart failure." (*Id.* (citing P. Ex. C at 34:6-11).) Plaintiff's argument fails both because (1) as a clinical cardiologist, Dr. Fintel is qualified to opine on what prior-art references teach a POSA about treating hypertension and heart failure with an ARB and/or NEP inhibitor, even if those references discuss the use of such drugs in animal models, and (2) Dr. Fintel has knowledge and experience performing and interpreting animal models.

### 1. As a Clinical Cardiologist, Dr. Fintel Is Qualified to Opine on References Concerning the Treatment of Hypertension and Heart Failure, Even If Those References Discuss Animal Models

Given his extensive and undisputed background as a clinical cardiologist, including treating patients with heart failure and hypertension, and participating in clinical studies relating

to heart failure and hypertension (*supra* § III.A), Dr. Fintel is capable of review references relating to the use of pharmaceutical compounds for the treatment of hypertension or heart failure. That certain references may discuss the use of such compounds in animal models does not change this fact. The '659 and '331 patents do not claim new animal models. Dr. Fintel is not being asked to *design* animal models or opine on the invalidity of *claims* to animal models. Rather, Dr. Fintel is opining what a POSA, in the area of the '659/'331 patents, which relate to pharmaceutical compositions and their use in treating hypertension or heart failure, would learn from references disclosing such compositions and their use. As explained above, a reference's teachings viewed through a POSA's perspective are vital to the issues in this case—and so the resulting testimony is helpful to the court under FRE 702. *See, e.g.*, *Shire*, 2021 WL 1227097, at *34-35 (formulation expert, although not qualified as medical expert, was qualified to testify on a formulator's perspective of medical effects of composition).

Plaintiff's requested relief, buried in a barrage of contextless numbers in a pair of footnotes of a proposed order, is not only overly simplistic—it is overkill. For example, in its proposed order, Plaintiff seeks to preclude Dr. Fintel from testifying regarding paragraphs 97, 100, 101, 102, 103, and 104 of his opening report, where Dr. Fintel discusses EP'072. (D.I. 670, at proposed order, at 2 n.2; P. Ex. D ¶¶ 97-106.) Plaintiff does not explain how Dr. Fintel oversteps his expertise in these paragraphs, other than its overbroad characterization of these and numerous other paragraphs as about "animal models." Thus, there is no specific argument to which Defendants can respond. Nevertheless, Defendants discuss Dr. Fintel's qualifications to offer testimony on these paragraphs in exemplary fashion.

In paragraph 97, Dr. Fintel, with direct quotes to EP'072, generally describes the subject matter of EP'072 and provides conclusions reached by the authors, including the following:

> This invention is directed to the discovery that the ***angiotensin II antagonist*** **acts synergistically** with a ***selective neutral endopeptidase inhibitor*** or a dual acting neutral endopeptidase inhibitor as defined below to ***reduce cardiac preload and afterload and enhance natriureses***. The combination of this angiotensin II antagonist and the selective or dual acting neutral endopeptidase inhibitor ***produced significant reductions in left ventricular end diastolic pressure (LVEDP) and left ventricular systolic pressure (LVSP)*** that were greater than those produced by either treatment alone. Thus, the combination of this particular angiotensin II antagonist and the selective or dual acting neutral endopeptidase inhibitor is useful in treating hypertension and/or congestive heart failure.

(*Id.* ¶ 97 (quoting EP '072 at 2:26-33) (emphasis added by Dr. Fintel).)  The fact that the authors may have considered animal studies reported in EP '072 in reaching these conclusions does not negate Dr. Fintel's expertise as a clinical cardiologist to consider, opine, and testify regarding these results and conclusions.  Indeed, these results relate to LVEDP and LVSP, about which Dr. Fintel has extensive knowledge and testified in detail at his deposition in the context of EP'072.  (D. Ex. 1 at 135:13-141:11.)

In paragraph 100, Dr. Fintel presents disclosures from EP'072 relating to the form of administration of the ARB and NEP inhibitor.  (P. Ex. D ¶ 100.)  For example, Dr. Fintel notes that EP '072 discloses that the compounds can be combined in a single tablet in a 1:1 ratio.  (*Id.*)  As a clinical cardiologist, Dr. Fintel is qualified to testify on this subject matter.

In paragraphs 101-103, Dr. Fintel provides further information from EP'072 about the reported synergistic effect, quoting results reported in the patent.  (P. Ex. D ¶¶ 101-03.)  For example, in paragraph 102, Dr. Fintel reproduces data tables from EP '072 showing changes in blood-pressure measurements.  In paragraph 103, Dr. Fintel quotes EP '072's teaching that "[t]he combination of BMS 186295 [an angiotensin II antagonist] and SQ 28603 [a neutral endopeptidase inhibitor] produced cardiovascular effects that were greater than those with either treatment alone."  (*Id.* ¶ 103 (quoting EP '072 at 9:22-23) (bracketed additions from Dr. Fintel).)  As a cardiovascular

clinician, Dr. Fintel is knowledgeable about the measurements of paragraph 102, as his deposition testimony on this paragraph makes clear (D. Ex. 1 at 144:24-149:20), and qualified to report and offer opinions on EP '072's conclusion, quoted in paragraph 103, of the effects of cardiovascular treatments.  Further bolstering his qualifications, at his deposition, Dr. Fintel demonstrated knowledge of the animal models discussed in EP '072, with paragraph 104 providing the dosing information in straightforward detail.  (*Id.* at 149:2-150:14.)

Given Dr. Fintel's extensive educational, research, and professional experience in hypertension and heart failure, including his personally having conducted research with animal models (dogs) (*supra* § III.A, *infra* § IV.B.2), he is qualified to present and interpret conclusions in the prior art about the effectiveness of treatments of hypertension and heart failure, including conclusions relying on data from animal models, from the perspective of a POSA interested in pharmaceutical compositions for treating hypertension and heart failure.  For example, Dr. Fintel is qualified to report and testify regarding EP'072's disclosure of a synergistic effect of the combination of an ARB and NEP inhibitor in hypertension and heart failure.

It is common sense that an expert does not have to be an expert in underlying data to rely on it. *See, e.g.*, *Shire*, 2021 WL 1227097, at *29; *Purdue*, 2018 WL 11169583, at *1-2; *Abbott*, 2005 WL 6225546, at *8-11.  But at any rate, it is also clear that an expert can testify as to a POSA's understanding of a disclosure where that question is the one at issue.  *See, e.g.*, *Shire*, 2021 WL 1227097, at *34-35; *Evonik*, 2016 WL 337378, at *14. And, here, Dr. Fintel's proffered testimony about pharmaceuticals of the type he administers and animal models of the type he has used is much closer to his expertise than the testimony allowed in *Shire*.

### 2.    Dr. Fintel Has Experience with Animal Models

Given the focus of the testimony at issue, whether Dr. Fintel has personal experience with animal models should be irrelevant.  Nevertheless, he does have such experience.  Indeed, Plaintiff

omits critical testimony from Dr. Fintel regarding his personal experience working with, and knowledge concerning, animal models.  (*Supra* § III.A (quoting P. Ex. C at 34:13-35:4, D. Ex. 1 at 75:9-16, 137:22-138:10).)  Given this testimony, Plaintiff's claim that Dr. Fintel's "curriculum vitae provides no hint of expertise in animal models of hypertension or heart failure" is misleading. (*See* Pl. Br. 5.)  Even if Dr. Fintel falls short of being an "expert on animal models of" hypertension or heart failure—whatever that means—this experience and knowledge further confirms that Dr. Fintel is qualified to opine on the significance of these references to a POSA interested in treating heart failure or hypertension.  *See Calhoun*, 350 F.3d at 321 ("We have interpreted this [qualification of 'specialized expertise'] requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such." (internal quotation marks omitted).)  In similar circumstances, courts have found experts to be qualified.  *E.g.*, *Purdue*, 2018 WL 11169583, at *1-2 (non-HPLC expert qualified to testify involving interpretation of HPLC results where he had that experience); *Abbott*, 2005 WL 6225546, at *8-11 (non-Raman expert qualified to testify involving interpretation of Raman results where he had that experience).

At any rate, when questioning Dr. Fintel, Plaintiff provided no explanation of what it meant by "expert on animal models of [hypertension/heart failure]," and sought no explanation as to why Dr. Fintel, despite his admitted experience with such animal models, testified that he was not a so-called "expert" thereon.  This vague, out-of-context testimony is insufficient to overcome the liberal standard applicable to the admission of Dr. Fintel's testimony.

## C.    Dr. Fintel Is Qualified to Testify About a POSA's Understanding of Disclosures of Sacubitril/Sacubitrilat

Plaintiff complains that Dr. Fintel called known chemicals by their known names.  That is, he identified compounds mentioned in the '659/'331 patents (including the claims) or in prior art as "sacubitril" or "sacubitrilat."  (Pl. Br. 2-3.)  All Dr. Fintel did was use the undisputed shorthand

names "sacubitril" and "sacubitrilat" in place of the longer chemical names used in those documents. (*See id.*; *supra* § III.B.)  Plaintiff's non-chemistry-expert Dr. Spinale did so too. (*See supra* § III.B.)  That should all be uncontroversial: one does not need to be an expert in chemistry to use synonyms.  That is not "chemistry"; it is a task having all the complexity of using a thesaurus.  At any rate, even Plaintiff acknowledges that Dr. Fintel has chemical education: it cites testimony that he was "very good in organic chemistry in college."  (Pl. Br. 4.)  That makes sense: chemistry is foundational to medicine.  It defies belief to suggest that an accomplished cardiologist, who had years of experience before the priority dates of the patents at issue, *including with compounds appearing in the asserted claims*,[5] cannot identify chemical compounds by name or structure, especially when those structures appear in the label of the drug.

For example, Plaintiff takes issue with the fact that "Dr. Fintel replaces the chemical name 'N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester' recited in the '659 Patent with 'sacubitril' in brackets and opines that the '996 Patent discloses 'sacubitril' and 'sacubitrilat,' even though the '996 Patent uses neither of those terms." (Pl. Br. 2.)  But non-chemist Dr. Spinale also relies on the same undisputed identification of compounds as sacubitril or sacubitrilat:

> The '996 patent also discloses "N-(3-carboxy-1-oxoproyl)-(4S)-p-phenylphenymethyl-4-amino-(2R)-methylbutanoic acid ethyl ester" which I understand is sacubitril, and "N-(3-carboxy-1-oxoproyl)-(4S)-p-phenylphenymethyl-4-amino-(2R)-methylbutanoic   acid," which I understand is sacubitrilat.  '996 patent, col. 21, ll. 5-7 (sacubitril), ll. 16-18 (sacubitrilat)).

(D. Ex. 2 ¶ 600.)  Thus, even though the '996 patent "uses neither" term" "sacubitril" or

---

[5] P. Ex. G, Fintel Report Ex. 1 (c.v.) at 6: Principal Investigator on Novartis study titled "Multinational, multi-center, double blind, randomized, active controlled, parallel group study comparing the efficacy and safety of long-term treatment with *valsartan*, captopril and their combination in high risk patients after myocardial infarction. VALIANT (*Valsartan* In Acute myocardial Infarction)." (Emphasis added.)

"sacubitrilat" (Pl. Br. 2), Dr. Spinale uses those terms to refer to compounds disclosed in the '996 patent.

Because the identity of prior-art compounds and the correctness of their synonym names are not actually in dispute, Dr. Fintel's so-called "identification" testimony is not, as Plaintiff's deem it, an "indispensable step" in his written description and obviousness analyses. (*See* Pl. Br. 4-5.) It is simply a recognition of undisputed facts. Dr. Fintel is qualified to opine on what the prior art teaches a POSA about known compounds and their use to treat hypertension or heart failure, whether those compounds are disclosed in the prior art by full chemical name or shorthand name.[6] Likewise, Dr. Fintel is qualified to opine on whether a POSA would understand the '659/'331 patents to disclose a compound claimed in those patents, and whether the patents further disclose "amounts [of such a compound] effective to treat hypertension or heart failure" or a "therapeutically effective amount" of such a compound, regardless of what the compound is called. And Dr. Fintel is certainly qualified to refer for convenience to compounds by unambiguous, common shorthand names that confuse no one.

The testimony of Dr. Fintel cited by Plaintiff is not to the contrary. Using an accepted shorthand name does not require "[i]nterpreting the chemical structure and the modes of synthesis" or organic chemistry. (*See* Pl. Br. 4 (citing P. Ex. C at 251:5-11, 251:24-252:6).) *See Evonik*, 2016 WL 337378, at *14 (expert testifying as to understanding of German patent application was not functioning as expert in German interpretation). But even if that *were* "chemistry," experts can rely on other experts, *see, e.g.*, *Shire*, 2021 WL 1227097, at *29 (expert qualified to rely on expert reports outside his expertise), and so Dr. Fintel can rely on the opinions of Dr. Klibanov, Plaintiff's chemistry expert, for these undisputed facts. Dr. Klibanov has explained the chemical

---

[6] After all, well-known prior art instructs that "A rose by any other name would smell as sweet."

names in detail,[7] and confirmed where the various references disclose them.[8]

Indeed, as Dr. Klibanov's citation to PubChem (a government compendium) with respect to the "sacubitrilat" name demonstrates, this Court can even take judicial notice of the identification of certain compounds as "sacubitril" or "sacubitrilat." Fed. R. Evid. 201(b)(2); *see also Daubert*, 509 U.S. at 592 n.11; *In re Norris*, 179 F.2d 970, 973 (C.C.P.A. 1950) (taking judicial notice of statements in chemistry textbooks); *Varela v. Walmart, Inc.*, No. CV 20-4448, 2021 WL 2172827, at *1 & n.3 (C.D. Cal. May 25, 2021) (taking judicial notice of PubChem, for identity of vitamin E, as government record).[9]

_____

[7] Dr. Klibanov explained:

> In item (ii) of claims 1–3, "N-(3-carboxy-1-oxopropyl)-(4S)-(pphenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester" is a chemical name for the molecule known as "sacubitril" (NPC-VS-001072613–74 at 618, 620). In item (ii) of claims 1 and 2, (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionyl amino)-2-methyl-pentanoic acid is a chemical name for the molecule known as "sacubitrilat," which is the active form of the prodrug sacubitril ("sacubitrilat," PubChem, National Institutes of Health – National Library of Medicine, available at https://pubchem.ncbi.nlm.nih.gov/compound/Sacubitrilat, last visited Jan. 14, 2022; *see also* Ksander et al., "*Dicarboxylic Acid Dipeptide Neutral Endopeptidase Inhibitors*," J. Med. Chem., Vol. 38, 1995, 1689–1700 ("Ksander 1995") at 1693 (indicating that compound "19a," *i.e.*, sacubitril, is the ethyl ester prodrug of compound "21a," *i.e.*, of sacubitrilat).

(D. Ex. 3 ¶ 23 (addressing '659 patent, Ksander).)

[8] *See supra* note 7; *see also* D. Ex. 3 ¶ 248 ("'996 patent at col. 21, ll. 5–7 (describing sacubitril); col. 21, ll. 16–18 (describing sacubitrilat)"); D. Ex. 4 ¶ 12 (addressing Ksander) ("A POSA would know that sacubitrilat is the active metabolite of sacubitril and one of the two active compounds tested for in vivo activity in Ksander 1995 (Ksander et al., *Dicarboxylic Aid Dipeptide Neutral Endopeptidase Inhibitors*, J. Med. Chem., Vol 38, 1995, 1689-1700 at 1693-94 (sacubitrilat 21a), sacubitril (compound 19a)).").

[9] It is worth noting that the knowledge of Dr. Spinale, Novartis's proffered expert in response to Dr. Fintel, does not even extend this far. According to his responsive expert report, Dr. Spinale's only knowledge of the structures of valsartan and sacubitril comes from his "understanding" of information provided from an unknown source, or from Dr. Fintel: "*I understand that* the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester is known as sacubitril, and Dr. Fintel agrees (Fintel Rpt. ¶ 84). *I also understand* that the NEP inhibitor (2R,4S)-5-biphenyl-4-yl-4-(3-carboxypropionyl amino)-2-methyl-pentanoic

Plaintiff's motion as to Dr. Fintel's so-called "chemistry" testimony should be denied.

### D.      **Plaintiff's Cases Do Not Apply**

In addition to neglecting foundational Federal Circuit law on the role of the perspective of a POSA, Plaintiff drums up just two examples of exclusion.  (Pl. Br. 1, 2.)  Neither case applies.

Plaintiff first cites *Withrow v. Spears*, 967 F. Supp. 2d 982, 993-95 (D. Del. 2013), as an example of exclusion.  There, an accident-reconstruction expert sought to testify about the medical cause of a person's hand injuries.  *Id.* at 993.  He was an expert in the accident mechanics—roads, vehicles, velocity, friction, etc.  *Id.*  Counsel had professed that "our accident reconstructionist cannot speak to" causes of injury.  *Id.* at 995.  The expert likewise confessed no expertise to opine on the medical causes of injuries, and no experience, yet went on to do just that.  *Id.* at 994.  That was a problem.  The problem, however, was not the broad label applied to the field of expertise; it was the *specific issue* of the proffered opinion.  Not so here: Dr. Fintel is testifying on how a POSA would understand disclosures using the expertise and tools to which he is accustomed.

Plaintiff next cites *TASER Int'l, Inc. v. Karbon Arms, LLC*, C.A. No. 11-426, 2013 WL 6705478 (D. Del. Dec. 18, 2013), to argue that being a POSA is not enough.  But in *TASER*, the specific testimony in question plainly included questions that only an electrophysiologist could answer: how human body parts reacted to electricity.  *Id.* at *1.  The expert was not an electrophysiologist.  In contrast, Plaintiff has not identified any specific questions that Dr. Fintel lacked the experience to answer.  Instead, it only gestures generally to the field.  In contrast, Defendants have pointed out how Dr. Fintel would use uncontroversial, common chemical names

---

acid is known as sacubitrilat, and Dr. Fintel agrees (Fintel Rpt. ¶ 109)."  (*See* D. Ex. 2, Spinale Report ¶ 44 (emphasis added).)  What is more, Dr. Spinale's *only* source of knowledge regarding the nature of sacubitrilat, an essential element of the claimed compound, is Dr. Fintel.  *Id.* ("Sacubitrilat is the active metabolite of the prodrug sacubitril.  Fintel Rpt. ¶ 109.").  In short, Dr. Spinale has no evidentiary basis to support his opinions based on the nature of valsartan, sacubitril, and sacubitrilat.

in his ordinary work, could turn to a chemical expert if needed, and had experience interpreting and even running animal-model studies.  Here, the relevant issues are squarely within Dr. Fintel's expertise: "Interpreting the chemical structure and the modes of synthesis are not part of the expertise of a clinical cardiologist, but interpreting the conclusion made by a patent in terms of how the compound functions, the dosing of the compound and how it might combine structurally with another compound like an androgenic receptor blocker are within my expertise."  (P. Ex. C, Fintel Dep. 251:8-17.)  Further, where Dr. Fintel did disclaim some "expertise," it was in relation to compounds that *are not a part of this case*; Dr. Fintel plainly testified that he could opine about the compounds claimed in the '659 and '331 patents: "[I]t's beyond my expertise to opine *on those other compounds* [disclosed in the '996 patent].· I can opine on the clinical conclusions of what the '996 patent stated was that this [claimed] compound could be of effectiveness for the treatment of hypertension or heart failure and other cardiac conditions that were listed."  (*Id.* at 252:4-12.) What's more, the testimony in question in *TASER* did not, like here, concern how a POSA would interpret a disclosure (the question underlying obviousness and written description).  At any rate, even where the court in *TASER* excluded some testimony, it permitted the expert to testify to "things within his expertise."  2013 WL 6705478, at *1.

## V.   <u>CONCLUSION</u>

Plaintiff's motion to preclude Dr. Fintel from offering certain testimony should be denied.

POTTER ANDERSON & CORROON, LLP

*/s/ David Ellis Moore*
David Ellis Moore (#3983)
Bindu Ann George Palapura (#5370)
1313 N. Market St., Hercules Plaza,
6th Flr.
Wilmington, DE 19899-0951
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

Robert L. Florence
Crystal Regan
PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, N.E., Suite 1500
Atlanta, GA 30309
(678) 690-5704
robertflorence@parkerpoe.com
crystalregan@parkerpoe.com

Tasneem A. Dharamsi
PARKER POE ADAMS & BERNSTEIN LLP
110 East Court Street Suite 200
Greenville, SC 29601
(864) 577-6370
tasneemdharamsi@parkerpoe.com

*Attorneys for Defendant Mylan
Pharmaceuticals Inc.*

SHAW KELLER LLP

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com

Mark C. McLennan
Alina Afinogenova
Jeanna M. Wacker
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Attorneys for Defendant Teva Pharmaceuticals
USA, Inc.*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (#3630)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

STAMOULIS & WEINBLATT LLC

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com
weinblatt@swdelaw.com

Scott A. Cunning, II
Elizabeth M. Crompton
PARKER POE ADAMS & BERNSTEIN LLP
1400 K St., NW, Suite 1000
Washington, DC 20005
(202) 434-9100
scottcunning@parkerpoe.com
elizabethcrompton@parkerpoe.com

Kyle Musgrove
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
(704) 372-9000
kylemusgrove@parkerpoe.com

*Attorneys for Defendant Crystal
Pharmaceutical (Suzhou) Co., Ltd.*


STAMOULIS & WEINBLATT LLC

*/s/ Richard C. Weinblatt*
Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
800 N West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com
weinblatt@swdelaw.com

Ronald M. Daignault
Richard Juang
DAIGNAULT IYER LLP
8200 Greensboro Drive, Suite 900
Mclean, VA 22102
rdaignault@daignaultiyer.com
rjuang@daignaultiyer.com

*Attorneys for Defendants MSN
Pharmaceuticals Inc., MSN Laboratories
Private Limited, and MSN Life Sciences
Private Limited*

Autumn Nero
PERKINS COIE LLP
33 East Main Street, Ste. 201
Madison, WI 53703-3095
(608) 663-7460
anero@perkinscoie.com

Bryan D. Beel
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, OR 97209
(503) 727-2000
bbeel@perkinscoie.com

Christopher D. Jones
PERKINS COIE LLP
700 Thirteenth Street, NW, Ste. 600
Washington, DC 20005
(202) 654-6200
cdjones@perkinscoie.com

*Attorneys for Defendants Dr. Reddy's
Laboratories, Ltd. and Dr. Reddy's
Laboratories, Inc.*


YOUNG CONAWAY STARGATT
 & TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (No. 3990)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com

Nirav N. Desai
Dennies Varughese
Joseph H. Kim
STERNE, KESSLER, GOLDSTEIN & FOX, PLLC
1100 New York Ave., NW, Suite 600
Washington, DC 20005
(202) 371-2600
ndesai@sternekessler.com

Young Conaway Stargatt
  & Taylor, LLP

*/s/ Adam W. Poff*
Adam W. Poff (No. 3990)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com

Michael J. Gaertner
James T. Peterka
Nina Vachhani
Jacob C. Britz
Locke Lord llp
11 South Wacker Dr.
Chicago, IL 60606
(312) 443-0700
mgaertner@lockelord.com
jpeterka@lockelord.com
nvachhani@lockelord.com
jacob.britz@lockelord.com

Zhibin Li
Locke Lord llp
Brookfield Place,
200 Vesey Street
New York, New York 10281
(646) 217-7897
zhibin.li@lockelord.com

*Attorneys for Defendants Zydus*
*Pharmaceuticals (USA) Inc. and Zydus*
*Lifesciences Limited*

dvarughese@sternekessler.com
josephk@sternekessler.com

*Attorneys for Defendants Laurus Labs Limited*
*and Laurus Generics Inc.*

Morris James llp

*/s/ Kenneth Laurence Dorsney*
Kenneth Laurence Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899-2306
(302) 888- 6855
kdorsney@morrisjames.com
chitch@morrisjames.com

Jitendra Malik
Katten Muchin Rosenman llp
505 South Tryon St., Ste. 2900
Charlotte, NC 28202
jitty.malik@katten.com

Matthew M. Holub
Jillian M. Schurr
Katten Muchin Rosenman llp
525 West Monroe St.
Chicago, IL 60661
matthew.holub@katten.com
jillian.schurr@katten.com

Christopher B. Ferenc
Katten Muchin Rosenman llp
2900 K. Street NW North
Tower-Suite 200
Washington, DC 20007
(202) 625-3647
christopher.Ference@Katten.com

*Attorneys for Defendants Biocon Limited, Biocon*
*Pharma Limited, and Biocon Pharma, Inc.*

MORRIS JAMES LLP

*/s/ Kenneth Laurence Dorsney*
Kenneth Laurence Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899-2306
(302) 888-6855
kdorsney@morrisjames.com

Stephen R. Auten
Richard T. Ruzich
Roshan P. Shrestha
Philip Y. Kouyoumdjian
Jane S. Berman
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, IL 60601
(312) 527-4000
sauten@taftlaw.com
rruzich@taftlaw.com
rshrestha@taftlaw.com
pkouyoumdjian@taftlaw.com
jberman@taftlaw.com

*Attorneys for Defendant Alkem Laboratories Ltd.*

ABRAMS & BAYLISS LLP

*/s/ April M. Ferraro*
John M. Seaman (#3868)
April M. Ferraro (#6152)
20 Montchanin Road
Suite 200
Wilmington, DE 19807
(302) 778-1000
seaman@abramsbayliss.com
ferraro@abramsbayliss.com

SMITH, KATZENSTEIN & JENKINS LLP

*/s/ Eve H. Ormerod*
Neal C. Belgam (#2721)
Eve H. Ormerod (#5369)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

Dmitry V. Shelhoff
Kenneth S. Canfield
Edward D. Pergament
PERGAMENT & CEPEDA LLP
25A Hanover Road, Suite 104
Florham Park, NJ 07932 (973)
998-7722
dshelhoff@pergamentcepeda.com
kcanfield@pergamentcepeda.com
epergament@pergamentcepeda.com

*Attorneys for Defendants Hetero USA Inc., Hetero Labs Limited, Hetero Labs Limited Unit III, Torrent Pharma Inc. and Torrent Pharmaceuticals Ltd.*

A. Neal Seth
Corey Weinstein
WILEY
1776 K St., NW
Washington, D.C. 20036
(202) 719-7000
nseth@wiley.law
cweinstein@wiley.law

*Attorneys for Defendants Macleods
Pharmaceuticals Ltd. and Macleods
Pharma USA, Inc.*

Dated: July 15, 2022

## CERTIFICATE OF SERVICE

I, Nate R. Hoeschen, hereby certify that on July 15, 2022, this document was served on

the persons listed below in the manner indicated:

### BY EMAIL

Daniel M. Silver
Alexandra M. Joyce
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

Helena C. Rychlicki
PINCKNEY, WEIDINGER, URBAN &
JOYCE LLC
3711 Kennett Pike, Suite 210
Greenville, DE 19807
(302) 504-1497
hrychlicki@pwujlaw.com

Frank D. Rodriguez
Stuart D. Sender
WINDELS MARX LANE &
MITTENDORF LLP
One Giralda Farms
Madison, NJ 07940
(973) 966-3200
frodriguez@windelsmarx.com
ssender@windelsmarx.com

Nicholas N. Kallas
Christina Schwarz
Christopher E. Loh
Susanne L. Flanders
Jared L. Stringham
Shannon K. Clark
Laura K. Fishwick
Gregory J. Manas
Whitney Meier Howard
VENABLE LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 218-2100
nkallas@venable.com
cschwarz@venable.com
cloh@venable.com
slflanders@venable.com
jlstringham@venable.com
skclark@venable.com
lfishwick@venable.com
gjmanas@venable.com
wmhoward@venable.com

/s/ Nathan R. Hoeschen
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant Teva
Pharmaceuticals USA, Inc.*

# Defendants' Ex. 1

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF DELAWARE

3   --------------------------------------------x
    IN RE:  ENTRESTO (SACUBITRIL/VALSARTAN) PATENT
4   LITIGATION, NOVARTIS PHARMACEUTICALS
    CORPORATION,

5
                       Plaintiff,    NO. 20-2930-LPS
6
    vs.
7
    ALKEM LABORATORIES, LTD., DR. REDDY'S
8   LABORATORIES, INC., DR. REDDY'S LABORATORIES,
    LTD., HETERO USA INC., HETERO LABS LIMITED,
9   HETERO LABS LIMITED UNIT III, MSN
    PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE
10  LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED,
    NOVUGEN PHARMA (MALAYSIA) SDN. BHD., ZYDUS
11  PHARMACEUTICALS (USA) INC., CADILA HEALTHCARE
    LTD., CRYSTAL PHARMACEUTICAL (SUZHOU) CO.,
12  LTD.,

13                     Defendants.
    --------------------------------------------x
14

15

16                     JUNE 3, 2022

17

18        Remote Video-Recorded Deposition of

19               DAN JAMES FINTEL

20

21

22

23  Stenographically Reported By:

24  Mark Richman, CSR, CCR, RPR, CM

25  Job No. 211977

1

2

3

4

5

6                      FRIDAY, JUNE 3, 2022

7                      8:06 A.M. (CST)

8

9           Remote Video-Recorded Deposition

10   of DAN JAMES FINTEL, before Mark Richman, a

11   Certified Shorthand Reporter, Certified

12   Court Reporter, Registered Professional

13   Reporter, and  Notary Public within and for

14   the State of New York.

15

16

17

18

19

20

21

22

23

24

25

1

2   R E M O T E   A P P E A R A N C E S:

3   VENABLE LLP

4   Attorneys for Plaintiff

5          1290 Avenue of the Americas

6          New York, NY 10104

7

8   BY:    CHRISTINA SCHWARZ, ESQ.

9          SUSANNE FLANDERS, ESQ.

10          SHANNON CLARK, ESQ.

11          LAURA FISHWICK, ESQ.

12

13

14

15

16   PERKINS COIE LLP

17   Attorneys for Defendant

18          1120 N.W. Couch Street

19          Portland, OR 97209

20

21   BY:    BRYAN BEEL, ESQ., PH.D.

22

23

24

25

1

2   R E M O T E   A P P E A R A N C E S:

3   TAFT STETTINIUS & HOLLISTER LLP

4   Attorneys for Alkem

5           111 East Wacker

6            Chicago, IL 60601

7

8   BY:    PHILIP KOUYOUMDJIAN, ESQ.

9

10

11

12  LOCKE LORD LLP

13  Attorneys for Zydus Defendants

14          111 South Wacker Drive

15          Chicago, IL 60606

16

17  BY:    NINA VACHHANI, ESQ.

18

19

20

21

22

23

24

25

1

2  R E M O T E   A P P E A R A N C E S:

3  WITHERS BERGMAN LLP

4  Attorneys for Aurobindo

5         1700 East Putnam Avenue

6         Greenwich, CT 06870

7

8  BY:    JAMES NEALON, ESQ.

9

10

11

12  PARKER POE ADAMS & BERNSTEIN LLP

13  Attorneys for Mylan

14         1075 Peachtree Street Northeast

15         Atlanta, GA 30309

16

17  BY:    ROBERT FLORENCE, ESQ.

18

19

20

21

22

23

24

25

```
 1
 2   R E M O T E   A P P E A R A N C E S:
 3   PERGAMENT & CEPEDA LLP
 4   Attorneys for Hetero, Torrent, and the Witness
 5        25A Hanover Road
 6        Florham Park, NJ 07932
 7
 8   BY:    DMITRY SHELHOFF, ESQ., PH.D.
 9
10
11
12   ALSO PRESENT REMOTELY:
13   DENIS BARBIER, ESQ., Novartis
14   PRESTON J. IMPERATORE, ESQ., Mylan
15
16
17
18
19
20
21
22
23
24
25
```

1                   D.J. FINTEL

2          THE VIDEOGRAPHER:  Good morning,

3    ladies and gentlemen.  My name is

4    Rick Richie.  I'm a legal

5    videographer in association with TSG

6    Reporting, Inc.

7          Because this is a remote

8    deposition, I will not be in the same

9    room with the witness.  Instead, I

10   will record this videotaped

11   deposition remotely.

12         The court reporter, Mark Richman,

13   also will not be in the same room and

14   will swear the witness remotely.

15         Do all parties stipulate to the

16   validity of this video recording and

17   remote swearing and that it will be

18   admissible in the courtroom as if it

19   had been taken following Rule 30 of

20   the Federal Rules of Civil Procedure

21   and the state's rules where this case

22   is pending?  Do all agree?

23         MS. SCHWARZ:  Yes for Novartis

24   plaintiffs.

25         MR. SHELHOFF:  Defendants

```
 1                    D.J. FINTEL

 2    stipulate as well.

 3           THE VIDEOGRAPHER:  This will be

 4    the start of media number 1 in the

 5    video recorded deposition of Dan J.

 6    Fintel, MD.

 7           Today's date is June 3rd, 2022,

 8    it's 8:06 a.m. Central Daylight Time.

 9           The case is In Re:  Entresto

10    Patent Litigation, number 20-2930-LPS

11    in the United States District Court

12    for the District of Delaware.

13           The attorneys' appearances have

14    been noted on the steno record.

15           Would the court reporter please

16    swear the witness.

17           DAN JAMES FINTEL, called as a

18    witness, having been first dual sworn

19    by the Notary Public (Mark Richman),

20    was examined and testified as

21    follows:

22           EXAMINATION BY MS. SCHWARZ:

23    Q.    Good morning, Dr. Fintel.

24    A.    Good morning.

25    Q.    Could you please state your full
```

```
 1                    D.J. FINTEL

 2   name and address for the record.

 3    A.    Dan James Fintel,




 6    Q.    Great.  So I'd like to tart today

 7   by discussing your qualifications and

 8   your experience.

 9            What percentage of your time do

10   you spend treating patients?

11    A.    At the current time, about 90

12   percent of my time is devoted to direct

13   patient care, both outpatient and

14   in-patient in the hospital.

15    Q.    And what do you do with the other

16   10 percent of your time?

17    A.    Administrative activities,

18   writing papers, academic activities,

19   committee memberships, etc.

20    Q.    Do you treat patients with heart

21   failure?

22    A.    I do, both in the hospital and in

23   my busy outpatient practice.

24    Q.    Do you treat patients with

25   hypertension?
```

1                    D.J. FINTEL

2    deposition or trial as an expert in a

3    patent case like this before?

4     A.    I don't recall testifying on

5    issues relating to patent, no.

6     Q.    Do you consider yourself an

7    expert in cardiology?

8     A.    Yes.

9     Q.    Is that clinical cardiology?

10     A.    Clinical cardiology, yes, and I

11    have areas of specialization within

12    clinical cardiology.  Clinical

13    cardiology, like the law, is a vast area

14    and we all have specialization.

15     Q.    What are your areas of

16    specialization?

17     A.    Critical care cardiology and that

18    reflects my years as a coronary care

19    unit director, and I still attend in the

20    CCU.  In fact, I'll be there this

21    weekend covering for another physician

22    in the coronary care unit starting

23    tomorrow.

24          Also, general clinical

25    cardiology.  I'm a noninvasive

Page 29

```
 1                  D.J. FINTEL

 2   cardiologist so I don't go into the cath

 3   lab and do coronary angiography although

 4   I can interpret coronary angiograms and

 5   I do on my patients.

 6         I'm also a nuclear cardiologist

 7   so I perform, interpret, supervise all

 8   kinds of stress tests and nuclear

 9   cardiology stress tests when we

10   administer small amounts of

11   radioactivity into the vein to take

12   images of the heart to understand its

13   blood flow and its function.  I'm

14   boarded in that as well.

15         And I mentioned general

16   outpatient and consultative cardiology.

17   Q.    You previously testified under

18   oath that you do not hold yourself out

19   as a heart failure expert?

20   A.    What I testified --

21         MR. SHELHOFF:  Objection.

22   A.    Yes.  The context of that

23   question is am I a specialist in heart

24   failure?  And we have six cardiologists

25   here at Northwestern who are specialists
```

```
 1                    D.J. FINTEL
 2   in heart failure who work with us in
 3   heart failure patients.
 4          But as a general clinical
 5   cardiologist, heart failure is one of
 6   the most common diagnoses I treat in
 7   both in-patients and outpatients.  I
 8   don't have advanced certification in
 9   heart failure, and that was the context
10   in which I understood that question in
11   that deposition.
12   Q.    Do you hold yourself out as a
13   hypertension expert?
14   A.    I don't know if there is
15   certification in hypertension but I
16   published in the area of hypertension.
17   I've lectured extensively on the subject
18   of hypertension internationally and
19   locally.  I've participated in clinical
20   trials, documented in my CV like the
21   ACCOMPLISH trial in hypertension.
22          So I consider myself an expert in
23   managing hypertension.
24   Q.    Have you published in the area of
25   heart failure?
```

```
 1                     D.J. FINTEL

 2   A.    I have.  For example, the Valeant

 3   trial which I led, I was Northwestern

 4   principal investigator of this

 5   multi-centric trial which compared

 6   valsartan to capryl in patients

 7   following a myocardial infarction with

 8   reduced ejection fraction.

 9          It was listed in that New England

10   Journal of Medicine publication.  And

11   patients with left ventricular

12   dysfunction have been part of the

13   patients say with acute myocardial

14   infarction that are included in many of

15   my papers about infarct management.  But

16   I don't think pure heart failure was the

17   primary focus of any of the other

18   publications besides my work in Valeant.

19   Q.    Have you ever published or been

20   involved in a clinical trial that

21   enrolled patients with diagnosed heart

22   failure?

23   A.    Yes, Valeant was an example of

24   one, left ventricular dysfunction heart

25   failure following myocardial infarction.
```

```
 1                    D.J. FINTEL
 2          There was a trial of an implanted
 3    device that measured heart rate that I
 4    think was published several years ago,
 5    and that enrolled patients with heart
 6    failure and left ventricular
 7    dysfunction, also patients without heart
 8    failure.
 9          And many of the trials that I've
10    led here at Northwestern, mostly post-
11    or peri-infarction trials evaluating
12    varying drugs to help prevent the
13    formation of new blood clots,
14    utilized -- enrolled patients with heart
15    failure following myocardial infarction
16    for which we were trying to determine
17    the optimal anti-thrombotic or
18    anti-clotting strategy.
19     Q.    Are you an expert in preclinical
20    models of hypertension?
21          MR. SHELHOFF:  Objection, vague.
22     A.    No.
23     Q.    Are you an expert in preclinical
24    models of heart failure?
25          MR. SHELHOFF:  Same objection,
```

```
 1                    D.J. FINTEL
 2   hypertension, as that pressure increases
 3   we refer to that as afterload, that
 4   creates pressure, hypertrophy upon the
 5   left ventricle, and that often leads to
 6   the beginning of the scarring process
 7   that I referred to and the shape change
 8   process in the left ventricle.
 9             In fact, a number of animal
10   models of heart failure are created when
11   a band is placed around the aorta to
12   create hypertension in increased
13   afterload causing failure of the left
14   ventricle.  That's one very common model
15   of heart failure related to high
16   pressure, hypertension.
17             So left ventricular performance
18   is critically dependent upon the
19   afterload into which the left ventricle
20   has to pump.
21    Q.    What does it mean for a drug to
22   have FDA approval?
23             MR. SHELHOFF:  Objection, vague.
24    A.    It means that the Food and Drug
25   Administration has carefully reviewed
```

```
 1                    D.J. FINTEL

 2          Apart from the LVEDP reference

 3    that you identified, is there anything

 4    else in this block quote that you're

 5    relying on to say ARBs and NEP

 6    inhibitors act synergistically to treat

 7    hypertension?

 8    A.    Aside from the marked reduction

 9    in left ventricular systolic pressure,

10    no.  And that was the data that was

11    reproduced in my submission on page 39,

12    those two boxes.

13    Q.    What is left ventricular end

14    diastolic pressure?

15    A.    That's the filling pressure of

16    the left ventricle.  As the ventricle

17    becomes less stiff, that filling

18    pressure falls and that's analogous in a

19    patient to having less shortness of

20    breath, less backward pressure of blood

21    filling into the lungs.

22          And the left ventricular end

23    diastolic pressure fell with this

24    treatment.

25    Q.    Where is left ventricular end
```

1                    D.J. FINTEL

2    diastolic pressure measured?

3     A.    It's with a catheter either in

4    the left ventricle or a wedge catheter

5    in the pulmonary vein.  I don't remember

6    this experimental prep, whether they had

7    their catheters in the left ventricle to

8    measure the left ventricular end

9    diastolic pressure.

10         But the second table on page 7

11   shows, and I don't know it was

12   reproduced here, shows quite striking

13   reductions in left ventricular end

14   diastolic pressure with the combination

15   at 30, 60 and 90 minutes, and that's an

16   effect which would be beneficial in a

17   heart failure patient.

18    Q.    Is it a measure of the pressure

19   in the heart or in the blood vessels?

20    A.    There are two ways to get that

21   pressure.  It can be measured directly

22   with a catheter in the left ventricle,

23   so it reads out a pressure at left

24   ventricular end diastole.

25         In clinical care, we often

```
 1                    D.J. FINTEL

 2   measure with a catheter in the pulmonary

 3   vein which is connected through the left

 4   atrium with the left ventricle and end

 5   diastole and that's the wedge pressure.

 6        I think this is measured directly

 7   with a catheter in the left ventricle.

 8   Because for them to obtain left

 9   ventricular systolic pressure they would

10   have needed a left ventricular systolic

11   catheter.

12        So I presume that this was

13   measured directly in the left ventricle,

14   and this is a striking episode --

15   evidence of synergy with a reduction

16   that was not seen with either of the

17   treatments as I'm looking at the bottom

18   of page 7 with neprilysin inhibitor or

19   the ARB.  Together they dramatically

20   dropped left ventricular end diastolic

21   pressure.

22    Q.    What type of catheter would you

23   use to measure LVEPD and LVSP?

24    A.    Very small catheter is put in by

25   the experiment -- by the technologist.
```

1               D.J. FINTEL

2    These are instrumented -- was this in

3    dogs or rodents?  I think Example 1 was

4    a male hamster.  So whether it's a dog

5    or a hamster, there has to be an intra

6    left ventricular catheter which is

7    advanced through the blood vessels or in

8    certain experimental preps the chest is

9    open and the catheter is inserted

10   directly into the left ventricle.

11    Q.    Would it be a fluid-filled

12   catheter?

13    A.    Oh, well, I don't know.  In

14   clinical care we generally use

15   fluid-filled catheters but sometimes

16   they are catheters with transducers at

17   the top, they are called Millar,

18   M-I-L-L-A-R, catheters that are even

19   more accurate that are solid state

20   sensors that are not fluid filled at the

21   tip of the catheter.  I don't know which

22   such catheters were used in this case.

23           I'm done with that answer.

24    Q.    Sorry, just reading.

25           So I think you just said

1                    D.J. FINTEL

2   catheters with transducers would be more

3   accurate than fluid-filled catheters for

4   measuring LVEDP and LVSP?

5    A.    Generally, but both are used in

6   both research and in clinical care.  And

7   with good attention to excellent

8   experimental technique a fluid-filled

9   catheter can give perfectly adequate

10  readings.

11   Q.    Is reducing LVEDP the same as

12  reducing hypertension?

13   A.    No.  Treatment of hypertension

14  can indirectly by reducing ventricular

15  afterload reduce LVEDP.  It's one of the

16  reasons that hypertensive therapy is so

17  critically important in the management

18  of the heart failure patient, because by

19  reducing ventricular afterload the

20  ventricle relaxes better, LVEDP falls,

21  and the patient feels less short of

22  breath so they are tightly connected.

23        But LVEDP is an independent

24  measure of blood ventricular relaxation.

25   Q.    What is left ventricular systolic

1               D.J. FINTEL

2  pressure?

3   A.    That is the peak pressure in the

4  left ventricular cavity at the end of

5  systole, or the period of time of left

6  ventricular contraction.

7   Q.    Is that the same as cardiac

8  afterload?

9   A.    Yes.  Well, left ventricular

10  afterload is the load into which the

11  left ventricular pumps.  Higher left

12  ventricular afterload, meaning higher

13  arterial pressure leads to higher left

14  ventricular systolic pressure.

15   Q.    Where is LVSP measured?

16   A.    In the left ventricle, with the

17  catheter in the left ventricle.  It's

18  obtained by advancing a catheter

19  retrogradely up the aorta, around the

20  aortic bend, through the aortic bend and

21  into the left ventricle.

22        That would be the typical of the

23  way we measure systolic and diastolic

24  pressure which is continuous reporting,

25  would be a left ventricular catheter

```
 1                  D.J. FINTEL
 2   advanced through the aorta.
 3    Q.    Is LVSP a measure of the pressure
 4   in the heart or in the blood vessels?
 5    A.    In the heart.  But unless there's
 6   aortic stenosis, the pressure in the
 7   heart should be reflected in the left
 8   ventricular -- in the aortic pressure
 9   because they -- at the end of left
10   ventricular systole they have to be the
11   same.
12    Q.    Does reducing LVSP of an animal
13   that does not have hypertension equate
14   to reducing hypertension?
15    A.    Well, in your example --
16          Hold on one moment.  (Telephone
17   interruption)  Please don't call this
18   number.  I'm doing a deposition.  Sorry
19   about that interruption.
20          That was a law firm.
21          What I was saying before the
22   interruption is, the animal is not
23   hypertensive.  The animal presumably is
24   healthy and is normal tensive.  So under
25   these experimental conditions, the
```

```
 1                    D.J. FINTEL
 2    Q.     What animal model was used for
 3  the experiment in Example 1?
 4    A.      Apparently male hamsters that
 5  developed a genetic form of
 6  cardiomyopathy.
 7    Q.     And what diseases or conditions
 8  are cardiomyopathic hamsters used to
 9  study?
10    A.      That's are conditions in which
11  the heart weakens as a muscle and it's
12  on the genetic basis.  It's not due to
13  high blood pressure or apparently valve
14  problems but it's a genetic
15  cardiomyopathy, inherited.
16    Q.     Is the cardiomyopathic hamster
17  model a hypertension model?
18    A.     No.  These animals apparently,
19  reading on the fourth sentence,
20  developed low mean arterial pressure.
21    Q.     So the animals didn't have
22  hypertension?
23    A.      Correct.
24    Q.     So we're going to look at
25  Paragraph 102 of your opening report.
```

```
 1                D.J. FINTEL

 2   But keep EP '072 handy because you may

 3   need to refer to it.

 4   A.    Yes.

 5   Q.    Do you have Paragraph 102?

 6   A.    I do.

 7   Q.    You stated there that (Reading:)

 8   The data provided in EP '072

 9   demonstrates that the administration of

10   a combination of an AT1-antagonist and a

11   NEP inhibitor resulted in

12   anti-hypertensive effects that are

13   greater than the sum of

14   anti-hypertensive effects demonstrated

15   by the angiotensin-II antagonist

16   activity and the NEP inhibitor

17   administered separately.

18         Do you see that?

19   A.    Yes.

20   Q.    What did you cite as support for

21   that statement?

22   A.    Well, the table right below is

23   the one that I -- in my report is the

24   one that I see at the top of page 8 of

25   EP '072.  It was copied directly from
```

```
 1                    D.J. FINTEL
 2   it.  And that says (Reading:)  Change
 3   from baseline in millimeters of mercury
 4   and it's clear that the combination, the
 5   NEP inhibitor and the ARB, led to 10 or
 6   11 millimeter falls in baseline
 7   pressure, millimeters of mercury.
 8    Q.    So that table at the top of page
 9   8 of EP '072 is change from baseline for
10   LVEDP?
11    A.    That is what I'm trying to
12   clarify as to whether that's arterial
13   pressure or EDP.  It's not clear to me
14   from the labeling in EP '072 which
15   particular parameter is measured.  In
16   the two boxes down, the minus 16 and
17   minus 18 is also showing a substantial
18   fall which I interpreted to mean
19   arterial pressure.  Yes, because the box
20   before it was fallen LVEDP in the bottom
21   of page 7 showing a 10 millimeter fall
22   in left ventricular end diastolic
23   pressure and it's identified as such.
24         So my interpretation of the data,
25   that's a fall in arterial pressure.  So
```

```
 1                  D.J. FINTEL
 2   the answer to the question is this would
 3   suggest an antihypertensive effect of
 4   the combination of these drugs as
 5   displayed in that table, both in my
 6   report and the top of page 8.
 7    Q.    I want to make clear I understand
 8   what you believe the table at the top of
 9   page 8 is showing.  It says Change From
10   Baseline.
11          What, what measurement is this
12   table reporting?
13    A.    I can't be absolutely sure
14   whether it's a change in mean arterial
15   pressure or change in left ventricular
16   systolic pressure because it isn't
17   labeled right above which parameter has
18   changed.  One second.
19          I think I understand it better
20   now.  The bottom of page 7 is left
21   ventricular end diastolic pressure and
22   the table that follows is the delta
23   instead of the absolute values.
24          Similarly, the second table in
25   page 8 is left systolic pressure and the
```

```
 1                  D.J. FINTEL
 2   table below it, which mathematically
 3   looks correct is the delta, is the
 4   change from baseline.
 5           And then we have the heart rate
 6   data.
 7           So this displays to me as
 8   reflected in my report that left
 9   ventricular systolic pressure fell as we
10   can see by 16, 20, minus 18 over the
11   first 90 minutes, and left ventricular
12   end diastolic pressure fell by 10 and
13   this would be considered both a
14   favorable effect for heart failure by
15   virtue of better left ventricular
16   filling performance and decreased left
17   ventricular systolic pressure which
18   would, as I interpret it, being a
19   hypertensive effect.
20    Q.    So Paragraph 102 of your report,
21   the top table is showing change from
22   baseline for LVEDP and the second table
23   is showing change from baseline for
24   LVSP; is that correct?
25    A.    Yes.
```

```
 1                    D.J. FINTEL
 2   Q.    And you're relying on both of
 3   these tables to support your statement
 4   that (Reading:)  EP '072 demonstrates
 5   that the combination of the ARB and NEP
 6   inhibitor resulted in antihypertensive
 7   effects that are greater than the sum of
 8   the antihypertensive effects
 9   demonstrated bite ARB and the NEP
10   inhibitor administered separately?
11   A.    In the --
12         MR. SHELHOFF:  Objection.
13   A.    In this hamster model of genetic
14   cardiomyopathy.  And that was summarized
15   on page 9, Discussion of Results, in the
16   EP '072, and I read (Reading:)  Thus the
17   combination of the two drugs produced
18   beneficial hemodynamic effect in
19   cardiomyopathic hamsters with
20   compensated heart failure.
21   Q.    So none of the tables at the
22   bottom of page 7 or on page 8 or page 9,
23   report mean arterial pressure data,
24   correct?
25   A.    Correct.  That apparently was in
```

Page 150

```
 1                    D.J. FINTEL

 2    the dog part of the study.  It's Example

 3    2.

 4     Q.    So Example 2 is the hypertension

 5    study in EP '072, correct?

 6     A.    In dogs that had been rendered

 7    hypertensive by prior unilateral

 8    nephrectomy, which means removing a

 9    kidney, and constriction of the renal

10    artery.

11          That's a well-known experimental

12    hypertensive model.  It's not identical

13    to human hypertension, but it's used in

14    animal studies.

15     Q.    Do you agree that the discussion

16    of results on page 9 of EP '072 at the

17    end of Example 1 does not mention

18    hypertension?

19     A.    Yes.

20          MR. SHELHOFF:  Objection.

21     A.    These were not hypertensive

22    animals.  These were cardiomyopathic

23    animals.

24     Q.    Do you recall that in his reports

25    Dr. Spinale pointed out several errors
```

1                        D.J. FINTEL

2           THE VIDEOGRAPHER:   3:51 p.m.,

3        Central Daylight Time, we're off the

4        record.

5               This concludes the deposition.

6               (Time noted: 3:51 p.m.)

7    _____

8    DAN JAMES FINTEL

9

10   _____

11   Subscribed and sworn to

12   before me this _____

13   day of _____, 2022.

14

15   _____

16        Notary Public

17

18

19

20

21

22

23

24

25

1                           D.J. FINTEL

2                     CERTIFICATION

3    STATE OF NEW YORK    )
                          : ss.
4    COUNTY OF NEW YORK   )

5        I, MARK RICHMAN, Certified Shorthand

6    Reporter, Certified Court Reporter,

7    Registered Professional Reporter and Notary

8    Public for and within the State of New York,

9    do hereby certify:

10       That the witness whose testimony is

11   herein set forth, was duly sworn by me; and

12   that the within transcript is a true record

13   of the testimony given by said witness.

14       I further certify that I am not related

15   to any of the parties to this action by

16   blood or marriage, and that I am in no way

17   interested in the outcome of this matter.

18       IN WITNESS WHEREOF, I have hereunto set

19   my hand this 15th day of JUNE, 2022.

20

21   _____

22       MARK RICHMAN, CSR, CRR, RPR, CM

23              *       *       *

24

25

# Defendants' Ex. 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | C.A. No. 20-2930-LPS **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| NOVARTIS PHARMACEUTICALS CORPORATION, Plaintiff, v. ALKEM LABORATORIES LTD., AUROBINDO PHARMA USA INC., AUROBINDO PHARMA LTD., BIOCON PHARMA LIMITED, BIOCON LIMITED, BIOCON PHARMA, INC., CRYSTAL PHARMACEUTICAL (SUZHOU) CO., LTD., LAURUS LABS LIMITED, LAURUS GENERICS INC., LUPIN ATLANTIS HOLDINGS, S.A., LUPIN LIMITED, LUPIN INC., LUPIN PHARMACEUTICALS, INC., NANJING NORATECH PHARMACEUTICAL CO., LIMITED, TEVA PHARMACEUTICALS USA, INC., TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD., Defendants. | C.A. No. 19-1979-LPS **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

|  |  |  |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| ALEMBIC PHARMACEUTICALS LIMITED, ALEMBIC PHARMACEUTICALS, INC., MACLEODS PHARMACEUTICALS LTD., MACLEODS PHARMA USA, INC., | ) ) ) ) ) ) ) | C.A. No. 19-2021-LPS **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| Defendants. | ) ) ) ) | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., HETERO USA INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT III, MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED, NOVUGEN PHARMA (MALAYSIA) SDN. BHD., ZYDUS PHARMACEUTICALS (USA) INC., CADILA HEALTHCARE LTD., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 19-2053-LPS **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| Defendants. | ) ) ) ) ) ) | |

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> ALEMBIC PHARMACEUTICALS LIMITED, ALEMBIC PHARMACEUTICALS, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. 20-74-LPS <br> **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> LUPIN ATLANTIS HOLDINGS, S.A., LUPIN LIMITED, LUPIN INC., LUPIN PHARMACEUTICALS, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. 20-415-LPS <br> **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MYLAN PHARMACEUTICALS, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. 20-445-LPS <br> **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

**RESPONSIVE EXPERT REPORT OF FRANCIS G. SPINALE, MD, PHD**
**<u>REGARDING VALIDITY OF THE '659 AND '331 PATENTS</u>**

# Table of Contents

I.      Introduction ................................................................................................ 1

II.     Qualifications ............................................................................................. 2

III.    Legal Principles ......................................................................................... 5

        A.  General ............................................................................................ 5

        B.  Obviousness .................................................................................... 6

        C.  Written Description ........................................................................ 8

IV.     The '659 And '331 Patents ..................................................................... 10

V.      Priority ..................................................................................................... 14

VI.     Person Of Ordinary Skill In The Art ...................................................... 15

VII.    State Of The Art As Of 2002 .................................................................. 17

        A.  Treatment Of Hypertension .......................................................... 17

            1.  Hypertension Involves A Complex Interplay Of Biologic Systems ............... 17

            2.  Drugs FDA Approved As Of 2002 To Treat Hypertension ......................... 17

            3.  As Of 2002, Many Drugs Were In Various Stages Of Clinical Investigation
                For Hypertension ................................................................ 24

        B.  Treatment Of Heart Failure .......................................................... 28

            1.  Heart Failure Involves A Complex Interplay Of Biologic Systems ............. 28

            2.  Drugs Approved As Of 2002 To Treat Heart Failure ................................ 29

            3.  As Of 2002, Many Drugs Were In Various Stages Of Clinical Investigation
                For Heart Failure ................................................................ 32

        C.  Heart Failure And Hypertension Are Different Conditions ......................... 38

VIII.   A POSA Would Not Have Been Motivated To Combine An ARB With A NEP Inhibitor
        For The Treatment Of Hypertension Or Heart Failure, Let Alone With A Reasonable
        Expectation Of Success ............................................................................ 43

        A.  The Possibility Of Combining Multiple Agents With Allegedly Complementary
            Mechanisms Of Action Would Not Have Motivated A POSA To Combine An ARB
            With A NEP Inhibitor For The Treatment Of Hypertension Or Heart Failure, Let
            Alone With A Reasonable Expectation Of Success ................................. 43

            1.  Dr. Fintel Overlooks The Variety Of Clinically Used Agents And
                Combinations ...................................................................... 45

            2.  ARBs, Including Valsartan, Were Not A "Preferred" Treatment For
                Hypertension Or Heart Failure ................................................ 49

            3.  NEP Inhibitors Had Produced Disappointing Results In The Treatment Of
                Hypertension And Heart Failure ............................................... 51

i

4.  The Alleged Effects Of NEP Inhibition On Angiotensin II Would Not Have Motivated A POSA To Combine An ARB And NEP Inhibitor For The Treatment Of Hypertension Or Heart Failure, Let Alone With A Reasonable Expectation Of Success ................................................................................. 57

B.  None Of The References Disclosing An ARB And A NEP Inhibitor In Combination Would Have Motivated A POSA To Combine Valsartan And Sacubitril For The Treatment Of Hypertension Or Heart Failure, Let Alone With A Reasonable Expectation Of Success ...................................................................................... 62

   1.  WO '564/EP '361 ......................................................................... 63

   2.  EP '072 And Trippodo 1995 ......................................................... 67

   3.  Matsumoto 1993 ......................................................................... 80

   4.  Chen 1999 ................................................................................... 86

   5.  None Of Dr. Fintel's Remaining Prior Art References Disclosed An ARB And A NEP Inhibitor ............................................................. 90

C.  Combinations Of ARBs And NEP Inhibitors Were Not Known To Be Synergistic For Treating Hypertension and Heart Failure ................................................. 91

D.  Neither Combinations Of ACE Inhibitors With NEP Inhibitors Nor Vasopeptidase Inhibitors Would Have Motivated A POSA To Combine An ARB With A NEP Inhibitor For The Treatment Of Hypertension Or Heart Failure, Let Alone With A Reasonable Expectation Of Success ....................................................... 94

   1.  Dr. Fintel's Prior Art Combinations Of ACE And NEP Inhibitors And Vasopeptidase Inhibitors Would Not Have Motivated A POSA To Combine An ARB And A NEP Inhibitor .......................................... 94

   2.  ARBs Were Not "The Primary Approach To Reducing The Impact Of Angiotensin II" For The Treatment Of Hypertension Or Heart Failure ......... 97

   3.  Dr. Fintel Overstates The Contribution Of Bradykinin To Side Effects And Overlooks Its Proposed Contribution To The Efficacy Of ACE Inhibitors.... 99

   4.  Even If Bradykinin Levels Were A Concern, A POSA Would Not Have Been Motivated To Substitute An ARB For An ACE Inhibitor In Combination With A NEP Inhibitor ...................................................................... 103

   5.  A POSA Would Not Have Had A Reasonable Expectation Of Success Of Treating Hypertension Or Heart Failure Based On Combinations Of ACE Inhibitors And NEP Inhibitors, Or Vasopeptidase Inhibitors ...................... 105

IX.  None of Dr. Fintel's Prior Art Would Have Motivated A POSA To Select Valsartan To Combine With A NEP Inhibitor For The Treatment Of Hypertension Or Heart Failure in View Of The Prior Art As A Whole .................................................. 106

   A.  Dr. Fintel's ARB Combination Prior Art Would Not Have Motivated A POSA To Select Valsartan To Combine With A NEP Inhibitor ................................ 108

ii

    B.  None Of The References Identified By Dr. Fintel That Disclosed Valsartan Would Have Motivated A POSA To Select Valsartan From Among Other ARBs To Combine With A NEP Inhibitor ............................................................. 110

        1.  '578 Patent ............................................................................. 112

        2.  Burnier 1998 ......................................................................... 113

        3.  Chen 1999 ............................................................................. 114

        4.  Cohn 2001 ............................................................................. 115

        5.  The 1999 Diovan® And Diovan HCT® Labels ............................ 115

        6.  Malacco 2000 ........................................................................ 117

        7.  McInnes 1999 ........................................................................ 118

        8.  Neutel 1999 ........................................................................... 119

        9.  Shetty 2000 ........................................................................... 120

X.    None of Dr. Fintel's Prior Art Would Have Motivated A POSA To Select Sacubitril To Combine With An ARB For The Treatment Of Hypertension Or Heart Failure In View Of The Prior Art As A Whole ............................................................. 122

    A.  Dr. Fintel's NEP Inhibitor Combination Prior Art Would Not Have Motivated A POSA To Select Sacubitril ............................................................. 123

    B.  None Of The References Identified By Dr. Fintel That Disclosed Sacubitril Would Have Motivated A POSA To Select Sacubitril From Among Other NEP Inhibitors To Combine With An ARB ............................................................. 125

        1.  '996 Patent ............................................................................. 126

        2.  Ksander 1995 ........................................................................ 127

XI.   Claims 1–4 Of The '659 Patent Would Not Have Been Obvious Over The Prior Art In Defendants' Experts' Combinations ............................................................. 131

    A.  Dr. Fintel's Combination I: Claims 1-4 Of The '659 Patent Would Not Have Been Obvious Over The '578 Patent, The '996 Patent, And EP '072 And The General Knowledge Of The POSA ............................................................. 132

        1.  No Motivation To Combine An ARB With A NEP Inhibitor. ..................... 133

        2.  No Motivation To Select Valsartan. ......................................... 138

        3.  No Motivation To Select Sacubitril. ......................................... 139

        4.  No Reasonable Expectation Of Success ('659 Patent, Claim 2). ................ 139

    B.  Dr. Fintel's Combination II: Claims 1-4 Of The '659 Patent Would Not Have Been Obvious Over Ksander 1995, Malacco 2000, And EP '072 And The General Knowledge Of The POSA ............................................................. 140

        1.  No Motivation To Combine An ARB With A NEP Inhibitor. ..................... 141

        2.  No Motivation To Select Valsartan. ......................................... 142

3.   No Motivation To Select Sacubitril. ........................................................ 143

4.   No Reasonable Expectation Of Success ('659 Patent, Claim 2). ................. 144

C.   Dr. Fintel's Combination III: Claims 1-4 Of The '659 Patent Would Not Have Been Obvious Over EP '072, The '996 Patent, 1999 Diovan® Label, And 1999 Diovan® HCT Label And The General Knowledge Of The POSA........................................ 145

1.   No Motivation To Combine An ARB With A NEP Inhibitor. .................... 145

2.   No Motivation To Select Valsartan. ........................................................ 146

3.   No Motivation To Select Sacubitril. ........................................................ 147

4.   No Reasonable Expectation Of Success ('659 Patent, Claim 2). ................. 148

D.   Dr. Fintel's Combination IV: Claims 1-4 Of The '659 Patent Would Not Have Been Obvious Over The '996 Patent, 1999 Diovan® Label, 1999 Diovan® HCT Label, And Trippodo 1995 And The General Knowledge Of The POSA.................................... 148

1.   No Motivation To Combine An ARB With A NEP Inhibitor. .................... 149

2.   No Motivation To Select Valsartan. ........................................................ 150

3.   No Motivation To Select Sacubitril. ........................................................ 150

4.   No Reasonable Expectation Of Success ('659 Patent, Claim 2). ................. 151

E.   Dr. Fintel's Combination V: Claims 1-4 Of The '659 Patent Would Not Have Been Obvious Over EP '072 And/Or Matsumoto 1993, The '996 Patent And/Or Ksander 1995, And McInnes 1999, And The General Knowledge Of The POSA................. 151

1.   No Motivation To Combine An ARB With A NEP Inhibitor. .................... 152

2.   No Motivation To Select Valsartan. ........................................................ 153

3.   No Motivation To Select Sacubitril. ........................................................ 154

4.   No Reasonable Expectation Of Success ('659 Patent, Claim 2). ................. 155

F.   Dr. Fintel's Combination VI: Claims 1-4 Of The '659 Patent Would Not Have Been Obvious Over WO '564 And/Or EP '072, The '578 Patent And/Or Malacco 2000, And The '996 Patent And/Or Ksander 1995, In View Of The General Knowledge Of The POSA..................................................................................................... 155

1.   No Motivation To Combine An ARB With A NEP Inhibitor. .................... 156

2.   No Motivation To Select Valsartan. ........................................................ 157

3.   No Motivation To Select Sacubitril. ........................................................ 159

4.   No Reasonable Expectation Of Success ('659 Patent, Claim 2). ................. 160

G.   Dr. Forrest's Combinations........................................................................ 160

XII.   Claims 1, 2 And 5-8 Of The '331 Patent Would Not Have Been Obvious Over The Prior Art In Defendants' Experts' Combinations ................................................... 162

A. Dr. Fintel's Combination I: Claims 1, 2 And 5-8 Of The '331 Patent Would Not Have Been Obvious Over The '996 Patent, EP '072, And Burnier 1998 And The General Knowledge Of The POSA ........................................................................ 163

    1. No Motivation To Combine An ARB With A NEP Inhibitor. ..................... 163

    2. No Motivation To Select Valsartan. ........................................................ 164

    3. No Motivation To Select Sacubitril. ........................................................ 165

    4. No Reasonable Expectation Of Success. ................................................. 165

B. Dr. Fintel's Combination II: Claims 1, 2 And 5-8 Of The '331 Patent Would Not Have Been Obvious Over The '578 Patent, The '996 Patent, And EP '072 And The General Knowledge Of The POSA ..................................................................... 166

C. Dr. Fintel's Combination III: Claims 1, 2 And 5-8 Of The '331 Patent Would Not Have Been Obvious Over EP '072, Ksander 1995, And Malacco 2000 And The General Knowledge Of The POSA .......................................................................... 166

D. Dr. Fintel's Combination IV: Claims 1, 2 And 5–8 Of The '331 Patent Would Not Have Been Obvious Over EP '072, The '996 Patent, 1999 Diovan® Label, And 1999 Diovan® HCT Label And The General Knowledge Of The POSA .......................... 167

E. Dr. Fintel's Combination V: Claims 1, 2 And 5-8 Of The '331 Patent Would Not Have Been Obvious Over The '996 Patent, 1999 Diovan® Label, 1999 Diovan® HCT Label, And Trippodo 1995 And The General Knowledge Of The POSA ................ 167

F. Dr. Fintel's Combination VI: Claims 1, 2 And 5-8 Of The '331 Patent Would Not Have Been Obvious Over EP '072 And/Or Matsumoto 1993, The '996 Patent And/Or Ksander 1995, And McInnes 1999, And The General Knowledge Of The POSA .. 168

G. Dr. Fintel's Combination VII: Claims 1, 2 And 5-8 Of The '331 Patent Would Not Have Been Obvious Over WO '564 And/Or EP '072, The '578 Patent And/Or Malacco 2000, The '996 Patent And/Or Ksander 1995 In View Of The General Knowledge Of The POSA ..................................................................................... 169

H. Dr. Forrest's Combinations ........................................................................................ 169

XIII. Real World Evidence of Nonobviousness of the '659 and '331 Patents ....................... 170

A. The Entresto® Products Are An Embodiment Of The Claimed Inventions ............. 172

    1. Claim 1 Of The '331 Patent: The 2021, 2019, And 2015 Entresto® Labels Encourage, Recommend, And/Or Promote Physicians And/Or Patients And/Or Caregivers To Administer A Combination Of Sacubitril And Valsartan For The Treatment Of Heart Failure As Recited In Claim 1 ........ 174

    2. Claim 5: The 2021, 2019, And 2015 Entresto® Labels Encourage, Recommend, And/Or Promote Physicians And/Or Patients And/Or Caregivers To Administer A Combination Of Sacubitril And Valsartan For The Treatment Of Heart Failure As Recited In Claim 5 ..................................... 185

    3. Claims 2 And 6–8: The 2021, 2019, And 2015 Entresto® Labels Encourage, Recommend, And/Or Promote Physicians And/Or Patients And/Or Caregivers

To Administer A Combination Of Sacubitril And Valsartan For The Treatment Of Heart Failure As Recited In Claims 2 And 6–8 ..................... 186

    4.   The Entresto® Products Provide Amounts Of Sacubitril And Valsartan Effective To Treat Heart Failure As Recited In Claim 2 Of The '659 Patent 186

B.  Unexpected Results In Treating HFrEF .............................................................. 190

    1.   State Of The Art In 2002 For Treating HFrEF ............................................. 190

    2.   Entresto® Products Are Highly Clinically and Statistically Superior to the Gold Standard, Enalapril ................................................................................. 194

    3.   The Entresto® Products Are Beneficial to Pediatric Patients ....................... 212

C.  Unexpected Results In Treating HFpEF ............................................................ 214

    1.   State Of The Art In 2002 For Treating HFpEF ............................................ 215

    2.   PARAGON-HF ............................................................................................. 220

    3.   FDA Approval in HFpEF Patients ............................................................... 224

D.  The Combination Of Valsartan And Sacubitril Has A Synergistic Antihypertensive Effect That Would Have Been Unexpected in 2002 ................................................. 224

    1.   DSS Rat Study ............................................................................................. 226

    2.   SHR Study .................................................................................................... 232

    3.   SHRsp Study ................................................................................................ 236

E.  Entresto® Met A Long-Felt And Unmet Need ................................................... 241

    1.   HFrEF in Adults ........................................................................................... 242

    2.   HFrEF in Pediatric Patients ......................................................................... 245

    3.   HFpEF .......................................................................................................... 246

F.  Failure Of Others .............................................................................................. 247

G.  Combinations Of An ARB And A NEP Inhibitor Had Been Abandoned ............... 248

H.  Industry Praise And Recognition ....................................................................... 249

I.  Commercial Success ......................................................................................... 251

XIV.  The '659 Patent SpecIfication Reasonably Conveys To A POSA That The Inventors Were In Possession Of The Pharmaceutical Composition Of '659 Patent Claim 2 ....... 252

XV.  The '331 Patent Specification Reasonably Conveys To A POSA That The Inventors Were In Possession Of The Claimed Methods ........................................................... 258

## I.      INTRODUCTION

1.      I am the same Dr. Francis G. Spinale who previously submitted opening expert reports on infringement in connection with the patent ligation between Novartis Pharmaceuticals Corporation ("Novartis") and the above-named Defendants ("Defendants") regarding the '659 and '331 patents, dated December 2, 2021.[1]

2.      I have been asked to providfe my opinions regarding whether each of claims 1–4 of the '659 patent and claims 1, 2, and 5–8 of the '331 patent would have been obvious to a person of ordinary skill in the art ("POSA") in light of the prior art as of January 17, 2002,[2] and whether certain of these claims satisfy the written description requirement of 35 U.S.C. § 112.  In particular, I have also been asked to review the Opening Expert Report of Dan Fintel, M.D., On The Invalidity Of The '659 And '331 Patents ("Fintel Rpt."), and respond to specific opinions in that report.[3]  I have also been asked to review portions of the Opening Expert Report of Laird Forrest Regarding Invalidity of U.S. Patent Nos. 8,101,659 and 8,796,331 ("Forrest Rpt."), and respond to specific opinions in that report.[4]  My opinions and the bases for those opinions are set forth below.

3.      I have also been asked to respond to certain questions about treating heart failure. My responses to those questions are included in **Appendix I** to this report.

---

[1] I am also the same Dr. Francis G. Spinale who previously submitted the Supplemental Opening Expert Report of Francis G. Spinale, MD, PhD, on Infringement by Defendants Alembic Pharmaceuticals Limited and Alembic Pharmaceuticals, Inc. dated January 4, 2022.

[2] My opinions in this report as of "2002" are as of January 17, 2002 unless otherwise noted.

[3] I was not asked to review or consider paragraphs 365–370 of Dr. Fintel's Report, which relate to a double patenting issue.

[4] I was asked to review paragraphs 23-25, 27-47, 50-52, 81-100 of Dr. Forrest's Report.  I was not asked to review aspects of his opinions that are limited to formulating pharmaceutical products.  I was also not asked to review or consider the remaining paragraphs of Dr. Forrest's report.

43.     I understand that with respect to obviousness, the relevant inquiry is whether a patent claim is obvious from the perspective of a POSA as of the priority date in view of the prior art (which does *not* include the patent's specification).  By contrast, I understand that with respect to written description, the relevant inquiry is whether a patent's *specification* conveys with reasonable clarity to a POSA that the inventor had possession of the invention claimed in the patent as of the priority date, in view of the state of the art.

## IV.    THE '659 AND '331 PATENTS

44.     The '659 patent, titled "Methods of Treatment and Pharmaceutical Composition," issued on January 24, 2012 from U.S. Application No. 12/147,570, filed June 27, 2008 ("the '570 application").  I understand from counsel that the '659 patent is assigned to Novartis.  The claims of the '659 patent relate to pharmaceutical compositions comprising the combination of (i) the AT 1-antagonist valsartan and (ii) the NEP inhibitor sacubitril.  I understand from Novartis's counsel that claim 1 of the '659 patent is an "independent" claim.  Claim 1 reads:

> **1.**  A pharmaceutical composition comprising:
>
> (i)     the AT 1-antagonist valsartan or a pharmaceutically acceptable salt thereof;
>
> (ii)    the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or (2R,4S)-5-biphenyl-4-yl-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid or a pharmaceutically acceptable salt thereof; and
>
> (iii)   a pharmaceutically acceptable carrier;
>
> wherein said (i) AT 1-antagonist valsartan or pharmaceutically acceptable salt thereof and said (ii) NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or (2R,4S)-5-biphenyl-4-yl-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid or pharmaceutically acceptable salt thereof, are administered in combination in about a 1:1 ratio.

I understand that the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester is known as sacubitril, and Dr. Fintel agrees (Fintel Rpt. ¶ 84). I also understand that the NEP inhibitor (2R,4S)-5-biphenyl-4-yl-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid is known as sacubitrilat, and Dr. Fintel agrees (Fintel Rpt. ¶ 109). Sacubitrilat is the active metabolite of the prodrug sacubitril.[5] Fintel Rpt. ¶ 109.

45. I understand that claims 2–4 of the '659 patent are "dependent" claims, meaning they include the elements of claim 1 and have additional elements. Claims 2–4 are reproduced below:

> **2.** The pharmaceutical composition of claim 1, wherein said (i) AT 1-antagonist valsartan or a pharmaceutically acceptable salt thereof and said (ii) NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or (2R,4S)-5-biphenyl-4-yl-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid or pharmaceutically acceptable salt thereof are administered in amounts effective to treat hypertension or heart failure.
>
> **3.** The pharmaceutical composition of claim 1 wherein (ii) said NEP inhibitor is N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester.
>
> **4.** The pharmaceutical composition of claim 3 in the form of a capsule or tablet.

46. The '331 patent, titled "Methods of Treatment and Pharmaceutical Composition," issued on August 5, 2014 from U.S. Application No. 13/687,659, filed November 28, 2012 ("the '659 application"). I understand that the '331 patent is assigned to Novartis. The claims of the '331 patent relate to methods for treating hypertension and heart failure by administering to a

---

[5] The non-obviousness arguments made in this report apply to both sacubitril and sacubitrilat unless otherwise stated.

that NEP inhibitors were *not* effective at lowering blood pressure as monotherapy.  Moreover, unlike some other NEP inhibitors, sacubitril had not even been tested in patients with hypertension.

133.    For these reasons, I disagree with Dr. Fintel to the extent that he suggests a POSA would have considered NEP inhibitors promising for hypertension or had an "expectation of FDA approval" of NEP inhibitor for hypertension (Fintel Rpt. ¶ 167).

134.    As set out below in more detail, the prior art that Dr. Fintel cites in Section X.C.2. of his report does not change my opinion.  The '996 patent and Ksander 1995 disclosed sacubitril as a NEP inhibitor, but would not have motivated a POSA to select sacubitril for the treatment of hypertension from among the many known NEP inhibitors in view of the prior art as a whole. None of Cases 2000, Cleland 1998, Sagnella 2000, Chen 1999, EP '072, Matsumoto 1993, or Trippodo 1995 taught or suggested sacubitril.  Further, none of these references taught or suggested that NEP inhibitors were promising agents in general for the treatment of hypertension.  Cleland 1998 taught that a different NEP inhibitor (ecadotril) did not improve symptoms compared to placebo in heart failure (not hypertension) patients on top of ACE inhibitor background therapy.  Cases 2000 and Sagnella 2000 taught that dual-acting molecules (vasopeptidase inhibitors) that inhibited both NEP and ACE (including omapatrilat) were being investigated, and omapatrilat was a promising strategy for treating hypertension, but did not teach or suggest that NEP inhibitors were promising to combine with any other agent.  Dr. Fintel's references disclosing an ARB and a NEP inhibitor (Chen 1999, EP '072, Matsumoto 1993, or Trippodo 1995) as a whole would not have taught or suggested that a NEP inhibitor combined with an ARB was a promising approach to treating hypertension.

Cleland 1998 at 1658; *see also* O'Connor 1999 at 1146-47.  Moreover, unlike some other NEP

inhibitors, sacubitril had not even been tested in patients with heart failure.

140.    For these reasons, I disagree with Dr. Fintel to the extent that he suggests a POSA

would have considered NEP inhibitors promising for heart failure or had an "expectation of FDA

approval" of NEP inhibitor for heart failure.  Fintel Rpt. ¶ 167.  As set out below in more detail,

the prior art that Dr. Fintel cites in Section X.C.2. of his report does not change my opinion.  The

'996 patent and Ksander disclosed sacubitril as a NEP inhibitor, but would not have motivated a

POSA to select sacubitril for the treatment of heart failure from among the many known NEP

inhibitors in view of the prior art as a whole.  None of Cases 2000, Cleland 1998, Sagnella 2000,

Chen 1999, EP '072, Matsumoto 1993, or Trippodo 1995 taught or suggested sacubitril.  Further,

none of these references taught or suggested that NEP inhibitors were promising agents in

general for the treatment of heart failure.  Cleland 1998 taught that a different NEP inhibitor

(ecadotril) did not improve symptoms in heart failure patients compared to placebo on top of

ACE inhibitor background therapy.  Cases 2000 and Sagnella 2000 taught that dual-acting

molecules that inhibited both NEP and ACE (including omapatrilat) were being investigated, and

omapatrilat was a promising strategy for treating heart failure, but did not teach or suggest that

NEP inhibitors as single compounds were promising to combine with any other agent.  Dr.

Fintel's references disclosing an ARB and a NEP inhibitor (Chen 1999, EP '072, Matsumoto

1993, or Trippodo 1995) as a whole would not have taught or suggested that a NEP inhibitor

combined with an ARB was a promising approach to treating heart failure.

Newby 1998 at 1809; Cleland 1998 at 1657-58.  Neither Newby 1998 nor Cleland 1998 disclosed sacubitril.

292.    I disagree with Dr. Fintel that **Cases 2000** disclosed a NEP inhibitor in combination with an ACE inhibitor.  Cases 2000 disclosed vasopeptidase inhibitors and specifically omapatrilat; Cases does not disclose NEP inhibitors or sacubitril.  Cases 2000 at 817.

293.    Therefore, none of the references relied upon by Dr. Fintel combining a NEP inhibitor with an ARB or a NEP inhibitor with an ACE inhibitor would have motivated a POSA to select sacubitril to combine with an ARB.[44]

**B.    None Of The References Identified By Dr. Fintel That Disclosed Sacubitril Would Have Motivated A POSA To Select Sacubitril From Among Other NEP Inhibitors To Combine With An ARB**

294.    As of 2002, I understand that sacubitril and sacubitrilat were known only by their chemical names or as "19a" and "21a," respectively.  Ksander 1995 at 1692-93; '996 patent at col. 9, ll. 6-12.   A POSA would have been aware of only two references that disclosed any original activity for sacubitril or its active metabolite sacubitrilat: the '996 patent and Ksander 1995.  *See e.g.*, Fintel Rpt. ¶ 143.  Neither the '996 patent nor Ksander 1995 discussed combination treatment with NEP inhibitors, or sacubitril in particular, or even mentioned an ARB.  Neither the '996 patent nor Ksander 1995 would have motivated a POSA to select sacubitril to combine with an ARB for the treatment of hypertension or heart failure.

---

[44] None of Dr. Fintel's remaining prior art references (the '578 patent, ACC/AHA Guidelines 2001, Burnier 1998, Cohn 2001, the 1999 Diovan® and Diovan HCT® Labels, Malacco 2000, McInnes 1999, Neutel 1999, Shetty 2000, Skolnik 2000, and Townsend 1990) disclosed NEP inhibitors, much less sacubitril.  Kotchen 2011 (which is not prior art) also did not disclose NEP inhibitors or sacubitril.

combination to treat hypertension or heart failure. Dr. Fintel opines that the '659 patent lacks written description support for amounts of sacubitril and valsartan (or pharmaceutically acceptable salts thereof) sufficient in combination to treat hypertension or heart failure.[82] Fintel Rpt. at Section XIII.A. Dr. Fintel's opinions in Section XIII.A of his report do not change my opinion.

600.     The '659 patent specification discloses that the invention relates to pharmaceutical combinations comprising valsartan and a NEP inhibitor (and identifies sacubitril and sacubitrilat as NEP inhibitors), or pharmaceutically acceptable salts thereof, and compositions comprising them. '659 patent, col. 3, ll. 19-25, col. 4, ll. 48-52, col. 5, ll. 46-54, col. 10, ll. 3-31; '660 priority application at 4, 6-7, 12-13. In particular, the '659 patent specification discloses that "NEP inhibitors within the scope of the present invention . . . include the compounds disclosed in [the '996 patent], particularly, N-(3-carboxy-1-oxoproyl)-(4S)-p-phenylphenymethyl)-4-amino-2R-methylbutanoic acid ethyl ester" ('659 patent, col. 4, ll. 48-52; '660 priority application at 6), which I understand is sacubitril. The '996 patent is "incorporated by reference in [its] entirety" in the '659 patent. '659 patent, col. 16, ll. 12-14; '660 priority application at 21. I understand this means that the '996 patent should be treated as if it is part of the disclosure of the '659 patent specification.[83] The '996 patent also discloses "N-(3-carboxy-1-oxoproyl)-(4S)-p-phenylphenymethyl-4-amino-(2R)-methylbutanoic acid ethyl ester" which I understand is sacubitril, and "N-(3-carboxy-1-oxoproyl)-(4S)-p-phenylphenymethyl-4-amino-

---

[82] Dr. Fintel has not opined that the '659 patent lacks written description support for any other aspect of claim 2.

[83] I understand from counsel that when a U.S. patent incorporates by reference a second U.S. patent in its entirety, that second U.S. patent should be treated as if it is part of the disclosure of the first patent.

(2R)-methylbutanoic acid," which I understand is sacubitrilat. '996 patent, col. 21, ll. 5-7 (sacubitril), ll. 16-18 (sacubitrilat)).

601. The '659 patent specification discloses that "[i]t can be shown that combination therapy with valsartan and a NEP inhibitor results in a more effective antihypertensive therapy (whether for malignant, essential, reno-vascular, diabetic, isolated systolic, or other secondary type of hypertension) through improved efficacy as well as a greater responder rate. The combination is also useful in the treatment or prevention of heart failure. . . ." '659 patent, col. 6, l. 65 – col. 7, l. 5; '660 priority application at 8.

602. The '659 patent specification further discloses that "[p]referred dosages for the active ingredients of the pharmaceutical combination according to the present invention are therapeutically effective dosages, especially those which are commercially available." '659 patent, col. 11, ll. 53-56; '660 priority application at 15. The '659 patent specification states that the following dosages of valsartan and NEP inhibitors, and pharmaceutically acceptable salts thereof, "encompass a therapeutically effective amount of the active ingredients of the present invention" ('659 patent, col. 12, ll. 13-14; '660 priority application at 15; *see also* Fintel Rpt. ¶¶ 357-58):

- "Normally, in the case of oral administration, an approximate daily dose of from about 1 mg to about 360 mg is to be estimated, e.g., for a patient of approximately 75 kg in weight." ('659 patent, col. 11, ll. 57-59; '660 priority application at 15);

- "Valsartan is supplied in the form of suitable dosage unit form, e.g., a capsule or tablet, and comprising a therapeutically effective amount, e.g., from about 20 mg to about 320 mg, of valsartan which may be applied to patients. The application of the active ingredient may occur up to three times a day, starting, e.g., with a daily dose of 20 mg or 40 mg of valsartan, increasing via 80 mg daily and further to 160 mg daily up to 320 mg daily. Preferably, valsartan is applied once a day (q.d.) or twice a day (b.i.d.) in heart failure patients with a dose of 80 mg or 160 mg, respectively, each. Corresponding doses may be taken, for example, in the morning, at mid-day or in the evening. Preferred is q.d. or b.i.d. administration in

254

February ___ 2022

Francis G. Spinale, M.D., Ph.D.

# Defendants' Ex. 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE ENTRESTO (SACUBITRIL/VALSARTAN) PATENT LITIGATION | ) ) ) MDL No. 20-2930-LPS ) ) **HIGHLY CONFIDENTIAL UNDER** ) **PROTECTIVE ORDER** ) ) ) ) ) |

**RESPONSIVE EXPERT REPORT OF DR. ALEXANDER M. KLIBANOV
ON THE VALIDITY OF THE '659 AND '331 PATENTS**

# TABLE OF CONTENTS

I.      Introduction and Qualifications ...................................................................... 1

II.     Anticipated Testimony ................................................................................... 3

III.    The '659 and '331 Patents and Priority Date ................................................. 6

IV.     A Person of Ordinary Skill in the Art ("POSA") .......................................... 9

V.      Legal Standards ............................................................................................ 15

        A.      General Principles and Claim Construction .................................... 15

        B.      Definiteness .................................................................................... 16

        C.      Non-Obviousness ............................................................................ 17

        D.      Enablement ..................................................................................... 18

        E.      Written Description ......................................................................... 19

        F.      Statutory Double Patenting ............................................................. 20

VI.     Summary of Opinions .................................................................................. 21

VII.    Claim Terms ................................................................................................ 22

VIII.   Claims 1–4 of the '659 Patent Are Not Indefinite ...................................... 23

IX.     Dr. Forrest Has Failed to Prove That Claims 1–4 of the '659 Patent and
        Claims 1, 2, and 5–8 of the '331 Patent Are Obvious .................................. 31

X.      Background Information on NEP Inhibitors ................................................. 34

XI.     Entresto® Tablets Are Covered by Claims 1–4 of the '659 Patent ............... 34

        A.      Entresto® Tablets Are Covered by Claim 1 of the '659 Patent ......... 35

                1.      A pharmaceutical composition comprising ............................. 35

                2.      (i) the AT 1-antagonist valsartan or a pharmaceutically
                        acceptable salt thereof ........................................................... 35

                3.      (ii) the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-
                        phenylphenylmethyl)-4-amino-2R-methylbutanoic acid
                        ethyl ester or a pharmaceutically acceptable salt thereof ....... 37

                4.      (iii) a pharmaceutically acceptable carrier ............................. 39

                5.      wherein said (i) AT 1-antagonist valsartan or
                        pharmaceutically acceptable salt thereof and said (ii) NEP
                        inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-
                        phenylphenylmethyl)-4-amino-2R-methylbutanoic acid

i

ethyl ester or pharmaceutically acceptable salt thereof, are administered in combination ..................................................... 40

    6.    in about a 1:1 ratio ................................................... 45

B.    Entresto® Tablets Are Covered by Claim 2 of the '659 Patent............................ 49

C.    Entresto® Tablets Are Covered by Claim 3 of the '659 Patent............................ 51

D.    Entresto® Tablets Are Covered by Claim 4 of the '659 Patent............................ 51

XII.    The Use of Entresto® Tablets Is Covered by Claims 1, 2, and 5–8 of the '331 Patent......................................................................................................... 52

A.    The Use of Entresto® Tablets Is Covered by Claim 1 of the '331 Patent......................................................................................................... 52

    1.    A method for the treatment of a condition or disease selected from the group consisting of hypertension and heart failure, comprising ..................................................... 52

    2.    administering to a patient in need thereof................................ 53

    3.    a therapeutically effective amount ........................................ 54

    4.    of the combination of: (i) the AT 1-antagonist valsartan or a pharmaceutically acceptable salt thereof; (ii) the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or a pharmaceutically acceptable salt thereof........................ 56

    5.    wherein said components (i) and (ii) are administered in one unit dose form or in two separate unit dose forms .......................... 57

B.    The Use of Entresto® Tablets Is Covered by Claim 2 of the '331 Patent......................................................................................................... 57

C.    The Use of Entresto® Tablets Is Covered by Claim 5 of the '331 Patent......................................................................................................... 58

D.    The Use of Entresto® Tablets Is Covered by Claim 6 of the '331 Patent......................................................................................................... 60

E.    The Use of Entresto® Tablets Is Covered by Claim 7 of the '331 Patent......................................................................................................... 60

F.    The Use of Entresto® Tablets Is Covered by Claim 8 of the '331 Patent......................................................................................................... 61

XIII.    The Combination of 30 mg/kg/day Valsartan and 30 mg/kg/day Sacubitril Described in the Webb Declaration Is Covered by Claims 1–3 of the '659 Patent......................................................................................................... 62

A.    The Combination of 30 mg/kg/day Valsartan and 30 mg/kg/day Sacubitril Described in the Webb Declaration Is Covered by Claim 1 of the '659 Patent..................................................................... 62

    1.    A pharmaceutical composition comprising........................... 62

    2.    (i) the AT 1-antagonist valsartan or a pharmaceutically acceptable salt thereof ......................................................... 62

3.     (ii) the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or a pharmaceutically acceptable salt thereof .......................... 62

4.     (iii) a pharmaceutically acceptable carrier ................................................ 63

5.     wherein said (i) AT 1-antagonist valsartan or pharmaceutically acceptable salt thereof and said (ii) NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or pharmaceutically acceptable salt thereof are administered in combination ................................................................. 63

6.     in about a 1:1 ratio ................................................................................... 63

B.    The Combination of 30 mg/kg/day Valsartan and 30 mg/kg/day Sacubitril Described in the Webb Declaration Is Covered by Claim 2 of the '659 Patent.................................................................... 64

C.    The Combination of 30 mg/kg/day Valsartan and 30 mg/kg/day Sacubitril Described in the Webb Declaration is Covered by Claim 3 of the '659 Patent.................................................................... 64

XIV.   Dr. Forrest Has Failed to Prove That Claims 1–4 of the '659 Patent and Claims 1, 2, and 5–8 of the '331 Patent Lack Written Description Support for a One Unit (Single Unit) Dosage Form ...................................................... 64

XV.   Dr. Steed Has Failed to Prove That Claims 1–4 of the '659 Patent and Claims 1, 2, and 5–8 of the '331 Patent Do Not Satisfy the Enablement and Written Description Requirements ........................................................... 72

A.    Dr. Steed's Analysis of Claim Scope Ignores the Claim Language ................... 72

B.    Dr. Steed Ignores that Chemical Linkage is Not a Claim Element ..................... 76

C.    Dr. Steed Has Failed to Prove That Claims 1–4 of the '659 Patent and Claims 1, 2, and 5–8 of the '331 Patent Do Not Satisfy the Enablement Requirement ................................................................. 77

D.    Dr. Steed Has Failed to Prove That Claims 1–4 of the '659 Patent and Claims 1, 2, and 5–8 of the '331 Patent Do Not Satisfy the Written Description Requirement ................................................... 84

XVI.   Dr. Fintel Has Failed to Prove That Claims 1 and 3 of the '659 Patent Are Invalid for Statutory Double Patenting over Claims 1 and 2, Respectively, of the '744 Patent ...................................................................................... 90

## I.     Introduction and Qualifications

1.      I am the same Dr. Alexander M. Klibanov who submitted opening expert reports on infringement of the '659 and '331 patents in the above-captioned matter dated December 14, 2021, ("Opening Infringement Reports"),[1] as well as claim construction declarations dated March 3, 2021, and April 28, 2021.

2.      I am currently a Professor Emeritus of Chemistry and Bioengineering at the Massachusetts Institute of Technology ("M.I.T."), where I taught and conducted research for over 40 years.  From 2014 to 2019 (and also from 2007 to 2011), I held the Novartis Endowed Chair Professorship at M.I.T.[2]  From 2012 to 2013, I held the Roger and Georges Firmenich Endowed Chair Professorship in Chemistry.  Prior to that, I was a Professor of Chemistry and a Professor of Bioengineering at M.I.T., positions I held from 1988 and 2000, respectively.  From 1979 to 1988, I was an Assistant Professor, then Associate Professor, and thereafter a Full Professor of Applied Biochemistry in the Department of Applied Biological Sciences (formerly the Department of Nutrition and Food Science) at M.I.T.

3.      I obtained my M.S. in Chemistry from Moscow University in Russia in 1971 and Ph.D. in Chemical Enzymology from the same university in 1974.  Thereafter, I was a Research Chemist at Moscow University's Department of Chemistry for three years.  From 1977 to 1979, following my immigration to the United States, I was a Post-Doctoral Associate at the Department of Chemistry, University of California at San Diego.

---

[1] I also submitted a supplemental opening infringement expert report on infringement of the '659 and '331 patents by Alembic Pharmaceuticals Limited and Alembic Pharmaceuticals, Inc., on January 6, 2022.

[2] Novartis had no say in deciding who received this position (which is at M.I.T.'s sole discretion), and this former position has no effect on the content of this expert report.

phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionyl amino)-2-methyl-pentanoic acid or pharmaceutically acceptable salt thereof, are administered in combination in about a 1:1 ratio.

2.     The pharmaceutical composition of claim **1**, wherein said (i) AT 1-antagonist valsartan or a pharmaceutically acceptable salt thereof and said (ii) NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester or (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionyl amino)-2-methyl-pentanoic acid or pharmaceutically acceptable salt thereof are administered in amounts effective to treat hypertension or heart failure.

3.     The pharmaceutical composition of claim **1** wherein (ii) said NEP inhibitor is N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester.

4.     The pharmaceutical composition of claim **3** in the form of a capsule or tablet.

23.     In item (ii) of claims 1–3, "N-(3-carboxy-1-oxopropyl)-(4S)-(p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester" is a chemical name for the molecule known as "sacubitril" (NPC-VS-001702613–74 at 618, 620).  In item (ii) of claims 1 and 2, (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionyl amino)-2-methyl-pentanoic acid is a chemical name for the molecule known as "sacubitrilat," which is the active form of the prodrug sacubitril ("sacubitrilat," PubChem, National Institutes of Health – National Library of Medicine, available at https://pubchem.ncbi.nlm.nih.gov/compound/Sacubitrilat, last visited Jan. 14, 2022; *see also* Ksander et al., "*Dicarboxylic Acid Dipeptide Neutral Endopeptidase Inhibitors*," J. Med. Chem., Vol. 38, 1995, 1689–1700 ("Ksander 1995") at 1693 (indicating that compound "19a," *i.e.*, sacubitril, is the ethyl ester prodrug of compound "21a," *i.e.*, of sacubitrilat).

24.     The '331 patent, entitled "Methods of Treatment and Pharmaceutical Composition," issued on August 5, 2014, from U.S. Application No. 13/687,659, filed on November 28, 2012 ("the '659 application").  I understand from counsel that the '331 patent, like the '659 patent, is assigned to Novartis.  The '331 patent claims priority to the same two

consistent with the use (and definition) of the term "compound" in U.S. Patent Nos. 8,977,938

("the '938 patent") and 9,388,134 ("the '134 patent"):[22]

> Indeed, the specification "discloses combinations of physically separate valsartan
> and sacubitril and does not disclose the later-invented *compound* of valsartan and
> sacubitril (<u>wherein valsartan and sacubitril salts are associated with non-covalent
> bonds</u>)." (*Id.* [Joint Claim Construction Brief at 10]) As Novartis also points out,
> the patentee did not define or disclaim the "combination" of those two
> ingredients. (*Id.* at 10-11)  In the Court's view, the absence of any indication in
> the written description that the patentee limited its invention solely to separate
> <u>compounds</u> means, in context, that a person of ordinary skill in the art ("POSA")
> would not read the claims as so limited.

(Claim Construction Opinion at 6 (underline emphases added; bold italics emphasis in original));

*see also id.* at 2, using "compound" to refer to *non-covalently bound* valsartan and sacubitril

salts ("'Several years later, Novartis developed a novel *compound* comprising *non-covalently

bound* valsartan and sacubitril salts, and methods of administering that *compound* to treat

hypertension and heart failure,' which are covered by the '938 and '134 patents. (*Id.* at 7)."

(emphases added)).  Therefore, the Court did *not* state that the claims cover covalently

bound/chemically linked valsartan and sacubitril.

248.    A POSA would understand that once valsartan and sacubitril are covalently bound

to one another (including Dr. Steed's hypothetical "prodrug" compounds where valsartan and

sacubitril are covalently linked to each other to form "imines, esters, acid anhydrides, acetals and

others" (Steed Report ¶ 218)), each of valsartan and sacubitril individually ceases to exist.  Such

covalently bound compounds no longer include either the valsartan or the sacubitril claim

---

[22] *See, e.g.*, '938 patent at col. 6, ll. 30–36, and '134 patent at col. 6, ll. 22–27 ("For the purpose
of the present invention, the term 'compound' is intended to describe a chemical substance
comprising *covalent bonds within the two pharmaceutically active agents*, the ARB and the
NEPi molecular moieties, *and non-covalent interactions between these two pharmaceutically
active agents*, the ARB and the NEPi molecular moieties" (emphases added)); *see also, e.g.*,
'938 patent at col. 32 (claim 11, referencing the "compound" of claim 1, where claim 1 describes
a non-covalently bound complex); '134 patent at col. 31 (claim 5).

elements, which are expressly identified in the shared specification of the '659 and '331 patents ('659 patent at col. 3, ll. 30–53; col. 4, ll. 48–52). And the '659 and '331 patents clearly distinguish between a compound and its prodrug by separately discussing sacubitrilat and sacubitril, which is the ethyl ester prodrug of sacubitrilat, both in the specification and in the claims (*see, e.g.*, '659 patent at col. 4, ll. 48–52 (describing sacubitril); col. 16 (claims 1–2 (separately describing sacubitril and sacubitrilat)), col. 16, ll. 12–14; '996 patent at col. 21, ll. 5–7 (describing sacubitril); col. 21, ll. 16–18 (describing sacubitrilat)). Consistent with this reasoning, Dr. Steed himself admits that a covalently linked valsartan-sacubitril "prodrug" would be "a ***new chemical molecule*** with an entirely new set of properties" (Steed Report ¶ 218 (emphasis added)).

249.     In contrast to a putative "prodrug" compound formed by covalently linking valsartan and sacubitril, in a non-covalently bound complex, valsartan and sacubitril continue to exist as individual entities.

250.     In summary, "a new chemical" compound resulting from covalently bonding valsartan to sacubitril would comprise neither the valsartan nor the sacubitril claim element of the '659 and '331 patents and, accordingly, would not be covered by the '659 and '331 patent claims. Because Dr. Steed's non-enablement and lack of written description analyses are premised in part on his unsupported and incorrect view that covalently bound combinations of valsartan and sacubitril are covered by the '659 and '331 patent claims, it is my opinion that his conclusions are without merit.

### B.     Dr. Steed Ignores that Chemical Linkage is Not a Claim Element

251.     To reiterate, Dr. Steed's enablement and written description arguments are at least partly based on the idea that the '659 and '331 patents must enable and describe combinations of

February _8_, 2022

_____
Alexander M. Klibanov, Ph.D.

# Defendants' Ex. 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| _____ | ) | C.A. No. 20-2930-RGA |
| | ) | |
| In re Entresto (Sacubitril/Valsartan) Patent | ) | |
| Litigation | ) | |
| | ) | |
| _____ | ) | |

**SUR-REPLY EXPERT REPORT OF DR. ALEXANDER M. KLIBANOV
<u>ON THE VALIDITY OF THE '659 AND '331 PATENTS</u>**

## I.    INTRODUCTION

1.    I am the same Alexander M. Klibanov, Ph.D., who submitted various expert reports in the above-captioned matter, including a responsive expert report on the validity of the '659 and '331 patents dated February 8, 2022 (my "Responsive Validity Report").

2.    Now I have been asked to review, and respond to, certain new arguments and references cited in the Reply Expert Reports of Dr. Jonathan W. Steed and Dr. Dan James Fintel with respect to validity, each report dated March 31, 2022 ("Steed Reply Report" and "Fintel Reply Report," respectively). This sur-reply report provides my opinions and the bases therefor.

3.    In preparing this sur-reply expert report, I have reviewed and considered the paragraphs of the Steed and Fintel Reply Reports discussed below, as well as the documents cited in those paragraphs and the other documents cited herein. As previously, I also have relied on my professional knowledge and experience in chemistry.

## II.    RESPONSE TO DR. STEED'S NEW NON-ENABLEMENT ARGUMENTS

4.    Dr. Steed newly argues that co-crystals generally were known as of January 2002 and that "some technological means to attempt to generate such a [non-covalently bonded sacubitril/valsartan] complex were known" (Steed Reply Report ¶¶ 44-45). I disagree that a POSA would find general information about unrelated co-crystals to be relevant to the issue here, which concerns pharmaceutical complexes of sacubitril and valsartan[1] for combination treatment of a medical condition. None of Dr. Steed's co-crystal examples or references (*see id.*[2]) mentions either sacubitril or valsartan, and they do not all involve co-crystals of two ionic

---

[1] For simplicity, I have used in this report "sacubitril" and "valsartan" to refer, respectively, to sacubitril or sacubitrilat or a pharmaceutically acceptable salt thereof, and valsartan or a pharmaceutically acceptable salt thereof, unless otherwise specified.

[2] Aakeroy, *Crystal Engineering: Strategies and Architectures*, Acta Cryst., Vol. B53, 1997, 569–86 at 572–73 ("Aakeroy 1997"); Vishweshwar et al., *Pharmaceutical Co-Crystals*, J. Pharm. Sci., Vol. 95, No. 3, 2006, 499–516 ("Vishweshwar 2006").

cited at ¶ 82 of Dr. Steed's Reply Report post-date 2002. In addition, a urea-NaCl co-crystal, even aside from not being a pharmaceutical, does not involve two organic components, much less carboxylic acid salts, because NaCl is an inorganic salt and urea is not a salt at all. And Adsmond 2001 describes studies on hydrogen-bond connectivity in sulfonamide-containing co-crystals with no suggestion that any such co-crystals involved ionic components or interactions, let alone two active ingredients for use in combination therapy of a medical condition. Thus, Dr. Steed's examples fail to show that non-covalently linked sacubitril/valsartan complexes or similar pharmaceutical complexes of two active ingredients for combination treatment of a medical condition were known in the art as of 2002.

## IV.   RESPONSE TO DR. FINTEL'S NEW SACUBITRILAT WRITTEN DESCRIPTION ARGUMENT

11.     Dr. Fintel now appears to contend that the '659 patent specification fails to provide adequate written description for the sacubitrilat claim element ("(2R,4S)-5-biphenyl-4-y1-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid") in claim 2 of the '659 patent (Fintel Reply Report ¶¶ 171–172).[6] I disagree.

12.     U.S. Patent No. 5,217,996 ("the '996 patent") discloses sacubitrilat, which fact Dr. Fintel does not dispute (see id. ¶ 172; '996 patent, col. 21, ll. 16–18 (Example 2); Responsive Validity Report ¶ 248, Appendix 1 ¶ 21). A POSA would know that sacubitrilat is the active metabolite of sacubitril and one of the two compounds tested for *in vivo* activity in Ksander 1995 (Ksander et al., *Dicarboxylic Acid Dipeptide Neutral Endopeptidase Inhibitors*, J. Med. Chem., Vol. 38, 1995, 1689–1700 at 1693–94 (sacubitrilat (compound 21a), sacubitril (compound 19a)). The '659 patent expressly states that "NEP inhibitors within the scope of the present invention

---

[6] To the extent Dr. Fintel is making this same argument with respect to claims 1, 2, and 5–8 of the '331 patent (*see* Fintel Reply Report ¶ 188), my opinions apply to those claims as well.

also include the compounds disclosed in U.S. Pat. No. 5,217,996" and further incorporates "[a]ll publications and patents mentioned herein," *i.e.*, necessarily including the '996 patent, "in their entirety as if set forth in full herein"[7] ('659 patent, col. 4, ll. 48–50, col. 16, ll. 12–14). Therefore, I disagree with Dr. Fintel that the '659 patent ostensibly fails to "identify to a POSA with detailed particularity what specific material it incorporates and [to] clearly indicate where that material is found in the various documents" (Fintel Reply Report ¶¶ 171–172). Accordingly, the specification of the '659 patent conveys to a POSA that the inventors of the patent were in possession of a pharmaceutical composition comprising a combination of sacubitrilat and valsartan, as well as methods of treatment of a medical condition using combinations of sacubitrilat and valsartan.

April 20, 2022

Alexander M. Klibanov, Ph.D.

---

[7] As explained in my Responsive Validity Report (¶¶ 86, 245 fn. 21), I understand that when a U.S. patent expressly incorporates by reference a second issued U.S. patent in its entirety, that second U.S. patent should be treated as if it is part of the disclosure of the first patent.

# Defendants' Ex. 5

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
MDL NO. 2930.
```

- - - - - - - - - - - - - - - - - - - - - - - -x

IN RE ENTRESTO (SACUBITRIL/VALSARTAN) PATENT
LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - -x

Videotaped Deposition of

DR. FRANCIS G. SPINALE

Friday, June 10, 2022 - 9:16 a.m.

Reported by:

DANIELLE GRANT

Job No.: 5044

1

2

3

4

5

6

7

8

9

10

11

12                          JUNE 10, 2022

13                          9:16 a.m.

14

15

16                          Remote Videotaped Deposition of

17    DR. FRANCIS G. SPINALE, held remotely with all

18    parties appearing from their respective locations,

19    pursuant to Notice before DANIELLE GRANT, a

20    Stenographic Reporter and Notary Public of the

21    State of New York.

22

23

24

25

Page 3

1

2    REMOTE APPEARANCES:

3

4    VENABLE LLP

5    Attorneys for Novartis Pharmaceuticals Corporation

6         1270 Avenue of the Americas

7         New York, New York 10020

8    BY:  SUSANNE FLANDERS, ESQ., of Counsel

9         sflanders@venable.com

10        SHANNON CLARK, ESQ., of Counsel

11        skclark@Venable.com

12        CHRISTINA SCHWARZ, ESQ., of Counsel

13        cschwarz@Venable.com

14        LAURA FISHWICK, ESQ., of Counsel

15        lfishwick@Venable.com

16   LOCKE LORD LLP

17   Attorneys for Zydus Pharmaceutical Inc., and Zydus

18   Lifesciences Limited

19        Brookfield Place

20        200 Vesey Street

21        New York, New York 10281

22   BY:  ZHIBIN LI, ESQ., of Counsel

23        zhibin.li@lockelord.com

24        JAMES PETERKA, ESQ., of Counsel

25        jpeterka@lockelord.com

 1   REMOTE APPEARANCES:

 2   PERKINS COIE LLP

 3   Attorneys for Dr. Reddy's Laboratories, Inc. And

 4   Dr. Reddy's Laboratories, Ltd.

 5       1120 NW Couch Street, 10th Floor

 6       Portland, Oregon 97209

 7   BY:  BRYAN D. BEEL, ESQ., of Counsel

 8       BBeel@perkinscoie.com

 9       CHRISTOPHER JONES, ESQ., of Counsel

10       CDJones@perkinscoie.com

11   PARKER POE ADAMS & BERNSTEIN

12   Attorneys for Mylan Pharmaceuticals

13       1075 Peachtree Street, N.E., Suite 1800

14       Atlanta, Georgia  30309

15   BY:  ROBERT L. FLORENCE, ESQ., of Counsel

16       robertflorence@parkerpoe.com

17

18   KIRKLAND & ELLIS, LLP

19   Attorneys for Teva Pharmaceuticals Usa, Inc.

20       601 Lexington Avenue

21       New York, New York 10022

22   BY:  ALINA AFINGENOVA, ESQ., of Counsel

23       alina.afinogenova@kirkland.com

24       MARK MCLENNAN, ESQ., Of Counsel

25       mark.mclennan@kirkland.com

```
 1   REMOTE APPEARANCES:

 2   PARKER POE ADAMS & BERNSTEIN

 3   Attorneys for Crystal Pharmaceutical Co., Ltd.

 4        300 Delaware Avenue

 5        Suite 200

 6        Wilmington, Delaware 19801

 7   BY:  ELIZABETH CROMPTON, ESQ., of Counsel.

 8        elizabethcrompton@parkerpoe.com

 9   WITHERS BERGMAN LLP

10   Attorneys for Aurobindo Pharma USA Inc., and

11   Aurobindo Pharma Ltd.

12        1700 East Putman Avenue

13        Suite 400

14        Greenwich, Connecticut 06870

15   BY:  STEVEN MOORE, ESQ., of Counsel

16        Steven.Moore@withersworldwide.com

17   DAIGNAULT IYER LLP

18   Attorneys for MSN Laboratories Private Limited,

19   and MSN

20        Life Sciences Private Limited

21        8618 Westwood Center Drive

22        Suite 150

23        Vienna, Virginia 22182

24   BY:  RICHARD JUANG, ESQ., of Counsel

25        rjuang@daignaultiyer.com
```

```
 1    REMOTE APPEARANCES:

 2    TAFT STETTINIUS & HOLLISTER LLP

 3    Attorneys for Alkem Laboratories Ltd.

 4         111 East Wacker Drive

 5         Suite 2800

 6         Chicago, Illinois 60601

 7    BY:  PHILIP Y. KOUYOUMDJIAN, Esq., of Counsel

 8         pkouyoumdjian@taftlaw.com

 9    PERGAMENT & CEPEDA, LLP

10    Attorneys for Hetero & Torrent

11         25A Hanover Road

12         Suite 104

13         Florham Park, New Jersey 07932

14    BY:  DMITRY SHELHOFF, ESQ., of Counsel

15         dshelhoff@pergamentcepeda.com

16         JULIA KIM, ESQ., of Counsel

17         jkim@pergamentcepeda.com

18

19    ALSO PRESENT:

20    BRIAN ROBINSON, ESQ., Novartis In-house Counsel

21    ADRIAN BELTRAN, Videographer

22

23

24

25
```

Page 7

1                    DR. F. SPINALE

2              COURT REPORTER:  Good morning.

3         Today is June 10, 2022.  This is the

4         deposition of Mr. Spinale.

5              VIDEOGRAPHER:  Good morning,

6         everyone.  We're on the record on

7         June 10, 2022 at approximately

8         9:16 a.m. Eastern time for the remote

9         video deposition of Francis D. Spinale

10        in the matter of In re:  Entresto.  My

11        name is Adrian Beltran and I'm the

12        videographer.  All present will be

13        noted on the stenographic record.

14             So now will the court reporter

15        please swear in the witness?

16  DR. F R A N C I S  G.  S P I N A L E, called as

17             a witness, having been first duly sworn

18             by Danielle Grant, a Notary Public

19             within and for the State of New York,

20             was examined and testified as follows:

21  EXAMINATION BY

22  MR. MOORE:

23        Q    And Doctor, I'm going to ask you

24  how do you spell and say your last name so I

25  try to say it correctly?

Page 8

DR. F. SPINALE

1

2       A     Spinale, S-p-i-n-a-l-e.

3       Q     Spinale.  Okay.

4             Mr. Spinale, would you start by

5       saying and spelling your full name?

6       A     Francis G. Spinale, F-R-A-N-C-I-S,

7       G, period, Spinale, S-P-I-N-A-L-E.

8       Q     Okay.  And have you gone by any

9       other names in the past?

10      A     My colleagues and friends call me

11      Frank.

12      Q     Okay.  No.  I'm saying have you

13      published under some other name in the -- in

14      the past?

15            That what I was talking about.

16      A     No.

17      Q     Okay.  And have you been deposed

18      before?

19      A     Not in this context.  I was

20      deposed once on a work-related case and

21      that's it.

22      Q     Okay.  So you've only been deposed

23      once?

24      A     Would you repeat that?

25      Q     You've only been deposed once,

                    DR. F. SPINALE

1

2   an approximate again, late 1990s, early

3   2000.

4       Q    And would that be the same as the

5   sacubitrilat?

6       A    I'm going to refer to my report

7   with respect to the definitions of

8   sacubitril and sacubitrilat.  And I think

9   the best place for the definitions would be

10  in my report on Page 252.  Regarding the

11  '659 Patent where it describes the

12  NEP inhibitors now identified as sacubitril

13  and sacubitrilat as NEP inhibitors or

14  pharmaceutically acceptable salts thereof,

15  and composition comprising them.  That is

16  the definition, as I understand it, for

17  sacubitril and sacubitrilat.

18      Q    Do you hold your out -- yourself

19  out as a expert in chemistry?

20      A    No, sir.

21      Q    Can you tell -- can you tell me

22  what percentage of time that you spend

23  treating patients?

24          We'll start with today and then

25  we'll go backwards.

Page 267

```
 1                    DR. F. SPINALE

 2       right and -- to depose Dr. Spinale at a

 3       later time, at a later date and

 4       complete my line of questioning which

 5       really shouldn't take more than 15,

 6       20 minutes.

 7            MS. FLANDERS:  And I'll just put

 8       on the record that Dr. Spinale has been

 9       very generous with his time.  He sat

10       for the full seven hours on the record

11       with extensive with two counsel.  And

12       he does have a plane to catch, so we're

13       going to end the deposition.  Thank you

14       very much.

15            VIDEOGRAPHER:  Counsel, the time

16       is 6:02 p.m. and this conclusion

17       today's deposition.  Thank you

18       everyone.

19            (Time noted:  6:02 p.m.)

20       _____

21        DR. FRANCIS G. SPINALE

22    Subscribed and sworn to before me

23    this_____day of _____2022.

24    _____

25    NOTARY PUBLIC
```

Page 274

```
 1                    CERTIFICATE
 2         STATE OF NEW YORK )
 3                          )ss:
 4         COUNTY OF RICHMOND)
 5                 I, DANIELLE GRANT, a Certified
 6                 Shorthand Reporter, and Notary
 7                 Public within and for the State of
 8                 New York, do hereby certify:
 9                 That DR. FRANCIS G. SPINALE, the
10                 witness whose deposition is
11                 hereinbefore set forth, was duly
12                 sworn by me and that such deposition
13                 is a true record of the testimony
14                 given by such witness remotely.
15                 I further certify that I am not
16                 related to any of the parties to
17                 this action by blood or marriage and
18                 that I am in no way interested in
19                 the outcome of this matter.
20                 In witness whereof, I have hereunto
21                 set my hand this 23rd day of June,
22                 2022.
23                 _____
24                      DANIELLE GRANT
25
```

# Defendants' Ex. 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re Entresto (Sacubitril/Valsartan) Patent Litigation** | C.A. No. 20-2930-LPS <br><br> **HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY** |

**OPENING EXPERT REPORT OF LAIRD FORREST
REGARDING INVALIDITY OF
<u>U.S. PATENT NOS. 8,101,659 AND 8,796,331</u>**

# TABLE OF CONTENTS

**Page**

I.   Qualifications and Background ...................................................................... 1

   A.   Education and Experience; Prior Testimony.......................................... 1

   B.   Legal Standards and Materials Considered............................................ 4

   C.   Retention and Compensation ................................................................. 6

II.  Person Of Ordinary Skill In The Art ........................................................... 6

III. The Asserted Patents ................................................................................... 8

   A.   The '331 Patent ..................................................................................... 8

   B.   The '659 Patent ..................................................................................... 9

IV.  Claim Construction..................................................................................... 10

V.   Summary of Opinions................................................................................. 11

   A.   Obviousness .......................................................................................... 11

   B.   Written Description ............................................................................... 13

   C.   Indefiniteness ....................................................................................... 13

VI.  Technical Background................................................................................. 14

   A.   Valsartan and NEP Inhibitors Were Well Known in the Art ................. 14

   B.   Solid, Oral Dosage Forms Were Well Known in the Art ...................... 16

VII. The Asserted Claims of the '659 Patent are Indefinite............................... 16

   A.   Background ........................................................................................... 17

   B.   The Claimed "About a 1:1 Ratio"........................................................ 19

   C.   The Claims, Specification, and File History of the '659 Patent Fail to Inform a POSA of the Scope of the Claims ........................................................................ 23

   D.   Conclusion............................................................................................ 26

VIII. The Asserted Claims of the '659 Patent and '331 Patent are Invalid as Obvious.......... 27

   A.   Scope and Content of the Prior art ....................................................... 27

      1.   European Patent App. Pub. No. EP0726072A2 ......................... 28

      2.   U.S. Patent No. 5,217,996 ........................................................ 29

      3.   Remington ................................................................................ 29

      4.   Additional Prior Art References and Knowledge of a POSA .................... 30

   B.   Claims 1-4 of the '659 Patent Were Obvious Over the Fintel Combinations and Optionally in View of Remington............................................................ 30

   C.   Claims 1, 2, and 5-8 of the '331 Patent Were Obvious Over the Fintel Combinations and Optionally in View of Remington............................................................ 31

IX.  If not found obvious, The Asserted Claims of the '659 Patent And '331 Patent are Invalid Under 35 U.S.C. § 112 For Lack of Written Description ........................................ 32

**Highly Confidential**

**TABLE OF CONTENTS**
**(continued)**

Page

A.     The Shared Specification of the '659 and '331 Patents .................................................. 32

B.     The full scope of the asserted claims of the '659 patent and the '331 patent encompass a single unit dose form containing both claimed active ingredients............................................ 34

    1.     The asserted claims of the '659 patent encompass at least a single dose form containing both claimed active ingredients ................................................................................ 34

    2.     The asserted claims of the '331 patent encompass at least a single dose form containing both claimed active ingredients ................................................................................ 35

C.     If found not obvious, the asserted claims of the '659 patent and the '331 patent are invalid for lack of an adequate written description................................................................ 37

    1.     If not found obvious, the asserted claims of the '659 patent are invalid for lack of an adequate written description of the single unit dose form encompassed by the claims ....... 37

    2.     If not found obvious, the asserted claims of the '331 patent are invalid for lack of an adequate written description of the claimed "one unit dose form"....................................... 38

X.    Reservation of rights............................................................................................ 39

**Highly Confidential**

## TABLE OF ABBREVIATIONS

| Full Name of Cited Reference | Abbreviation |
|---|---|
| U.S. Patent No. 8,796,331 | '331 patent |
| U.S. Patent No. 8,101,659 | '659 patent |
| U.S. Patent No. 6,071,931 | '931 patent |
| U.S. Patent No. 5,217,996 | '996 patent |
| Ball et al., *Clavulanic Acid and Amoxycillin: A Clinical, Bacteriological, and Pharmacological Study*, 315 THE LANCET 620 (1980) | Ball 1980 |
| Bastin et al., *Salt Selection and Optimisation Procedures for Pharmaceutical New Chemical Entities*, 4 ORGANIC PROC. RSCH. & DEV. 427 (2000) | Bastin 2000 |
| Berge, *Pharmaceutical Salts*, 66 J. PHARM. SCIS. 1 (1977) | Berge 1977 |
| EP0726072A2 | EP '072 |
| Ksander et al., *Dicarboxylic Acid Dipeptide Neutral Endopeptidase Inhibitors*, 38 J. MED. CHEM. 1689 (1995) | Ksander |
| Martin, PHYSICAL PHARMACY ch. 5 (4th ed. 1995) | Martin 1995 |
| Morton et al., *Refining Procedures for the Administration of Substances*, 35 LAB'Y ANIMALS 1 (2000) | Morton 2000 |
| OXFORD DICTIONARY OF CHEMISTRY (6th ed. 2008) | Oxford Dictionary of Chemistry |
| PHYSICIAN'S DESK REFERENCE (54th ed. 2000) | Physicians' Desk Reference 2000 |
| REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY (Alfonso R. Gennaro ed., 20th ed. 2000) | Remington |
| Zumdahl, CHEMISTRY CH. 3 (3d ed. 1993) | Zumdahl 1993 |

Highly Confidential

1.      My name is Laird Forrest, Ph.D. I have been retained by counsel for Alembic Pharmaceuticals Limited and Alembic Pharmaceuticals, Inc.; Alkem Laboratories, Ltd.; Aurobindo Pharma USA Inc. and Aurobindo Pharma Ltd.; Biocon Pharma Limited, Biocon Limited, and Biocon Pharma, Inc.; Crystal Pharmaceutical (Suzhou) Co., Ltd.; Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories, Ltd.; Hetero USA Inc., Hetero Labs Limited, and Hetero Labs Limited Unit III; Laurus Labs Ltd. and Laurus Generics Inc.; Lupin Atlantis Holdings, S.A., Lupin Limited, Lupin Inc., and Lupin Pharmaceuticals, Inc.; Macleods Pharmaceuticals Ltd. and Macleods Pharma USA, Inc.; MSN Laboratories Private Limited, MSN Life Sciences Private Limited, and MSN Pharmaceuticals Inc.; Mylan Pharmaceuticals Inc.; Teva Pharmaceuticals USA, Inc.; Torrent Pharma Inc. and Torrent Pharmaceuticals Ltd.; and Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited  (collectively, "Defendants") to provide my expert opinions.  I understand that Novartis Pharmaceuticals Corp. ("Novartis" or "Plaintiff") asserts that Defendants infringe claims 1-4 of U.S. Patent No. 8,101,659 ("'659 patent") and claims 1, 2, and 5-8 of U.S. Patent No. 8,796,331 ("'331 patent").  I therefore address only claims 1-4 of the '659 patent and claims 1, 2, and 5-8 of the '331 patent in this expert report.  I reserve the right to address the invalidity of any additional claims later asserted by Plaintiff.

## I.      QUALIFICATIONS AND BACKGROUND

### A.      Education and Experience; Prior Testimony

2.      I am currently a Professor in the Department of Pharmaceutical Chemistry at the University of Kansas in Lawrence, Kansas, a position I have held since 2017.  I am also Professor in the Bioengineering Center, a position I have held since 2011, and Professor in the Department of Medicinal Chemistry, a position I have held since 2015, both also at the University of Kansas. I have been on the faculty at the University of Kansas since 2007.

- 1 -

**Highly Confidential**

However, the claim fails to specify if the ratio refers to a weight ratio, a molar ratio, or another type of ratio.  Moreover, the specification and file history fail to provide any clarity on what "about a 1:1 ratio" means in the context of the claimed subject matter.  Accordingly, in my opinion the asserted claims, read in light of the specification and prosecution history, fail to inform a POSA of the scope of the claimed invention with reasonable certainty.

## VI.  TECHNICAL BACKGROUND

### A.  Valsartan and NEP Inhibitors Were Well Known in the Art

50.     Valsartan is a "nonpeptide, orally active, and specific angiotensin II antagonist" that acts on the $AT_1$ receptor (i.e., an AT-1 antagonist).  *See* Physicians' Desk Reference 2000 at 2015.  Valsartan is a small molecule having the following chemical structure:



*See, e.g.*, Physicians' Desk Reference 2000 at 2015; '659 patent at 3:29-50.[4]

51.     In the mid and late 1990s, the FDA approved Novartis's Diovan™ and Diovan HCT™ products, respectively.  *See, e.g.*, 1996 Diovan Approval Letter; 1998 Diovan HCT Approval Letter.  The Diovan products were orally available solid-form drug products containing valsartan as an active ingredient and at least one pharmaceutically acceptable carrier.  Diovan contained valsartan in a capsule formulation while Diovan HCT contained valsartan and

---

[4] Because the '659 patent and '331 patent share a common specification, citations are only provided to the specification of the '659 patent.  However, these citations are also intended to encompass the corresponding portion of the specification of the '331 patent.

**Highly Confidential**

hydrochlorothiazide in a tablet formulation.  Accordingly, it was well known that valsartan could be formulated as a solid, orally available drug product, such as a capsule or tablet, well before the priority date of the asserted patents.

52.     In addition, neutral endopeptidase inhibitors ("NEP inhibitors") were a known class of drugs before the priority dates of the asserted patents.  Indeed, the background section of the asserted patents acknowledge that NEP inhibitors were known to exhibit an anti-hypertensive effect.  *See, e.g.*, '659 patent at 2:10-65.  In particular, the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-(pphenylphenylmethyl)-4-amino-2R-methylbutanoic     acid     ethyl     ester ("sacubitril"), also referred to as sacubitril, was initially described in the early 1990s.  *See* '996 patent at 11:7-10.  Sacubitril is a small molecule having the following chemical structure:



*See, e.g.*, '659 patent at 6:15-30; *see also* '996 patent at 6:66-9:12.  I also understand that sacubitril is metabolized to form the NEP inhibitor (2R,4S)-5-biphenyl-4-yl-4(3-carboxy-propionyl amino)-2-methyl-pentanoic acid ("sacubitrilat"), which I understand is responsible for the biological activity of the compound.  *See, e.g.*, Ksander at Abstract, 1692-95.  Oral administration of sacubitril was known at least as early as 1995 to result in pharmacologically active levels of sacubitrilat over a period of several hours in mammals.[5]  *Id.* at 1693.  Sacubitrilat is a small

---

[5] Ksander compound 21a at Table 3 is sacubitril, and compound 19a is sacubitrilat.

**Highly Confidential**

molecule having a chemical structure similar to sacubitril, but lacks the "ethyl ester" group of sacubitril, the parent prodrug:



*Id*. at 1692-93.

### B.    Solid, Oral Dosage Forms Were Well Known in the Art

53.    As of the priority date of the asserted patents, the use of solid, oral dosage forms of drug products was common practice in the art.  Generally speaking, drug substances are most frequently administered orally via solid dosage forms, such as tablets and capsules.  *See, e.g.*, Remington at 858.  In addition to the drug substance itself, solid dosage forms also contain inactive materials, typically referred to as excipients, a number of which are commonly used in the art.  *Id*. at 860-63.  Formulating such a simple orally available solid dosage form would require only ordinary skill and common knowledge of a POSA.

54.    "Tablets may be defined as solid pharmaceutical dosage forms containing drug substances with or without suitable diluents and prepared by either compression or molding methods."  *Id*. at 858.  "Tablets remain popular as a dosage form because of the advantages afforded both to the manufacturer ... and the patient."  *Id*.  Moreover, tablets frequently contain coatings that may be used for a variety of reasons.  *Id*. at 858-59.

### VII.    THE ASSERTED CLAIMS OF THE '659 PATENT ARE INDEFINITE

55.    As explained above, it is my opinion that the asserted claims of the '659 patent are indefinite.  I understand that a patent is invalid as indefinite if the claim, read in light of the

- 16 -

**Highly Confidential**

I declare under penalty of perjury that the factual statements contained in this report are known by me or believed by me to be correct.

Dated: December 14, 2021                    By:

                                            _____

                                            Dr. Laird Forrest, PhD

**Highly Confidential**

# Defendants' Ex. 7

Highly Confidential - Attorneys' Eyes Only

Page 1

1

2                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
3

4    In Re Entresto                   C.A. No. 20-2930-RGA
     (Sacubitril/Valsartan)
5    Patent Litigation
     _____

6
     NOVARTIS PHARMACEUTICALS CORPORATION,
7
             Plaintiff,
8
     -vs-                             C.A. No. 19-1979-RGA
9
     ALKEM LABORATORIES LTD.,
10   AUROBINDO PHARMA USA INC.,
     AUROBINDO PHARMA LTD.,
11   BIOCON PHARMA LIMITED,
     BIOCON LIMITED, BIOCON
12   PHARMA, INC. CRYSTAL
     PHARMACEUTICAL (SUZHOU) CO.,
13   LTD., LAURUS LABS LIMITED,
     LAURUS GENERICS INC., LUPIN
14   ATLANTIS HOLDINGS, S.A.,
     LUPIN LIMITED, LUPIN
15   PHARMACEUTICALS, INC.,
     NANJING NORATECH PHARMACEUTICAL
16   CO., LIMITED, TEVA
     PHARMACEUTICALS USA, INC.,
17   TORRENT PHARMA INC.,
     TORRENT PHARMACEUTICALS LTD.,
18
             Defendants.
19   _____/

20           =============================
             CONTAINS HIGHLY CONFIDENTIAL
21           ATTORNEYS' EYES ONLY TESTIMONY
             =============================
22
             DEPOSITION OF LAIRD FORREST, PHD
23

24   Reported by: Pamela J. Pelino, RPR, FPR, CLR

25   Job No. 211984

```
 1

 2   NOVARTIS PHARMACEUTICALS
     CORPORATION,
 3
                Plaintiff,
 4

     -vs-                              C.A. No. 19-2021-RGA
 5

     ALEMBIC PHARMACEUTICALS LIMITED,
 6   ALEMBIC PHARMACEUTICALS, INC.,
     MACLEODS PHARMACEUTICALS LTD.,
 7   MACLEODS PHARMA USA, INC.,

 8              Defendants.
     _____/
 9

     NOVARTIS PHARMACEUTICALS
10   CORPORATION,

11              Plaintiff,

12   -vs-                              C.A. No. 19-2053-RGA

13   DR. REDDY'S LABORATORIES, INC.,
     DR. REDDY'S LABORATORIES, LTD.,
14   HETERO USA INC., HETERO LABS
     LIMITED, HETERO LABS LIMITED
15   UNIT III, MSN PHARMACEUTICALS
     INC., MSN LABORATORIES PRIVATE
16   LIMITED, MSN LIFE SCIENCES
     PRIVATE LIMITED, NOVUGEN PHARMA
17   (MALAYSIA) SDN, BHD., ZYDUS
     PHARMACEUTICALS (USA) INC.,
18   CADILA HEALTHCARE LTD.,

19              Defendants.
     _____/
20

21

22              =============================
                CONTAINS HIGHLY CONFIDENTIAL
23              ATTORNEYS' EYES ONLY TESTIMONY
                =============================
24

25
```

Highly Confidential - Attorneys' Eyes Only

1

2  NOVARTIS PHARMACEUTICALS
   CORPORATION,
3
             Plaintiff,
4
   -vs-                                C.A. No. 20-445-RGA
5
   MYLAN PHARMACEUTICALS, INC.,
6
             Defendant.
7  _____/

8

9

10            ==============================
              CONTAINS HIGHLY CONFIDENTIAL
11            ATTORNEYS' EYES ONLY TESTIMONY
              ==============================
12

13

14         DEPOSITION OF LAIRD FORREST, PHD

15

16              Tuesday, May 31, 2022
                9:03 a.m. - 4:46 p.m.

17              Conducted Remotely

18

19

20

21  Stenographically Reported By
    Pamela J. Pelino, RPR, FPR, CLR
22  Notary Public, State of Florida
    TSG Reporting
23
                       -  -  -
24

25

Highly Confidential - Attorneys' Eyes Only

Page 4

```
 1                        L. FORREST

 2    APPEARANCES:

 3    On behalf of the Plaintiff:

 4         Christina Schwarz, Esq.
           Venable
 5         1290 Avenue of the Americas
           New York, NY 10104
 6


 7
      On behalf of Reddy's Laboratories, Inc., Dr. Reddy's
 8    Laboratories, Ltd.:

 9         Bryan Beel, Esq.
           Perkins Coie
10         1120 N.W. Couch Street
           Portland, OR 97209
11


12
      On behalf of Zydus Pharmaceuticals (USA) Inc.:
13
           Nina Vachhani, Esq.
14         Locke Lord
           111 South Wacker Drive
15         Chicago, IL 60606

16


17    On behalf of Hetero USA Inc., Hetero Labs Limited,
      Hetero Labs Limited Unit III, Torrent Pharma Inc.,
18    Torrent Pharmaceuticals Ltd.:

19         Dmitry Shelhoff, Ph.D., Esq.
           Kenneth Canfield, Esq.
20         Pergament & Cepeda
           25A Hanover Road
21         Florham Park, NJ 07932

22


23


24

25                        -Continued-
```

Highly Confidential - Attorneys' Eyes Only

```
 1                    L. FORREST

 2

 3     APPEARANCES CONTINUED:

 4

 5     On behalf of Alkem Laboratories Ltd:

 6          Philip Kouyoumdjian, Esq.
            Taft Stettinius & Hollister
 7          111 East Wacker
            Chicago, IL 60601
 8

 9
       On behalf of Mylan Pharmaceuticals, Inc:
10
            Robert Florence, Esq.
11          Parker Poe Adams & Bernstein
            1075 Peachtree Street Northeast
12          Atlanta, GA 30309

13

14     On behalf of Crystal Pharmaceutical
       (Suzhou) Co., Ltd.:
15
            Elizabeth Crompton, Ph.D., Esq.
16          Parker Poe Adams & Bernstein
            1400 K Street NW
17          Washington, DC 20005

18

19     Also Present:

20          TIMOTHY MOORE, PARALEGAL
            WITHERSWORLDWIDE
21

22
       Videographer:
23
            RODOLFO DURAN
24

25
```

Highly Confidential - Attorneys' Eyes Only

1                          L. FORREST

2                   P R O C E E D I N G S

3                        -   -   -

4          Deposition taken before Pamela J. Pelino,

5   Registered Professional Court Reporter and Notary Public

6   in and for the State of Florida at Large, in the above

7   cause.

8                        -   -   -

9              THE VIDEOGRAPHER:  Good morning,

10       Counselors.  My name is Rodolfo Duran.  I am

11       the legal videographer in association with

12       TSG Reporting, Inc.  Because this is a remote

13       deposition, I will not be in the same room with

14       the witness.  Instead, I will record this

15       remotely.  The court reporter, Pamela Pelino,

16       also will not be in the same room and will

17       swear in the witness remotely.

18              Do all parties stipulate to the validity

19       of this video recording, of swearing in of the

20       witness, and that it will be admissible in the

21       courtroom as if it had been taken following

22       Rule 30 of the Federal Rules of Civil

23       Procedures and the state's rules where this

24       case is pending?

25              MS. SCHWARZ:  That's fine for Novartis.

1                          L.  FORREST

2          Poe Adams and Bernstein on behalf of the

3          defendant Mylan Pharmaceuticals, Inc.

4                  MS. CROMPTON:  Elizabeth Crompton of

5          Parker Poe Adams and Bernstein on behalf of

6          defendant Crystal Pharmaceuticals.

7                  THE VIDEOGRAPHER:  Will the court

8          reporter please swear in or affirm the witness.

9                          -  -  -

10    Thereupon,

11                    LAIRD FORREST, PHD,

12    having been first duly sworn or affirmed, responded and

13    was examined and testified as follows:

14                  THE WITNESS:  I affirm.

15                    DIRECT EXAMINATION

16    BY MS. SCHWARZ:

17         Q.    Good morning, Dr. Forrest.

18         A.    Good morning.

19         Q.    Could you please state your full name and

20    address for the record.

21         A.    Certainly.  It's Marcus Laird Forrest,

22    L-A-I-R-D,

24         Q.    Great.  Thanks.

25                I know you've been deposed before, but

Highly Confidential - Attorneys' Eyes Only

Page 14

1                    L. FORREST

2      A.    Yes, although I do have a few minor

3  errata that we just are -- that I just recently

4  noticed, typos.

5      Q.    Would you like to point those out for us?

6      A.    Certainly.  One moment.

7            So if I look at page 15 of Exhibit 1, my

8  opening report, footnote 5, the 21 and the 19 were

9  switched.  The figures and everything else and

10  discussion are correct, but simply the footnote

11  numbers got switched there.

12            And then if you go to page 18 where I'm

13  discussing the ratio, again, the discussion is all

14  correct, and the examples of grams of sugar to grams

15  of salt are correct, but the ratio was reversed too.

16  It should have been 3.121.

17            And I believe my table is correct on page

18  22 of all the molecular weights, but in paragraph

19  70, the sodium salt sacubitril was marked as 434.5,

20  and it should have been 433.5, as it is given in the

21  table.  That's on the opposing page of 22.

22            Pardon for the minor typos.

23      Q.    If there was anything in the report that

24  was incorrect or that you didn't agree with, would

25  you have changed it before you signed the report?

Highly Confidential - Attorneys' Eyes Only

1                          L. FORREST

2         use in the treatment of cardiovascular

3         conditions.  And that it further disclosed the

4         chemical structure of sacubitril as well as

5         methods of making it.  And it disclosed that

6         they may be formulated orally as solid dosage

7         forms such as tablets with incipient interiors

8         and into capsules.  And then I referenced, you

9         know, for example, columns 18 through 3.

10   BY MS. SCHWARZ:

11        Q.    And you mentioned that the '996 patent

12   discloses sacubitril, I think you said the structure

13   of sacubitril; is that right?

14        A.    Yes.

15        Q.    Does the '996 patent also disclose

16   sacubitrilat?

17        A.    Well, sacubitril would be the ester pro

18   drug, and I have to recall if it disclosed the

19   hydrolysis product or esterase product of that in

20   the synthesis or characterization of it.

21             Definitely you put it in a culture or

22   other place where there's going to be a presence of

23   esterases, and you're going to get cleavage of

24   anything in it.

25             So let me -- let me see.  Let's see.  I

Highly Confidential - Attorneys' Eyes Only

Page 210

1                         L. FORREST

2                    CERTIFICATE OF OATH

3    THE STATE OF FLORIDA

4    COUNTY OF PALM BEACH

5

6

7              I, the undersigned authority, certify

8    that LAIRD FORREST, PhD personally appeared before

9    me and was duly sworn.

10

11             Dated this 13th day of June, 2022.

12

13

14

15       _____

16       Pamela J. Pelino, RPR, FPR
         Notary Public - State of Florida
17       My Commission No.:  GG 225932
         My Commission Expires:  June 7, 2022
18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only

Page 211

1                          L. FORREST

2                    C E R T I F I C A T E

3    THE STATE OF FLORIDA

4    COUNTY OF PALM BEACH

5

6            I, Pamela J. Pelino, Registered Professional
     Court Reporter and Notary Public in and for the State of
7    Florida at large, do hereby certify that I was
     authorized to and did report said deposition in
8    stenotype; and that the foregoing pages are a true and
     correct transcription of my shorthand notes of said
9    deposition.

10           I further certify that said deposition was
     taken at the time and place hereinabove set forth and
11   that the taking of said deposition was commenced and
     completed as hereinabove set out.

12

13           I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative or
     employee of any attorney or counsel of party connected
14   with the action, nor am I financially interested in the
     action.

15

16           The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
     means unless under the direct control and/or direction
17   of the certifying reporter.

18           Dated this 13th day of June, 2022.

19

20

21

22   _____
     Pamela J. Pelino, RPR, FPR

23

24

25