IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | ) ) ) ) | C.A. No. 20-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ALKEM LABORATORIES LTD., AUROBINDO PHARMA USA INC., AUROBINDO PHARMA LTD., BIOCON PHARMA LIMITED, BIOCON LIMITED, BIOCON PHARMA, INC., CRYSTAL PHARMACEUTICAL (SUZHOU) CO., LTD., LAURUS LABS LIMITED, LAURUS GENERICS INC., LUPIN ATLANTIS HOLDINGS, S.A., LUPIN LIMITED, LUPIN INC., LUPIN PHARMACEUTICALS, INC., NANJING NORATECH PHARMACEUTICAL CO., LIMITED, TEVA PHARMACEUTICALS USA, INC., TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 19-1979-RGA |

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| ALEMBIC PHARMACEUTICALS LIMITED, ALEMBIC PHARMACEUTICALS, INC., MACLEODS PHARMACEUTICALS LTD., MACLEODS PHARMA USA, INC., | ) ) ) ) ) C.A. No. 19-2021-RGA ) ) ) ) |
| Defendants. | ) ) |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., HETERO USA INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT III, MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED, NOVUGEN PHARMA (MALAYSIA) SDN. BHD., ZYDUS PHARMACEUTICALS (USA) INC., ZYDUS LIFESCIENCES LIMITED, | ) ) ) ) ) ) ) ) C.A. No. 19-2053-RGA ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' POST-TRIAL REPLY BRIEF REGARDING INVALIDITY OF THE '659 PATENT

## <u>TABLE OF CONTENTS</u>

Table of Authorities ............................................................................................... ii

Table of Abbreviations ........................................................................................... iv

Cited Trial Exhibits (By Number) ........................................................................ vi

I.   The Asserted Claims Would Have Been Obvious to a POSA .............................. 1

   A.   EP '072/Trippodo Taught and Encouraged Combining an ARB and NEPi ........... 1

      1.   EP '072/Trippodo Demonstrated Synergy for Hypertension ...................... 1

      2.   EP '072/Trippodo Demonstrated Synergy for Heart Failure ...................... 3

   B.   A POSA Would Have Replaced the ACEi in an ACEi/NEPi Combination with an ARB ............................................................................................................. 3

      1.   A POSA Would Have Replaced an ACEi with an ARB to Reduce Bradykinin Potentiation and the Occurrence of Angioedema ..................... 3

      2.   A POSA Would Have Pursued an ARB to Counter an Increase in Angiotensin II Levels Caused by the NEPi ................................................ 5

   C.   Defendants Did Not Rely on Hindsight ................................................................ 6

      1.   Pursuing an ARB-NEPi Combination Is Not Hindsight ............................ 6

      2.   Ksander Directed the POSA to Sacubitril Without Using Hindsight ......... 7

      3.   A POSA Would Have Selected Valsartan Without Hindsight ................... 8

   D.   Secondary Considerations Do Not Evidence Non-Obviousness ........................... 9

      1.   No Failure of Others or Abandonment ...................................................... 9

      2.   No Unexpected Results ............................................................................. 9

II.  The Asserted Claims Are Not Enabled .............................................................. 10

   A.   Claim Construction Frames the Enablement Inquiry ......................................... 10

   B.   The Portion of *Hogan* That Novartis Relies Upon Is Dicta ............................... 12

III. The Asserted Claims Lack Sufficient Written Description ................................. 14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001).................................................................................10

*Alza Corp. v. Andrx Pharms., LLC*,
    603 F.3d 935 (Fed. Cir. 2010)..................................................................................11

*Ariad Pharms. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010)..........................................................................14, 15

*Best Medical Int'l, Inc. v. Elekta Inc.*,
    46 F.4d 1346, 1353-54 (Fed. Cir. 2022) .................................................................11

*BTG Int'l Ltd. v. Amneal Pharms. LLC*,
    923 F.3d 1063 (Fed. Cir. 2019)........................................................................6, 7, 8

*Chiron Corp. v. Genentech, Inc.*,
    363 F.3d 1247 (Fed. Cir. 2004).....................................................................11, 14, 15

*In re Hogan*,
    559 F.2d 595 (C.C.P.A. 1977) .................................................................................12

*In re Cyclobenzaprine Hydrochloride Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012)..................................................................................6

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007).................................................................................................8, 9

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004)..................................................................................11

*Merck v. Mylan Pharm.*,
    19-CV-101, 2002 U.S. Dist. LEXIS 195204 (N.D. W. Va. Sept. 21, 2022) ............14

*Nalpropion Pharms., Inc. v. Actavis Lab'ys FL, Inc.*,
    934 F.3d 1344 (Fed. Cir. 2019)..................................................................................6

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007)..................................................................................5

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)...............................................................10

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
    315 F.3d 1335 (Fed. Cir. 2003)................................................................................11, 12, 13, 14

*Regents Univ. Cal. v. Dako N. Am.*,
    C 05-03955, 2009 WL 1083446 (N.D. Cal. Apr. 22, 2009) ....................................................14

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*,
    748 F.3d 1354 (Fed. Cir. 2014)..........................................................................................6, 7, 9

*Schering Corp. v. Amgen Inc.*,
    222 F.3d 1347 (Fed. Cir. 2000)................................................................................................13

*Trustees of Boston Univ. v. Everlight Elecs. Co. Ltd.*,
    896 F.3d 1357 (Fed. Cir. 2018)................................................................................................11

*U.S. Steel Corp. v. Phillips Petroleum Co.*,
    865 F.2d 1247 (Fed. Cir. 1989)................................................................................................12

## TABLE OF ABBREVIATIONS[1]

| Term | Description |
|---|---|
| '197 patent | U.S. Patent No. 6,294,197 (JTX-203) |
| '217 patent | U.S. Patent No. 6,211,217 (DTX-686) |
| '659 patent | U.S. Patent No. 8,101,659 (JTX-1) |
| '578 patent | U.S. Patent No. 5,399,578 (JTX-23) |
| '996 patent | U.S. Patent No. 5,217,996 (JTX-362) |
| 2001 HF Guidelines | Hunt et al., "ACC/AHA Guidelines for the Evaluation and Management of Chronic Heart Failure in the Adult: Executive Summary," Circulation (2001) 104(24):2996–3007 (JTX-366) |
| ACE | angiotensin converting enzyme |
| ACEi | ACE inhibitor |
| ARB | angiotensin receptor blocker |
| API | active pharmaceutical ingredient |
| $AT_1$ receptor | Angiotensin II receptor, subtype 1 |
| BMS | Bristol-Myers Squibb |
| Cases | Cases, "Omapatrilat: Clinical Pharmacology," Drugs Today (2000) 36(12):817-28 (JTX-49) |
| Cohn | Cohn et al., "A Randomized Trial of the Angiotensin-Receptor Blocker Valsartan in Chronic Heart Failure," New Engl. J. Med. (2001) 345(23):1667-75 (JTX-60) |
| Cleland | Cleland et al., "Lack of Efficacy of Neutral Endopeptidase Inhibitor Ecadotril in Heart Failure," Lancet (1998), 351:1657-58 (JTX-56) |
| D. Br. | Defendants' Post-Trial Brief Regarding the '659 Patent, D.I. 888 |
| Defendants | The Crystal, Dr. Reddy's, Hetero, Macleods, MSN, and Torrent defendants |
| Diovan Label | Diovan®, Physicians' Desk Reference (53rd ed. 1999) at 2013-15 (JTX-67) |
| DFF _[2] | citation to ¶___ of Defendants' Proposed Findings of Fact Regarding the '659 Patent, filed with Defendants' Opening Brief |
| EP '072 | EP0726072A2 (JTX-368) |
| Ksander | Ksander et al., "Dicarboxylic Acid Dipeptide Neutral Endopeptidase Inhibitors," J. Med. Chem. (1995) 38:1689-700 (JTX-352) |
| Levy | Levy et al., "The Progression From Hypertension to Congestive Heart Failure," J. Am. Med. Ass'n (1996) 275(20) 1557–62 (JTX-211) |
| LVEDP | left ventricular end diastolic pressure |
| LVSP | left ventricular end systolic pressure |
| Malacco | Malacco et al., "Comparison of Valsartan and Irbesartan in the Treatment of Mild to Moderate Hypertension: A Randomized, Open-Label, Crossover Study," Curr. Therapeutic Res. (2000) 61(11):789-97 (JTX-118) |

---

[1] Defendants include the Table of Abbreviations and Cited Trial Exhibits (By Number) from their Opening Brief, with additional abbreviations/cited exhibits from this reply brief added.

[2] Cited as "FF" in Defendants' Opening Brief.

| Term | Description |
|------|-------------|
| Mann | Mann et al., "Effect of Treatment with Sacubitril/Valsartan in Patients with Advanced Heart Failure and Reduced Ejection Fraction," J. Am. Med. Ass'n Cardiol. (2022) 7(1):17–25 (JTX-213) |
| Moser | Moser et al., "Prevention of Disease Progression, Left Ventricular Hypertrophy and Congestive Heart Failure in Hypertension Treatment Trials," J. Am. Coll. Cardiol. (1996) 27(5):1214-18 (JTX-215) |
| NEP | neutral endopeptidase |
| NEPi | NEP inhibitor |
| Novartis | Plaintiff Novartis Pharmaceuticals Corporation |
| P. Br. | Novartis's Post-Trial Answering Brief on the Validity of the '659 Patent, D.I. 930 |
| sac/val | sacubitril and valsartan combination |
| Shetty | Shetty & DelGrande, "Differential Inhibition of the Prejunctional Actions of Angiotensin II in Rat Atria by Valsartan, Irbesartan, Eprosartan, and Losartan," J. Pharmacol. & Exper. Therapeutics (2000) 294(1):179-86 (JTX-169) |
| Taavitsainen | Taavitsainen et al., "In vitro Inhibition Screening of Human Hepatic P450 Enzymes by Five Angiotensin-II Receptor Antagonists," Eur. J. Clin. Pharmacol. (2000) 56:135-40 (JTX-218) |
| Tr. __:___ | Citation to transcript of bench trial held September 12-14, 2022, before Hon. Richard G. Andrews |
| Trippodo | Trippodo et al., "Repression of Angiotensin II and Potentiation of Bradykinin Contribute to the Synergistic Effects of Dual Metalloprotease Inhibition in Heart Failure," J. Pharmacol. & Exper. Therapeutics (1995) 272(2):619-27 (JTX-369) |
| Udvary | Udvary et al., "Cardiovascular effects of the calcium sensitizer, levosimendan, in heart failure induced by rapid pacing in the presence of aortic constriction," Br. J. Pharmacol. (1995) 114:656–661 (JTX-189) |

**CITED TRIAL EXHIBITS (BY NUMBER)**

| Exhibit | Description (see above Table of Abbreviations) |
|---|---|
| JTX-1 | '659 patent (patent-in-suit) |
| JTX-23 | '578 patent (prior art) |
| JTX-49 | Cases (prior art) |
| JTX-56 | Cleland (prior art) |
| JTX-60 | Cohn (prior art) |
| JTX-67 | Diovan Label (prior art) |
| JTX-118 | Malacco (prior art) |
| JTX-157 | "The Galien Foundation Honors Excellence in Scientific Innovation at 2021 Prix Galien Awards Gala," Cision PR Newswire, Press Release (Oct. 29, 2021) (available at http://www.prnewswire.com/news-releases/the-galien-foundation-honors-excellence-in-scientific-innovation-at-2021-prix-galien-awards-gala-301411801.html) |
| JTX-169 | Shetty (prior art) |
| JTX-189 | Udvary (prior art) |
| JTX-203 | '197 patent (prior art) |
| JTX-211 | Levy (prior art) |
| JTX-213 | Mann |
| JTX-215 | Moser (prior art) |
| JTX-218 | Taavitsainen (prior art) |
| JTX-352 | Ksander (prior art) |
| JTX-362 | '996 patent (prior art) |
| JTX-366 | 2001 HF Guidelines (prior art) |
| JTX-369 | Trippodo (prior art) |
| DTX-30 | Novartis's 2002 Annual Report |
| DTX-686 | '217 patent (prior art) |
| DTX-721 | Curriculum Vitae of Dan Fintel |
| DTX-722 | Curriculum Vitae of Laird Forrest |
| DTX-723 | Curriculum Vitae of Jonathan Steed |
| DTX-2003 | (Rule 1006) '659 Patent Claims Are Obvious over the '578 Patent, the '996 Patent, and EP '072 |
| DTX-2004 | (Rule 1006) '659 Patent Claims Are Obvious over EP '072, Diovan Label, and the '996 Patent |

With respect to obviousness, Novartis requires Defendants to show certainty or knowledge of success rather than the mere reasonable expectation required by law. The claimed combination is obvious because of the following undisputed facts: 1) combination treatment for hypertension and heart failure was common, 2) EP '072/Trippodo disclosed synergism of an ARB-NEPi combination for those conditions (a fact that Novartis asks the Court to disregard), and 3) valsartan (ARB) and sacubitril (NEPi) had preferred status within those classes of compounds.

Faced with a claim construction for which it advocated for infringement, with a corresponding scope that it can neither enable nor describe, Novartis argues it does not have to enable the full scope because a POSA would have never thought complexes (such as Defendants') were within the scope of the claims. Such an approach twists the claims to have a broader scope for easier accusations of infringement but a narrower scope for an easier standard of enablement. Here, Novartis acknowledges that the non-covalently bound complexes are not enabled. Furthermore, the claimed complexes did not exist at the time of filing and thus, were not described.

## I.   THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS TO A POSA

### A.   EP '072/Trippodo Taught and Encouraged Combining an ARB and NEPi

#### 1.   EP '072/Trippodo Demonstrated Synergy for Hypertension

Disagreeing with, but not denying, EP '072/Trippodo's conclusion of ARB-NEPi synergy for hypertension, Novartis cites no evidence for the proposition that Example 2 of EP '072 was the only hypertension model "disclosed in the prior art at all." *Contra* P. Br. 4 (citing PFF 24, 33, 38). More importantly, Dr. Fintel did *not* testify that "to know if a combination **lowers blood pressure**, a POSA would need to test it in a hypertension model." *Contra id.* (emphasis added). Instead, Dr. Fintel testified with respect to the combination in Example 1 of EP '072 (heart-failure model), "***[i]t's reducing blood pressure***, but it's not treating the clinical problem of hypertension because these were not hypertensive animals." Tr. 120:10-21 (adding "changes in blood pressure

1

can also be important even in a normal tensive case"). Furthermore, contrary to Novartis, he explained why a POSA would credit EP '072's conclusion that its combination is useful in treating hypertension. DFF 22.

Novartis dismisses EP '072's LVSP data as irrelevant to blood pressure, P. Br. 5, even though EP '072 relied on LVSP to conclude an ARB-NEPi combination is "useful in treating hypertension":

> The combination of this angiotensin II antagonist and the selective or dual acting neutral endopeptidase inhibitor produced **significant reductions** in left ventricular end diastolic pressure (LVEDP) and **left ventricular systolic pressure (LVSP)** that were greater than those produced by either treatment alone. **Thus**, the combination of this particular angiotensin II antagonist and the selective or dual acting neutral endopeptidase inhibitor is **useful in treating hypertension** and/or congestive heart failure.

DFF 22. Dr. Fintel explained how the LVSP data supported synergy for hypertension. DFF 42.

It is Novartis, not Defendants, who is "pick[ing] and choos[ing]" from EP '072. *Contra* P. Br. 5. Defendants, supported by Dr. Fintel, **agree** with EP '072's conclusion—based on the entirety of the data—with respect to hypertension. Novartis, in contrast, **dismisses** EP '072's conclusion and encouraging data. But given Dr. Fintel's testimony explaining how EP '072's data are consistent with EP '072's conclusion, a POSA would have credited EP '072's teachings.

Trying to undermine both EP '072 and Dr. Fintel's logic, Novartis proposes the court find that "Dr. Fintel's contrary testimony that drugs like calcium channel blockers were established treatments for both hypertension and heart failure … was incorrect and not supported by any evidence." PFF 15. Dr. Fintel testified that "half of these [hypertension] drugs are also part of the standard of care for the management of heart failure. Those include …, in some cases calcium channel blockers," Tr. 52:5-24, and this testimony is supported by record evidence: the 2001 HF Guidelines teach the "[u]se of a calcium channel blocking drug as a treatment for HF [heart

failure]," JTX-366 at 3002.

### 2.    EP '072/Trippodo Demonstrated Synergy for Heart Failure

Novartis also attempts to avoid EP '072/Trippodo's conclusion that the decrease in LVSP seen in Example 1 would be beneficial for treating heart failure, DFF 22 (*quoted supra* § I.A.1. P), Br. 6. But Dr. Fintel explained how lowering LVSP treats heart failure. DFF 42. As a clinical cardiologist who has cared for more than 10,000 patients with cardiovascular disease, DFF 10, Dr. Fintel is qualified to offer this opinion. *Contra* P. Br. 6.

Dr. Spinale's opinion that lowering LVSP would worsen heart failure contradicts EP '072/Trippodo and did not withstand cross examination. Dr. Spinale cited only a single reference (Udvary) in support of this position. Tr. 383:9-384:3. But he conceded, fatally, that *pacing*, not a reduction in LVSP, caused the deterioration in left ventricular function of the animals in Udvary. *Id.* at 384:4-18. Likewise, Dr. Spinale admitted that there were no data in Trippodo to support a conclusion that lowering LVSP caused heart failure. *Id.* at 384:20-385:4. Dr. Fintel's testimony, which explains and is consistent with the conclusions of EP '072/Trippodo, was credible and persuasive, and Dr. Spinale's contrary speculation and disagreement with the references was not.

### B.    A POSA Would Have Replaced the ACEi in an ACEi/NEPi Combination with an ARB

### 1.    A POSA Would Have Replaced an ACEi with an ARB to Reduce Bradykinin Potentiation and the Occurrence of Angioedema

Novartis does not dispute that, by 2002, angioedema was a known side effect of ACE inhibitors but questions the relative incidence of angioedema with ACE inhibitors as compared to ARBs. P. Br. 8-9. However, as of 2002, ARBs were preferred to ACE inhibitors on this basis. D. Br. 8. Indeed, while Novartis supposes that "the prior art expressly cautioned against substituting an ARB for an ACE inhibitor in patients with angioedema," P. Br. 8, the 2001 HF Guidelines *expressly recommended* "[ARBs] in patients who … cannot be given an ACE inhibitor because

3

of cough or angioedema. (*Level of Evidence: A*).” JTX-366 at 3002; *see also* DFF 46. This undermines Novartis's argument that ARBs also can cause angioedema. P. Br. 8. Indeed, the 2001 Diovan (valsartan) label indicates that “reports of angioedema” are “rare.” PTX-189 at 2167. In contrast, angioedema was a determining factor in the withdrawal of the NDA for omapatrilat prior to the priority date. *See infra*. Thus, a POSA's knowledge of the reason ACE inhibitors caused angioedema was not required for the motivation to substitute an ARB for an ACEi.

Novartis, relying on Dr. Spinale, argues that the dual-acting ACEi-NEPi omapatrilat was viewed as a “promising new strategy” in 2002 and, apparently for that reason, a POSA would not have tried to replace an ACEi with an ARB. *See* P. Br. 8 (citing PFF 82 (quoting Tr. 311:12-25 (Spinale)). But Dr. Spinale was proven wrong. While he testified on direct that angioedema was identified as a problem with omapatrilat **after** 2002, Tr. 312:1-3, he admitted on cross that BMS withdrew its NDA for omapatrilat in 2000, i.e., **before** the priority date, and did so because of angioedema concerns. *Id.* at 380:19-381:15. Thus, Dr. Spinale's rebuttal of a POSA's motivation to replace ACEi activity in omapatrilat with ARB activity is undermined by his admission.

In the face of Cases's disclosure that omapatrilat had a greater incidence of angioedema than ACE inhibitors alone, DFF 25, Novartis relies on Weber, which it deems the “closest [data] to January 2002,” for the proposition that the frequency of angioedema in omapatrilat is similar to that in ACE inhibitors. P. Br. 8 (citing PFF 76, 83). The totality of the evidence belies Novartis's position. First, Weber does not provide any citation and does not purport to present any new data compared to Cases. JTX-197 at 1530. Second, while BMS withdrew omapatrilat's NDA due to angioedema, DFF 45, there is no evidence that any ACE inhibitors were similarly withdrawn, providing particular motivation for a POSA to replace an ACEi with an ARB when combining with a NEPi.

4

Finally, Novartis questions whether it was known that ACE inhibitors' potentiation of bradykinin was responsible for the angioedema. P. Br. 8-9. But Dr. Fintel, an experienced clinical cardiologist, opined that a POSA would have known that bradykinin potentiation leads to angioedema; this opinion is supported by the evidence. DFF 10, 37, 44-46. In fact, Dr. Spinale conceded that "[b]radykinin was certainly a potential candidate for the cause of angioedema." Tr. 313:15-16. And Dr. Spinale's own "factual support," the 2001 Weber reference, reads: "mediation by bradykinin has been suggested [as the cause of angioedema], and inhibition of ACE and of NEP can each produce increases in bradykinin." JTX-197 at 1530. Even if the role of bradykinin were "not known" with certainty, P. Br. 8-9, certainty is not the proper legal standard. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). The bradykinin involvement, supported by Dr. Spinale and Weber, provides further motivation for a POSA to use an ARB, in place of an ACEi, in order to lower the incidence of angioedema and potentiation of bradykinin. DFF 37, 44-46.

## 2. A POSA Would Have Pursued an ARB to Counter an Increase in Angiotensin II Levels Caused by the NEPi

The prior art suggested that combining an ARB and NEPi could unmask the benefits of the NEPi. *Contra* P. Br. 9. Dr. Fintel testified why Cleland would have motivated a POSA to combine an ARB (as opposed to an ACEi) with a NEPi. DFF 27-28. Citing Cleland, Novartis argues that "the prior art showed that NEP inhibition did not increase angiotensin II." P. Br. 9 (citing PFF 20). But Novartis ignores that the lack of increase in angiotensin II levels in Cleland resulted from the patients also taking an ACEi. DFF 28. Dr. Spinale admitted to this possibility. *Id.* Weber also supports this: "One reason why NEP inhibitors fail to lower blood pressure when used alone may be because inhibiting NEP without simultaneously inhibiting angiotensin II formation results in a pressor response." JTX-197 at 1526. Even Dr. Spinale acknowledged a "theoretical" "relationship between [an NEPi] and angiotensin II." Tr. 308:17-309:12. Certainty is not required. Based on

this, a POSA would have pursued an ARB-NEPi combination over an ACEi-NEPi. DFF 27, 50.

C.   **Defendants Did Not Rely on Hindsight**

1.   **Pursuing an ARB-NEPi Combination Is Not Hindsight**

Defendants do not argue that a POSA would have been motivated to combine an ARB and NEPi "just because" other combinations have been used. *Contra* P. Br. 10. Rather, combination treatment for heart failure and hypertension was standard, leading a POSA seeking improved treatments to pursue combination treatments generally. And the ARB-NEPi combination was disclosed by EP '072/Trippodo to have promising, synergistic results for treating hypertension and heart failure, leading a POSA to pursue the ARB-NEPi combination in particular. D. Br. 7. In addition, ACEi-NEPi combinations were disclosed, and a POSA would have been motivated to replace the ACEi with an ARB. *Id.* at 7-8. Defendants did not rely on hindsight, define the problem to be solved to be the claimed invention, or use "an ARB/NEP[i] combination as their starting point." P. Br. 12. Moreover, the number of classes of drugs for heart failure and hypertension is "finite" and "easily traversed," making it obvious to try an ARB-NEPi combination in view of the general motivation to pursue combination treatment. *See In re Cyclobenzaprine Hydrochloride Patent Litig.*, 676 F.3d 1063, 1072 (Fed. Cir. 2012) (citations omitted); Tr. 52:5-24 (Fintel).

The facts here are similar to *Nalpropion Pharms., Inc. v. Actavis Lab'ys FL, Inc.*, 934 F.3d 1344 (Fed. Cir. 2019), and *BTG Int'l Ltd. v. Amneal Pharms. LLC*, 923 F.3d 1063 (Fed. Cir. 2019), and distinguishable from *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*, 748 F.3d 1354 (Fed. Cir. 2014), the *only* case cited by Novartis where a claimed combination of prior-art drugs was held not obvious. *Nalpropion* and *BTG* illustrate that combining two preferred, prior-art drugs—here, valsartan and sacubitril—for their prior-art uses would have been obvious. D. Br. 2-3. *Sanofi* does not contradict this. *Contra* P. Br. 11. Rather, in *Sanofi*, the court held the jury could have reasonably relied on testimony that one of the drugs was not expected to be effective

6

for its proposed use. 748 F.3d at 1361. That is not the case here.

*Sanofi* is distinguishable in other ways. There, the court held the jury could have credited testimony that a POSA "would not have predicted the longer-lasting hypertension control demonstrated by" the claimed combination. *Id.* Here, EP '072/Trippodo disclosed an ARB-NEPi had synergistic effects. And, in *Sanofi*, defendants did not provide a reason to select the particular drugs from their classes. *Id.* at 1359. Here, valsartan and sacubitril were preferred in their classes.

Defendants do not proceed "piecemeal," P. Br. 12, but follow the logical path of obviousness in *BTG*, where the prior art combined prednisone and CYP17 inhibitor ketoconazole for prostate cancer, and it would have been obvious, as claimed, to replace the ketoconazole with the more-selective CYP17 inhibitor abiraterone. 923 F.3d at 1074-75. Here, EP '072/Trippodo discloses the ARB-NEPi combination, and it would have been obvious to replace the ARB (irbesartan) and NEPi (SQ 28,603) with the preferred ARB (valsartan) and NEPi (sacubitril).

## 2. Ksander Directed the POSA to Sacubitril Without Using Hindsight

Ksander disclosed sacubitrilat (for which sacubitril is a prodrug) as "the most active compound" for NEP inhibition. DFF 30, 54. Despite Dr. Spinale's testimony that a POSA need not study every compound in a class to conclude that a drug is interesting for further consideration, DFF 55, Novartis faults Ksander and Dr. Fintel for not comparing sacubitrilat to every prior-art NEPi. However, because Ksander's goal was "to identify novel NEP inhibitors with superior pharmacologic properties compared to NEP inhibitors already studied," a POSA would not have had to consider all of the NEP inhibitors predating Ksander, including EP '072/Trippodo's SQ 28,603, which was one of the "already studied" NEP inhibitors upon which Ksander was striving to improve. DFF 30, 54-55. And Novartis presents no later prior art that professes to improve upon Ksander's "most active compound," sacubitrilat. Ksander's preference toward sacubitrilat (compound 21a) and sacubitril itself (compound 19a) is further apparent from the paper's focus on

7

those compounds in the abstract and "Pharmacokinetic Profile" section, including Figures 1-5 and the concluding "summary paragraph." JTX-352 at 1693-95. This motivated a POSA to try sacubitril.

Moreover, Novartis misstates what Ksander did. Ksander did not simply compare sacubitrilat's potency to that of "two known NEP inhibitors," P. Br. 14, but presents potency data for 31 NEP inhibitors. DFF 30. Even if it were true that two other NEP inhibitors had similar potency to sacubitrilat, P. Br. 14, and ignoring Ksander's overall emphasis on sacubitrilat, that would leave only three NEP inhibitors, making each obvious to try. *See KSR*, 550 U.S. at 421.

Finally, although Novartis asserts, "[n]or did Dr. Fintel assert that potency for NEP inhibition would translate to biological activity," P. Br. 14, Novartis's cited finding of fact admits he testified Ksander's data made sacubitril a "very promising, very potent agent to combine with an ARB" to treat heart failure and hypertension. PFF 56. And Ksander stated that sacubitrilat's potency in *in vitro* assays was "predictive of functional potency *in vivo*." JTX-352 at 1693.

### 3.   A POSA Would Have Selected Valsartan Without Hindsight

Dr. Fintel testified that the Val-HeFT trial (Cohn 2001) generated "buzz among cardiologists at meetings and heart failure doctors that valsartan was an excellent drug to replace an ACE inhibitor for the treatment of congestive heart failure" and was used increasingly for heart failure by 2002. Tr. 74:21-75:5. Novartis mischaracterizes that trial as reinforcing "the importance of ACE inhibition," P. Br. 17, but it is valsartan that is the star, as reflected in the title and the conclusions. JTX-60, DFF 26. The fact that valsartan, and not another ARB, was evaluated in this large multicenter trial is a testament to valsartan's prominence among ARBs. Regardless, as of the priority date, there were only six FDA-approved ARBs, including EP '072/Trippodo's irbesartan. PTX-1017. It would have been obvious to try the five others, including valsartan, in EP '072/Trippodo's combination. *See KSR*, 550 U.S. at 421. But there was also a motivation

specifically to try valsartan based on its favorable potency, selectivity, and drug-interaction profile (CYP2C9) compared to other ARBs. D. Br. 8-9. *See BTG*, 923 F.3d at 1074-75 (obvious to replace a drug in a combination with a more selective drug from the same class). Novartis's response amounts to a suggestion that irbesartan was also a favorable ARB. P. Br. 15-16. That does not detract from a POSA's motivation to try valsartan as well. *See KSR*, 550 U.S. 421. With respect to valsartan's lower potential for drug-drug interactions, given that hypertensive patients were often on four or five drugs, any reduction in the potential for drug-drug interaction (e.g., lower "rate of interaction with [the human hepatic P450] drug-elimination enzymes") is beneficial. DFF 52; *contra* P. Br. 16.

### D.   Secondary Considerations Do Not Evidence Non-Obviousness

#### 1.   No Failure of Others or Abandonment

No economist is necessary to determine that the '578 patent, which claims valsartan and the use thereof to treat high blood pressure or heart failure, DFF 18, JTX-23 at claims 3 (claiming the valsartan compound) and 6 (claiming its use), blocked researchers from pursuing drug combinations having valsartan. With respect to EP '072, Novartis presented no evidence why BMS abandoned it, and Dr. Spinale "couldn't comment" on whether another company's ownership of the rights to irbesartan may have been a factor. DFF 73. With respect to Novartis's abandonment of the '996 patent, Novartis would have the evidence as to the reason and did not present it.

#### 2.   No Unexpected Results

Defendants explained the lack of unexpected results in their opening brief, including the disappointing LIFE trial, showing "no difference between sacubitril/valsartan and valsartan," and the PARAGON-HF trial, which failed to meet its primary endpoint, leading the FDA to reject Novartis's desired indication for Entresto naming HFpEF. D. Br. 14. Novartis tries to dodge these post-approval failures while relying on purported post-approval evidence of unexpected results. P.

Br. 23. But "patentability may consider all of the characteristics possessed by the claimed invention, whenever those characteristics become manifest." *Sanofi*, 748 F.3d at 1360.

Novartis insists its comparison to the ACEi enalapril satisfies its obligation to compare to the closest prior art. P. Br. 22. Not so. When Novartis compared Entresto to the closest prior art, valsartan (LIFE and PARAGON-HF trials), the results were negative for Entresto. D. Br. 14; DFF 65-68. Contrary to Novartis, the LIFE trial was not statistically underpowered with respect to its primary outcome, and the results were discouraging for Entresto. JTX-213 at 21, 23; DFF 65-66.

## II.     THE ASSERTED CLAIMS ARE NOT ENABLED

### A.     Claim Construction Frames the Enablement Inquiry

Novartis argues that claims should be interpreted differently for invalidity and infringement. But "[b]ecause the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

Claims are construed as they would be understood by a POSA as of the time of the invention in view of the intrinsic evidence. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). Here, during claim construction, Defendants argued that the claims should be limited to "combinations" of sacubitril and valsartan as separate components. Novartis disagreed and successfully urged the Court to hold that a POSA "would not read the claims as" limited to administration of separate components. D.I. 294 at 6. In other words, at Novartis's request, Judge Stark found that the claims' ordinary meaning to a POSA as of 2002 would include non-covalently bound complexes. Absent such a claim construction, Defendants' products could not infringe.

Now, faced with the fact that its claims cannot meet the enablement requirement based on the claim construction that it urged the court to adopt, Novartis argues that a POSA reading the claims in 2002 would not have "foreseen that a complex of valsartan and sacubitril was something

that could be explored or would even be possible to make." P. Br. 27; DFF 99. And Novartis argues that a POSA would not have had solid-state chemistry experience or knowledge of complexes, the only type of experience and knowledge that would have permitted a POSA even to endeavor to make and use the full claim scope. P. Br. 35-38. These arguments fly in the face of the Court's claim construction and the positions that Novartis took to obtain that construction. Novartis cannot now do an about face and state that for invalidity purposes, the POSA would never contemplate or envision non-covalently bound complexes as within the scope of the claims. *See Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1341 (Fed. Cir. 2003) ("[T]he law does not support … that the '236 patent is entitled to both a broad scope of coverage and a lower standard of enablement.").[3]

Thus, contrary to Novartis's suggestion, Defendants are not relying on hindsight; Defendants rely on the Court's claim construction, which frames the enablement question. The Federal Circuit has repeatedly held that where a patentee urges a broad construction, it must enable the full scope of the claims as construed. D. Br. 17-20 (discussing *Liebel-Flarsheim* and *Alza*), 23-27 (discussing *Plant Genetic*, *Chiron*, and *Trustees of Boston*).

Novartis attempts to distinguish the many cases requiring the full scope of claims be enabled on the basis that prior art in those cases expressly contemplated the non-enabled embodiments. P. Br. 33-35. But here, the prior art contemplated them as well. It is undisputed, and

---

[3] Moreover, as Novartis admits, a POSA is a hypothetical person presumed to be aware of all the pertinent art. P. Br. 35. In *Best Medical Int'l, Inc. v. Elekta Inc.*, to decide whether a POSA would have had computer programming experience, the Federal Circuit emphasized that the **claimed invention** was implemented on a computer. 46 F.4th 1346, 1353-54 (Fed. Cir. 2022). Novartis has not cited a single case stating that a POSA would not have knowledge of the "pertinent art" as defined by the claims. Because the Court has construed the claims to include complexes, a POSA would have had knowledge of "the types of problems encountered" in making such complexes and "prior art solutions to those problems." *Id.* at 1353. Thus, given the scope of the claims, a POSA would have had solid-state-chemistry experience.

Dr. Klibanov admitted, that non-covalent complexes, e.g., co-crystals, were known to a POSA before 2002. DFF. 84, 90, 95. Novartis also admits that Aakeröy, published in 1997, discussed non-covalently-bound co-crystals, including their application to pharmaceuticals, noting that it would be desirable to develop this field as several billion dollars are at stake. DFF 97.

Thus, Defendants' cases are directly on point. In each, the claims were construed (often at the patentee's express urging) to encompass embodiments that the patentee did not describe how to make and use without undue experimentation (and often where the patentee had expressly tried and failed to make the claimed embodiments), and were therefore found invalid on this basis.

### B.   The Portion of *Hogan* That Novartis Relies Upon Is Dicta

The portion of *Hogan* that Novartis relies upon is dicta—the Federal Circuit has described it as such. *Plant Genetic*, 315 F.3d at 1341. Novartis further cites *U.S. Steel*, a follow-on case addressing related applications to those at issue in *Hogan*. P. Br. 28, 30 (citing *U.S. Steel Corp. v. Phillips Petroleum Co.*, 865 F.2d 1247, 1249-52 (Fed. Cir. 1989)). While *Hogan* left unresolved an infringement-validity distinction, *U.S. Steel* does not address that distinction. Rather, *Hogan* dealt with crystalline and amorphous polymers, but the claim ultimately at issue in *U.S. Steel* recited "solid propylene … having a substantial crystalline propylene content." *U.S. Steel*, 865 F.2d at 1249. The court did not address whether the claim encompassed amorphous propylene.

*In Hogan*, the CCPA reversed because the Patent Office was not considering the prior applications in addressing enablement. 559 F.2d 595, 604-05 (CCPA 1977). But the CCPA left unresolved the question at issue here, noting that enablement revolves around "the more fundamental question: To what scope of protection is this applicant's particular contribution to the art entitled?" *Id.* at 606. It then continued with an extended discussion of pioneer inventions, which it "d[id] not reach" on appeal. *Id.* This dicta concludes with the PTO's concern that allowing the claim might lead to improper enforcement, noting that this concern is unwarranted because that is

the province of infringement, not patentability. *Id.* at 607. And district courts have the ability to construe claims as commensurate in scope with their disclosure. *See id.* at 606-07; *see also id.* at 609-11 (concurring in result). Thus, contrary to Novartis's suggestion, *Hogan* expressly refused to decide the issue of whether the claim scope could be broad enough to encompass amorphous propylene.

While the distinction remains unresolved by *Hogan* and *U.S. Steel*, Defendants' cases show that once a claim is construed, it must be enabled for its full scope:

> Having agreed that the cell claims encompass monocot cells, a later development, PGS' reliance on *Hogan* ignores the validity-infringement differentiation *Hogan* made. … We conclude that ***the law does not support PGS's assertion that the '236 patent is entitled to both a broad scope of coverage and a lower standard of enablement***.

*Plant Genetic Sys. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1341 (Fed. Cir. 2003) (emphasis added). This same issue was addressed in *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347 (Fed. Cir. 2000). There, the claims were directed to "leukocyte interferon," a term that indicated the source of the interferon, i.e., leukocytes. It was later discovered that this term did not accurately differentiate between species, and it was replaced with the term "IFN-α." 222 F.3d at 1352. The inventor subsequently amended his application to replace "leukocyte interferon" with "IFN-α."

The Federal Circuit determined that the patent should be interpreted as a POSA would have understood it at the time of filing. *Id.* at 1353. The new claim language merely renamed the invention with "whatever its scope may have been at the time of application. … This reasoning refocuses the question before this court on the scope of the claim term 'polypeptide of the IFN-α type' at the time of application. As already noted, this court interprets the claim at issue to cover no more than what the specification supported at the time of filing." *Id.* Thus, the Federal Circuit acknowledged that even though the meaning of "IFN-α" had evolved, that "could not enlarge the

scope of the patent to embrace technology arising after its filing. … Because, at the time of the '901 application, neither Dr. Weissmann nor others skilled in the art knew of the existence of, let alone the identity of, the specific polypeptides now identified as subtypes of IFN-α, those subtypes cannot be within the scope of the claims. … To grant broader coverage would reward Dr. Weissmann for inventions he did not make." *Id.* at 1353-54.

This case is no different. Novartis and its expert admit that a POSA would not even contemplate non-covalently bound complexes upon reading the '659 patent in 2002 and that such complexes "cannot possibly be enabled." Tr. at 419:3-420:2. But Novartis argued for a broad construction of the claims—one that included such complexes—to allege infringement. Novartis, having successfully done so, was required to show that its patent taught a POSA how to practice the full scope, in keeping with *Liebel, Alza, Chiron, Plant Genetic,* and *Trustees of Boston. See* D. Br. 17-20, 23-27.[4] Because it is undisputed that the specification does not teach how to make and use sac/val complexes without undue experimentation, the asserted claims are invalid.

## III.     THE ASSERTED CLAIMS LACK SUFFICIENT WRITTEN DESCRIPTION

Novartis ignores that the touchstone of written description is possession. As such, the written description inquiry here touches the issue above: does the '659 patent demonstrate that the inventors possessed merely combinations as separate components or a larger genus also encompassing non-covalently bound complexes? *Ariad Pharms. v. Eli Lilly & Co.*, 598 F.3d 1336, 1349 (Fed. Cir. 2010). Novartis presses that a POSA would not have contemplated in 2002 that the claims covered non-covalently bound complexes as part of a genus. Tr. 414:4-415:7; 417:4-

---

[4] *Merck* and *Regents of California* are district court decisions that cannot be used to overrule the Federal Circuit's precedent that a patentee must provide an enabling disclosure for the full scope of the claims. *See* P. Br. 33 (citing *Merck v. Mylan Pharm.*, 19-CV-101, 2002 U.S. Dist. LEXIS 195204 (N.D. W. Va. Sept. 21, 2022) and *Regents Univ. Cal. v. Dako N. Am.*, C 05-03955, 2009 WL 1083446 (N.D. Cal. Apr. 22, 2009)).

14, 419:12-420:2 (Klibanov). Novartis and Dr. Klibanov therefore admit that written description must be lacking. Novartis ignores that the features common to the members of the genus must enable a POSA to "'visualize or recognize' the members of the genus." *Ariad*, 598 F.3d at 1350. It is not enough to state that any combination of sac/val will be immediately recognizable because such a combination will have sacubitril and valsartan as common features. This might define the outer boundaries of the claim but it does not allow a POSA to visualize the members of the genus sufficient to show possession. *Id.* at 1349. ("[A] generic claim may define the boundaries of a vast genus …, and yet the question may still remain whether the specification … demonstrates that the applicant has invented species sufficient to support a claim to a genus."). Here, it is undisputed that the specification does not describe a single sac/val complex. DFF 121-122. Novartis's expert admits as much. DFF 121-122. This alone establishes lack of written description.

Novartis's view of written description is inconsistent with *Chiron*. There, the construction included both murine and chimeric antibodies. *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1252 (Fed. Cir. 2004). The Federal Circuit determined that the 1984 application lacked written description because Chiron did not (and could not) actually possess chimeric antibodies and, thus, could not describe chimeric antibodies at the time of filing. *Id.* at 1255. The Federal Circuit required written descriptions of both claimed species of antibodies (murine and chimeric). *See id.* Similarly, here, sac/val complexes were not in existence at filing, so written description is lacking.

Dated: January 13, 2023

15

Respectfully Submitted:

/s/ Stamatios Stamoulis
Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
STAMOULIS & WEINBLATT LLC
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com
weinblatt@swdelaw.com

Autumn Nero
PERKINS COIE LLP
33 East Main Street, Ste. 201
Madison, WI 53703-3095
(608) 663-7460
anero@perkinscoie.com

Bryan D. Beel
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, OR 97209
(503) 727-2000
bbeel@perkinscoie.com

Shannon M. Bloodworth
Christopher D. Jones
PERKINS COIE LLP
700 Thirteenth Street, NW, Ste. 800
Washington, DC 20005
(202) 654-6200
SBloodworth@perkinscoie.com
cdjones@perkinscoie.com

*Attorneys for Defendants Dr. Reddy's
Laboratories, Ltd. and Dr. Reddy's
Laboratories, Inc.*

/s/ Dominick T. Gattuso
Dominick T. Gattuso (#3630)
HEYMAN ENERIO GATTUSO & HIRZEL
LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

Scott A. Cunning, II
Elizabeth M. Crompton
PARKER POE ADAMS & BERNSTEIN,
LLP
1400 K Street, NW
Suite 1000
Washington, DC 20005
(202) 434-9100
scottcunning@parkerpoe.com
elizabethcrompton@parkerpoe.com

C. Kyle Musgrove
PARKER POE ADAMS & BERNSTEIN,
LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
(704) 372-9000
kylemusgrove@parkerpoe.com

*Attorneys for Defendant Crystal
Pharmaceutical (Suzhou) Co., Ltd.*

*/s/ Richard C. Weinblatt*
Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
STAMOULIS & WEINBLATT LLC
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com
weinblatt@swdelaw.com

DAIGNAULT IYER LLP
Ronald M. Daignault
Richard Juang
8200 Greensboro Drive, Suite 900
Mclean, VA 22102
rdaignault@daignaultiyer.com

*Attorneys for Defendants MSN*
*Pharmaceuticals Inc., MSN Laboratories*
*Private Limited, and MSN Life Sciences*
*Private Limited*

*/s/ Eve H. Ormerod*
Neal C. Belgam (#2721)
Eve H. Ormerod (#5369)
SMITH, KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

Dmitry V. Shelhoff
Kenneth S. Canfield
Edward D. Pergament
PERGAMENT & CEPEDA LLP
25A Hanover Road, Suite 104
Florham Park, NJ 07932
(973) 998-7722
dshelhoff@pergamentcepeda.com
kcanfield@pergamentcepeda.com
epergament@pergamentcepeda.com

*Attorneys for Defendants Hetero USA Inc.,*
*Hetero Labs Limited, Hetero Labs Limited*
*Unit III, Torrent Pharma Inc. and Torrent*
*Pharmaceuticals Ltd.*

*/s/ April M. Ferraro*
John M. Seaman (#3868)
April M. Ferraro (#6152)
ABRAMS & BAYLISS LLP
20 Montchanin Road
Suite 200
Wilmington, DE 19807
(302) 778-1000
seaman@abramsbayliss.com
ferraro@abramsbayliss.com

A. Neal Seth
Corey Weinstein
WILEY
2050 M St. NW
Washington, D.C. 20036
(202) 719-7000
nseth@wiley.law
cweinstein@wiley.law

17

*Attorneys for Defendants Macleods*
*Pharmaceuticals Ltd. and Macleods*
*Pharma USA, Inc.*