# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | ) ) ) ) | C.A. No. 20-2930-RGA ███████████████ |
| | | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) ) | REDACTED VERSION FILED: September 29, 2023 |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 21-1760-RGA |
| HETERO USA INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT III, | ) ) ) ) ) | ███████████████ |
| Defendants. | ) ) | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 21-1794-RGA ███████████████ |
| TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD., | ) ) ) | |
| Defendants. | ) ) | |

NOVARTIS PHARMACEUTICALS
CORPORATION,

    Plaintiff,

    v.

MYLAN PHARMACEUTICALS INC.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 22-451-RGA

 

**LETTER TO THE HONORABLE RICHARD G. ANDREWS FROM DANIEL M.
SILVER, ESQ. REGARDING NOVARTIS'S DISCOVERY MOTION TO STRIKE NEW
THEORIES INTRODUCED BY DEFENDANTS IN THE OPENING EXPERT REPORT
OF DAN FINTEL, M.D. ON THE INVALIDITY OF U.S. PATENT NO. 11,058,667**

Dear Judge Andrews:

We write on behalf of Plaintiff Novartis Pharmaceuticals Corporation ("Novartis") regarding Defendants' attempt to introduce new invalidity theories after the close of fact discovery and the deadline for final invalidity contentions. Defendants' untimely theories are based on a clinical trial consent form from the Minneapolis VA Medical Center ("VA Consent Form") and three clinical trial patients identified by the codes ████████████, ████████████, and ████████████ ("Trial Patients"). Novartis respectfully requests the Court strike and preclude Defendants' reliance on the portions of Defendants' Opening Expert Report of Dan Fintel, M.D. (Exh. A) that set forth these untimely theories. Defendants refused to voluntarily withdraw their new theories. (*See* Exh. B, pp. 3-4).[1]

## I.    BACKGROUND

The above-captioned actions involve Entresto® and U.S. Patent No. 11,058,667 ("the '667 patent"), and they are consolidated into the multi-district litigation C.A. No. 20-md-2930-RGA for pretrial proceedings. Fact discovery closed June 16th, 2023. Scheduling Order, C.A. No. 20-2930 (D.I. 749), ¶ 4(a). Defendants had to serve final invalidity contentions and provide all invalidity references by May 19th. *Id.*, ¶ 12. Defendants did not seek an extension of that deadline.

There are two new categories of alleged prior art that are the centerpiece of Defendants' new invalidity theories: the (1) VA Consent Form and (2) three Trial Patients. The VA Consent Form (of which there are three versions) is an informed consent form purportedly used by one site in Novartis's TITRATION clinical trial. The Trial Patients are three patients enrolled in that trial referenced in Novartis internal documents.[2] Defendants' May 19th Final Invalidity Contentions (Exh. C), did not mention the VA Consent Form or Trial Patients, much less as prior art or a basis for anticipation or obviousness, even though Defendants have been in possession of the documents they now rely on for these arguments since January 2023. Novartis thus was surprised when Defendants' July 28th Opening Expert Report asserted that this alleged prior art anticipates and/or renders obvious the '667 patent claims. Defendants now assert the VA Consent Form and three Trial Patients constitute "prior art public use[s] … described by internal Novartis documents." (Exh. A, pp. 34–35, ¶¶ 158, 174–178). Defendants also instructed their expert to analyze the VA Consent Form as an alleged printed publication. (*Id.*, ¶¶ 158–164).

---

[1] Two weeks after the parties' meet and confer and in connection with a different discovery dispute, Defendants asserted that Novartis waived its complaint because it waited 3 weeks (instead of 1 week) to request withdrawal of the new theories. (Exh. B, p. 1). During those 3 weeks, Novartis was reviewing and deconstructing Defendants' 154-page expert report (raising almost 30 invalidity defenses, styled as 12 defenses with multiple sub-defenses via use of "alone or in view of," "optionally further in view of," "and/or") and comparing it to Defendants' invalidity contentions and the parties' fact discovery disclosures. Novartis notified Defendants promptly of its complaint. Defendants failed to raise any objection to the timing of Novartis's complaint as part of the meet and confer process, and in any event have not been prejudiced.

[2] Defendants include the Trial Patients under the umbrella of what they term "NCT'089 Prior Use." "NCT'089" is based on the clinicaltrials.gov designation for the TITRATION clinical trial; it is not how Novartis (or its internal documents) identified the trial. (*See* Exh. C, pp. 54, 56).

## II.      DEFENDANTS VIOLATED RULE 26(a) AND THE SCHEDULING ORDER

Contentions are initial disclosures under Rule 26(a), and failure to disclose information required by Rule 26(a) may lead to its exclusion under Rule 37(c)(1). *See Chervon (HK) Ltd. v. One World Techs., Inc.*, C.A. No. 19-1293, 2023 WL 2372938, at *1 (D. Del. Mar. 6, 2023). Defendants' failure to disclose their new theories was not justified or harmless, and exclusion is warranted under either the *Pennypack* factors, *see id.* at *1, or good cause standard, *id.* at *3 n.3; *see also Faiella v. Sunbelt Rentals, Inc.*, 341 F.R.D. 553, 560 (D.N.J. 2022) ("[W]hen a party does not first obtain an extension of time to complete discovery, and instead … produces discovery in disregard of a scheduling order, the party must be held to the … good cause standard of Rule 16.").

**Prejudice, Ability to Cure, and Disruption:** Defendants' late disclosures foreclose Novartis from conducting its own investigation into the prior art status of the VA Consent Form and the Trial Patients (*e.g.*, confidentiality restrictions on and control over the patients) or developing independent facts to challenge Defendants' allegation that the VA Consent Form is a printed publication (*e.g.*, whether and to what extent the document was disseminated, and if so, to whom; whether the contents were considered confidential by the Minneapolis VA, patients, or any other potential recipients; whether and how an interested party could obtain the document). Given these fact-intensive inquiries—many of which would originate from fact witnesses, not experts opining from the perspective of a POSA—a rebuttal expert report does not cure Novartis's prejudice. *See Finjan, Inc. v. Rapid7 Inc.*, C.A. No. 18-1519, 2020 WL 5798545, at *3 (D. Del. Sept. 29, 2020) ("[A] party in this position is faced with 'two bad options: either scramble to have an expert respond ... or offer no response and risk not preserving an opinion for trial if the Motion to Strike is denied.'").

Defendants asserted during the parties' meet and confer that Novartis was on notice of Defendants' defenses, because Defendants identified public use (generally) in their contentions, identified the VA Consent Form in discovery correspondence, and elicited testimony on the VA Consent Form and the Trial Patients from two Novartis fact witnesses. Yet the public use defense in Defendants' Final Invalidity Contentions relied on public documents (*see* Exh. C, pp. 52, 54, 56, 64–65, identifying clinicaltrials.gov printouts and a McMurray journal article), not documents from Novartis's internal files or any specific study patients. Defendants' correspondence and fact depositions did not disclose their intent to rely on the VA Consent Form as alleged prior art or the three Trial Patients (or any individual patient) as an alleged public use.

As to depositions, while Defendants listed the VA Consent Form among several documents on which Defendants would seek testimony, Defendants represented only that it was a relevant clinical trial agreement, not that it was alleged prior art itself. (Exh. D, p. 5). Depositions are fact discovery devices that cover a range of topics, and Novartis had no reason to believe that Defendants' limited questions raised new invalidity theories to be illuminated only in their expert report. And Defendants never mentioned in contentions, at deposition, or in correspondence one of the three Trial Patients they now rely on ▮▮▮▮▮▮▮▮▮▮, or two of the four internal documents upon which their Trial Patients argument is based ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* Exh. A, p. 73)). Even if Novartis was generally aware of the Trial Patients and VA Consent Form, that does not excuse Defendants' failure to disclose their intent to rely on them as prior art that allegedly anticipates and/or renders obvious the '667 patent

claims. *Praxair Inc. v. ATMI, Inc.*, C.A. No. 03-1158, 2005 WL 3159054, at *4 (D. Del. Nov. 28, 2005) (party must disclose prior art and intent to rely thereon even if "the opposing party is aware of the reference"); *see also Takeda Pharm. Co. v. TWi Pharms., Inc.*, C.A. No. 13-2420, 2015 WL 1227817, at *5 n.3 (N.D. Cal. Mar. 17, 2015) (if party discovered supporting evidence through late discovery, it should have moved to supplement its contentions).

**Bad Faith/Willfulness:** Novartis produced the VA Consent Form and clinical trial data for the Trial Patients in January 2023 (Exh. E), and thus Defendants knew of those documents well before the May 19, 2023 deadline to serve final contentions. Instead of providing any reason for failing to disclose their new theories earlier, Defendants blamed Novartis for not agreeing to extend the deadline for final contentions and for being reluctant to produce fact witnesses. Not so. First, Defendants never asked for an extension for their '667 patent invalidity contentions.[3] And given Defendants' inaction, it was reasonable for Novartis to assume Defendants would not raise new theories after invalidity contentions were due based on documents and information produced months ahead of depositions. Second, it was Defendants who waited until two weeks before the due date for final contentions to notice depositions (*e.g.*, Exhs. F and G),[4] and it was Defendants who requested and/or accepted deposition dates on and after the close of fact discovery. Thus, Defendants must accept the consequences of their belated fact discovery strategy. At bottom, if Defendants had wanted to pursue these new theories, they should have included them in their final contentions, thus putting Novartis on timely notice of the potential additional defenses. Instead, Defendants did not disclose these theories, and never supplemented their contentions at any time prior to the service of their opening expert reports. This is willful misconduct, if not bad faith.

**Importance of the Evidence to Defendants:** Defendants' new invalidity theories are not important to their case. When confronted with their failure to disclose, Defendants asserted that "[a]ll major prior art ha[d] been identified" in their final contentions (Exh. B, p. 5), implicitly admitting that the Trial Patients and VA Consent Form are not important. Defendants would retain the majority of their invalidity defenses if the Court strikes the new theories. *See Chervon*, at *2.

Thus, the *Pennypack* factors favor striking Defendants' new invalidity theories. *See Bridgestone Sports Co. v. Acushnet Co.*, C.A. No. 05-132, 2007 WL 521894, at *4 (D. Del., Feb. 15, 2007) (In "sophisticated, complex litigation involving parties represented by competent counsel[, Courts] have been ... more willing to exclude evidence without a strict showing" of each *Pennypack* factor). For the same reasons, Defendants lack good cause for ignoring the Scheduling Order's invalidity contention deadline. *Faiella*, 341 F.R.D. at 560; *Chervon*, at *3 n.3.

---

[3] During the parties' meet and confer, Defendants asserted they asked for an extension. But Defendants requested and Novartis agreed to such a request only in a parallel litigation (C.A. No. 21-1330) on a different patent (the '918 patent). (Exh. H).

[4] On May 17th, Novartis offered June 7th for Mr. Rizkala's deposition; on May 30th, Defendants declined that date and proposed June 12-23. (Exh. I, pp. 1, 5). On June 2nd, Defendants narrowed Topics 19 and 22 for their Rule 30(b)(6) deposition of Novartis. (Exh. D, p. 5). On June 12th, Novartis identified Ms. Twisk for those topics (Exh. J, p. 4), and on June 15th, offered June 30th for her deposition, which Defendants accepted on June 20th (Exh. K, pp. 1, 3). The parties agreed to treat this deposition as if it occurred during fact discovery. These timelines do not evidence any reluctance on Novartis's part, and Defendants never previously complained about the dates.

Page 4
September 18, 2023

Respectfully submitted,

*/s/ Daniel M. Silver*

Daniel M. Silver, Esq. (#4758)


cc: Counsel of Record for Hetero, Torrent, and Mylan (via E-Mail)

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | C.A. No. 20-md-2930-RGA<br><br>**Highly Confidential -**<br>**Outside Attorneys' Eyes Only** |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>HETERO USA INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT III,<br><br>Defendants. | C.A. No. 21-1760-RGA<br><br>**Highly Confidential -**<br>**Outside Attorneys' Eyes Only** |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MYLAN PHARMACEUTICALS INC.,<br><br>Defendant. | C.A. No. 22-451-RGA<br><br>**Highly Confidential -**<br>**Outside Attorneys' Eyes Only** |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD.,<br><br>Defendants. | C.A. No. 21-1794-RGA<br><br>**Highly Confidential -**<br>**Outside Attorneys' Eyes Only** |

**OPENING EXPERT REPORT OF DAN FINTEL, M.D.**
**ON THE INVALIDITY OF U.S. PATENT NO. 11,058,667**

**TABLE OF CONTENTS**

I.      Introduction ................................................................................................................... 1

II.     Background, Experience, and Qualifications .............................................................. 2

III.    Materials Considered .................................................................................................... 6

IV.     Summary of Opinions ................................................................................................... 6

V.      Legal Understandings ................................................................................................... 7

        A.      Anticipation ........................................................................................................ 8

        B.      Obviousness ........................................................................................................ 8

        C.      Prior Art Patents and Publications .................................................................... 9

        D.      Prior Use as Prior Art ........................................................................................ 9

        E.      Other Prior Art ................................................................................................. 10

VI.     Claim Constructions ................................................................................................... 10

VII.    Technical Background ................................................................................................. 11

        A.      Terminology ..................................................................................................... 11

        B.      Technical Background ...................................................................................... 13

VIII.   The '667 Patent ........................................................................................................... 19

        A.      667 Patent Claims ............................................................................................ 19

        B.      Comments on Certain Claim Elements ............................................................ 22

                1.      Titration periods .................................................................................... 22

                2.      Naïve/Low-Dose of ACEI/ARB .............................................................. 23

                3.      BNP/NT-NBP Levels .............................................................................. 25

                4.      LVEF Level ............................................................................................ 25

                5.      Treating HFrEF ..................................................................................... 25

IX.     Level of Ordinary Skill in the Art ............................................................................ 26

X.      Scope and Content of the Prior Art .......................................................................... 28

        A.      Identification of Prior Art ................................................................................ 28

                1.      Patent Literature ................................................................................... 29

                2.      Non-Patent Literature ........................................................................... 29

3. Prior Uses .................................................................................................35

B. Brief Description of Prior Art Patents, Prior Art Publications, and Publications that Evidence Prior Public Uses .................................................................35

1. '659 Patent .............................................................................................36

2. ACCF/AHA Guideline ...........................................................................36

3. Cohn ........................................................................................................41

4. Desai ........................................................................................................41

5. Dickstein .................................................................................................42

6. Diovan Label ..........................................................................................43

7. Dungen ....................................................................................................44

8. FDA IND Guidance ...............................................................................44

9. First Report Managed Care ..................................................................46

10. Flack .......................................................................................................46

11. Gu ...........................................................................................................47

12. Jandeleit-Dahm .....................................................................................49

13. Jessup .....................................................................................................49

14. Konstam .................................................................................................49

15. Krum .......................................................................................................51

16. McMurray 2013 ......................................................................................52

17. McMurray 2014 ......................................................................................55

18. McMurray 2016 ......................................................................................56

19. Medscape Interview ..............................................................................57

20. Minguet ..................................................................................................57

21. NCT'089 Pub. 2013 ...............................................................................58

22. NCT'089 Pub. 2015 ...............................................................................60

23. NCT'588 Pub. 2013 ...............................................................................61

24. O'Meara ..................................................................................................61

25. Schumacher ...........................................................................................62

26. Solomon ..................................................................................................64

27. Swedberg ................................................................................................66

28. VA Consent Form ..................................................................................66

29. Vardeny ..................................................................................................69

30. Vasotec Label .........................................................................................70

ii

31.    Voors ............................................................................71

C.    Brief Description of Prior Public Use – TITRATION Trial ....................................72

1.    ████████████████ ...............................................73

2.    Open-Label Patients ..............................................................74

3.    Not Experimental ..................................................................75

D.    Brief Summary of Prior Art ..............................................................87

1.    The Administration of LCZ696 in Patients with Chronic HFrEF at a Target Dose of 200 mg bid Was Already Known ......................................87

2.    Conservative Uptitrating Was Well Known and the Prior Art Discloses Titration Regimen Starting with a Low Dose of LCZ696 and Uptitrating to Reach the Target Dose Over a Period of Time to Avoid Adverse Effects ............................................................89

3.    The Prior Art Taught Conservative Uptitration for the Administration of LCZ696 in Patient Populations Not Taking an ACEI/ARB or Taking an ACEI/ARB Equivalent to ≤10 mg/day Enalapril (and Other Patient Population Characteristics) .........................................................93

4.    The Prior Art Fails to Support the Patentee's Claim of "Surprising/Unexpected" Treatment Success ..........................................95

XI.    Claims 1-19 of the '667 Patent Would Have Been Anticipated or Obvious Over the Prior Art .............................................................................................98

A.    Claims 1 and 7 of the '667 Patent Are Anticipated by or Obvious Over, Either NCT'089 Pub. 2013 or NCT'089 Prior Use .........................................99

1.    Independent Claims 1 and 7 ....................................................101

B.    Claims 2, 3, 6, 8, and 11-19 of the '667 Patent Are Anticipated by and/or Obvious Over Either NCT'089 Pub. 2013 or NCT'089 Prior Use .....................105

1.    Claims 2 and 8 (Anticipated or Obvious) ...................................105

2.    Claims 6 and 11 (Anticipated or Obvious) .................................106

3.    Claims 3 and 12 (Anticipated or Obvious by NCT'089 Prior Use) .........106

4.    Claims 13 and 15 (Anticipated or Obvious) ...............................107

5.    Claims 14 and 16 (Obvious) ...................................................108

6.    Claim 17 (Anticipated or Obvious) ..........................................109

7.    Claims 18 and 19 (Anticipated or Obvious) ...............................109

C.    Claims 1-3, 6-8, 11, 12, and 17-19 Are Anticipated by VA Consent Form ........111

1.    Independent Claim 1 ............................................................111

2.    Independent Claim 7 ............................................................114

3.    Claims 2 and 8 ....................................................................114

iii

4.      Claims 3 and 12 ...................................................................115

5.      Claims 6 and 11 ...................................................................115

6.      Claim 17 ...............................................................................116

7.      Claims 18 and 19 .................................................................116

D.    Claims 4-5, 9-10, and 13-16 Would Have Been Obvious Over VA Consent Form Alone or in View of McMurray 2013 and/or NPC'089 Pub. 2013 ....................116

1.      Claims 4-5 and 9-10 Would Have Been Obvious Over VA Consent Form in View of McMurray 2013 ...........................................117

2.      Claims 13-16 Would Have Been Obvious Over VA Consent Form Optionally in View of NCT'089 Pub. 2013 ...........................117

E.    Claims 1-3, 6-8, 11-13, 15, and 17-19 Are Anticipated by NCT'089 Prior Use, ██████████████████ ...................................................119

1.      Independent Claim 1 .............................................................119

2.      Independent Claim 7 .............................................................121

3.      Claims 2 and 8 .....................................................................122

4.      Claims 3 and 12 ...................................................................122

5.      Claims 13 and 15 .................................................................123

6.      Claims 6 and 11 ...................................................................123

7.      Claim 17 ...............................................................................123

8.      Claims 18 and 19 .................................................................123

F.    Claims 4-5, 9-10, 14, and 16 Would Have Been Obvious Over NCT'089 Prior Use, ████████████████ Alone or in View of McMurray 2013 ...............124

G.    Claims 1-3, 6-8, 11-16, and 17-19 Are Anticipated by Open Label Patients ██████████████ and/or ██████████████ ...................................................124

1.      Independent Claim 1 .............................................................124

2.      Independent Claim 7 .............................................................128

3.      Claims 2 and 8 .....................................................................128

4.      Claims 3 and 12 ...................................................................129

5.      Claims 13 and 15 .................................................................129

6.      Claims 14 and 16 .................................................................130

7.      Claims 6 and 11 ...................................................................130

8.      Claim 17 ...............................................................................130

9.      Claims 18 and 19 .................................................................131

H.    Claims 3, 4-5, 9-10, and 12 Would Have Been Obvious Over NCT'089 Prior Use, Open-Label Patients Alone or in View of McMurray 2013 .......................131

iv

1.  Claims 3 and 12 Would Have Been Obvious Over NCT'089 Prior Use, Open-Label Patients.................................................................131

2.  Claims 4-5 and 9-10 Would Have Been Obvious Over NCT'089 Prior Use, Open-Label Patients in View of McMurray 2013 ..........................132

I.  Claims 4-6 and 9-11 Are Obvious Over NCT'089 Pub. 2013 or NCT'089 Prior Use, Optionally in View of McMurray 2013 ......................................132

J.  Claims 1 and 7 Are Obvious Over NCT'089 Pub. 2013 or NCT'089 Prior Use in View of McMurray 2013 .................................................................135

K.  Claims 1 and 7 Are Obvious Over Schumacher in View of McMurray 2013 and/or Konstam and, Optionally, Further in View of Dickstein and/or Dungen.139

L.  Dependent Claims 2-6 and 8-19 Are Invalid as Obvious Over Schumacher in View of McMurray 2013 and/or Konstam, and Optionally Further in View of Dickstein, Dungen, or Minguet.............................................................146

   1.  Claims 2 and 8 ...................................................................146

   2.  Claims 3 and 12 .................................................................147

   3.  Claims 4-6 and 9-11.............................................................147

   4.  Claims 13 and 15 ................................................................149

   5.  Claims 14 and 16 ................................................................149

   6.  Claim 17..........................................................................150

   7.  Claims 18 and 19 ................................................................151

M.  No Secondary Considerations Support Non-Obviousness of the '667 Patent.....151

   1.  Treatment Success Due to Gradual Uptitration Periods and Administering to ARB/ACEI Naïve/Low Dose Patients is Not Unexpected ......................................................................151

XII.  Conclusion ...................................................................................154

## I.     **INTRODUCTION**

1.     I, Dan James Fintel, M.D., and Academic Legal Consulting, LLC, have been retained by certain defendants[1] in the above-captioned litigation to provide opinions relating to U.S. Patent No. 11,058,667 ("the '667 patent") asserted in this litigation against defendants. In particular, for the purposes of this report, I have been asked to:

      a.     describe the technical background of the field of art of the '667 patent;

      b.     provide my opinion as to the level of skill of a person of ordinary skill in the art ("POSA") of the '667 patent;

      c.     summarize prior art to the '667 patent;

      d.     provide my opinion as to anticipation, i.e., whether a single prior art reference discloses all elements of any asserted claims expressly and/or inherently to a POSA as arranged in the claim;

      e.     provide my opinion as to obviousness, i.e., whether a POSA would have found any asserted claims of the '667 patent obvious over the prior art; and

      f.     provide my opinion as to the lack of unexpected results of the claimed embodiments of the '667 patent.

I understand that I may be asked to reply to any response to my opinions from any expert who may submit a report on behalf of plaintiff Novartis Pharmaceuticals Corp. ("Novartis").

2.     I am currently a Professor of Medicine at the Feinberg School of Medicine, Northwestern University, and an Attending Physician at the Northwestern Memorial Hospital.

3.     Academic Legal Consulting is being compensated for my time at my usual rate of $ 750.00 per hour for working time and $ 450.00 per hour for non-working travel time to/from depositions or trial, of which I receive the full amounts. My compensation does not depend in any way on the substance of this report, any other report I submit in this litigation, any testimony I

---

[1] Hetero USA Inc., Hetero Labs Limited, and Hetero Labs Limited Unit III (collectively, "Hetero"); Mylan Pharmaceuticals Inc. ("Mylan"); and Torrent Pharma Inc. and Torrent Pharmaceuticals Ltd. (collectively, "Torrent"). When I refer to "defendants" in this report, I am referring to these defendants.

residents and fellows at Northwestern University and other institutions in Chicago, and faculty members at Northwestern University.

18.     Based on my background, experience, and qualifications, I consider myself to be an expert in cardiology, including heart failure and hypertension, and including treatments for heart failure and hypertension, and I was such an expert in May 2015 (and earlier).

19.     A listing of my prior testimony at deposition or trial appears in Exhibit 2. I note that I submitted expert reports and testified at deposition and trial earlier in C.A. No. 20-md-2930-RGA captioned above relating to Novartis's U.S. Patent No. 8,101,659 and ANDAs filed by Torrent, Hetero, and other parties. My expert reports and deposition testimony, but not my trial testimony, was also on behalf of Mylan.

## III.    MATERIALS CONSIDERED

20.     I have considered the materials cited in this report, including the '667 patent, and the prior art identified in Section X.A below, as well as the materials listed in Exhibit 3 hereto.

## IV.    SUMMARY OF OPINIONS

21.     In addition to my discussions of technical background (§ VII), level of skill of a POSA (§ IX), and scope and content of the prior art (§ X) below, in my opinion, the asserted claims of the '667 patent are invalid for the following reasons:

    a.    the asserted claims of the '667 patent would have been anticipated by or, obvious over, the prior art (as defined below), including the following prior art/combinations (§ XI):

        i.    NCT'089 Pub. 2013: anticipates or renders obvious claims 1, 2, 6-8, 11, 13, 15, 17-19; renders obvious claims 14, 16 (§ XI.A-B);

        ii.   NCT'089 Prior Use (based on public documents): anticipates or renders obvious claims 1-3, 6-8, 11-13, 15, 17-19; renders obvious claims 14 and 16 (§ XI.A-B);

        iii.  VA Consent Form: anticipates claims 1-3, 6-8, 11, 12, 17-19 (§ XI.C); renders obvious claims 13-16 (§ XI.D.2);VA Consent Form in view of McMurray 2013: renders obvious claims 4-5, 9-10 (§ XI.D.1);

6

iv.     VA Consent Form in view of NCT'089 Pub. 2013: renders obvious claims 13-16 (§ XI.D.2);

v.      NCT'089 Prior Use, Patient USA/1100/00003: anticipates claims 1-3, 6-8, 11-13, 15, 17-19 (§ XI.E); renders obvious claims 14, 16 (§ XI.F);

vi.     NCT'089 Prior Use, Patient USA/1100/00003 in view of McMurray 2013: renders obvious claims 4-5, 9-10 (§ XI.F);

vii.    NCT'089 Prior Use, Open Label Patients: anticipates claims 1-3, 6-8, 11-16, 17-19 (§ XI.G); renders obvious claims 3, 12 (§ XI.H.1);

viii.   NCT'089 Prior Use, Open Label Patients in view of McMurray 2013: renders obvious claims 4-5, 9-10 (§ XI.H.2);

ix.     NCT'089 Pub. 2013 or NCT'089 Prior Use (based on public documents) optionally in view of McMurray 2013: claims 4-6, 9-11 (§ XI.I)

x.      NCT'089 Pub. 2013 or NCT'089 Prior Use (based on public documents) in view of McMurray 2013: claims 1, 7 (§ XI.J); and

xi.     Schumacher in view of (McMurray 2013 and/or Konstam) and, optionally, further in view of (Dickstein and/or Dungen) or Minguet: claims 1-19 (§XI.K-L);

where (1) for obviousness, I also rely on the general knowledge of a POSA, and (2) any reference that anticipates a particular claim also renders that claim obvious; and

b.      there are no unexpected results of the claimed embodiments of the '667 patent (§ XI.M).

## V.     <u>LEGAL UNDERSTANDINGS</u>

22.     Counsel for defendants has informed me of certain legal principles that I apply in this report. In this section, I summarize my understanding of those principles.

23.     I have been informed that defendants bear the burden of proving invalidity by clear and convincing evidence. I have been told that this means the Court must be left with a clear conviction that the claims are invalid.

24.     I was also informed that the question of whether the claims of a patent are invalid is to be considered from the perspective of the POSA at the time the alleged invention was made. Thus, in this report, unless stated otherwise, I opine from the perspective of a POSA at the time

### 1. Patent Literature

80. The following table identifies issued patents and published patent applications. The last column contains the issue date for issued patents and the publication date for the published applications. All of these references issued/published prior to May 11, 2014.

| Abbreviation | Patent/Publication No. | Location | Issue/Publication Date |
|---|---|---|---|
| '659 patent | 8,101,659 | US | January 24, 2012 |
| Schumacher et al. | WO 2014/029848 A1 | Worldwide | February 27, 2014 |
| Feng et al. | WO2007/056546 A1 | Worldwide | May 18, 2007 |
| Al-Fayoumi et al. | WO2009/061713 A1 | Worldwide | May 14, 2009 |

### 2. Non-Patent Literature

81. The following table identifies non-patent references. All of these references are (1) prior art themselves because they either published prior to May 11, 2014, or published between May 11, 2014 and May 11, 2015, and describe work other than that of the named inventors of the '667 patent not previously published by the named inventors; or (2) describe a public prior use that occurred prior to May 11, 2014.

| Abbreviation | Title | Publication Date | Author(s) | Publisher/Source |
|---|---|---|---|---|
| ACCF/AHA Guideline | 2013 ACCF/AHA Guideline for the Management of Heart Failure: A Report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines | 2013 | Yancy et al. | 128 *Circulation* e240 (2013) |

| Abbreviation | Title | Publication Date | Author(s) | Publisher/Source |
|---|---|---|---|---|
| Cohn | A Randomized Trial of the Angiotensin-Receptor Blocker Valsartan in Chronic Heart Failure | Dec. 2001 | Cohn et al. | 345(23) *N. Eng. J. Med.* 1167 (2001) |
| Desai | Incidence and Predictors of Hyperkalemia in Patients with Heart Failure | 2007 | Desai et al. | 50(20) *J. of American College of Cardiology* 1959 (2007) |
| Dickstein | ESC Guidelines for the Diagnosis and Treatment of Acute and Chronic Heart Failure 2008 | 2008 | Dickstein et al. | 29 *European J. of Heart Failure* 2388 (2008) |
| Diovan label | DIOVAN® (valsartan) capsules prescribing information | March 2014 | | FDA[3] |
| Dungen | Titration to Target Dose of Bisoprolol vs. Carvedilol in Elderly Patients With Heart Failure: The CIBIS-ELD Trial | 2011 | Dungen et al. | 13 *European J. of Heart Failure* 670 (2011) |
| FDA IND Guidance | Good Review Practice: Clinical Review of Investigational New Drug Applications | 2013 | U.S. Food & Drug Administration | |
| First Report Managed Care | Literature Review: Heart Failure | April 2015 | | 12(4) *First Report Managed Care* |

---

[3]  available at
https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/020665s034s035lbl.pdf

| Abbreviation | Title | Publication Date | Author(s) | Publisher/Source |
|---|---|---|---|---|
| Flack | The Rapidity of Drug Dose Escalation Influences Blood Pressure Response and Adverse Effects Burden in Patients With Hypertension | 2000 | Flack et al. | 160 *Arch. Int. Med.* 1842 (2000) |
| Gu | Pharmacokinetics and Pharmacodynamics of LCZ696, a Novel Dual-Acting Angiotensin Receptor-Neprilysin Inhibitor (ARNi) | 2009 | Gu et al. | 50 *J. Clin. Pharmacol.* 401 (2010) |
| Jandeleit-Dahm | Dual ACE/NEP Inhibitors – More Than Playing the ACE Card | 2006 | Jandeleit-Dahm et al. | 20 *J. Human Hypertension* 478 (2006) |
| Jessup | Neprilysin Inhibition – A Novel Therapy for Heart Failure | 2014 | Jessup | 371(11) *N. Engl. J. Med.* 1062 (2014) |
| Konstam | Effects of High-Dose Versus Low-Dose Losartan on Clinical Outcomes in Patients With Heart Failure (HEAAL Study): A Randomized, Double-Blind Trial | 2009 | Konstam et al. | 374 *The Lancet* 1840 (2009) |

31

| Abbreviation | Title | Publication Date | Author(s) | Publisher/Source |
|---|---|---|---|---|
| Krum | Prospective Comparison of ARNi with ACE-I to Determine Impact on Global Mortality and Morbidity in Heart Failure (PARADIGM-HF), Paragon of a Study or Further Investigation Paramount? | Jan. 2015 | Krum | 131 *Circulation* 1 (2015) |
| McMurray 2013 | Dual Angiotensin Receptor and Neprilysin Inhibition as an Alternative to Angiotensin Converting Enzyme Inhibition in Patients With Chronic Systolic Heart Failure: Rationale for and Design of the Prospective Comparison of ARNI with ACEI to Determine Impact on Global Mortality and Morbidity in Heart Failure trial (PARADIGM-HF) | 2013 | McMurray et al. | 15 *Eur. J. Heart Failure* 1062 (2013) |
| McMurray 2014 | Angiotensin-Neprilysin Inhibition Versus Enalapril in Heart Failure | 2014 | McMurray et al. | 371(11) *N. Eng. J. Med.* 993 (2014) |

| Abbreviation | Title | Publication Date | Author(s) | Publisher/Source |
|---|---|---|---|---|
| McMurray 2016 | Initiating Sacubitril / Valsartan (LCZ696) in Heart Failure: Results of TITRATION, a Double-Blind, Randomized Comparison of Two Uptitration Regimens | 2016 (not itself prior art, but describes (NCT'089 Prior Use)[4] | Senni et al. | 18 *European Journal of Heart Failure* 1193 (2016) |
| Medscape Interview | An Interview with PARADIGM HF PI, John McMurray | Jan. 2015 | Piña et al. | *Medscape,* available at www.medscape.com/ viewarticle/838396 _print |
| Minguet | LCZ696: A New Paradigm for the Treatment of Heart Failure? | Jan. 2015 | Minguet et al. | 16(3) *Expert Opinion* 435 (2015) |
| NCT'089 Pub. 2013 | Nov. 20, 2013 NCT01922089 publication | 2013 (itself prior art and also described NCT'089 Prior Use) | | https://clinicaltrials.g ov/study/NCT019220 89?tab=history&a=3 |
| NCT'089 Pub. 2015 | Sept. 16, 2015 NCT01922089 publication | 2015 (not itself prior art, but describes (NCT'089 Prior Use) | | https://clinicaltrials.g ov/study/NCT019220 89?tab=history&a=7 |
| NCT'588 Pub. 2013 | Jan. 2, 2013 NCT00887588 publication | 2013 | | https://clinicaltrials.g ov/ct2/history/NCT0 0887588?V_11=Vie w#StudyPageTop |
| O'Meara | The Epidemic of Heart Failure: A Lucid Approach to Stemming the Rising Tide | 2014 | O'Meara, et al. | 30 *Can. J. Cardiology* S442 (2014) |

---

[4] Prior uses are defined in § X.A.3 below

| Abbreviation | Title | Publication Date | Author(s) | Publisher/Source |
|---|---|---|---|---|
| Solomon | The Angiotensin Receptor Neprilysin Inhibitor LCZ696 in Heart Failure with Preserved Ejection Fraction: a Phase 2 Double-Blind Randomised Controlled Trial | Oct. 2012 | Solomon, et al. | 380 *The Lancet* 1387 Oct. 2012) |
| Swedberg | Guidelines for the Diagnosis and Treatment of Chronic Heart Failure: Executive Summary (Update 2005) | 2005 | Swedberg et al. | 26 *European Heart Journal* 1115 (2005) |
| VA Consent Form | VA Research Consent Form for A Multicenter, Randomized, Double-Blind, Parallel Group Study to Assess the Safety and Tolerability of Initiating LCZ696 in Heart Failure Patients Comparing Two Titration Regimens | 3/11/2014 (itself prior art and also describes (NCT'089 Prior Use) | | Minneapolis VA Medical Center |
| Vardeny | Combined Neprilysin and Renin-Angiotensin System Inhibition for the Treatment of Heart Failure | Dec. 2014 | Vardeny et al. | 2(6) *JACC: Heart Failure* 663 (2014) |
| Vasotec label | VASOTEC (enalapril maleate) tablets prescribing information | Sept. 2012 | | FDA[5] |

---

[5]  available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/018998s077lbl.pdf

| Abbreviation | Title | Publication Date | Author(s) | Publisher/Source |
|---|---|---|---|---|
| Voors | The Potential Role of Valsartan + AHU377 (LCZ696) in the Treatment of Heart Failure | 2013 | Voors et al. | 22(8) *Expert Opin. Investig. Drugs* 1041 (2013) |

### 3.    Prior Uses

82.    It is my understanding that aspects of the following constitute prior art public uses as described in section § X.C below.

| Prior Public Use | Completion Date | Evidenced By |
|---|---|---|
| NCT01922089 (TITRATION) Clinical Trial | At least the portion of the trial completed prior to May 11, 2014 | NCT'089 Pub. 2013, NCT'089 Pub. 2015, McMurray 2016, VA Consent Form; Novartis internal documents defined below, e.g., ██████████████ |

### B.    Brief Description of Prior Art Patents, Prior Art Publications, and Publications that Evidence Prior Public Uses

83.    In this section, I briefly describe the prior art patents and publications, and publications that evidence prior-art public uses, listed above in a general fashion. I discuss these references further in my summary of the prior art (§ X.D below) and in my obviousness analysis (§ XI below). I reserve the right to rely on any portions of these references for any purpose, including in response to any opinions from any expert retained by Novartis.

84.    Where elements are disclosed at multiple locations within a single prior art reference, I have not necessarily identified every location in that reference, but I reserve the right to rely on any portion of the reference disclosing such elements. When I discuss a particular Example, Table, or Figure from a reference, I mean to include the caption and description and any

### 27.    Swedberg

156.    Swedberg et al., *Guidelines for the Diagnosis and Treatment of Chronic Heart Failure: Executive Summary (Update 2005)*, 26 European Heart Journal 1115 (2005) ("Swedberg") is prior art to the '667 patent at least because it was published by May 11, 2014, more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent..

157.    Swedberg discloses dose ranges for "[c]urrently available angiotensin II receptor antagonists" in Table 16:



*Id.* at 1130. Swedberg further discloses "[t]he recommended procedure for starting … an angiotensin receptor blocker" in Table 10:

> Start with a low dose (Table 9) and build-up to maintenance dosages shown to be effective in large trials (Table 8).

*Id*. at 1127.

### 28.    VA Consent Form

66





Indeed, according to FDA guidance, a prospective patient should be provided with an informed consent form "to allow the subject to *review the information with others*, both before and after making a decision to participate in the study." FDA Guidance for Institutional Review Boards and Clinical Investigators dated January 1998 at 12 ¶ 36 (emphasis added).

Based on my own experience with clinical trials, potential patients and patients in clinical trials freely discuss the subject of the consent form with their family and other healthcare providers.



'667 patent at 17:34-36 ("At Visit 1, during the screening phase, all patients who had provided their written informed consent were evaluated for eligibility to enter the study."), 19:21-22 ("Written informed consent was obtained before any assessment was performed.").

### 29.    Vardeny

165.    Vardeny et al., *Combined Neprilysin and Renin-Angiotensin System Inhibition for the Treatment of Heart Failure*, 2(6) JACC: Heart Failure 663 (Dec. 2014) ("Vardeny") is prior

---

[7] Full Title:  A multicenter, randomized, double-blind, parallel group study to assess the safety and tolerability of initiating LCZ696 in heart failure patients comparing two titration regimens.

heart failure. Its blood pressure-lowering effects are superior to the angiotensin receptor blocker valsartan alone … ."  *See id.* at 1045.

### C.      Brief Description of Prior Public Use – TITRATION Trial

172.    It is my understanding from counsel that at least certain aspects of the NCT01922089 (TITRATION) Clinical Trial constitute a prior art public use or uses.

173.    The NCT01922089 clinical trial ("NCT'089 Prior Use"), as described by at least NCT'089 Pub. 2013, NCT'089 Pub. 2015, McMurray 2016, VA Consent Form and various Novartis internal documents, at least to the extent conduced prior to May 11, 2014, is a prior art public use because that activity occurred more than one year before May 11, 2015, and was not "experimental" within my understanding of that term as instructed by counsel I incorporate the discussions of NCT'089 Pub. 2013, NCT'089 Pub. 2015, McMurray 2016, and VA Consent Form from elsewhere in this report (*e.g.*, *supra* §§ X.B.18, B.21, B.22, B.28), as those references together describe the public use.

174.    In addition, this prior art public use is further described by internal Novartis documents.







**3.     Not Experimental**

i.     <u>Independent Claim 1</u>

1. A regimen for treating chronic heart failure with reduced ejection fraction, which comprises

regimen. Based on decades of known success with titration, as well as prior art successes with LCZ696, a POSA would have had a reasonable expectation of success that following standard practice and titrating LCZ696 by doubling doses every few weeks would successfully treat HFrEF patients. I incorporate these opinions into each obviousness analysis discussed below.

A.   **Claims 1 and 7 of the '667 Patent Are Anticipated by or Obvious Over, Either NCT'089 Pub. 2013 or NCT'089 Prior Use[14]**

239.   Independent claims 1 and 7 of the '667 patent are directed to methods of treating chronic HFrEF, by administering a twice-daily target dose of sacubitril and valsartan, or their respective pharmaceutically acceptable salts, in a 1:1 molar ratio, at particular dosages subject to a specific titration scheme. Claims 1 and 7 are reproduced below:

> 1. A regimen for treating chronic heart failure with reduced ejection fraction, which comprises administering to a human patient in need thereof a twice-daily target dose of 200 mg of sacubitril or a pharmaceutically acceptable salt thereof together with valsartan or a pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, wherein the twice daily target dose of 200 mg corresponds to 97 mg of sacubitril and 103 mg of valsartan;
>
> wherein the twice daily target dose of 200 mg is reached after a titration with a twice daily starting dose of 50 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 weeks to about 4 weeks, wherein the twice daily starting dose of 50 mg corresponds to 24 mg of sacubitril and 26 mg of valsartan, followed by a twice daily dose of 100 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 weeks to about 4 weeks, wherein the twice daily dose of 100 mg corresponds to 49 mg of sacubitril and 51 mg of valsartan, followed by the twice daily target dose of 200 mg thereafter; and
>
> wherein:
>
> (i) the twice daily starting dose of 50 mg is for use in a human patient neither taking an angiotensin-converting enzyme (ACE) inhibitor nor taking an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically

---

[14] For the purposes of this anticipation (or obviousness) theory, I am considering the NCT'089 PCT Use based on public publications only, and not Novartis's internal documents. I also am not relying on the VA Consent Form in this section, despite its public availability.

acceptable salt thereof, or

(ii) the twice daily starting dose of 50 mg is for use in a human patient taking a low dose of an angiotensin-converting enzyme (ACE) inhibitor or a low dose of an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to a dose of ≤10 mg of enalapril per day.

7. A regimen for treating chronic heart failure with reduced ejection fraction, which comprises administering to a human patient in need thereof a twice-daily target dose of 200 mg of sacubitril or a pharmaceutically acceptable salt thereof together with valsartan or a pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, wherein the twice daily target dose of 200 mg corresponds to 97 mg of sacubitril and 103 mg of valsartan;

wherein the twice daily target dose of 200 mg is reached after a titration with a twice daily starting dose of 50 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 2 weeks to about 4 weeks, wherein the twice daily starting dose of 50 mg corresponds to 24 mg of sacubitril and 26 mg of valsartan, followed by a twice daily dose of 100 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 2 weeks to about 4 weeks, wherein the twice daily dose of 100 mg corresponds to 49 mg of sacubitril and 51 mg of valsartan, followed by the twice daily target dose of 200 mg thereafter, and wherein said titration to the target dose occurs over a period of at least about 6 weeks; and

wherein:

(i) the twice daily starting dose of 50 mg is for use in a human patient neither taking an angiotensin-converting enzyme (ACE) inhibitor nor taking an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, or

(ii) the twice daily starting dose of 50 mg is for use in a human patient taking a low dose of an angiotensin converting enzyme (ACE) inhibitor or a low dose of an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to a dose of ≤10 mg of enalapril per day.

240.    The most substantive difference between the two claims pertains to the claimed

titration schemes as indicated as follow:

- Claim 1 recites that the time period at each dosage is "from about <u>3 weeks</u> to about 4 weeks" and claim 7 recites that the time period at each dosage is "from about <u>2</u>

<u>weeks</u> to about 4 weeks" (emphasis added).

- Claim 7 further recites that "said titration to the target dose occurs over a period of at least about 6 weeks," and this limitation is not recited in claim 1.

241.    All of the limitations of claims 1 and 7 were either already known, or would have been obvious to a POSA prior to May 11, 2015.

### 1.    Independent Claims 1 and 7

a.    <u>A regimen for treating chronic heart failure with reduced ejection fraction, which comprises</u>

b.    <u>administering to a human patient in need thereof a twice-daily target dose of 200 mg of sacubitril or a pharmaceutically acceptable salt thereof together with valsartan or a pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, wherein the twice daily target dose of 200 mg corresponds to 97 mg of sacubitril and 103 mg of valsartan;</u>

242.    First, NCT'089 Pub. 2013 disclosed administering LCZ696 for treating chronic HFrEF in human patients. NCT'089 Pub. 2013 at Title and Study Description. As evidenced by Schumacher, the LCZ696 of NCT'089 Pub. 2013 is the same sacubitril-valsartan complex of the '667 patent, which fact is inherent in NCT'089 Pub. 2013. Schumacher at 31-32.[15]  NCT'089 Pub. 2013 also taught a target dose of LCZ696 that is 200 mg bid for treating HFrEF in human patients. NCT'089 Pub. 2013 at Arms and Intervention.

---

[15] Schumacher is not being relied upon here as a secondary reference. It is simply evidence of how a POSA would understand what is disclosed in NCT'089 Pub. 2013 regarding LCZ696.

c. <u>wherein the twice daily target dose of 200 mg is reached after a titration with a twice daily starting dose of 50 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 [2] weeks to about 4 weeks, wherein the twice daily starting dose of 50 mg corresponds to 24 mg of sacubitril and 26 mg of valsartan,</u>

d. <u>followed by a twice-daily dose of 100 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 [2] weeks to about 4 weeks, wherein the twice daily dose of 100 mg corresponds to 49 mg of sacubitril and 51 mg of valsartan, followed by the twice daily target dose of 200 mg thereafter [, and wherein said titration to the target dose occurs over a period of at least about 6 weeks]; and</u>

243. Second, the conservative arm of the study in NCT'089 Pub. 2013 involved uptitration to LCZ696 200 mg bid over 6 weeks using the drug LCZ696–starting at 50 mg, followed by 100 mg, followed by 200 mg bid thereafter. NCT'089 Pub. 2013 at Arms and Intervention. A POSA would understand that the 6 week titration period to LCZ696 200 mg bid may be reached by starting with 50 mg for 1-5 weeks, followed by 100 mg for 1-5 weeks, to reach 200 mg bid at the end of 6 weeks. *See id*. Thus, a POSA would understand that NCT'089 Pub. discloses, e.g., titration period of 2 weeks, 3 weeks, or 4 weeks at 50 mg, and 2 weeks, 3 weeks, or 4 weeks at 100 mg, such that the combined titration period is 6 weeks.

244. Thus, the claimed dosage regimen of "50 mg of sacubitril and valsartan in a 1:1 molar ratio for from about 2-3 weeks to about 4 weeks, followed by a twice daily dose of 100 mg of sacubitril and valsartan in a 1:1 molar ratio for from about 2-3 weeks to about 4 weeks, followed thereafter by the twice daily target dose of 200 mg of sacubitril and valsartan in a 1:1 molar ratio" reads on the prior art dosage regimen disclosed in NCT'089 Pub. 2013. *See id*.

e.   wherein:
(i) the twice daily starting dose of 50 mg is for use in a human patient neither taking an angiotensin-converting enzyme (ACE) inhibitor nor taking an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, or

f.   (ii) the twice daily starting dose of 50 mg is for use in a human patient taking a low dose of an angiotensin-converting enzyme (ACE) inhibitor or a low dose of an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to a dose of ≤10 mg of enalapril per day.

245.   Third, NCT'089 Pub. 2013 at least inherently teaches administering the above dosage regimen to patients not taking an ARB/ACEI or taking a low dose thereof. Notably, where being "on beta blockers" is a listed inclusion criteria, there is no similar criteria that a patient has been taking enalapril or any ARB/ACEI. Nor is there any exclusion of patients who have **_not_** been taking enalapril or any ARB/ACEI. Therefore, NCT'089 encompasses administering its dosage regimen to patients not taking an ARB/ACEI.

246.   To the extent that NCT'089 Prior Use is used, NCT'089 Pub. 2015 (which described the prior use) teaches measuring the effects such as hypotension, renal dysfunction, hyperkalemia, and angioedema and comparing those effects in high versus low RAAS stratum patients over a period of 12 weeks. NCT'089 Pub. 2015 at Outcome Measures. Low RAAS stratum includes patients receiving ≤160 mg of valsartan or ≤10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs, respectively, at screening, i.e., low doses thereof. *Id*. Notably, the low RAAS stratum included patients who were not on an ACEI or ARB four weeks prior to screening (i.e., ACEI/ARB-naïve patients). *Id*. Thus, the NCT'089 Pub. 2015 explicitly teaches a patient population that is neither taking an ACEI nor ARB and a patient population taking less

than 10 mg of ACEI/ARB such as enalapril, i.e., a low dose thereof. *Id*.

247.    In summary, NCT'089 Pub. 2013 and NCT'089 Prior Use each contains all elements of claims 1 and 7: a regimen for treating chronic HFrEF, which comprises administering to a human patient in need thereof a twice-daily target dose of 200 mg of LCZ696, wherein the target dose is reached after a titration with a twice daily starting dose of 50 mg of LCZ696 for about 2-3 weeks to about 4 weeks, followed by a twice daily dose of 100 mg for about 2-3 weeks to about 4 weeks, followed thereafter by the twice daily target dose of 200 mg of LCZ696; administering said regimen to a patient not on an ACEI/ARB or taking an ACEI/ARB that is less than or equal to 10 mg, for example a patient receiving less than 10 mg of enalapril. With respect to claim 7, NCT'089 Pub. 2013 teaches a total titration period of 6 weeks to reach the target dose of 200 mg bid.

248.    Thus, claims 1 and 7 are anticipated by or obvious over either NCT'089 Pub. 2013 or NCT'089 Prior Use.

249.    To the extent that claims 1 and 7 are not anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use, such claims are obvious over either such reference. For example, to the extent a court determines that either such reference does not disclose an ACEI/ARB naïve patient population or a patient population taking a low dose ARB/ACEI, such sub-populations are obvious over the same disclosures because NCT'089 Pub 2013 and NCT'089 Prior Use disclose the use of LCZ696, along with the claimed uptitration regimen, in a broader patient population encompassing those sub-populations.

250.    Similarly, to the extent that either such reference does not disclose a weekly interval for the titration interval, the prior art taught that it was routine to select a weekly interval when uptitrating the dose of a drug for treating heart failure. *See, e.g.*, Cohn at 1668; Schumacher at 31;

McMurray 2013 at 1064; Desai at 1960; Diovan label. Thus, it would have been obvious to a POSA to select a weekly titration interval when titrating the dose of LCZ696 as taught in NCT'089 Pub. 2013.

**B.** **Claims 2, 3, 6, 8, and 11-19 of the '667 Patent Are Anticipated by and/or Obvious Over Either NCT'089 Pub. 2013 or NCT'089 Prior Use[16]**

**1. Claims 2 and 8 (Anticipated or Obvious)**

251.    Dependent claims 2 and 8 depend from independent claims 1 and 7, respectively, and recite the following:

> 2. The regimen for treating chronic heart failure according to claim 1, wherein the twice daily target dose of 200 mg is reached after the titration with the twice daily starting dose of 50 mg for about 3 weeks, followed by the twice daily dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter.
>
> 8. The regimen for treating chronic heart failure according to claim 7, wherein the twice daily target dose is reached after the titration with the twice daily starting dose of 50 mg for about 3 weeks, followed by the twice daily dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter.

252.    As indicated above, claim 2, which depends from claim 1, and claim 8, which depends from claim 7, specify the further limitation that the twice daily target dose of 200 mg is reached after the titration with the twice daily target dose of 50 mg for about 3 weeks, followed by the twice daily starting dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter.

253.    As discussed above, independent claims 1 and 7 are anticipated by or obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use. The conservative arm disclosed in NCT'089 Pub. 2013 involved uptitration to LCZ696 200 mg bid over 6 weeks using the drug LCZ696–starting at 50 mg, followed by 100 mg, followed by 200 mg bid thereafter. NCT'089 Pub. 2013 at Arms and

---

[16] *Supra* note 14.

Intervention. As discussed above, a POSA would understand NCT'089 Pub. 2013's teaching of a 6-week titration period to LCZ696 200 mg bid to disclose starting with 50 mg for 3 weeks, followed by 100 mg for 3 weeks, to reach 200 mg bid at the end of 6 weeks. *See id.* Thus, NCT'089 Pub. 2013 discloses every element of claims 2 and 7. For the same reasons, NCT'089 Prior Use does as well.

### 2.      Claims 6 and 11 (Anticipated or Obvious)

254.    Dependent claims 6 and 11 depend from independent claims 1 and 7, respectively, and recite the following:

> 6. The regimen for treating chronic heart failure according to claim 1, wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

> 11. The regimen for treating chronic heart failure according to claim 7, wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

255.    Claim 6, which is depends from independent claim 1, and claim 11, which depends from independent claim 7, recite the further limitation that the human patient has a reduced left ventricular ejection fraction of ≤35%.

256.    As discussed above, independent claims 1 and 7 are anticipated by or obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use. NCT'089 Pub. 2013 expressly discloses that the patients in the study had chronic heart failure with New York Heart Association (NYHA) class II-IV, left ventricular ejection fraction (LVEF) of ≤35%. NCT'089 Pub. 2013 at Eligibility Criteria. Thus, NCT'089 Pub. 2013 discloses every element of claims 6 and 11. For the same reasons, NCT'089 Prior Use does as well.

### 3.      Claims 3 and 12 (Anticipated or Obvious by NCT'089 Prior Use)

257.    Dependent claims 3 and 12 depend from independent claims 1 and 7, respectively, and recite the following:

> 3. The regimen for treating chronic heart failure according to claim 1, wherein the

human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

12. The regimen for treating chronic heart failure according to claim 7, wherein the human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

258.    Claim 3, which depends from independent claim 1, and claim 12, which depends from independent claim 7, specify the further limitation that the human patient has to stop taking the ARB or ACEI at least 36 hours before initiating the treatment with LCZ696. Claim 12 includes the further limitation that the human patient has to stop taking the ARB or ACEI at least 36 hours before initiating the treatment with LCZ696.

259.    As discussed above, independent claims 1 and 7 are obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use. McMurray 2016, which discloses the NCT'089 Prior Use, discloses "[p]atients using an ACEI before enrolment discontinued this treatment for a 36-h washout period before starting sacubitril/valsartan."  McMurray 2016 at 1195. Thus, NCT'089 Prior Use discloses the element of claims 3 and 12.

### 4.    Claims 13 and 15 (Anticipated or Obvious)

260.    Dependent claims 13 and 15 depend from independent claims 1 and 7, respectively, and recite the following:

13. The regimen for treating chronic heart failure according to claim 1, wherein the twice daily starting dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

15. The regimen for treating chronic heart failure according to claim 7, wherein the twice daily starting dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

261.    Claim 13, which depends from claim 1, and claim 15, which depends from claim 7, specify the further limitation that the twice daily dose of 50 mg is for use in the human patient taking the low dose of the ACEI or the low dose of the ARB before initiating the treatment with LCZ696.

262.    As discussed above, independent claims 1 and 7 are anticipated by or obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use. As discussed above in connection with claims 1 and 7, NCT'089 Pub. 2013 at least inherently discloses giving its treatment regimen to patients not taking an ACEI or ARB or taking a low dose of an ACEI or ARB. To the extent that the relevant reference is NCT'089 Prior Use, NCT'089 Pub. 2015 discloses a patient population that is "low RAAS stratum," which patients are receiving ≤10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs, respectively, at screening as opposed to the high RAAS stratum patients receiving >10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs. NCT'089 Pub. 2015 at Outcome Measures. Thus, NCT'089 Pub. 2013 or NCT'089 Prior Use disclose every element of claims 13 and 15.

### 5.    Claims 14 and 16 (Obvious)

263.    Dependent claim 14 depends from dependent claim 13, and dependent claim 16 depends from dependent claim 15 and recite the following:

14. The regimen for treating chronic heart failure according to claim 13, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to the dose of <10 mg of enalapril per day.

16. The regimen for treating chronic heart failure according to claim 15, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to the dose of <10 mg of enalapril per day.

264.    Claim 14, which depends from claim 13, and claim 16, which depends from claim 15, specify the further limitation that the low dose of the ACEI or the low dose of the ARB is equivalent to <10 mg enalapril.

265.   As discussed above, dependent claims 13 and 15 are obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use. NCT'089 Pub. 2013 at least inherently discloses giving its treatment regimen to patients taking a low dose of an ACEI or ARB, where that low dose is equivalent to ≤10 mg enalapril. To the extent that the relevant reference is NCT'089 Prior Use, NCT'089 Pub. 2015 discloses a patient population that is "low RAAS stratum," which patients are receiving ≤10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs. As discussed above, <10 mg total daily dose of enalapril is obvious over a ≤10 mg total daily dose of enalapril. Thus, NCT'089 2013 or NCT'089 Prior Use renders obvious every element of claims 14 and 16.

### 6.   Claim 17 (Anticipated or Obvious)

266.   Dependent claim 17 depends from independent claim 7 and recites the following:

17. The regimen for treating chronic heart failure according to claim 7, wherein a first week of the at least about 6 weeks is 5±2 days.

267.   Claim 17, depends from claim 7 and specifies the further limitation that "a first week of the at least about 6 weeks is 5±2 days." As discussed above, independent claim 7 is anticipated by or obvious over NCT'089 Pub. 2013. Claim 17 is also anticipated or obvious because the first week of the weeks disclosed in NCT'089 Pub. 2013 at least inherently has 7 days, which is a subset of 5±2 days. Thus, NCT'089 Pub. 2013 discloses expressly or inherently every element of claim 17. For the same reasons, NCT'089 Prior Use does as well.

### 7.   Claims 18 and 19 (Anticipated or Obvious)

268.   Dependent claims 18 and 19 depend from independent claims 1 and 7, respectively, and recite the following:

18. The regimen for treating chronic heart failure according to claim 1, wherein sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof are provided to the human patient in a 1:1 molar ratio by administering to the human patient a compound trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-

ylmethyl}amino)butyrate] hemipentahydrate (LCZ696).

19. The regimen for treating chronic heart failure according to claim 7, wherein sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof are provided to the human patient in a 1:1 molar ratio by administering to the human patient a compound trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate (LCZ696).

269.    Claim 18, which depends from independent claim 1, and claim 19, which depends

from independent claim 7, specify the further limitation that the "sacubitril or the pharmaceutically

acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof are

provided to the human patient in a 1:1 molar ratio by administering to the human patient a

compound         trisodium         [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-

butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2''-(tetrazol-5-ylate)biphenyl-4'-

ylmethyl}amino)butyrate] hemipentahydrate (LCZ696)."

270.    As discussed above, independent claims 1 and 7 are anticipated by or obvious over

NCT'089 Pub. 2013 or NCT'089 Prior Use. NCT'089 Pub. 2013 discloses that the compound

administered in the disclosed regimen is in fact LCZ696. As evidenced by Schumacher, LCZ696

is trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-

(S)-3'-methyl-2'-(pentanoyl{2"(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate]

hemipentahydrate, the same compound as recited in claims 18 and 19. Thus, NCT'089 Pub. 2013

recites every element of claims 18 and 19. For the same reasons, NCT'089 Prior Use does as well.

271.    In view of the foregoing, since NCT'089 Pub. 2013 and NCT'089 Prior Use each

disclose or render obvious every element of claims 1 and 7, 2-3, 6-8, 11-13, 15, and 17-19, these

claims are anticipated by or obvious over NCT'089 Pub. 2013 and NCT'089 Prior Use. In addition,

since NCT'089 Pub. 2013 and NCT'089 Prior Use render obvious the elements of claims 14 and

16, these claims are also obvious over NCT'089 Pub. 2013 and NCT'089 Prior Use.

**C.** **Claims 1-3, 6-8, 11, 12, and 17-19 Are Anticipated by VA Consent Form**

272. Claims 1-3, 6-8, 11, 12, and 17-19 are anticipated by VA Consent Form. I will discuss independent claims 1 and 7 first, followed by the dependent claims. To the extent any expert for Novartis contends that any of these claims are not anticipated by VA Consent Form, I reserve the right to rely on secondary references, e.g., NCT'089 Pub. 2013 or McMurray 2013, with respect to any alleged deficiencies.

### 1. Independent Claim 1

a. A regimen for treating chronic heart failure with reduced ejection fraction, which comprises

███  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

b. administering to a human patient in need thereof a twice-daily target dose of 200 mg of sacubitril or a pharmaceutically acceptable salt thereof together with valsartan or a pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, wherein the twice daily target dose of 200 mg corresponds to 97 mg of sacubitril and 103 mg of valsartan;

███  ████████████████████████████████████

████████████████████████  LCZ696 was known to be a 1:1 molar ratio of sacubitril and valsartan. *E.g.*, Gu at 401.[17]  Because LCZ696 was known to be trisodium sacubitril-valsartan hemipentahydrate, a POSA would have known that 200 mg LCZ696 corresponded to 97 mg of sacubitril and 103 mg of valsartan. *See, e.g., id; see also* ENTRESTO® label at § 3.

---

[17] Gu is not being relied upon here as a secondary reference. It is simply evidence of how a POSA would understand what is disclosed in VA Consent Form regarding LCZ696.

c.     <u>wherein the twice daily target dose of 200 mg is reached after a titration with a twice daily starting dose of 50 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 weeks to about 4 weeks, wherein the twice daily starting dose of 50 mg corresponds to 24 mg of sacubitril and 26 mg of valsartan,</u>

275.  Because LCZ696 was known to be trisodium sacubitril-valsartan hemipentahydrate, a POSA would have known that 50 mg LCZ696 corresponded to 24 mg of sacubitril and 26 mg of valsartan. *See, e.g.*, Gu at 401; ENTRESTO® label at § 3.

d.     <u>followed by a twice-daily dose of 100 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 weeks to about 4 weeks, wherein the twice daily dose of 100 mg corresponds to 49 mg of sacubitril and 51 mg of valsartan,</u>

276. █████████████████████████████████████ Because LCZ696 was known to be trisodium sacubitril-valsartan hemipentahydrate, a POSA would have known that 100 mg LCZ696 corresponded to 49 mg of sacubitril and 51 mg of valsartan. *See, e.g.*, Gu at 401; ENTRESTO® label at § 3.

e.      followed by the twice daily target dose of 200 mg thereafter; and

277.    

f.      wherein:
(i) the twice daily starting dose of 50 mg is for use in a human patient neither taking an angiotensin-converting enzyme (ACE) inhibitor nor taking an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, or

278.

g.      (ii) the twice daily starting dose of 50 mg is for use in a human patient taking a low dose of an angiotensin-converting enzyme (ACE) inhibitor or a low dose of an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to a dose of ≤10 mg of enalapril per day.

279.    Claim 1 requires only that this element or the previous element (i) discussed in the previous section be satisfied. Because element (i) is satisfied, I do not need to analyze this element.

280.    Thus, VA Consent Form anticipates independent claim 1.

### 2. Independent Claim 7

281. As discussed *supra*, claim 7 differs from claim 1 in the following ways:

    a.    the patient is on the 50 mg bid LCZ696 dose for about 2 weeks to about 4 weeks (claim 7) instead of for about 3 weeks to about 4 weeks (claim 1).

282. Because the claim 7 element is broader than and encompassed the claim 1 element, for the reasons discussed in connection with the corresponding element of claim 1, this element of claim 7 is met.

    b.    the patient is on the 100 mg bid LCZ696 dose for about 2 weeks to about 4 weeks (claim 7) instead of for about 3 weeks to about 4 weeks (claim 1).

283. Because the claim 7 element is broader than and encompassed the claim 1 element, for the reasons discussed in connection with the corresponding element of claim 1, this element of claim 7 is met.

    c.    "the titration to the target dose occurs over a period of at least about 6 weeks."

284. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████

285. Thus, VA Consent Form anticipates independent claim 7.

### 3. Claims 2 and 8

286. Claim 2 depends from claim 1, and claim 8 depends from claim 7. Both claims recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the twice daily target dose of 200 mg is reached after the titration with the twice daily starting dose of 50 mg for about 3 weeks, followed by the twice daily dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter.

████████████████████████████████████████████



287.     Thus, VA Consent Form anticipates claims 2 and 8.

### 4.     Claims 3 and 12

288.     Claim 3 depends from claim 1, and claim 12 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

289.     Thus, VA Consent Form anticipates claims 3 and 12.

### 5.     Claims 6 and 11

290.     Claim 6 depends from claim 1, and claim 11 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

A POSA would have understood that a common definition of HFrEF was a LVEF of ≤35%. *E.g.*,

ACCF/AHA Guideline at e247 ("The definition of HFrEF has varied, with guidelines of left

ventricular ejection fraction (LVEF) ≤35%, <40%, and ≤40%").[18]

291. Thus, VA Consent Form anticipates claims 6 and 11.

### 6. Claim 17

292. Claim 17 depends from claim 7 and recites:

The regimen for treating chronic heart failure according to claim 7, wherein a first week of the at least about 6 weeks is 5±2 days.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

293. Thus, VA Consent Form anticipates claim 17.

### 7. Claims 18 and 19

294. Claims 18 and 19 depend from claims 1 and 7, respectively, and recite that the claimed active ingredients are administered as LCZ696.██████████████████████████

███████████████████████████████████████████

295. Thus, VA Consent Form anticipates claims 18-19.

**D.   Claims 4-5, 9-10, and 13-16 Would Have Been Obvious Over VA Consent Form Alone or in View of McMurray 2013 and/or NPC'089 Pub. 2013**

296. A POSA would have been motivated to combine VA Consent Form with McMurray 2013 and/or NPC'089 Pub. 2013 because they all involve administering LCZ696 for treating heart failure and a POSA would have been aware of the common and desirable practice of uptitrating to reach a target dose that provides the desired clinical benefit for the patient, and that

---

[18] ACCF/AHA Guideline is not being relied upon here as a secondary reference. It is simply evidence of how a POSA would understand what is disclosed in VA Consent Form regarding HFrEF.

uptitrating slowly helps avoid adverse events.

### 1. Claims 4-5 and 9-10 Would Have Been Obvious Over VA Consent Form in View of McMurray 2013

297.    Claim 4 depends from claim 1, and claim 9 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has an elevated plasma BNP of ≥100 pg/mL or NT-pro BNP of ≥400 pg/mL.

298.    Claim 5 depends from claim 1, and claim 10 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has an elevated plasma BNP of;≥150 pg/mL or NT-pro BNP of ≥600 pg/mL.

As discussed above, independent claims 1 and 7 are anticipated by VA Consent Form. In addition

to the VA Consent Form, a POSA would have been motivated to further consider McMurray 2013

and/or NPC'089 because they all pertain to the administration of LCZ696 to patients with HFrEF.

McMurray 2013 discloses using LCZ696 to treat HFrEF patients having "plasma BNP ≥150

pg/mL (or NT-proBNP ≥600 pg/mL) at the screening visit."  McMurray 2013 at 1063. This meets

all of claims 4-5 and 9-10.

299.    Thus, claims 4-5 and 9-10 would have been obvious over VA Consent Form in

view of McMurray 2013.

### 2. Claims 13-16 Would Have Been Obvious Over VA Consent Form Optionally in View of NCT'089 Pub. 2013

#### a. Claims 13 and 15

300.    In my analysis above, I did not address the optional element of claims 1 and 7 that

recite:

> (ii) the twice daily starting dose of 50 mg is for use in a human patient taking a low dose of an angiotensin-converting enzyme (ACE) inhibitor or a low dose of an

angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to a dose of ≤10 mg of enalapril per day.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ A POSA would be more worried about potential side effects from the ACEI/ARB-naïve patients than the low-dose ACEI/ARB patients. Thus, a POSA would have expected the same dosage regimen appropriate for ACEI/ARB-naïve patients to work for low-dose ACEI/ARB patents. Thus, this optional element of claims 1 and 7 would have been obvious based on VA Consent Form alone.

301.    In addition, NCT'089 Pub. 2013 discloses this element. In particular, NCT'089 Pub. 2013 discloses, "Low RAAS stratum: Patients receiving ≤ 160 mg of valsartan or ≤ 10 mg total daily dose of enalapril, or equivalent doses of other ARBs/ACEIs, respectively, at screening." NCT'089 Pub. 2013 at 2. Thus, in addition to being anticipated by VA Consent Form, claims 1 and 7 would have been obvious over VA Consent Form in view of NCT'089 Pub. 2013.

302.    Claim 13 depends from claim 1, and claim 15 depends from claim 7. Both claims recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the twice daily starting dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

This is the optional element of claims 1 and 7 I just discussed. Thus, claims 13 and 15 would have been obvious over VA Consent Form optionally in view of NCT'089 Pub. 2013.

b.    Claims 14 and 16

303.    Claim 14 depends from claim 13, and claim 16 depends from claim 15. Both claims recite:

> The regimen for treating chronic heart failure according to claim [13/15], wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to the dose of <10 mg of enalapril per day.

As discussed above, claims 14 and 16 would have been obvious over VA Consent Form optionally in view of NCT'089 Pub. 2013. A dose of ACEI or ARB equivalent to <10 mg of enalapril is obvious over a dose of ACEI or ARB equivalent to 10 mg of enalapril because "<10 mg" encompasses values arbitrarily close to "10 mg." ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

304.    Thus, claims 14 and 16 would have been obvious over VA Consent Form optionally in view of NCT'089 Pub. 2013.

### E.    Claims 1-3, 6-8, 11-13, 15, and 17-19 Are Anticipated by NCT'089 Prior Use, ████████████

305.    Claims 1-3, 6-8, 11-13, 15, and 17-19 are anticipated by NCT'089 Public Use, ████████████████████████████████████████████████

██████████████████████████

#### 1.    Independent Claim 1

a.    A regimen for treating chronic heart failure with reduced ejection fraction, which comprises

306.    *See* above discussion of VA Consent Form.

b.    administering to a human patient in need thereof a twice-daily target dose of 200 mg of sacubitril or a pharmaceutically acceptable salt thereof together with valsartan or a pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, wherein the twice daily target dose of 200 mg corresponds to 97 mg of sacubitril and 103 mg of valsartan;

307.    *See* above discussion of VA Consent Form.

c.    wherein the twice daily target dose of 200 mg is reached after a titration with a twice daily starting dose of 50 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 weeks to about 4 weeks, wherein the twice daily starting dose of 50 mg corresponds to 24 mg of sacubitril and 26 mg of valsartan,

308.    ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

d.    followed by a twice-daily dose of 100 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 weeks to about 4 weeks, wherein the twice daily dose of 100 mg corresponds to 49 mg of sacubitril and 51 mg of valsartan,

309.    ███████████████████████████████████████████

███████████████████████████████████████████

e.    followed by the twice daily target dose of 200 mg thereafter; and

310.    ███████████████████████████████████████████

██████████████████████████

f.    wherein:
(i) the twice daily starting dose of 50 mg is for use in a human patient neither taking an angiotensin-converting enzyme (ACE) inhibitor nor taking an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, or

311.    Claim 1 requires only that this element or the next element (ii) discussed in the next section be satisfied. Because element (ii) is satisfied, I do not need to analyze this element.

g.     (ii) the twice daily starting dose of 50 mg is for use in a human patient taking a low dose of an angiotensin-converting enzyme (ACE) inhibitor or a low dose of an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to a dose of ≤10 mg of enalapril per day.

312.     ██████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████

313.     Thus, NCT'089 Prior Use, ████████████████ anticipates independent claim 1.

## 2.     Independent Claim 7

314.     As discussed *supra*, claim 7 differs from claim 1 in the following ways:

a.     the patient is on the 50 mg bid LCZ696 dose for about 2 weeks to about 4 weeks (claim 7) instead of for about 3 weeks to about 4 weeks (claim 1).

315.     Because the claim 7 element is broader than and encompassed the claim 1 element, for the reasons discussed in connection with the corresponding element of claim 1, this element of claim 7 is met.

b.     the patient is on the 100 mg bid LCZ696 dose for about 2 weeks to about 4 weeks (claim 7) instead of for about 3 weeks to about 4 weeks (claim 1).

316.     Because the claim 7 element is broader than and encompassed the claim 1 element, for the reasons discussed in connection with the corresponding element of claim 1, this element of claim 7 is met.

c.     "the titration to the target dose occurs over a period of at least about 6 weeks."

317.     ████████████████████████████████████████████
████████████████████████████████████████████████████

121

[REDACTED]

[REDACTED]

318.   Thus, NCT'089 Prior Use, [REDACTED] anticipates independent claim 7.

### 3.   Claims 2 and 8

319.   Claim 2 depends from claim 1, and claim 8 depends from claim 7. Both claims recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the twice daily target dose of 200 mg is reached after the titration with the twice daily starting dose of 50 mg for about 3 weeks, followed by the twice daily dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter.

[REDACTED]

[REDACTED]

[REDACTED]

320.   Thus, NCT'089 Prior Use, [REDACTED] anticipates claims 2 and 8.

### 4.   Claims 3 and 12

321.   Claim 3 depends from claim 1, and claim 12 depends from claim 7. Both claims recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

322.   Thus, NCT'089 Prior Use, Patient USA/1100/00003 anticipates claims 3 and 12.

### 5. Claims 13 and 15

323. Claim 13 depends from claim 1, and claim 15 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the twice daily starting dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

324. This is the optional element of claims 1 and 7 discussed above, ███████████

█████████████████████████████████████████████████████████████

███████████████████████████████████

### 6. Claims 6 and 11

325. Claim 6 depends from claim 1, and claim 11 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

A POSA would have understood that a common definition of HFrEF was a LVEF of ≤35%. *E.g.*,

NCT'089 Pub. 2013 states that the inclusion criteria is LVEF ≤35%. *Id.* at Eligibility.

326. Thus, NCT'089 Prior Use, ████████████████ anticipates claims 6 and 11.

### 7. Claim 17

327. Claim 17 depends from claim 7 and recites:

> The regimen for treating chronic heart failure according to claim 7, wherein a first week of the at least about 6 weeks is 5±2 days.

█████████████████████████████████████████████████████████████

█████████████████████████████████████████

328. Thus, NCT'089 Prior Use, ████████████████ anticipates claim 17.

### 8. Claims 18 and 19

329. Claims 18 and 19 depend from claims 1 and 7, respectively, and recite that the

claimed active ingredients are administered as LCZ696. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

330.    Thus, NCT'089 Prior Use, ████████████████ anticipates claims 18-19.

**F.    Claims 4-5, 9-10, 14, and 16 Would Have Been Obvious Over NCT'089 Prior Use, ██████████████ Alone or in View of McMurray 2013**

331.    A POSA would have been motivated to combine NPC'089 Prior Use with McMurray 2013 because they both involve administering LCZ696 for treating heart failure and a POSA would have been aware of the common and desirable practice of uptitrating to reach a target dose that provides the desired clinical benefit for the patient, and that uptitrating slowly helps avoid adverse events.

332.    For the reasons provided above in connection with VA Consent Form, claims 4-5 and 9-10 would have been obvious over NCT'089 Prior Use, ████████████████ in view of McMurray 2013, and claims 14 and 16 would have been obvious over NCT'089 Prior Use, █████ ████████████

**G.    Claims 1-3, 6-8, 11-16, and 17-19 Are Anticipated by Open Label Patients ██████████████████████**

333.    Claims 1-3, 6-8, 11-13, 15, and 17-19 are anticipated by NCT'089 Public Use, ██████████████████████████████████ (collectively, "Open Label Patients"). These patients' specific dosing regimens are provided *supra* § X.C.

**1.    Independent Claim 1**

a.    A regimen for treating chronic heart failure with reduced ejection fraction, which comprises

334.    ████████████████████████████████

████████████████████████████████████████████████

███████

        b.      <u>administering to a human patient in need thereof a twice-daily target dose of 200 mg of sacubitril or a pharmaceutically acceptable salt thereof together with valsartan or a pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, wherein the twice daily target dose of 200 mg corresponds to 97 mg of sacubitril and 103 mg of valsartan;</u>

335.    ████████████████████████████████ LCZ696 was known to be a 1:1 molar ratio of sacubitril and valsartan. *E.g.*, Gu at 401.[19]  Because LCZ696 was known to be trisodium sacubitril-valsartan hemipentahydrate, a POSA would have known that 200 mg LCZ696 corresponded to 97 mg of sacubitril and 103 mg of valsartan. *See, e.g.*, *id.; see also* ENTRESTO® label at § 3. █████████████████████

███████

        c.      <u>wherein the twice daily target dose of 200 mg is reached after a titration with a twice daily starting dose of 50 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 weeks to about 4 weeks, wherein the twice daily starting dose of 50 mg corresponds to 24 mg of sacubitril and 26 mg of valsartan,</u>

336.    ████████████████████████████████████

█████████████████████████

█   ████████████████████████████

█   ████████████████████████████

████████████████████ Because LCZ696 was known to be trisodium sacubitril valsartan hemipentahydrate, a POSA would have known that 50 mg LCZ696 corresponded to 24 mg of sacubitril and 26 mg of valsartan. *See, e.g.*, Gu at 401;

---

[19] Gu is not being relied upon here as a secondary reference. It is simply evidence of how a POSA would understand what is disclosed in TITRATION Protocol regarding LCZ696.

ENTRESTO® label at § 3.

> d.  <u>followed by a twice-daily dose of 100 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 weeks to about 4 weeks, wherein the twice daily dose of 100 mg corresponds to 49 mg of sacubitril and 51 mg of valsartan,</u>

337. 

Because LCZ696 was known to be trisodium sacubitril valsartan hemipentahydrate, a POSA would have known that 100 mg LCZ696 corresponded to 49 mg of sacubitril and 51 mg of valsartan. *See, e.g.*, Gu at 401; ENTRESTO® label at § 3.

> e.  <u>followed by the twice daily target dose of 200 mg thereafter; and</u>

338.

> f.  <u>wherein:</u>
> <u>(i) the twice daily starting dose of 50 mg is for use in a human patient neither taking an angiotensin-converting enzyme (ACE) inhibitor nor taking an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, or</u>

339. This element is optional. Either this or the next element must be met.

340.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

      g.    <u>(ii) the twice daily starting dose of 50 mg is for use in a human patient taking a low dose of an angiotensin-converting enzyme (ACE) inhibitor or a low dose of an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to a dose of ≤10 mg of enalapril per day.</u>

341.    This element is optional. Either this or the previous element must be met. ████

████████████████████████████████████████████████

████████████████

    ███   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

    ███   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

[REDACTED]

344.    Thus, NCT'089 Prior Use, Open Label Patients anticipates independent claim 1.

**2.    Independent Claim 7**

345.    As discussed *supra*, claim 7 differs from claim 1 in the following ways:

a.    the patient is on the 50 mg bid LCZ696 dose for about 2 weeks to about 4 weeks (claim 7) instead of for about 3 weeks to about 4 weeks (claim 1).

346.    Because the claim 7 element is broader than and encompassed the claim 1 element, for the reasons discussed in connection with the corresponding element of claim 1, this element of claim 7 is met.

b.    the patient is on the 100 mg bid LCZ696 dose for about 2 weeks to about 4 weeks (claim 7) instead of for about 3 weeks to about 4 weeks (claim 1).

347.    Because the claim 7 element is broader than and encompassed the claim 1 element, for the reasons discussed in connection with the corresponding element of claim 1, this element of claim 7 is met.

c.    "the titration to the target dose occurs over a period of at least about 6 weeks."

348.    [REDACTED]

349.    Thus, NCT'089 Prior Use, Open Label Patents anticipates independent claim 7.

**3.    Claims 2 and 8**

350.    Claim 2 depends from claim 1, and claim 8 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the twice daily target dose of 200 mg is reached after the titration with the twice daily starting dose of 50 mg for about 3 weeks, followed by the twice daily dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████

351.    Thus, NCT'089 Prior Use, Open Label Patients anticipates claims 2 and 8.

**4.    Claims 3 and 12**

352.    Claim 3 depends from claim 1, and claim 12 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

353.    Thus, NCT'089 Prior Use, ██████████████████████████ anticipates claims 3 and 12.

**5.    Claims 13 and 15**

354.    Claim 13 depends from claim 1, and claim 15 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the twice daily starting dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

355. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

### 6. Claims 14 and 16

356. Claim 14 depends from claim 13, and claim 16 depends from claim 15. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [13/15], wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to the dose of <10 mg of enalapril per day.

357. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

### 7. Claims 6 and 11

358. Claim 6 depends from claim 1, and claim 11 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

A POSA would have understood that a common definition of HFrEF was a LVEF of ≤35%. *E.g.*,

NCT'089 Pub. 2013 states that the inclusion criteria is LVEF ≤35%. *Id.* at Eligibility.

359. Thus, NCT'089 Prior Use, Open Label Patients anticipates claims 6 and 11.

### 8. Claim 17

360. Claim 17 depends from claim 7 and recites:

The regimen for treating chronic heart failure according to claim 7, wherein a first week of the at least about 6 weeks is 5±2 days.

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

361.    Thus, NCT'089 Prior Use, Open Label Patients anticipates claim 17.

### 9.    Claims 18 and 19

362.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

363.    Thus, NCT'089 Prior Use, ████████████████ anticipates claims 18-19.

**H.    Claims 3, 4-5, 9-10, and 12 Would Have Been Obvious Over NCT'089 Prior Use, Open-Label Patients Alone or in View of McMurray 2013**

364.    A POSA would have been motivated to combine NPC'089 Prior Use with McMurray 2013 because they both involve administering LCZ696 for treating heart failure and a POSA would have been aware of the common and desirable practice of uptitrating to reach a target dose that provides the desired clinical benefit for the patient, and that uptitrating slowly helps avoid adverse events.

### 1.    Claims 3 and 12 Would Have Been Obvious Over NCT'089 Prior Use, Open-Label Patients

365.    Claim 3 depends from claim 1, and claim 12 depends from claim 7. Both claims recite:

The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

131

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████

366.    Thus, claims 3 and 12 would have been obvious over NCT'089 Prior Use, Open-

Label Patients.

### 2. Claims 4-5 and 9-10 Would Have Been Obvious Over NCT'089 Prior Use, Open-Label Patients in View of McMurray 2013

367.    Claim 4 depends from claim 1, and claim 9 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has an elevated plasma BNP of ≥100 pg/mL or NT-pro BNP of ≥400 pg/mL.

368.    Claim 5 depends from claim 1, and claim 10 depends from claim 7. Both claims

recite:

> The regimen for treating chronic heart failure according to claim [1/7], wherein the human patient has an elevated plasma BNP of;≥150 pg/mL or NT-pro BNP of ≥600 pg/mL.

As discussed above, independent claims 1 and 7 are anticipated by NCT'089 Prior Use, Open-

Label Patient. McMurray 2013 discloses using LCZ696 to treat HFrEF patients having "plasma

BNP ≥150 pg/mL (or NT-proBNP ≥600 pg/mL) at the screening visit." McMurray 2013 at 1063.

This meets all of claims 4-5 and 9-10.

369.    Thus, claims 4-5 and 9-10 would have been obvious over NCT'089 Prior Use,

Open-Label Patient in view of McMurray 2013.

### I. ==Claims 4-6 and 9-11 Are Obvious Over NCT'089 Pub. 2013 or NCT'089 Prior Use, Optionally in View of McMurray 2013==

370.    A POSA would have been motivated to combine NPC'089 Pub. 2013 or NPC'089

Prior Use with McMurray 2013 because they all involve administering LCZ696 for treating heart failure and a POSA would have been aware of the common and desirable practice of uptitrating to reach a target dose that provides the desired clinical benefit for the patient, and that uptitrating slowly helps avoid adverse events.

371.    Dependent claims 4-6 depend from independent claim 1, and dependent claims 9-11 depend from independent claim 7. These claims recite the following:

> 4. The regimen for treating chronic heart failure according to claim 1, wherein the human patient has an elevated plasma BNP of ≥100 pg/mL or NT-proBNP of ≥400 pg/mL.

> 5. The regimen for treating chronic heart failure according to claim 1, wherein the human patient has an elevated plasma BNP of ≥150 pg/mL or NT-proBNP of ≥600 pg/mL.

> 6. The regimen for treating chronic heart failure according to claim 1, wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

> 9. The regimen for treating chronic heart failure according to claim 7, wherein the human patient has an elevated plasma BNP of ≥100 pg/mL or NT-proBNP of ≥400 pg/mL.

> 10. The regimen for treating chronic heart failure according to claim 7, wherein the human patient has an elevated plasma BNP of ≥150 pg/mL or NT-proBNP of ≥600 pg/mL.

> 11. The regimen for treating chronic heart failure according to claim 7, wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

372.    Claims 4-6 and 9-11 of the '667 patent are obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use, in further view of McMurray 2013.

373.    Claim 4, which depends from claim 1, and claim 9, which depends from claim 7, specify the further limitation that the human patient has an elevated plasma BNP ≥100 pg/mL or NT-proBNP of ≥400 pg/mL. Claim 5, which depends from claim 1, and claim 10, which depends from claim 7, specify the further limitation that the human patient has an elevated plasma BNP ≥150 pg/mL or NT-proBNP of ≥600 pg/mL. Claim 6, which depends from claim 1, and claim 11,

which depends from claim 7, specify the further limitation that the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

374.    As discussed above, independent claims 1 and 7 are anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use. Claims 4-6 and 9-11 claim sub-populations of the patients treated in claims 1 and 7, and would consequently be obvious to a POSA.

375.    In addition, claims 4-6 and 9-11 are also obvious over either primary reference in view of McMurray 2013. For example, NCT'089 Pub. 2013 discloses that the patients in the study had chronic heart failure with New York Heart Association (NYHA) class II-IV, left ventricular ejection fraction (LVEF) of ≤35%. NCT'089 Pub. 2013 at Eligibility Criteria. McMurray 2013 describes a related clinical trial where LCZ696 was evaluated as an alternative to ACEIs like enalapril in patients with HFrEF. *See* McMurray 2013 at 1062. McMurray 2013's study sets the entry criteria limited to patients with NYHA class II-IV, LVEF ≤35%, and additionally requires that patients have a plasma BNP ≥150 pg/mL or NT-proBNP ≥600 pg/mL at the screening visit; or a BNP ≥100 pg/mL or NT-proBNP ≥400 pg/mL. *Id.* at 1063. Thus a POSA would be motivated to further consider McMurray 2013, and a POSA in view of McMurray 2013 would find it obvious to include patients with the specified amounts of elevated BNP that is plasma BNP ≥150 pg/mL or NT-proBNP ≥600 pg/mL and BNP ≥100 pg/mL or NT-proBNP ≥400 pg/mL as recited in claims 4, 5, 9, and 10 in the study disclosed by NCT'089 Pub. 2013. *See id.*

376.    Thus, claims 4-5 and 9-10 are obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use, alone or in further view of McMurray 2013.

**J.** **Claims 1 and 7 Are Obvious Over NCT'089 Pub. 2013 or NCT'089 Prior Use in View of McMurray 2013**

    a.    A regimen for treating chronic heart failure with reduced ejection fraction, which comprises

    b.    administering to a human patient in need thereof a twice-daily target dose of 200 mg of sacubitril or a pharmaceutically acceptable salt thereof together with valsartan or a pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, wherein the twice daily target dose of 200 mg corresponds to 97 mg of sacubitril and 103 mg of valsartan;

377.    A POSA would have been motivated to combine NCT'089 Pub. 2013 or NCT'089 Prior Use with McMurray 2013 because they all involve administering LCZ696 for treating heart failure and a POSA would have been aware of the common and desirable practice of uptitrating to reach a target dose that provides the desired clinical benefit for the patient, and that uptitrating slowly helps avoid adverse events. A POSA would have further understood that this is especially important for patient groups who may be more susceptible to adverse events, such as patients who are naïve to or have less exposure to prior medications, particularly medications with any similar activity to the one being introduced. Thus, a POSA would have a reasonable expectation that conservative uptitration can be successfully utilized for the administration of LCZ696 to patients with heart failure, including HFrEF.

378.    First, NCT'089 Pub. 2013 discloses administering LCZ696 for treating chronic HFrEF in human patients. NCT'089 Pub. 2013 at Title and Study Description. As evidenced by Schumacher, LCZ696 is the same sacubitril-valsartan complex of the '667 patent. Schumacher at 31-32. NCT01922089 also taught a target dose of LCZ696 that is 200 mg bid for treating HFrEF in human patients. NCT'089 Pub. 2013 at Arms and Intervention.

c.   wherein the twice daily target dose of 200 mg is reached after a titration with a twice daily starting dose of 50 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 [2] weeks to about 4 weeks, wherein the twice daily starting dose of 50 mg corresponds to 24 mg of sacubitril and 26 mg of valsartan,

d.   followed by a twice-daily dose of 100 mg of sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof, which are provided to the human patient in a 1:1 molar ratio, for from about 3 [2] weeks to about 4 weeks, wherein the twice daily dose of 100 mg corresponds to 49 mg of sacubitril and 51 mg of valsartan, followed by the twice daily target dose of 200 mg thereafter [, and wherein said titration to the target dose occurs over a period of at least about 6 weeks]; and

379.   Second, the conservative arm of the study described in NCT'089 Pub. 2013 involved uptitration of LCZ696 to 200 mg bid over 6 weeks using the drug LCZ696–starting at 50 mg, followed by 100 mg, followed by 200 mg bid thereafter. *Id*. A POSA would understand that the 6-week titration period LCZ696 to 200 mg bid may be reached by starting with 50 mg for 1-5 weeks, followed by 100 mg for 1-5 weeks, to reach 200 mg bid at the end of 6 weeks. *See id*. Thus, NCT'089 Pub. 2013 discloses a titration period of 2 weeks, 3 weeks, or 4 weeks at 50 mg and 2 weeks, 3 weeks, or 4 weeks at 100 mg, such that the combined titration period is 6 weeks.

e. <u>wherein:</u>
<u>(i) the twice daily starting dose of 50 mg is for use in a human patient neither taking an angiotensin-converting enzyme (ACE) inhibitor nor taking an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, or</u>

f. <u>(ii) the twice daily starting dose of 50 mg is for use in a human patient taking a low dose of an angiotensin-converting enzyme (ACE) inhibitor or a low dose of an angiotensin II receptor blocker (ARB) before initiating treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to a dose of ≤10 mg of enalapril per day.</u>

380. Third, McMurray 2013 discloses pre-study doses of ACEIs and ARBs that are equivalent to a dose of ≤10 mg of enalapril per day, e.g., doses of olmesartan or candesartan lower than the standard doses. McMurray 2013 at 1064, Table 1. In addition, McMurray 2013's disclosure of a 5 mg bid, or a 10 mg/day, enalapril run-in is also equivalent to ≤10 mg/day enalapril. *Id*. & at Fig. 1.

381. Alternatively, McMurray 2013, describing the PARADIGM-HF trial, discloses a potential risk of angioedema due to overlapping ACE inhibition and NEP inhibition during step iii and step v of the clinical trial. McMurray 2013 at 1068. In order to minimize such an overlap, the study provided for two washout periods. *Id*. The first washout period after step ii consisted of stopping enalapril a day prior to starting LCZ696. *Id.* Similarly, the washout period before step iv involved stopping of LCZ696 a day prior to possible start of enalapril. *Id.*

> ***For safety reasons***, there are also two short washout periods during the run-in. ***These washout periods are designed to minimize concomitant neprilysin and ACE inhibition which is likely to increase the risk of angioedema.***

*Id.* (emphasis added); *see also* McMurray 2014 at 995-97; Schumacher at 31-32 (teaching that ACEIs and ARBs are required to be discontinued 24 hours prior to randomization); Minguet at

137

443-44 (teaching that *"[a] careful up-titration scheme was adhered to* during the run-in, and *a washout period of 36 h was implemented to prevent concomitant exposure to ACE inhibition and NEP inhibition*") (emphasis added).

382.    Thus, a POSA would understand from NCT'089 Pub. 2013 in further view of McMurray 2013, that LCZ696 (which dosage regimen starts with 50 mg LCZ696) should not be concomitantly administered with an ACEI. In other words, in view of McMurray 2013, a POSA would stop using an ACEI before starting the 50 mg initial starting dose of LCZ696, or at least use an ACEI dose that is minimal (less than the 10 mg target dose of enalapril). McMurray 2013 at 1064.

383.    In summary, NCT'089 Pub. 2013 teaches a regimen for treating chronic HFrEF, which regimen comprises administering to a human patient in need thereof a twice-daily target dose of 200 mg of LCZ696, wherein the target dose is reached after a titration with a twice-daily starting dose of 50 mg of LCZ696 for 2-3 weeks to about 4 weeks, followed by a twice-daily dose of 100 mg of LCZ696 for 2-3 weeks to about 4 weeks, followed thereafter by the twice-daily target dose of 200 mg of LCZ696. *See* generally NCT'089 Pub. 2013. McMurray 2013 teaches stopping enalapril/ACEI inhibitor before initiating a LCZ696 treatment regimen for patients with HFrEF for safety reasons–to avoid angioedema due to overlap of ACE inhibition and NEP inhibition. McMurray 2013 at 1064. In view of McMurray 2013, in order to avoid such adverse effects, a POSA would use the dosage regimen as taught by NCT'089 Pub. 2013 for administration to patients not on ACEI/ARB or taking a low dose of an ACEI/ARB of 10 mg/day or less enalapril (or equivalent).

384.    In view of the foregoing, the claimed regimen is obvious over the references of NCT'089 Pub. 2013 or NCT'089 Prior Use in view of McMurray 2013.

practice, a POSA would have a reasonable expectation of success that implementing the steps of slow gradual titrations and administering the claimed regimen to ARB/ACEI naïve or ARB/ACEI low dose patients would lead to fewer adverse events and a higher treatment success. *See* McMurray 2013 at 1064, -68; Konstam at 1845, -47; Desai at 1960-65. Thus, any claims of alleged improved treatment success described by the patentee during the '667 patent prosecution do not alter my obviousness analysis.

## XII.   <u>CONCLUSION</u>

426.    I may use the documents referenced in this report, or portions of those documents, at any hearing or trial in this litigation. I may further prepare and use exhibits that summarize portions of my report or testimony that I may provide, or key terms or concepts presented therein, or other demonstrative exhibits, at any hearing or trial in this litigation.

427.    I reserve my right to supplement my report in response to any judicial determinations, in response to any opinions expressed by Novartis's experts in this litigation, and/or in light of additional evidence or testimony brought forth at trial or otherwise brought to my attention after the date of my signature below.

Date: July 28, 2023

Dan Jame

# EXHIBIT B

**From:** Dmitry Shelhoff <dshelhoff@pergamentcepeda.com>
**Sent:** September 14, 2023 4:16 PM
**To:** Clark, Shannon K. <SKClark@Venable.com>; 'Regan, Crystal L.' <crystalregan@parkerpoe.com>; Roberts, Melinda R. <MRRoberts@Venable.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Flanders, Susanne L. <SLFlanders@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; dsilver@mccarter.com; 'Joyce, Alexandra' <ajoyce@mccarter.com>
**Cc:** 'Florence, Robert L.' <robertflorence@parkerpoe.com>; 'Dharamsi, Tasneem A.' <tasneemdharamsi@parkerpoe.com>; '[contact] Kenneth Canfield' <kcanfield@pergamentcepeda.com>; '[contact] Julia Kim' <jkim@pergamentcepeda.com>; '[contact] David Moore' <dmoore@potteranderson.com>; '[contact] Bindu Palapura' <bpalapura@potteranderson.com>
**Subject:** RE: In re Entresto, C.A. 20-2930-RGA; 21-1760-RGA; 21-1794-RGA; 22-451-RGA - '667 Patent Litigation

**Caution: External Email**

Counsel,

Defendants' object to inclusion of Ms. Twisk declaration in Dr. Katz's expert report in violation of paragraph 11(a) of the scheduling order. D.E. 749 in 20-cv-02930 (RGA).

Further, paragraph 11(a) of the scheduling order implores the parties to resolve their disputes with respect to any objectionable disclosures in expert reports without burdening the Court.  We will do that here with respect to Plaintiffs' complaints about Dr. Fintel's opening expert report.  Paragraph 11(a) states that the complaining party – Plaintiffs here – "must notify the offending party one (1) week of the submission of the expert report."  Defendants submitted Dr. Fintel's opening expert report on July 28, 2023.  Plaintiffs complained about the allegedly "untimely disclosure[s]" in Dr. Fintel's report on August 16, 2023, which is almost 3 weeks (20 days) after the service of the report.  Plaintiffs failed to make a timely objection pursuant to paragraph 11(a) of the scheduling order and consequently waived it.  We suggest that Plaintiffs drop their letter writing campaign to the Court, as this will be the first thing we are going to tell the Court should Plaintiffs pursue their unwarranted course of action.

Truly Yours,
Dmitry

Dmitry Shelhoff
Partner| Chair of Litigation | PERGAMENT & CEPEDA LLP
25 Hanover Road, Suite 104
Florham Park, NJ 07932
973-998-7722 | dshelhoff@pergamentcepeda.com

**From:** Clark, Shannon K. <SKClark@Venable.com>
**Sent:** Monday, August 21, 2023 3:40 PM

1

**To:** Dmitry Shelhoff <dshelhoff@pergamentcepeda.com>; 'Regan, Crystal L.'
<crystalregan@parkerpoe.com>; Roberts, Melinda R. <MRRoberts@Venable.com>; Kallas, Nicholas N.
<NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L.
<JLStringham@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Flanders, Susanne L.
<SLFlanders@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Fishwick, Laura K.
<LFishwick@Venable.com>; dsilver@mccarter.com; 'Joyce, Alexandra' <ajoyce@mccarter.com>
**Cc:** 'Florence, Robert L.' <robertflorence@parkerpoe.com>; 'Dharamsi, Tasneem A.'
<tasneemdharamsi@parkerpoe.com>; '[contact] Kenneth Canfield'
<kcanfield@pergamentcepeda.com>; '[contact] Julia Kim' <jkim@pergamentcepeda.com>; '[contact]
David Moore' <dmoore@potteranderson.com>; '[contact] Bindu Palapura'
<bpalapura@potteranderson.com>
**Subject:** RE: In re Entresto, C.A. 20-2930-RGA; 21-1760-RGA; 21-1794-RGA; 22-451-RGA - '667 Patent
Litigation

Dmitry,

Tomorrow at 11 am works for us.  Please use the dial in below.

1-844-621-3956
Attendee access code: 372 779 19

Best regards,
Shannon

***Please note our new street address effective March 27, 2023. All other information is the same.***

**Shannon K. Clark, Esq. | Venable LLP**
**t** 212.218.2311 | **f** 212.307.5598
151 W. 42nd Street, 49th Floor, New York, NY 10036

SKClark@Venable.com |
https://linklock.titanhq.com/analyse?url=http%3A%2F%2Fwww.Venable.com&data=eJxLtjUzTk4zNUizMDQyMk1VS7EtSC1KT8
xNzStJTi1ITUnUS87PVcu1NbTw8MnyDDEPDA83VSu2Lc5OzkksyIY1MShLzUtMykkFKyuyzU5OzEvLTM1JAcpgM6jUNqOkpED
V2FHVyA2IysvL9cIQBgAABUkv6g%%
**From:** Dmitry Shelhoff <dshelhoff@pergamentcepeda.com>
**Sent:** August 21, 2023 11:51 AM
**To:** Clark, Shannon K. <SKClark@Venable.com>; 'Regan, Crystal L.' <crystalregan@parkerpoe.com>;
Roberts, Melinda R. <MRRoberts@Venable.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz,
Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Loh,
Christopher E. <CLoh@Venable.com>; Flanders, Susanne L. <SLFlanders@Venable.com>; Manas,
Gregory J. <GJManas@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>;
dsilver@mccarter.com; 'Joyce, Alexandra' <ajoyce@mccarter.com>
**Cc:** 'Florence, Robert L.' <robertflorence@parkerpoe.com>; 'Dharamsi, Tasneem A.'
<tasneemdharamsi@parkerpoe.com>; '[contact] Kenneth Canfield'
<kcanfield@pergamentcepeda.com>; '[contact] Julia Kim' <jkim@pergamentcepeda.com>; '[contact]
David Moore' <dmoore@potteranderson.com>; '[contact] Bindu Palapura'
<bpalapura@potteranderson.com>

**Subject:** RE: In re Entresto, C.A. 20-2930-RGA; 21-1760-RGA; 21-1794-RGA; 22-451-RGA - '667 Patent Litigation

**Caution: External Email**

Counsel,

The '667 Defendants are available for an M&C tomorrow, 22nd, at 11 a.m. EST.

Best,
Dmitry

Dmitry Shelhoff
Partner| Chair of Litigation | Pᴇʀɢᴀᴍᴇɴᴛ & Cᴇᴘᴇᴅᴀ LLP
25 Hanover Road, Suite 104
Florham Park, NJ 07932
973-998-7722 | dshelhoff@pergamentcepeda.com

**From:** Clark, Shannon K. <SKClark@Venable.com>
**Sent:** Thursday, August 17, 2023 4:47 PM
**To:** Dmitry Shelhoff <dshelhoff@pergamentcepeda.com>; 'Regan, Crystal L.' <crystalregan@parkerpoe.com>; Roberts, Melinda R. <MRRoberts@Venable.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Flanders, Susanne L. <SLFlanders@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; dsilver@mccarter.com; 'Joyce, Alexandra' <ajoyce@mccarter.com>
**Cc:** 'Florence, Robert L.' <robertflorence@parkerpoe.com>; 'Dharamsi, Tasneem A.' <tasneemdharamsi@parkerpoe.com>; '[contact] Kenneth Canfield' <kcanfield@pergamentcepeda.com>; '[contact] Julia Kim' <jkim@pergamentcepeda.com>; '[contact] David Moore' <dmoore@potteranderson.com>; '[contact] Bindu Palapura' <bpalapura@potteranderson.com>
**Subject:** RE: In re Entresto, C.A. 20-2930-RGA; 21-1760-RGA; 21-1794-RGA; 22-451-RGA - '667 Patent Litigation

Counsel,

We disagree.

First, invalidity contentions are considered initial disclosures under FRCP 26(a), *see* Delaware Default Standard for Discovery 4(d), and failure to disclose information required by FRCP 26(a) may lead to the exclusion of the materials in question under FRCP 37(c)(1). *See ViaTech Tech., Inc. v. Microsoft Corp.*, 2021 WL 663057, at *1, 5 (D. Del. Feb. 19, 2021) ("I do not understand how [the party's] experienced lawyers could have thought that springing clearly new theories on [the other party] in opening expert reports was in compliance with the scheduling order, the Rules, or expected standards of practice."). It is irrelevant whether Novartis was aware of the documents Defendants asserted for the first time in Dr.

Fintel's report as invalidity references. *Praxair Inc. v. ATMI Inc.*, 2005 WL 3159054, at *4 (D. Del. Nov. 28, 2005) ("Prior art references must be disclosed during fact discovery and parties must disclose their intent to rely thereon, regardless of whether or not the opposing party is aware of the reference.").

Second, the Scheduling Order (¶ 12) states that "[a]bsent agreement among the parties, and approval of the Court, no later than May 19, 2023, the parties must finally supplement … invalidity contentions, and all invalidity references." C.A. Nos. 21-cv-01760 (DI 29), 21-cv-01794 (DI 28), 22-cv-451 (DI 42). Defendants never requested an extension of that date for the '667 patent, much less showed good cause for one. *See* FRCP 16(b) ("A schedule may be modified only for good cause and with the judge's consent."); FRCP 16(f) (when a party fails to obey a scheduling order, court may issue sanction authorized by FRCP37(b)(2)(A), including exclusion of evidence); *TQ Delta LLC v. 2Wire, Inc.*, C.A. No. 13-1835-RGA (D.I. 1522) (striking paragraphs of defendant's expert report on invalidity relating to prior art not disclosed before the expert report where the defendant failed to show good cause for amending the scheduling order's deadline for final invalidity contentions).

==Assuming Defendants are unwilling to withdraw reliance on the documents referenced in my email below, kindly provide your availability tomorrow or Monday to meet and confer.==

Best regards,
Shannon

*Please note our new street address effective March 27, 2023. All other information is the same.*

**Shannon K. Clark, Esq. | Venable LLP**
**t** 212.218.2311 | **f** 212.307.5598
151 W. 42nd Street, 49th Floor, New York, NY 10036

SKClark@Venable.com |
https://linklock.titanhq.com/analyse?url=http%3A%2F%2Fwww.Venable.com&data=eJxLtjUzTk4zNUizMDQyMk1VS7EtSC1KT8xNzStJTi1ITUnUS87PVcu1zdR1z89OMvQtTMoKUCu2Lc5OzkksylY1MShLzUtMykkFKyuyTSnOSM3JyE9LA8pgM6jUNqOkpEDV2FHVyA2IysvL9cIQBgAAT0cwsQ%%
**From:** Dmitry Shelhoff <dshelhoff@pergamentcepeda.com>
**Sent:** August 16, 2023 6:47 PM
**To:** Clark, Shannon K. <SKClark@Venable.com>; 'Regan, Crystal L.' <crystalregan@parkerpoe.com>; Roberts, Melinda R. <MRRoberts@Venable.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Flanders, Susanne L. <SLFlanders@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; dsilver@mccarter.com; 'Joyce, Alexandra' <ajoyce@mccarter.com>
**Cc:** 'Florence, Robert L.' <robertflorence@parkerpoe.com>; 'Dharamsi, Tasneem A.' <tasneemdharamsi@parkerpoe.com>; '[contact] Kenneth Canfield' <kcanfield@pergamentcepeda.com>; '[contact] Julia Kim' <jkim@pergamentcepeda.com>; '[contact] David Moore' <dmoore@potteranderson.com>; '[contact] Bindu Palapura' <bpalapura@potteranderson.com>
**Subject:** RE: In re Entresto, C.A. 20-2930-RGA; 21-1760-RGA; 21-1794-RGA; 22-451-RGA - '667 Patent Litigation

**Caution: External Email**

Counsel,

Plaintiffs' email below stems from misunderstanding of the role of contentions and expert reports.  The documents identified below were featured in the depositions of Novartis' fact witnesses Rizkala and Twisk.  See deposition dates of those Novartis's fact witnesses.  And an expert is certainly allowed to rely on any documents he identifies and decides to use in his expert report including those Novartis' fact witnesses testified about especially on such an issue as prior use.  With respect to contentions, lawyers are not experts.  ==All major prior art has been identified.==  And by the way, experts can certainly add references prior art or not – depending on the context – to their expert report.  With respect to the '659 patent, as you may recall, the parties discussed it extensively during the September 2022 trial.  Plaintiffs' experts are welcome to respond to Defendants' opening expert reports.  Other than that, Defendants will object to Novartis' "reservation" of the "right" to identify any additional fact witnesses.  There are no new issues here.  Your citation to Rule 37 and 26 are inapposite and again show misunderstanding of the role of contentions and expert reports.

Best,
Dmitry

Dmitry Shelhoff
Partner| Chair of Litigation | PERGAMENT & CEPEDA LLP
25 Hanover Road, Suite 104
Florham Park, NJ 07932
973-998-7722 | dshelhoff@pergamentcepeda.com

**From:** Clark, Shannon K. <SKClark@Venable.com>
**Sent:** Wednesday, August 16, 2023 5:51 PM
**To:** Regan, Crystal L. <crystalregan@parkerpoe.com>; Roberts, Melinda R. <MRRoberts@Venable.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Flanders, Susanne L. <SLFlanders@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; dsilver@mccarter.com; Joyce, Alexandra <ajoyce@mccarter.com>
**Cc:** Florence, Robert L. <robertflorence@parkerpoe.com>; Dharamsi, Tasneem A. <tasneemdharamsi@parkerpoe.com>; [contact] Dmitry Shelhoff <dshelhoff@pergamentcepeda.com>; [contact] Kenneth Canfield <kcanfield@pergamentcepeda.com>; [contact] Julia Kim <jkim@pergamentcepeda.com>; [contact] David Moore <dmoore@potteranderson.com>; [contact] Bindu Palapura <bpalapura@potteranderson.com>
**Subject:** RE: In re Entresto, C.A. 20-2930-RGA; 21-1760-RGA; 21-1794-RGA; 22-451-RGA - '667 Patent Litigation

Counsel,

In the Opening Expert Report of Dan Fintel, M.D. on the Invalidity of U.S. Patent No. 11,058,667, Defendants rely on the following:

- VA Consent Form as a public use or prior art printed publication (see Fintel Opening Report at ¶¶ 158-164, 173-174, 181, 199, 272-310, 317, 329, 332, 362)
- FDA Guidance for Institutional Review Boards and Clinical Investigators dated January 1998 (see Fintel Opening Report at ¶ 162);
- ███████████████████ as a public use (see Fintel Opening Report at ¶¶ 174-175, 305-332, 363);
- Open Label Patients as a public use (see Fintel Opening Report at ¶¶ 174, 176-178, 333-376);
- LCZ696 Angioedema Adjudication Committee TC October 17, 2013 meeting minutes (see Fintel Opening Report at ¶ 207);
- '659 patent as a prior art patent (see Fintel Opening Report at ¶¶ 85-87, 201-204).

None of the above was disclosed in Defendants' invalidity contentions. Thus, given their untimely disclosure, please confirm by no later than August 18th that Defendants withdraw reliance on (1) the VA Consent Form, (2) FDA Guidance for Institutional Review Boards and Clinical Investigators dated January 1998, (3) █████████████████, (4) the Open-Label Patients, (5) LCZ696 Angioedema Adjudication Committee TC October 17, 2013 meeting minutes, and (6) the '659 patent. See FRCP 37(c)(1) ("If a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or is harmless.").  Novartis reserves its right to identify additional fact witness(es) to speak to the new issues if Defendants refuse to withdraw them.

Best regards,
Shannon

***Please note our new street address effective March 27, 2023. All other information is the same.***

Shannon K. Clark, Esq. | Venable LLP
t 212.218.2311 | f 212.307.5598
151 W. 42nd Street, 49th Floor, New York, NY 10036

SKClark@Venable.com |
https://linklock.titanhq.com/analyse?url=http%3A%2F%2Fwww.Venable.com&data=eJxLtjUzTk4zNUizMDQyMk1VS7EtSC1KT8xNzStJTi1ITUnUS87PVcu1DSquMCss9csJL9W1VCu2Lc5OzkksyIY1MShLzUtMykkFKyuyTSnOSM3JyE9LA8pgM6jUNqOkpEDV2FHVyA2IysvL9cIQBgAAW3Uw0g%%
**From:** Regan, Crystal L. <crystalregan@parkerpoe.com>
**Sent:** July 28, 2023 4:50 PM
**To:** Roberts, Melinda R. <MRRoberts@Venable.com>; Clark, Shannon K. <SKClark@Venable.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Flanders, Susanne L. <SLFlanders@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; dsilver@mccarter.com; Joyce, Alexandra <ajoyce@mccarter.com>
**Cc:** Florence, Robert L. <robertflorence@parkerpoe.com>; Dharamsi, Tasneem A. <tasneemdharamsi@parkerpoe.com>; [contact] Dmitry Shelhoff <dshelhoff@pergamentcepeda.com>; [contact] Kenneth Canfield <kcanfield@pergamentcepeda.com>; [contact] Julia Kim <jkim@pergamentcepeda.com>; [contact] David Moore <dmoore@potteranderson.com>; [contact] Bindu Palapura <bpalapura@potteranderson.com>
**Subject:** In re Entresto, C.A. 20-2930-RGA; 21-1760-RGA; 21-1794-RGA; 22-451-RGA - '667 Patent Litigation

**Caution: External Email**

Counsel, attached please find the Opening Expert Report of Dan Fintel, M.D. on the Invalidity of U.S. Patent No. 11,058,667, which has been designated "Highly Confidential - Outside Attorneys' Eyes Only."  Please follow the below link to access the accompanying production of documents labeled DEF-SACVAL-667-00000036-DEF-SACVAL-667-00000391.  Thank you.

https://parkerpoe.sharefile.com/d-s2959ab4e54bc4ed18fc4826369a2be6c

---

**Crystal Regan**
Paralegal



1075 Peachtree Street N.E. | Suite 1500 | Atlanta, Georgia 30309
Office: 678.690.5705 | Mobile: 404.227.7946 | Fax: 404.869.6972 | map
Email: crystalregan@parkerpoe.com

Visit our website at
https://linklock.titanhq.com/analyse?url=http%3A%2F%2Fwww.parkerpoe.com&data=eJxtz
DsPwiAUhuFfA5tNpZfocAaXjg4unfFwkKRQkIv48yWdTb7t_fIgzAPqqdeXsxATcQWB4ks62jNSI
CU79I47eKTv_C53u5bTlSdIG1oZNzb2H9rl09Jxi6CSIWu81q38gwqYnAMbbkwsbbXWLjSHYvA
H8QPBHDHe

*********************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
*********************************************************************

*********************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
*********************************************************************

*********************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
*********************************************************************

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | C.A. No. 20-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>CRYSTAL PHARMACEUTICAL (SUZHOU) CO., LTD.,<br><br>Defendant. | C.A. No. 21-1452-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>HETERO USA INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT III,<br><br>Defendants. | C.A. No. 21-1760-RGA |

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>       Plaintiff,<br><br>       v.<br><br>MYLAN PHARMACEUTICALS INC.,<br><br><br>       Defendant. | C.A. No. 22-451-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>       Plaintiff,<br><br>       v.<br><br>TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD.,<br><br><br>       Defendants. | C.A. No. 21-1794-RGA |

## DEFENDANTS' JOINT SUPPLEMENTAL INVALIDITY CONTENTIONS FOR U.S. PATENT NO. 11,058,667

treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to a dose of ~~<10 mg~~≤ 10 mg of enalapril per day.

Aug. 31, 2021 Certificate of Correction at 1.

## V.     SCOPE AND CONTENT OF PRIOR ART

An identification and brief overview of selected prior art related to the '667 patent is provided below. The identified references and overview are representative of the general knowledge and state of the art that was available to a person of ordinary skill in the art ("POSA").

The following items of prior art are prior art to the '667 patent as specified below. The items identified as prior art under § 102(b) are prior art regardless of the earliest filing date asserted by Novartis. Any item identified as prior art under § 102(a) is prior art under such section even if the '667 patent is entitled to its earliest possible filing date. Such a reference is also prior art under § 102(b) to the extent that the '667 patent is not entitled to its earliest possible filing date. To the extent Novartis attempts to establish priority to the earliest possible filing date or to any other date earlier than the filing of the '399 application, Defendants reserve the right to respond.

Defendants fully incorporate all of the references discussed herein, as well as those listed on the face of the '667 patent and cited in its prosecution history. The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations.

Moreover, the references discussed herein are representative of additional prior-art references in the relevant field. Discussions of any specific disclosures of what was typical or well-known at the relevant time should not be construed as limiting. A POSA knew to read references as a whole and in the context of other publications, literature, and the general

30

knowledge in the field. Defendants may rely on all such information, including other portions of the prior-art references listed herein and other publications and expert testimony, to provide context and as aids to understanding and interpreting the listed references, or to establish that it would have been obvious for a POSA to modify or combine any of the cited references. Defendants reserve the right to modify their bases for invalidity, including to add additional prior-art references, in light of fact discovery, expert discovery, arguments or positions advanced by Novartis, or the Court's claim-construction rulings.

For prior art publications identified herein, Defendants reserve the right to rely on the public use, offer for sale, and/or sale of products described in those prior-art publications.

## A.    Brief Description of Select Prior Art

Defendants identify the following patents and publications as prior art that anticipate and/or render obvious the asserted claims under 35 U.S.C. §§ 102 and 103, either alone or in combination. Because investigation and discovery are ongoing, Defendants reserve the right to supplement, amend and/or modify their disclosures. Defendants also incorporate all references and prior art cited on the faces of the patents-in-suit and any related family members, and any references contained in the file histories of the patents-in-suit, to the extent not included on the faces of the patents-in-suit. Additionally, the order in which the prior art is analyzed in these contentions is in no way indicative of Defendants' beliefs in the relative strength of any position. To the extent that any of the elements of the asserted claims are deemed missing from the references, such elements would have been known or obvious to a POSA at the time of the invention. *See generally KSR, Int'l Co. v. Teleflex, Inc*., 550 U.S. 398 (2007).

Without limiting the contents of the prior art references on which Defendants rely, Defendants set forth a summary of each prior art reference below. Where elements are disclosed at multiple locations within a single prior art reference, Defendants have not necessarily identified

every location in that reference. Likewise, where a reference is listed for one or more claim elements, Defendants have not necessarily identified every element of that claim, or claim in that patent, to which that reference applies. Defendants may rely on uncited portions of the identified prior art, references identified in the prior art disclosed herein, other documents, and expert testimony. The citations to a particular Example, Table, or Figure from a reference include the caption and description and any text relating to the same. Similarly, citations to particular text referring to an Example, Table, or Figure also include the Example, Table, or Figure and caption.

### 1.   ACCF/AHA Guideline

Yancy et al., 2013 ACCF/AHA Guideline for the Management of Heart Failure: A Report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines, 128 Circulation e240 (2013) ("ACCF/AHA Guideline"). ACCF/AHA Guideline was published on October 15, 2013 (and published online on June 5, 2013). It constitutes prior art under 35 U.S.C. § 102(a)(1) to the '667 patent. ACCF/AHA Guideline was neither cited by the Examiner in an Office Action nor submitted by Applicant in an Information Disclosure Statement during prosecution of the '667 patent.

ACCF/AHA Guideline discloses clinical practice guidelines set forth by the American College of Cardiology Foundation and the American Heart Association Task Force for the management of heart failure. ACCF/AHA Guideline discusses management of heart failure (HF), including heart failure with reduced ejection fraction (HF$r$EF), and discloses, "[r]andomized controlled trials (RCTs) in patients with HF have mainly enrolled patients with HF$r$EF with an [ejection fraction] ≤35% or ≤40%, and it is only in these patients that efficacious therapies have been demonstrated to date." *See* ACCF/AHA Guideline at e247. ACCF/AHA Guideline describes HF$r$EF as referring to heart failure with an ejection fraction ≤40%:

32

**Table 3.   Definitions of HF*r*EF and HF*p*EF**

| Classification | EF (%) | Description |
|---|---|---|
| I. Heart failure with reduced ejection fraction (HF*r*EF) | ≤40 | Also referred to as systolic HF. Randomized controlled trials have mainly enrolled patients with HF*r*EF, and it is only in these patients that efficacious therapies have been demonstrated to date. |
| II. Heart failure with preserved ejection fraction (HF*p*EF) | ≥50 | Also referred to as diastolic HF. Several different criteria have been used to further define HF*p*EF. The diagnosis of HF*p*EF is challenging because it is largely one of excluding other potential noncardiac causes of symptoms suggestive of HF. To date, efficacious therapies have not been identified. |
| a. HF*p*EF, borderline | 41 to 49 | These patients fall into a borderline or intermediate group. Their characteristics, treatment patterns, and outcomes appear similar to those of patients with HF*p*EF. |
| b. HF*p*EF, improved | >40 | It has been recognized that a subset of patients with HF*p*EF previously had HF*r*EF. These patients with improvement or recovery in EF may be clinically distinct from those with persistently preserved or reduced EF. Further research is needed to better characterize these patients. |

EF indicates ejection fraction; HF, heart failure; HF*p*EF, heart failure with preserved ejection fraction; and HF*r*EF, heart failure with reduced ejection fraction.

*See id.*, Table 3 (emphasis added).

ACCF/AHA Guideline discloses that angiotensin receptor blockers ("ARBs") may be useful pharmacological treatments for patients with HF*r*EF, as first line therapy in the treatment of HF*r*EF. In particular, ACCF/AHA Guideline discloses the following treatment protocol, wherein patients are initially treated with an ACE inhibitor <u>or</u> ARB, and a beta blocker:



**Figure 1.** Stage C HF*r*EF: evidence-based, guideline-directed medical therapy. ACEI indicates angiotensin-converting enzyme inhibitor; ARB, angiotensin-receptor blocker; HF*r*EF, heart failure with reduced ejection fraction; Hydral-Nitrates, hydralazine and isosorbide dinitrate; LOE, Level of Evidence; and NYHA, New York Heart Association.

*See id.* at e264 (emphasis added).

ACCF/AHA Guideline discloses that ACE inhibitors can be used for the treatment of HF*r*EF and that "[t]reatment with an ACE inhibitor should be initiated at low doses (Table 15), followed by gradual dose increments if lower doses have been well tolerated" and that "[i]f these target doses [shown to reduce the risk of cardiovascular events in clinical trials] cannot be used or are poorly tolerated, intermediate doses should be used with the expectation that there are likely to be only small differences in efficacy between low and high doses." *See id.* at e266.

Table 15 discloses the following:

**Table 15.   Drugs Commonly Used for Stage C HF*r*EF**

| Drug | Initial Daily Dose(s) | Maximum Dose(s) | Mean Doses Achieved in Clinical Trials |
|---|---|---|---|
| **ACE inhibitors** | | | |
| Captopril | 6.25 mg 3 times | 50 mg 3 times | 122.7 mg/d[422] |
| Enalapril | 2.5 mg twice | 10 to 20 mg twice | 16.6 mg/d[413] |
| Fosinopril | 5 to 10 mg once | 40 mg once | N/A |
| Lisinopril | 2.5 to 5 mg once | 20 to 40 mg once | 32.5 to 35.0 mg/d[445] |
| Perindopril | 2 mg once | 8 to 16 mg once | N/A |
| Quinapril | 5 mg twice | 20 mg twice | N/A |
| Ramipril | 1.25 to 2.5 mg once | 10 mg once | N/A |
| Trandolapril | 1 mg once | 4 mg once | N/A |
| **ARBs** | | | |
| Candesartan | 4 to 8 mg once | 32 mg once | 24 mg/d[420] |
| Losartan | 25 to 50 mg once | 50 to 150 mg once | 129 mg/d[421] |
| Valsartan | 20 to 40 mg twice | 160 mg twice | 254 mg/d[198] |
| **Aldosterone antagonists** | | | |
| Spironolactone | 12.5 to 25.0 mg once | 25 mg once or twice | 26 mg/d[425] |
| Eplerenone | 25 mg once | 50 mg once | 42.6 mg/d[446] |
| **Beta blockers** | | | |
| Bisoprolol | 1.25 mg once | 10 mg once | 8.6 mg/d[117] |
| Carvedilol | 3.125 mg twice | 50 mg twice | 37 mg/d[447] |
| Carvedilol CR | 10 mg once | 80 mg once | N/A |
| Metoprolol succinate extended release (metoprolol CR/XL) | 12.5 to 25 mg once | 200 mg once | 159 mg/d[448] |
| **Hydralazine and isosorbide dinitrate** | | | |
| Fixed-dose combination[424] | 37.5 mg hydralazine/20 mg isosorbide dinitrate 3 times daily | 75 mg hydralazine/40 mg isosorbide dinitrate 3 times daily | ~175 mg hydralazine/90 mg isosorbide dinitrate daily |
| Hydralazine and isosorbide dinitrate[449] | Hydralazine: 25 to 50 mg, 3 or 4 times daily and isosorbide dinitrate: 20 to 30 mg 3 or 4 times daily | Hydralazine: 300 mg daily in divided doses and isosorbide dinitrate: 120 mg daily in divided doses | N/A |

ACE indicates angiotensin-converting enzyme; ARB, angiotensin-receptor blocker; CR, controlled release; CR/XL, controlled release/extended release; HF*r*EF, heart failure with reduced ejection fraction; and N/A, not applicable.

*See id.*, Table 15 (emphasis added).

ACCF/AHA Guideline also discloses that angiotensin receptor blockers can also be used to treat heart failure patients. ACCF/AHA Guideline discloses that "ARBs are recommended in patients with HF*r*EF with current or prior symptoms who are ACE inhibitor intolerant, unless contraindicated, to reduce morbidity and mortality," and that "ARBs are reasonable to reduce morbidity and mortality as alternatives to ACE inhibitors as first-line therapy for patients with HF*r*EF, especially for patients already taking ARBs for other indications, unless contraindicated." *See id.* at e267, under *7.3.2.3. ARBs: Recommendations*. Further, ACCF/AHA Guideline discloses that ARBs can also be used in patients being treated with an ACE inhibitor, stating: "Addition of an ARB may be considered in persistently symptomatic patients with HF*r*EF who are already being treated with an ACE inhibitor… ." *See id*.

ACCF/AHA Guideline discloses that ARB therapy should be initiated with starting doses, and with dose changes occurring "within 1 to 2 weeks of initiation," after assessing the patient. *See id*., under *7.3.2.3.2: ARBs: Initiation and Maintenance*. Further, as indicated below, ACCF/AHA Guideline states that "[t]itration is generally achieved by doubling doses."

> *7.3.2.3.2. ARBs: Initiation and Maintenance.* When used, ARBs should be initiated with the starting doses shown in Table 15. Many of the considerations with initiation of an ARB are similar to those with initiation of an ACE inhibitor, as discussed previously. Blood pressure (including postural blood pressure changes), renal function, and potassium should be reassessed within 1 to 2 weeks after initiation and followed closely after changes in dose. Patients with systolic blood pressure <80 mm Hg, low serum sodium, diabetes mellitus, and impaired renal function merit close surveillance during therapy with inhibitors of the renin angiotensin-aldosterone system. Titration is generally achieved by doubling doses. For stable patients, it is reasonable to add therapy with beta-blocking agents before full target doses of either ACE inhibitors or ARBs are reached.

35

*See id.* Further, ACCF/AHA Guideline discloses, *inter alia*, the following strategies for achieving optimal guideline-directed medical therapy (GDMT):

**Table 20.    Strategies for Achieving Optimal GDMT**

1. *Uptitrate in small increments* to the recommended target dose or the highest tolerated dose for those medications listed in Table 15 with an appreciation that some patients cannot tolerate the full recommended doses of all medications, particularly patients with low baseline heart rate or blood pressure or with a tendency to postural symptoms.
2. Certain patients (eg, the elderly, patients with chronic kidney disease) may require *more frequent visits and laboratory monitoring during dose titration* and more gradual dose changes. However, such vulnerable patients may accrue considerable benefits from GDMT. Inability to tolerate optimal doses of GDMT may change after disease-modifying interventions such as CRT.

*See id.* at e276, Table 20 (emphasis in original).

Finally, ACCF/AHA Guideline discloses exemplary drug therapies for patients with HF*r*EF, which include administration of the ARB valsartan at an initial daily dose of 20 to 40 mg twice daily, to a maximum dose of 160 mg twice daily. *See id.* at e266, Table 15.

## 2.    Cohn

J. Cohn et al*., A Randomized Trial Of The Angiotensin-Receptor Blocker Valsartan In Chronic Heart Failure*, N. Eng. J. Med., 345(23):1167-1675, December 2001 ("Cohn") is prior art to the '667 patent at least under 35 U.S.C. § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Cohn was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent.

Cohn disclosed a study "to determine whether the angiotensin-receptor blocker valsartan could further reduce morbidity and mortality among patients who were already receiving the pharmacologic therapy that was considered optimal by their physicians." Cohn at 1667. Cohn disclosed that "Valsartan was initiated at a dose of 40 mg twice daily, and the dose was doubled every two weeks until a target dose of 160 mg twice daily was reached." Cohn at 1668.

## 3.    Desai

Desai et al., *Incidence and Predictors of Hyperkalemia in Patients with Heart Failure,* Journal of American College of Cardiology (2007), 1959-66 ("Desai") is prior art to the '667 patent

at least under 35 U.S.C. § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Desai was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent. Desai teaches:

> Heart failure patients are particularly susceptible to hyperkalemia, since the reduction in renal function associated with HF, older age, and comorbidities such as diabetes mellitus hampers baseline potassium excretion.

Desai at 1959.

> Although these groups derive incremental clinical benefit from candesartan, careful surveillance of serum potassium and creatinine is particularly important.

*Id.* at 1959.

> **Study drug was dosed according to an incremental, biweekly, forced titration scheme.** At randomization, study drug was initiated at 4 mg once daily (or at 8 mg once daily at the investigator's discretion). The dose was then doubled every 2 weeks as tolerated up to a maximum target dose of 32 mg candesartan (or matching placebo) once daily. Visits were scheduled at 2, 4, and 6 weeks; 6 months; and then every 4 months until study end. Investigators were instructed to assess serum creatinine and potassium before drug initiation, within 2 weeks of dose escalation or completion of dose titration, yearly thereafter, and at their discretion. There were no pre-specified mandates regarding the management of hyperkalemia. Follow-up was conducted over a minimum of 2 years, and a maximum of 4 years with median duration of 3.2 years.

*Id.* at 1960 (emphasis added).

> Reassuringly, many hyperkalemia events in the CHARM Program could be adequately addressed by dose adjustment or discontinuation of the study drug, with the minority progressing to hospitalization or death. We conclude that **periodic surveillance of serum potassium and creatinine** (e.g., at baseline, within 1 to 2 weeks of a change in drug dosing, and at least annually thereafter) is critically important to limiting adverse events. The subset of older HF patients who have moderate or severe renal dysfunction (stage III chronic kidney disease or worse, many of whom were not eligible for the CHARM Program), those with high serum potassium at baseline, and those who receive combination RAAS antagonists are particularly vulnerable, **necessitating even closer monitoring.**

*Id.* at 1965 (emphasis added).

4.        **Dickstein**

Dickstein et al., *ESC Guidelines for the diagnosis and treatment of acute and chronic heart failure 2008,* European Journal of Heart Failure (2008), 933-989 ("Dickstein") is prior art to the '667 patent at least under § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Dickstein was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent. Dickstein is informative and instructive on the definition, symptomology, and treatment for HF and reduced ejection fraction, and teaches:

> There is no consensus concerning the cut-off for preserved EF. The EF is the stroke volume divided by the end-diastolic volume for the relevant ventricular chamber of the heart and is therefore largely determined by the end-diastolic volume of the ventricular chamber (i.e. a dilated heart). An EF below or above 40%, distinguishes between large or normal left end-diastolic ventricular volumes. The distinction has arisen largely because in the past most patients admitted to hospitals for investigation or entered into clinical trials have had dilated hearts with a reduced EF<35 or 40%.

*Id.* at 936.

Dickstein teaches how to use an Angiotensin-Converting Enzyme Inhibitor (ACEI):

> Consider dose up-titration after 2-4 weeks. Do not increase the dose if significant worsening of renal function or hyperkalaemia. Re-check renal function and serum electrolytes 1 and 4 weeks after an increasing dose. More rapid dose uptitration can be carried out in patients in hospital or otherwise closely supervised, tolerability permitting.

*Id.* at 950.

Dickstein discloses both the recommended starting dosage and a titration approach for valsartan under its discussion of the drug class angiotensin receptor blockers (ARBs), to which valsartan belongs:

> Unless contraindicated or not tolerated, an ARB is recommended in patients with HF and an LVEF ≤40% who remain symptomatic despite optimal treatment with an ACEI and b-blocker, unless also taking an aldosterone antagonist. Treatment with an ARB improves ventricular function and patient well-being, and

38

reduces hospital admission for worsening HF.

*Id.* at 953.

Dickstein ties the recommendation of an ARB, such as valsartan, to patients with heart failure and a reduced ejection fraction. Dickstein continues:

> **How to use an angiotensin receptor blocker in heart failure**. . . Starting dose … valsartan 40 mg b.i.d. . . . Consider dose up-titration after 2–4 weeks. Do not increase dose if worsening renal function or hyperkalaemia. Re-check renal function and serum electrolytes 1 and 4 weeks after increasing dose. In absence of problems, aim for evidence-based target dose . . . valsartan 160 mg b.i.d.—or maximum tolerated dose.

*Id.* at 954.

### 5.   Diovan (valsartan) capsules FDA Label, Revised: 03/2014

The Diovan (valsartan) capsules FDA Label, Revised: 03/2014 ("Diovan label") is prior art to the '667 patent at least under § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because the Diovan label was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent.

The label states in the section relating to heart failure:

> **2.3 Heart Failure**
> The recommended starting dose of Diovan is 40 mg twice daily. (Doses below 80 mg are available only in the tablet form.) Uptitration to 80 mg and 160 mg twice daily should be done to the highest dose, as tolerated by the patient. Consideration should be given to reducing the dose of concomitant diuretics. The maximum daily dose administered in clinical trials is 320 mg in divided doses.

Diovan label at 3.

### 6.   Dungen

Dungen et al., is entitled "Titration to target dose of bisoprolol vs. carvedilol in elderly patients with heart failure: the CIBS-ELD trial," European Journal of Heart Failure (2011) 13, 670-680 ("Dungen"). Dungen is prior art to the '667 patent at least under § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Dungen was published more than one year before

May 11, 2015, the earliest possible effective filing date of the '667 patent.

Dungen discloses a titration schedule which gradually moves from a low starting dose to a full target dose over a conventional duration of six weeks, along with recommendations to extend that duration if clinically indicated:

> During the initial titration phase of the study, patients were seen at fortnightly intervals. According to the titration scheme [based on the 2005 European Society of Cardiology (ESC) guidelines][14], the dose was scheduled to double at every visit to reach the target dose of 10 mg bisoprolol once daily or 25 mg carvedilol twice daily within 6 weeks (50 mg twice daily within 8 weeks for patients >85 kg). Investigators were free to delay titration or reduce the dose if clinically indicated. The titration phase was followed by a maintenance period lasting 4 weeks and the final visit was at 10 weeks (12 weeks for patients >85 kg).

Dungen at 672. Footnote 14 of Dungen, which appears after the bracketed text in the passage quoted above, identifies the authoritative article followed in design of this study as being the very same Swedberg article discussed below.

### 7. FDA IND Guidance

U.S. Food & Drug Administration, CDER, Office of New Drugs, *Good Review Practice: Clinical Review of Investigational New Drug Applications* (Dec. 2013) ("FDA IND Guidance") was published in 2013, *available at*. FDA IND Guidance is prior art to the '667 patent at least under § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because FDA IND Guidance was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent.

FDA IND Guidance discloses that "[d]ose-response and concentration-response information for both effectiveness and adverse effects of drugs are critical components of the evaluation, safety, and effectiveness of drugs and the findings are important components of drug labeling." FDA IND Guidance at 22. FDA IND Guidance further discloses:

> In assessing dose-response, it is important to allow adequate duration at a given drug dose to allow full effect of the specific drug to be manifested, a potential problem for titration designs. Because the subject's response during the early dosing period may not be the same as in the subsequent maintenance dosing period, it is desirable to study dose-response during maintenance treatment.

*Id*. FDA IND Guidance further discloses:

> A lower starting dose can be used when the drug has significant first dose effects (e.g., alpha blockers for hypertension), serious dose-related adverse effects, and adverse effects that decrease with continued use or that are decreased by titration. There is value in examining not only the mean (population average) dose-response, but also individual responses, looking for subsets of patients also responding to lower doses. The need for lower starting doses could be suggested by intersubject variability in PD response to a given concentration of drug in the blood or by intersubject PK differences that could arise from nonlinear kinetics, metabolic polymorphism, or drug-drug interactions. In certain cases, adequate knowledge of exposure-response can allow assessment of the appropriateness of proposed doses and/or dosing regimens. In some cases, such analysis leads to approval of doses not directly studied in clinical trials to improve benefit-to-risk ratio.

*Id*. at 24. FDA IND Guidance further discloses, under "4.2 Titration Clinical Trials":

> *Titration designs with only two groups* (e.g., a titrated group and placebo) require fewer subjects than a randomized, parallel dose-response trial of the same number of doses, and, with a concurrent placebo group included in the trial design, can provide evidence of effectiveness and an early estimate of dose-response. If the effect of the drug and of dose changes is fairly rapid (e.g., as it is for many antihypertensives), such a trial can explore many doses effectively. This kind of trial can be particularly valuable early in the drug development process and can be used to narrow the dose range for a later, more definitive randomized parallel group dose-response trial.

*Id*. at 26 (italics original).

### 8.     First Report Managed Care

The First Report Managed Care "The Goal of Our Trial Was to Find Evidence Convincing Enough to Replace Gold Standard Angiotensin-Converting Enzyme Inhibitor Therapy" (April 2015). The First Report Managed Care published in April 2015 and qualifies as prior art under 35 U.S.C. § 102(a)(1) to the '667 patent. The First Report Managed Care was neither cited by the Examiner in an Office Action nor submitted by Applicant in an Information Disclosure Statement during prosecution of the '667 patent.

41

The First Report Managed Care discloses that patients were eligible for study inclusion if they were ≥ 18 years of age with New York Heart Association class 2, 3, or 4 and an ejection fraction of ≤40% (which was later changed to ≤35% during the study). There were 3 phases of PARADIGM: (1) screening; (2) a single-blind, run-in period in which all patients received enalapril 10 mg twice daily, followed by a single-blind, run-in period in which all patients received LCZ696 (100 mg twice daily and titrated to 200 mg twice daily); and (3) subsequent double-blind treatment in the 2 study groups.

The First Report Managed Care discloses that participants moved on from the run-in periods only if no unacceptable side effects occurred. A minimum of 36 hours had to elapse between treatment with enalapril and LCZ696 during the run-in periods to protect patients from being exposed to both mechanisms of action. *Id.* ¶ 7.

### 9. Flack

J. Flack et al.*, The Rapidity of Drug Dose Escalation Influences Blood Pressure Response and Adverse Effects Burden in Patients With Hypertension*, Arch. Int. Med., 160:1842-1847, 2000 is prior art to the '667 patent at least under 35 U.S.C. § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Flack was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent.

Flack discloses a clinical trial "to determine whether quinapril, a long-acting angiotensin-converting enzyme (ACE) inhibitor, would result in greater hypertension control rates as well as fewer adverse effects in patients with Joint National Committee on Prevention, Detection, Evaluation, and Treatment of High Blood Pressure (JNC) VI stage 1 to 2 hypertension when dose escalation of the ACE inhibitor quinapril was undertaken at a slower pace." Flack at 1842-43. Flack discloses that in the slow titration group, drug titration occurred every 6 weeks and in the fast titration group, drug titration occurred every 2 weeks. *Id*. at 1843. Flack disclosed that, when

titrating a drug, a slower titration can lead to fewer adverse events than a rapid titration. Specifically, Flack disclosed "Slower dose escalation of [quinapril] provides higher BP control and fewer serious adverse events than more rapid dose escalation." *Id*. at 1842.

### 10.   Gu

Gu et al., Pharmacokinetics and Pharmacodynamics of LCZ696, a Novel Dual-Acting Angiotensin Receptor-Neprilysin Inhibitor (ARNi), 50(4) J. Clin. Pharmacol. 401 (2010) ("Gu"). Gu was published in April 2010, and constitutes prior art under 35 U.S.C. § 102(a)(1) to the '667 patent. Gu was cited by Applicant in an Information Disclosure Statement, but Gu was not cited by the Examiner in an Office Action during prosecution of the '667 patent.

Gu discusses pharmacokinetic and pharmacodynamics properties of LCZ696, which is described as follows:

> LCZ696 (trisodium [3-((1$S$,3$R$)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-($S$)-3'-methyl-2'-(pentanoyl{2''-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate) comprises molecular moieties of valsartan, a well-established ARB,[11] and of the NEP inhibitor prodrug AHU377 ((2R, 4S)-5-biphenyl-4-yl-5-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester; Figure 1), which is metabolized to the active NEP inhibitor LBQ657 by enzymatic cleavage of its ethyl ester.[12] LCZ696 is a novel single molecule in which the molecular moieties of valsartan and the molecular moieties of AHU377 are present in a 1:1 molar ratio. The details of the molecular structure of LCZ696 will be presented elsewhere (manuscript submitted).

*See* Gu at 401. Gu also discloses the results of a clinical study in human participants measuring the bioequivalence evaluating the relative exposure of valsartan following administration of LCZ696 and valsartan. Gu discloses "[m]ean plasma concentration-time profiles for valsartan were similar following the administration of a single oral dose of LCZ696 400 mg or valsartan 320 mg (Figure 4)." *See id.* at 408. Further, Gu discloses the following:

> Systemic exposure to valsartan following dosing with LCZ696 400 mg met bioequivalence criteria compared with valsartan 320 mg for $C_{max}$ (geometric mean ratio [90% CI]: 0.98 [0.87-1.10]) and AUC (geometric mean ratio [90% CI]: $AUC_{0\text{-last}}$ 0.90 [0.81-1.00]; $AUC_{0\text{-}\infty}$ 0.90 [0.82-0.99]). Analysis of dose-normalized values for systemic exposure showed that a 40% higher valsartan exposure was achieved following LCZ696 administration than after administration of valsartan alone ($C_{max}$ 1.52 [1.35-1.71]; $AUC_{0\text{-}\infty}$ 1.40 [1.27-1.55]).

*Id.*

Additionally, Gu discloses that "[t]he concurrent effects of LCZ696 on NEP inhibition and $AT_1$ receptor blockade may have benefits for clinical efficacy." *Id.* at 413. Gu concludes:

> In summary, the pharmacokinetic and pharmacodynamic properties of LCZ696 indicate that it is a potent dual-acting angiotensin receptor-NEP inhibitor (ARNi). Following oral administration in healthy participants, LCZ696 rapidly delivers NEP inhibition and angiotensin receptor blockade. The time course and duration of $AT_1$ receptor blockade and NEP inhibition support once-daily dosing in hypertension. Antihypertensive efficacy of LCZ696 was demonstrated in a renin-angiotensin-driven genetic rat model of fulminant hypertension. These results support further development of LCZ696, a novel dual-acting angiotensin receptor−NEP inhibitor, for the treatment of hypertension and heart failure.

*Id.*

### 11.    Jandeleit-Dahm

Jandeleit-Dahm et al. "Dual ACE/NEP inhibitors – more than playing the ACE card," 20, J. Human Hypertension, 478-481 (2006) is prior art to the '667 patent under at least 35 U.S.C. § 102(a)(1). It discloses "as the inhibition of bradykinin breakdown by ACE and NEP is additive, excess bradykinin accumulation may be the cause of angioedema observed with some ACE/NEP inhibitors and, in particular, with omapatrilat." *Id.* at p. 3, ll. 13-15.

### 12.    Jessup

Jessup M., "Neprilysin Inhibition – A Novel Therapy for Heart Failure," 371(11): 1062-64 N. Engl. J. Med. (Sep. 11, 2014) is prior art to the '667 patent under at least 35 U.S.C. § 102(a)(1).

Jessup discloses the PARADIGM-HF study comparing LCZ696 to a target-dose enalapril-based regimen. Jessup at 1. Jessup discloses that "[a]lthough heart-failure guidelines suggest a target twice-daily administration of either 10 mg of enalapril or 160 mg of valsartan, numerous registries acknowledge that lower doses are commonly used in clinical practice." *Id.* at 2.

### 13.  Konstam

Konstam et al., *Effects of high-dose versus low-dose losartan on clinical outcomes in patients with heart failure (HEAAL study): a randomized, double-blind trial,* The Lancet (2009), 1840-48 ("Konstam") is prior art to the '667 patent at least under 35 U.S.C. § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Konstam was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent.

Konstam discussed that adverse events of hyperkalaemia, hypotension, and renal impairment are more common in higher doses of losartan 150 mg daily than with losartan 50 mg daily. Konstam at 1847. Konstam suggested starting at a lower dose and titrating up to a target dose with close monitoring for adverse effects. *Id.*

Konstam et al. compared the effects of high-dose versus low-dose losartan on clinical outcomes in patients with heart failure. Konstam described the study as follows:

> The **H**eart failure **E**ndpoint evaluation of **A**ngiotensin II **A**ntagonist **L**osartan (HEAAL) study compared clinical outcomes in patients with heart failure, reduced LVEF, and intolerance to ACE inhibitors who were randomly assigned to a high (150 mg) or low (50 mg) daily dose of losartan. We tested the hypothesis that incremental losartan dosing would reduce the risk of primary combined endpoint of death or admission for heart failure.

*Id.* at 1840. The dose titration period after randomization is described as follows:

> **Within each stratum, patients were randomly assigned to the** 150 mg (**up-titrated from 50 mg daily over a 3-week period**) and 50 mg doses of losartan, with a 1:1 allocation with block randomization (block size of four). During and after up-titration (or mock titration), every patient received two pills daily: one containing active losartan 50 mg and one containing additional losartan or placebo to achieve the

45

targeted dose.

*Id.* at 1841 (emphasis added).

> During the dose titration period after randomization 1808 patients (94%) patients assigned the 150 mg and 1823 (95%) assigned to the 50 mg dose were titrated up to the 150 mg dose, or mock 150 mg dose, and remained at this dose for a minimum of 30 days.

*Id.* at 1843-44.

> The adverse events of hyperkalaemia, hypotension, and renal impairment, as defined by investigators occurred more commonly in the 150 mg group than the 50 mg group (table 4). . . . Angioedema occurred in six patients in the 150 mg group and in none of in the 50 mg group.

*Id.* at 1845.

> The outcome benefits of losartan 150 mg daily have to be weighed against the several types of adverse effects that we detected with increased frequency. **The rates of hypotension, hyperkalaemia, and renal failure were greater with losartan 150 mg daily than with losartan 50 mg daily.** However, the overall rates and clinical relevance of these events were small, as shown by the infrequent discontinuation of study drug, which occurred with similar frequency to that recorded in previous investigations of ARBs. These findings should be considered in the context that 77% of patients were treated with ARBs before randomization and that a run-in period was used, probably resulting in the enrolment of patients who would better tolerate high doses of losartan over long-term follow-up. **Blood pressure, serum electrolytes, and renal function should be monitored carefully during ARB up-titration**, and the clinical implications of changes in any of these variables should be weighed against the potential outcome benefits that are achievable with an increased ARB dose.

*Id.* at 1847 (emphasis added).

### 14.  Krum

Krum, entitled "Prospective Comparison of ARNi with ACE-I to Determine Impact on Global Mortality and Morbidity in Heart Failure (PARADIGM-HF), *Paragon of a Study or Further Investigation Paramount?"* is an editorial in Circulation, 2015; 131:00-00, p. 1-2 (January

6, 2015) ("Krum"). Krum is prior art to the '667 patent at least under 35 U.S.C. § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Krum is not the work of a named inventor of the '667 patent. The exception of § 102(b)(1) is inapplicable to the extent that the '667 patent is not entitled to its earliest possible filing date.

First, Krum expressed his medical concern that LCZ-696 had a greater side effect profile for postural hypotension than the ACE inhibitor enalapril.

> ***Symptomatic postural hypotension was greater in the LCZ-696 group compared with enalapril and may limit clinical utility***, particularly in those with borderline blood pressure levels before commencement of therapy. Undoubtedly, an analysis of the utility of this agent according to baseline blood pressure will be forthcoming in future studies.

*Id.* at 1 (emphasis added). Krum adds:

> It has to be remembered that this increase in hypotension occurred despite a very carefully controlled run-in period whereby patients were exposed to both ACE inhibitor and LCZ-696, sequentially.

*Id.* (emphasis added). Krum continues:

> Patients not tolerating this run-in for hypotension (or other reasons) were removed from the trial before randomization.

*Id.* (emphasis added).

According to Krum "***in the real world it may be expected that this adverse event will occur with even greater frequency*** and certainly needs to be carefully followed in post-marketing surveillance if/when the drug is approved." *Id.* (emphasis added).

Moreover, Krum noted that even after exclusion of patients who could not tolerate the "run-in period," LCZ-696 was still reported as having a nearly two-fold increase in angioedema as compared to enalapril:

> ***The other major adverse event of concern is the nearly double rate of angioedema with LCZ-696 versus enalapril.***

*Id.* (emphasis added).

47

### 15.    McMurray 2013

McMurray et al., entitled "Dual angiotensin receptor and neprilysin inhibition as an alternative to angiotensin converting enzyme inhibition in patients with chronic systolic heart failure: rationale for and design of the Prospective comparison of ARNI with ACEI to Determine Impact on Global Mortality and morbidity in Heart Failure trial (PARADIGM-HF)", Eur. J. Heart Failure (2013) 15, 1062-1073 ("McMurray 2013") is prior art to the '667 patent at least under § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because McMurray 2013 was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent.

McMurray 2013 discloses the following:

> LCZ696 belongs to a new class of drugs, the angiotensin receptor neprilysin inhibitors (ARNIs), which both block the RAAS and augment natriuretic peptides.

McMurray 2013 at 1062. McMurray 2013 goes on:

> LCZ696 is a first-in-class ARNI. After ingestion, LCZ696 delivers systemic exposure to AHU377, a neprilysin inhibitor pro-drug, and valsartan, an ARB. AHU377 is then rapidly metabolized by non-specific esterases to the active neprilysin inhibitor LBQ657. LCZ696 causes dose-dependent increases in ANP, plasma and urinary cGMP, plasma renin activity, and angiotensin II, effects consistent with activation of the NPR-A receptor and blockade of the angiotensin II type 1 receptor. In healthy volunteers and patients with heart failure, a total daily dose of 400 mg of LCZ696 gives systemic exposure to valsartan similar to Diovan 320 mg daily.

*Id.* at 1067.

McMurray 2013 describes a large heart failure clinical trial, called PARADIGM-HF, which tested the use of ARNI LCZ696 as an alternative to ACE inhibitor enalapril:

> The trial has been registered on Clinicaltrials.gov, NCT01035255.

*Id.*

> Patients with chronic HF [Heart Failure], NYHA class II-I symptoms, an elevated plasma BNP or NT-pro BNP level, and an

48

> LVEF [Left Ventricular Ejection Fraction] of ≤40% were enrolled in the Prospective comparison of ARNI [Angiotensin receptor neprilysin inhibitors] with ACEI to Determine Impact on Global Mortality and morbidity in Heart Failure trial (PARADIGM-HF). Patients entered a single-blind enalapril run-in period (titrated to 10 mg b.i.d.), followed by an LCZ696 run-in period (100 mg titrated to 200 mg b.i.d.). A total of 8436 patients tolerating both periods were randomized 1:1 to either enalapril 10 mg b.i.d. or LCZ696 200 mg b.i.d.

*Id.* at 1062.

The entry criteria for the study were as follows:

> (i) age 18 years or older and able to give written informed consent; (ii) NYHA functional class II–IV; (iii) LVEF ≤ 35% (initially this was ≤ 40% but changed in a protocol amendment dated 15 December 2010); (iv) plasma BNP ≥150 pg/mL (or NT-proBNP ≥600 pg/mL) at the screening visit (Visit 1, Figure 1) or a BNP ≥100 pg/mL (or NT-proBNP ≥400 pg/mL) and a hospitalization for heart failure within the last 12 months;(v) treatment with a stable dose of an ACE inhibitor or an ARB equivalent to enalapril 10 mg/day (see Table 1) for at least 4 weeks before the screening visit; and (vi) treatment with a stable dose of a beta-blocker for at least 4 weeks prior to the screening visit, unless contraindicated or not tolerated.

*Id.* at 1063.

McMurray 2013 describes the study design of PARADIGM as follows:

> The study consists of four phases: (i) screening; (ii) single-blind enalapril run-in; (iii) single-blind LCZ696 run-in; and (iv) randomized double-blind treatment (Figure 1).

*Id.* at 1063.



**Figure I** PARADIGM-HF study schema.

*Id.* at 1064.

### Enalapril active run-in period (Visit 2)

At Visit 2, most eligible patients started 2 weeks of single-blind treatment with enalapril 10 mg b.i.d. A lower dose of enalapril (5 mg b.i.d.) was allowed for patients currently treated with an ARB and for those taking a low dose of ACE inhibitor (see Table 1) if the investigator was concerned that switching directly to enalapril 10 mg b.i.d. might not be tolerated (e.g. because of hypotension, renal dysfunction, and/or hyperkalaemia). These patients were up-titrated to enalapril 10 mg b.i.d. after 1–2 weeks. Patients tolerating enalapril 10 mg b.i.d. as defined by the criteria in Table 3 were eligible for Visit 3.

### LCZ696 active run-in period (Visits 3 and 4)

At Visit 3, patients started single-blind treatment with LCZ696 100 mg b.i.d. After 1–2 weeks, the dose was up-titrated to 200 mg b.i.d., for a further 2–4 weeks.

Other heart failure medication (except for an ACE inhibitor or ARB) was continued during the run-in periods.

### Randomization to double-blind treatment (Visit 5)

Patients tolerating both enalapril 10 mg b.i.d. and LCZ696 200 mg b.i.d., as defined by the criteria in Table 3, were randomized in a 1:1 ratio to double-blind treatment with either enalapril 10 mg b.i.d. or LCZ696 200 mg b.i.d. Study visits occur every 2–8 weeks during the first 4 months of the double-blind period and every 4 months thereafter (with additional unscheduled visits, at the discretion of the investigator).

50

> There were two short washout periods during the run-in periods to minimize the potential risk of angioedema due to overlapping ACE inhibition and NEP inhibition at Visit 3 and Visit 5: (i) enalapril was stopped a day prior to starting LCZ696 at Visit 3 and (ii) LCZ696 was stopped a day prior to starting randomized study drug at Visit 5.

*Id.*

McMurray 2013 uses "washout periods" during run-in periods to decrease adverse effects through concomitant use of neprilysin and ACE inhibitors:

> For safety reasons, there are also two short washout periods during the run-in. These washout periods are designed to minimize concomitant neprilysin and ACE inhibition which is likely to increase the risk of angioedema. Although the risk of angioedema is expected to be low, for the reasons outlined earlier, a special committee of experts are adjudicating all cases of suspected angioedema in PARADIGM-HF and other studies with LCZ696.

*Id.* at 1068.

### 16. McMurray 2014

McMurray et al., *Angiotensin-Neprilysin Inhibition versus Enalapril in Heart Failure, 2014,* New England Journal of Medicine (2014), 993-1003 ("McMurray 2014") is prior art to the '667 patent at least under 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because McMurray 2014 is not the work of a named inventor of the '667 patent (e.g., there are authors other than named inventors). The exception of § 102(b)(1) is inapplicable to the extent that the '667 patent is not entitled to its earliest possible filing date. Even if McMurray 2014 were not itself prior art as a publication, it is relevant to the extent it describes a prior art public use, i.e., that of the NCT01922089 clinical trial.

McMurray 2014 described the study design of PARADIGM-HF, clinical trial NCT01035255, which used LCZ696 in patients having heart failure with a reduced ejection fraction.

> Eligible patients were switched from the ACE inhibitor or ARB that they had been receiving to single-blind treatment with

51

> enalapril (at a dose of 10 mg twice daily) for 2 weeks. If no unacceptable side effects occurred, this regimen was followed by single-blind treatment with LCZ696 for an additional 4 to 6 weeks (initially at a dose of 100 mg twice daily, which was increased to 200 mg twice daily). (The ARB component of the 200 mg dose of LCZ696 is equivalent to 160 mg of valsartan.) During this run-in period, to minimize the risk of angioedema caused by overlapping ACE and neprilysin inhibition, **enalapril was withheld a day before the initiation of treatment with LCZ696**, and LCZ696 was withheld a day before randomization.

McMurray 2014 at 995-97 (emphasis added).

Further, McMurray 2014 described that their study was "designed to provide evidence to support the replacement of ACE inhibitors or ARBs with LCZ696 in the management of chronic heart failure." *Id.* at 1002.

### 17.    McMurray 2016

McMurray et al., entitled "Initiating sacubitril/valsartan (LCZ696) in heart: results of TITRATION, a double-blind, randomized comparison of two uptitration regimens", European Journal of Heart Failure (2016), 18, 1193-1202 ("McMurray 2016"), describes a prior use from 2013-14, i.e., that of the NCT01922089 clinical trial. That prior use, also discussed in other references and described in more detail below, is prior art under at least § 102(a)(1).

McMurray 2016 describes clinical trial NCT01922089, which was initiated in November 2013 and has an "actual primary completion date" of Aug 2014. *See* NCT'089 Pub. McMurray 2016 describes the clinical trial methods and results as follows:

> A 5-day open-label run-in (sacubitril/valsartan 50 mg twice daily) preceded an 11-week, double-blind, randomization period [100 mg twice daily for 2 weeks followed by 200 mg twice daily ('condensed' regimen) vs. 50 mg twice daily for 2 weeks, 100 mg twice daily for 3 weeks, followed by 200 mg twice daily ('conservative' regimen)]. Patients were stratified by pre-study dose of angiotensin-converting enzyme inhibitor/angiotensin-receptor blocker (ACEI/ARB; low-dose stratum included ACEI/ARB-naïve patients). Of 540 patients entering run-in, 498 (92%) were randomized and 429 (86.1% of randomized) completed the study. Pre-defined tolerability criteria were hypotension, renal dysfunction

52

and hyperkalaemia; and adjudicated angioedema, which occurred in ('condensed' vs. 'conservative') 9.7% vs. 8.4% (P = 0.570), 7.3% vs. 7.6% (P = 0.990), 7.7% vs. 4.4% (P = 0.114), and 0.0% vs. 0.8% of patients, respectively. Corresponding proportions for pre-defined systolic blood pressure <95 mmHg, serum potassium >5.5 mmol/L, and serum creatinine >3.0 mg/dL were 8.9% vs. 5.2% (P = 0.102), 7.3% vs. 4.0% (P = 0.097), and 0.4% vs. 0%, respectively. In total, 378 (76%) patients achieved and maintained sacubitril/valsartan 200 mg twice daily without dose interruption/down-titration over 12 weeks (77.8% vs. 84.3% or 'condensed' vs. 'conservative'; P = 0.078). Rates by ACEI/ARB pre-study dose stratification were 82.6% vs. 83.8% (P = 0.783) for high-dose/'condensed' vs. high-dose/'conservative' and 84.9% vs. 73.6% (P = 0.030) for low-dose/'conservative' vs. low-dose/'condensed'.

McMurray 2016 at 1193. The reference describes the following conclusions from the trial:

> Initiation/uptitration of sacubitril/valsartan from 50 to 200 mg twice daily over 3 or 6 weeks had a tolerability profile in line with other HF treatments. More gradual initiation/uptitration maximized attainment of target dose in the low-dose ACEI/ARB group.

*Id.* at 1194.

### 18.     Medscape Interview

An Interview with PARADIGM HF PI, John McMurray – *Medscape,* January 28, 2015, available at was published on January 28, 2015, and is therefore prior art to the '667 patent under at least 35 U.S.C. § 102(a)(1). The Medscape Interview discloses that the PARADIGM trial compared two treatments: "the ACE inhibitor enalapril, 10 mg twice a day" and "sacubitril/valsartan, previously known as LCZ696." Medscape Interview at 1. The Medscape Interview discloses that the ACE inhibitor enalapril has been shown to reduce mortality in placebo-controlled trials. It also discloses that "only 22% of patients in CONSENSUS could tolerate 20 mg bid," and "only 46% of patients could tolerate 10 bid in the SOLVD treatment trial." *Id.* The Medscape Interview also discloses that "in more recent trial where there is a forced titration of enalapril," the "average achieved dose of enalapril was only about 15 mg."

### 19.     Minguet

Minguet et al., *LCZ696: A New Paradigm for the Treatment of Heart Failure?,* Expert

53

Opinion (Feb. 2015), 435-446 ("Minguet") is prior art to the '667 patent at least under 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Minguet is not the work of a named inventor of the '667 patent. The exception of § 102(b)(1) is inapplicable to the extent that the '667 patent is not entitled to its earliest possible filing date. Even if Minguet were not itself prior art as a publication, it is relevant to the extent it describes a prior art public use, i.e., that of the PARADIGM-HF clinical trial.

Minguet teaches the use of LCZ696 for heart failure with reduced ejection fraction. Minguet at 435. Minguet described the study protocol of the PARADIGM-HF clinical trial:

> The trial consisted of a screening period, a 2 - 4 weeks enalapril single-blind run-in, discontinuation of enalapril for 36 h, a 3 - 6 weeks LCZ696 single-blind run-in, followed by a 36-h washout prior to randomization to either enalapril or LCZ696. During the first 1 - 2 weeks of the run-in period, enalapril was administered at a dose of 5 mg twice daily for patients treated with an ARB and those taking a low-dose ACEI, with up-titration to a target dose of 10 mg twice daily. For LCZ696, doses of 100 mg twice daily were administered for 1 - 2 weeks, and the dose was up-titrated to a target of 200 mg twice daily for 2 - 4 weeks. During randomized, double-blind treatment, follow-up visits were conducted every 2 - 8 weeks during the first 4 months, followed by every 4 months over a median follow up of 27 months.

Minguet at 439-40.

Minguet opines that "Replication of the eligibility criteria and titration protocol in the PARADIGM-HF trial would be valuable in clinical practice and may minimize adverse events." *Id.* at 435.

### 20.    NCT'089 Pub. 2013

Various versions of the NCT01922089 publication describe the Phase 2 NCT01922078 clinical trial. During prosecution of the '399 application, the examiner cited a version of this publication dated November 20, 2013 (v.3) (retrieved by examiner 7/16/18) ("NCT'089 Pub. 2013"). NCT'089 Pub. 2013 is prior art under at least under 35 U.S.C. § 102(a)(1), and the

exception of § 102(b)(1) is inapplicable at least because that publication was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent. Defendants are citing NCT'089 Pub. 2013 in the form cited by the examiner and reserve the right to supplement their positions accordingly. For present purposes, the prior art November 20, 2013 version of the NCT01922089 publication can be recreated on the ClinicalTrials.gov website by viewing the "History of Changes" between the November 20, 2013 version and the most recent September 16, 2015 version. https://clinicaltrials.gov/ct2/history/NCT01922089?A=3&B=7& C=Side-by-Side#StudyPageTop.)

According to NCT'089 Pub. 2013, the NCT01922089 clinical trial, sponsored by Novartis, with the official title "A Multicenter, Randomized, Double-blind, Parallel Group Study to Assess the Safety and Tolerability of Initiating LCZ696 in Heart Failure Patients Comparing Two Titration Regimens," was conducted to "assess the safety and tolerability of initiating LCZ696 in heart failure patients with reduced ejection fraction (HF-rEF) using **conservative** (reaching target dose over 6 weeks) and **condensed** (reaching target dose over 3 weeks) up-titration regimens." NCT'089 Pub. 2013 at Study Description (emphasis added). The study had 2 arms:

| Arms | Assigned Interventions |
|---|---|
| Experimental: Condensed<br>    Up-titration to LCZ696 200 mg twice daily (bid) over 3 weeks | Drug: LCZ696<br>    LCZ696 50 mg/100 mg/200 mg bid |
| Experimental: Conservative<br>    Up-titration to LCZ696 200 mg twice daily (bid) over 6 weeks | Drug: LCZ696<br>    LCZ696 50 mg/100 mg/200 mg bid |

*Id.* at Arms and Intervention.

NCT'089 Pub. 2013 reports various "Primary Outcome Measures." *Id.* at Primary Outcome Measures. One such measure is "Percentage of patients with systolic blood pressure < 95 mmHg," which a POSA would understand to correspond to hypotension. Another such measure is "Percentage of patients with Serum potassium > 5.5 mmol/l and ≥ 6.0 mmol/l, which a POSA

would understand to correspond to hyperkalemia. A further such measure is "Percentage of patients with abnormal serum creatinine and doubling of serum creatinine," which a POSA would understand to correspond to abnormal renal activity.

NCT'089 Pub. 2013 discloses various eligibility criteria, including the following:

Inclusion Criteria:

- Age ≥ 18 years; CHF with New York Heart Association class II-IV; left ventricular ejection fraction ≤ 35%; on beta blockers

Exclusion Criteria:

- Potassium > 5.2 mmol/l; estimated glomerular filtration rate < 30 ml/min/1.73 m2; systolic blood pressure <100 mmHg or > 180 mmHg; history of intolerance to recommended target doses of angiotensin converting enzyme inhibitors or angiotensin receptor blockers

Other protocol-defined inclusion/exclusion criteria may apply.

*Id.* at Eligibility.

## 21.    NCT'089 Pub. 2015

The NCT01922089 publication of the previous section was last updated September 16, 2015 ("NCT'089 Pub. 2015"), *available at* https://clinicaltrials.gov/ct2/history/ NCT01922089?V_7. NCT'089 Pub. 2015 states that the clinical trial was started in November 2013 and concluded in August 2014. NCT'089 Pub. 2015 at Study Status. At least the study activity from November 2013 through May 11, 2014, represents prior art use under at least § 102(a)(1); the exception of § 102(b)(1) is inapplicable at least because such activity occurred more than one year before May 11, 2015. In addition, Defendants will seek discovery into who performed the study; to the extent the study is not the work of the named inventors of the '667

patent, then the activity after May 11, 2014, through the August 2014 conclusion of the study is also prior art under § 102(a)(1), with the exception of § 102(b)(1) being unavailable. Moreover, to the extent that the '667 patent is not entitled to its earliest possible filing date, the full study is available as a prior art public use.

NCT'089 Pub. 2015 states that the primary outcome measure of the NCT01922089 study was recording the number of participants experiencing hypotension, renal dysfunction, hyperkalemia, and angioedema and by Renin-Angiotensin-Aldosterone System (RAAS) Stratum in a period of 12 weeks. *Id.* at Outcome Measures. In other words, participant outcomes of hypotension, renal dysfunction, and angioedema are measured in relation to high v. low RAAS stratum. *Id.* High RAAS stratum includes patients receiving > 160 mg valsartan, or > 10 mg total daily dose of enalapril, or equivalent doses of other ARBs/ACEIs, respectively, at screening. *Id.* Low RAAS stratum includes patients receiving ≤ 160 mg of valsartan or ≤ 10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs, respectively, at screening. Notably, the low RAAS stratum included patients who were not on an ACEI or ARB four weeks prior to screening (i.e., ACEI/ARB-naïve patients). *Id. See* Prosecution History of the '399 application, Jan. 25, 2019 Amendment in Response to Non-final Office Action at 11 (applicant noting that NCT01922089 Clinical Trial encompassed "patients not taking an ACEI or an ARB and patients taking any dose (i.e., low and high dose) of an ACEI or an ARB).")

## 22.   NCT'588 Pub. 2013

NCT00887588, a version of which was submitted January 2, 2013 ("NCT'588 Pub. 2013"), *available at* https://clinicaltrials.gov/ct2/history/NCT00887588?V_11=View#StudyPageTop, is prior art at least under 35 U.S.C. § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because that publication was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent. The study described in NCT'588 Pub. 2013 is a

phase 2 clinical trial titled, "A 36-week, Randomized, Double-blind, Multi-center, Parallel Group, Active Controlled Study to Evaluate the Efficacy, Safety and Tolerability of LCZ696 Compared to Valsartan in Patients with Chronic Heart Failure and Preserved Left-ventricular Ejection Fraction." NCT'588 Pub. 2013 at Study Identification. The study discloses use of LCZ696 for treatment of chronic heart failure in patients with preserved ejection fraction. *Id.* at Conditions. The study discloses a LCZ696 arm where the drug LCZ696 was titrated from 50 mg to 100 mg to 200 mg. *Id.* at Arms and Intervention; Outcome Measures.

### 23.   O'Meara

O'Meara, E. et al., The Epidemic of Heart Failure: A Lucid Approach to Stemming the Rising Tide, 30, S442-454, Can. J. Cardiology (2014) is prior art to the '667 patent under at least 35 U.S.C. § 102(a)(1). O'Meara discloses that "The results of the Efficacy and Safety of LCZ696 Compared to Enalapril on Morbidity and Mortality of Patients With Chronic Heart Failure (PARADIGM-HF) trial will likely result in the replacement of angiotensin-converting enzyme inhibitors and angiotensin II receptor blockers as a first-line therapy in patients with HFrEF." O'Meara at S447.

### 24.   Schumacher

Schumacher et al., WO 2014/029848 A1, published Feb 27, 2014, entitled "NEP Inhibitors for Treating Diseases Characterized by Atrial Enlargement or Remodeling," is prior art at least under § 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Schumacher was published more than one year before May 11, 2015, the earliest possible effective filing date of the '667 patent.

Schumacher teaches a composition comprising an "NEP inhibitor prodrug N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid ethyl ester, or a pharmaceutically acceptable salt thereof; or the NEP inhibitor N-(3-carboxyl- oxopropyl)-(4S)-p-

phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid, or a pharmaceutically acceptable salt thereof, pro-drug." *See* Schumacher, Abstract. Schumacher further discloses a pharmaceutical composition that "comprises the NEP inhibitor pro-drug N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid ethyl ester or the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic   acid,   or pharmaceutically acceptable salts thereof, and the Angiotensin Receptor Blocker valsartan or a pharmaceutically acceptable salt thereof, in a 1:1 molar ratio." *Id* at 22, ll. 5-10. Schumacher further discloses the use of the NEP inhibitor pro-drug or the NEP inhibitor "for use in the treatment, prevention or delay of progression of a disease characterized and/or manifested by atrial enlargement and/or remodeling," including "heart failure with reduced ejection fraction (HF-REF)." *Id*. at 3, l. 31 – 4, l. 9; claim 3. Schumacher further discloses "the NEP inhibitor is administered together, concomitantly or sequentially with the Angiotensin Receptor Blocker (ARB) valsartan." *See* Schumacher at 17. Schumacher further discloses a study to "evaluate the efficacy, safety, and tolerability of LCZ696 compared to valsartan in patients with chronic heart failure with preserved left-ventricular ejection fraction (HF- PEF)." *Id*. at 30, ll. 5-8. Schumacher discloses that at screening, patients were "required to have an NT-proBNP > 400 pg/mL." *Id*. at 30, l. 33 – 31, l. 1.

> Schumacher at Example 1, discloses:

> A 36-week, randomized, double-blind, multi-center, parallel group, active controlled study to evaluate the efficacy, safety, and tolerability of LCZ696 compared to valsartan in patients with chronic heart failure with preserved left-ventricular ejection fraction (HF-PEF).

> LCZ696:
> LCZ696 refers to the supramolecular complex trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2''-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate]hemipentahydrate.

....LCZ696 is a first-in-class angiotensin receptor neprilysin inhibitor that comprises the molecular moieties of the NEP (neutral endopeptidase EC 3.4.24.11) inhibitor pro-drug AHU377 (N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid ethyl ester) and the angiotensin receptor blocker valsartan as a single compound.

....

Eligible patients are enrolled into a 2-week, single-blind placebo run-in period, during which time they continue their background medications. ACE inhibitors and angiotensin receptor blockers are required to be discontinued 24 hours prior to randomization. . . .

**Patients are started on LCZ696 50 mg twice daily** or valsartan 40 mg twice daily **and are titrated to their final medication doses of LCZ696 200 mg twice daily** or valsartan 160 mg twice daily over a period of 2 to 4 weeks. **Patients are on their starting dose for 1 week and titrated up to either LCZ696 100 mg twice daily** or valsartan 80 mg twice daily for 1 week. The maximum LCZ696 dose achieves exposures similar to a dose of valsartan that provides comparable AT1 blockade. At the investigator's discretion, patients are allowed to stay on each titration dose for an additional week. **All patients are then titrated to their final doses of LCZ696 200 mg twice daily** or valsartan 160 mg twice daily, in addition to standard background therapy. Patients remain on these doses for the remainder of the study, although those not tolerating the maximum dose of study medication could be down-titrated to a lower dose at the Investigator's discretion and then re-challenged to the maximum dose of study medication, or remain on the lower dose.

Schumacher at 31-32 (emphasis added).

Schumacher at Example 2, discloses:

A randomized, double-blind, parallel group, active-controlled, two-arm, event-driven trial comparing the long-term efficacy and safety of enalapril and LCZ696 on morbidity and mortality in patients with chronic symptomatic heart failure and reduced ejection fraction (HF-REF) [PARADIGM-HF].

LCZ696: see Example 1

*Id.* at 35-36. Schumacher thus discloses the same LCZ696 regimen as that of Example 1 for

Example 2's treatment of heart failure with reduced ejection fraction. *Id.* Schumacher further

discloses, under "Objective & Methods":

> Patients with chronic HF, NYHA functional class II-IV symptoms, an elevated
> plasma B-type natriuretic peptide (BNP) or NT-proBNP level and, initially, a left
> ventricular ejection fraction of ≤40% (later amended to ≤35%) are eligible. Patients
> enter a single blind enalapril run-in period (titrated to 10 mg bid) which, depending
> on tolerability, is followed by an LCZ696 run-in period (100 mg titrated to 200 mg
> bid). Then, patients tolerating both drugs at the target dose, are randomized 1:1 to
> either enalapril 10 mg bid or LCZ696 200 mg bid. The primary outcome is the
> composite of cardiovascular death or HF hospitalization, although the trial is
> powered to detect a 15% relative risk reduction in cardiovascular death with
> LCZ696, compared with enalapril.

*Id.* at 36, ll. 9-19.

Schumacher at Example 3 discloses a study evaluating "the efficacy and safety of LCZ696

compared to valsartan, on morbidity and mortality in heart failure patients (NYHA Class II-IV)

with preserved ejection fraction [PARAGON-HF] (*id.* at 36, ll. 30-32; 37), and discloses:

> Active Run-In Period: 3-8 weeks (can be shorter for patients
> previously exposed to standard doses of RAAS blockade; longer for
> patients with no prior exposure or on low doses of ACEIs or ARBs.).

*Id.* at 37, ll. 28-30.

Schumacher further explains that "the NEP inhibitor or NEP inhibitor pro-drug and the

ARB are administered in a 1: 1 molar ratio." *Id.* at 41.

### 25.    Swedberg

Swedberg et al., entitled "Guidelines for the diagnosis and treatment of chronic heart

failure; executive summary (update 2005)" European Heart Journal (2005) 26, 1115-1140

("Swedberg"), is prior art at least under § 102(a)(1), and the exception of § 102(b)(1) is

inapplicable at least because Swedberg was published more than one year before May 11, 2015,

the earliest possible effective filing date of the '667 patent.

Swedberg discloses dose ranges for "Currently available angiotensin II receptor

antagonists" in Table 16:

"<u>Drug   –   Daily Dose (mg)</u>

Valsartan    80 – 320."

*Id.* at 1130.

Swedberg further discloses "The recommended procedure for starting . . . an angiotensin receptor blocker" on Table 9:

> Start with a low dose and build-up to maintenance dosages shown
> to be effective in large trials.

*Id*. at 1127.

### 26.    Vardeny

Vardeny et al., entitled "Combined neprilysin and renin-angiotensin system inhibition for the treatment of heart failure," JACC: Heart failure Vol. 2, No. 6, (2014) December 2014: 663-70 ("Vardeny"), is prior art at least under 102(a)(1), and the exception of § 102(b)(1) is inapplicable at least because Vardeny is not the work of a named inventor of the '667 patent. The exception of § 102(b)(1) is inapplicable to the extent that the '667 patent is not entitled to its earliest possible filing date.

Vardeny discloses:

LCZ696 (sacubitril valsartan) is a first-in-class angiotensin receptor neprilysin inhibitor that has been developed for use in heart failure. This compound is composed of 2 molecular moieties in a single crystalline complex—the angiotensin receptor blocker valsartan and a neprilysin inhibitor prodrug—and has now been tested in hypertension, in a phase 2 trial in heart failure with preserved ejection fraction, and has demonstrated greater efficacy than enalapril in a phase 3 trial in heart failure with reduced ejection fraction.

Vardeny at Abstract.

Vardeny further discloses:

> The dose-normalized bioavailability of the valsartan
> component of LCZ696 is 40% to 60% higher than would be
> delivered by the equimolar amount of valsartan as an individual
> drug. This increased bioavailability may be due in part to the fact

that valsartan in LCZ is present in its anionic form, whereas is normally in the form of a free acid. In a bioavailability study, the mean plasma concentration-time curves of valsartan 320 mg and LCZ696 400 mg were very similar, meeting criteria for drug bioequivalence for systemic exposure of valsartan.

*Id*. at 666. Vardeny states:

**HFrEF.** The PARADIGM-HF (Prospective Comparison of ARNI With ACEI to Determine Impact on Global Mortality and Morbidity in Heart Failure) trial was designed to test the hypothesis that LCZ696 could result in reduced morbidity and mortality in patients with HFrEF (LVEF ≤40%). Inclusion criteria were NYHA functional class II to IV, LVEF ≤40%, plasma BNP ≥150 pg/ml (or NT-proBNP ≥600 pg/ml), or BNP ≥100 pg/ml (or NT-proBNP ≥400 pg/ml) if the patient was previously hospitalized for HF within the past 12 months. Patients were required to be taking stable doses of ACE inhibitors or angiotensin receptor blockers equivalent to enalapril ≥10 mg/day for at least 4 weeks before screening.

*Id*. at 668.

### 27.    VASOTEC Label

The VASOTEC (Enalapril Maleate) Tablet Label, published Sep. 13, 2012**,** is prior art to the '667 patent under at least 35 U.S.C. § 102(a)(1). The VASOTEC Label discloses that "enalapril is a pro-drug; following oral administration, it is bioactivated by hydrolysis of the ethyl ester to enalaprilat, which is the active angiotensin converting enzyme inhibitor," and it is "supplied as 2.5 mg, 5 mg, 10 mg, and 20 mg tablets for oral administration." *Id.* at 1. The VASOTEC Label also discloses that it is "indicated for the treatment of symptomatic heart failure, usually in combination with diuretics and digitalis. In the placebo-controlled studies that demonstrated improved survival, patients were titrated as tolerated up to 40 mg, administered in two divided doses." VASOTEC Label at 18. The VASOTEC Label further discloses that "[t]he recommended initial dose is 2.5 mg," "[t]he recommended dosing range is 2.5 to 20 mg given twice a day," and "[d]oses should be titrated upward, as tolerated, over a period of a few days or weeks." *Id.* at 18.

### 28.    Voors

Voors et al., The Potential Role of Valsartan + AHU377 (LCZ696) in the Treatment of Heart Failure, 22(8) Expert Opin. Investig. Drugs 1041 (2013) ("Voors"). Voors was published on

May 10, 2013, and constitutes prior art under 35 U.S.C. § 102(a)(1) to the '667 patent. Voors was neither cited by the Examiner in an Office Action nor submitted by Applicant in an Information Disclosure Statement during prosecution of the '667 patent.

> Voors describes studies involving LCZ696 and states the following:

>> Hypertension is a major risk factor for the development of cardiovascular events, including the development of heart failure. The largest Phase II trial with LCZ696 investigated the role of this compound in 1328 patients with mild to moderate hypertension. LCZ696 showed statistically significant larger reduction in the average reduction in diastolic blood pressure across the doses of LCZ696 vs the comparator dose of valsartan.

*See* Voors at 1044. Voors further discloses "LCZ696, the combination of a neprilysin inhibitor and an angiotensin receptor blocker, is an interesting novel drug for the treatment of hypertension and heart failure. Its blood pressure-lowering effects are superior to the angiotensin receptor blocker valsartan alone…." *See id.* at 1045.

### B.   Prior Public Uses

Defendants presently identify the following prior art public uses. Defendants intend to seek discovery regarding these and any additional prior art uses during discovery. Defendants expect that Novartis possesses evidence relating to these, and potentially other, prior art public uses.

#### 1.   NCT01922089 Clinical Trial

The NCT01922089 clinical trial ("NCT'089 Prior Use"), as described by at least NCT'089 Pub. 2013, NCT'089 Pub. 2015, and McMurray 2016, is a prior art public use at least under § 102(a)(1) because it was conducted between November 2013 and August 2014, prior to the earliest possible filing date for the '667 patent. Moreover, for the period of November 2013–May 11, 2014, the exception of § 102(b)(1) is inapplicable at least because such activity occurred more than one year before May 11, 2015. In addition, Defendants will seek discovery into who performed the study; to the extent the study is not the work of the named inventors of the '667 patent, the exception of § 102(b)(1)(A) is unavailable for the entire study. Moreover, to the extent

that the '667 patent is not entitled to its earliest possible filing date, the full study is available as a prior art public use with the exception unavailable.

The discussions of NCT'089 Pub. 2013, NCT'089 Pub. 2015, and McMurray 2016 are incorporated herein by reference, as those references together describe a single, prior-art public use. Defendants expect to uncover additional information relating to this public use, which purportedly was conducted by or on behalf of Novartis, during discovery.

### 2.       NCT01035255 Clinical Trial

The NCT01035255 clinical trial ("NCT'255 Prior Use"), also known as the PARADIGM-HF clinical trial, and as described by at least McMurray 2013, McMurray 2014, Minguet, Schumacher, Krum, and Vardeny, is a prior art public use at least under 35 U.S.C. § 102(a)(1); because it was conducted in December 2009, more than one year prior to the earliest possible filing date for the '667 patent, the exception of § 102(b)(1) is unavailable. The discussions of McMurray 2013, McMurray 2014, Minguet, Schumacher, and Vardeny are incorporated herein by reference, as those references together describe a single, prior-art public use. Defendants expect to uncover additional information relating to this public use, which purportedly was conducted by or on behalf of Novartis, during discovery.

### 3.       NCT00887588 Clinical Trial

The NCT00887588 clinical trial ("NCT'588 Prior Use") is a prior art public use at least under 35 U.S.C. § 102(a)(1) to the extent that it was conducted prior to May 11, 2015. Moreover, for the period prior to May 11, 2014, the exception of 35 U.S.C. § 102(b)(1) is inapplicable at least because such activity occurred more than one year before May 11, 2015. In addition, Defendants will seek discovery into who performed the study; to the extent the study is not the work of the named inventors of the '667 patent, the exception of § 102(b)(1)(A) is unavailable for additional portions of the study. Moreover, to the extent that the '667 patent is not entitled to its earliest

possible filing date, additional portions of the study would be prior art.

The discussion of NCT'588 Pub. 2013 is incorporated herein by reference. Defendants expect to uncover additional information relating to this public use, which purportedly was conducted by or on behalf of Novartis, during discovery.

## VI.  CLAIMS 1-19 OF THE '667 PATENT ARE INVALID OVER THE PRIOR ART

### A.  Background

#### 1.  Prior Art Discloses Administration of LCZ696 in Patients with Chronic Heart Failure with Reduced Ejection Fraction at a Target Dose of 200 mg bid

NCT'089 Pub. 2013 reports a clinical trial entitled "[a] Multicenter, Randomized, Double-blind, Parallel Group Study to Assess the Safety and Tolerability of Initiating LCZ696 in Heart Failure Patients Comparing Two Titration Regimens" that was conducted to evaluate the safety and tolerability of initiating and titrating LCZ696 in heart failure patients. NCT'089 Pub. 2013 at Title and Study Description. Specifically, the study was conducted with the purpose of "assess[ing] the safety and tolerability of initiating LCZ696 in heart failure patients with reduced ejection fraction (HF-rEF)." *Id.*

As evidenced by Schumacher, the LCZ696 referenced in NCT'089 Pub. 2013 is the same sacubitril-valsartan complex of the '667 patent (also referred to in the '667 patent as "LCZ696"):

> LCZ696 refers to the supramolecular complex trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2''-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate]hemipentahydrate.

Schumacher at 31-32. Thus, NCT'089 Pub. 2013 inherently discloses this complex. NCT'089 Pub. 2013 also taught a target dose of LCZ696 that is 200 mg bid for treating the HF-rEF in human patients. NCT'089 Pub. 2013 at Arms and Intervention.

McMurray 2013 described another large clinical trial, PARADIGM-HF, registered as NCT01035255, which studied and tested the use of LCZ696 as an alternative to enalapril, an

66

angiotensin converting enzyme (ACE) inhibitor, the then-first line of treatment for heart failure. McMurray 2013 at 1067. The PARADIGM-HF clinical trial included patients with chronic heart failure and a left ventricular ejection fraction of $\leq 40\%$. *Id.* at 1062; *see also* McMurray 2014; Minguet. McMurray 2013 taught the target dose of 200 mg bid for LCZ696. McMurray 2013 at 1064.

For similar reasons as described above, the NCT'089 Prior Use and/or NCT'255 Prior Use also teach administering LCZ696 to patients with chronic heart failure with reduced ejection fraction.

### 2. Prior Art Discloses Titration Regimen Starting with a Low Dose of LCZ696 and Up-Titrating to Reach the Target Dose over a Period of Time to Avoid Adverse Effects

The clinical study in NCT'089 Pub. 2013 used a design with two arms – a conservative arm and a condensed arm. NCT'089 Pub. 2013 at Arms and Intervention. The conservative arm of the study involved up-titration to LCZ696 200 mg bid over 6 weeks using the drug LCZ696 starting at 50 mg, followed by 100 mg, followed by 200 mg bid. *Id.* Such a titration regimen would involve only a small group of up-titration periods: 50 mg bid for 1 week followed by 100 mg bid for 5 weeks; 50 mg bid for 2 weeks followed by 100 mg bid for 4 weeks; 50 mg bid for 3 weeks followed by 100 mg bid for 3 weeks; 50 mg bid for 4 weeks followed by 100 mg bid for 2 weeks; 50 mg bid for 5 weeks followed by 100 mg bid for 1 week. *See id.* Thus, the study in NCT'089 Pub. 2013 taught a titration regimen where LCZ696 200 mg bid is reached by starting with 50 mg for 1-5 weeks, followed by 100 mg for 1-5 weeks, to reach 200 mg bid at the end of 6 weeks. *See id.*

Prior art also taught other titration periods and that they may be optimized to reduce adverse effects. Schumacher described starting with 50 mg bid of LCZ696 and increasing to 200 mg over 2-4 weeks. Schumacher at 31-32, 35-36. Notably, Schumacher teaches that "[a]t the investigator's discretion, patients are allowed to stay on each titration dose for an additional week." *Id.* Further,

by teaching that "those not tolerating the maximum dose of study medication could be down-titrated to a lower dose at the Investigator's discretion and then re-challenged to the maximum dose of study medication, or remain on the lower dose," Schumacher teaches adjusting the dose depending on the toleration limit of the patients. *See id.*

McMurray 2013, describing the PARADIGM-HF study, taught that adjustments of titration periods may be done to avoid adverse effects like hypotension, renal dysfunction, and/or hyperkalemia. McMurray 2013 at 1065; *see also* Schumacher 31-32. For example, McMurray 2013 describes a gradual enalapril run-in, where patients are up-titrated from a lower dose of enalapril to 10 mg bid after 2 weeks to avoid adverse effects like hypotension, renal dysfunction, and/or hyperkalemia. *See id.* at 1064. Similarly, in McMurray 2013, the LCZ696 run-in patients were initially given 100 mg bid for 2 weeks, followed by 200 mg bid for a further of 2-4 weeks. *Id.* Minguet opines that the "[r]eplication of the … titration protocol in the PARADIGM-HF trial would be valuable in clinical practice and may minimize adverse events." Minguet at 435. *See also* other recommended ARB titration periods: the Diovan (valsartan) capsules FDA label at 2.3 (teaching valsartan titration periods of 40mg bid/160 mg bid/320 mg bid); Dickstein at 954 (teaching valsartan titration periods of 40 mg bid for 2-4 weeks/80 mg bid for 2-4 weeks/160 mg bid); Dungen at 672 (teaching starting with low dose and moving to a target dose over 6 weeks by doubling the dose every 2 weeks); Cohn at 1668 (disclosing "Valsartan was initiated at a dose of 40 mg twice daily, and the dose was doubled every two weeks until a target dose of 160 mg twice daily was reached.").

Other prior art taught that slow titrations are advantageous because they can lead to fewer side effects than more rapid titrations. For example, Flack disclosed "Slower dose escalation of [quinapril] provides higher BP control and fewer serious adverse events than more rapid dose escalation." Flack at 1842. FDA IND Guidance also discloses that "[a] lower starting dose can be

used when the drug has significant first dose effects (e.g., alpha blockers for hypertension), serious dose-related adverse effects, and adverse effects that decrease with continued use or that are decreased by titration." FDA IND Guidance at 24.

For similar reasons as described above, the NCT'089 Prior Use and/or NCT'255 Prior Use also teach the claimed titration regimen.

### 3. Prior Art Taught Administration of LCZ696 in Patient Populations Not Taking an ACEI/ARB or Taking Less Than 10 mg of an ACEI/ARB

NCT'089 Pub. 2015 discloses as a primary outcome measurement recording the number of participants experiencing hypotension, renal dysfunction, hyperkalemia, and angioedema versus Renin-Angiotensin-Aldosterone System (RAAS) Stratum over a period of 12 weeks. NCT'089 Pub. 2015 at Outcome Measures. In other words, participant outcomes of hypotension, renal dysfunction, and angioedema are measured in relation to high v. low RAAS stratum patients. *Id.* High RAAS stratum patients are those patients receiving > 160 mg valsartan, or > 10 mg total daily dose of enalapril, or equivalent doses of other ARBs/ACEIs, respectively, at screening. *Id.* Low RAAS stratum includes patients receiving < 160 mg of valsartan or < 10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs, respectively, at screening. *Id.* Notably, the low RAAS stratum includes patients who were not on an ACEI or ARB for at least 4 weeks prior to screening (i.e., ACEI/ARB-naïve patients). *Id.* For similar reasons as described above, the NCT'089 Prior Use also teaches the claimed titration regimen.

The study in NCT'089 Pub. 2013, under inclusion criteria, includes patients "on beta blockers." NCT'089 Pub. 2013 at eligibility. Similarly, there is an express list of exclusion criteria, which do not exclude a patient who has not been taking enalapril or any ARB/ACEI. Therefore, the study in NCT'089 Pub. 2013 encompasses administering its dosage regimen to patients not taking an ARB/ACEI or taking a low dose thereof. *Id.*

Further, prior art taught that an overlap of ACEI and NEP inhibition could result in adverse effects. For example, McMurray 2013 described about a potential risk of angioedema due to overlapping ACE inhibition and NEP inhibition during step iii and step v of the clinical trial. McMurray 2013 at 1068. To minimize such an overlap, the study comprised two washout periods. *Id.* The washout period after step ii consists of stopping enalapril a day prior to starting LCZ696. *Id.* Similarly, the washout period before step iv involved stopping LCZ696 a day prior to possible start of enalapril. *Id.*

> For safety reasons, there are also two short washout periods during the run-in. **These washout periods are designed to minimize concomitant neprilysin and ACE inhibition which is likely to increase the risk of angioedema.**

McMurray 2013 at 1068 (emphasis added); *see also* McMurray 2014 at 995-97; Schumacher at 31-32 (teaching that ACE inhibitors and angiotensin receptor blockers are required to be discontinued 24 hours prior to randomization); Minguet at 439-440 (teaching a wash-out period of 36 hours).

### 4. Prior Art Does Not Support Patentee's Claim of "Surprising/Unexpected" Treatment Success

Konstam discussed that adverse events of hyperkalaemia, hypotension, and renal impairment are more common at higher doses of losartan 150 mg daily than with losartan 50 mg daily. Konstam at 1847. Konstam suggested starting at a lower dose and titrating up to a target dose with close monitoring for adverse effects. *Id.* For example, Konstam compared the effects of high-dose versus low-dose losartan on clinical outcomes in patients with heart failure. Konstam described the study as follows:

> The **H**eart failure **E**ndpoint evaluation of **A**ngiotensin II **A**ntagonist **L**osartan (HEAAL) study compared clinical outcomes in patients with heart failure, reduced LVEF, and intolerance to ACE inhibitors who were randomly assigned to a high (150 mg) or low (50 mg) daily dose of losartan. We tested the hypothesis that incremental losartan dosing would reduce the risk of primary combined endpoint

70

of death or admission for heart failure.

*Id.* at 1840.

> The adverse events of hyperkalaemia, hypotension, and renal impairment, as defined by investigators occurred more commonly in the 150 mg group than the 50 mg group (table 4). … Angioedema occurred in six patients in the 150 mg group and in none of in the 50 mg group.

*Id.* at 1845.

> The outcome benefits of losartan 150 mg daily have to be weighed against the several types of adverse effects that we detected with increased frequency. **The rates of hypotension, hyperkalaemia, and renal failure were greater with losartan 150 mg daily than with losartan 50 mg daily.** However, the overall rates and clinical relevance of these events were small, as shown by the infrequent discontinuation of study drug, which occurred with similar frequency to that recorded in previous investigations of ARBs. These findings should be considered in the context that 77% of patients were treated with ARBs before randomization and that a run-in period was used, probably resulting in the enrolment of patients who would better tolerate high doses of losartan over long-term follow-up. **Blood pressure, serum electrolytes, and renal function should be monitored carefully during ARB up-titration**, and the clinical implications of changes in any of these variables should be weighed against the potential outcome benefits that are achievable with an increased ARB dose.

*Id.* at 1847 (emphasis added).

Thus, Konstam disclosed that the rates of hypotension, hyperkalaemia, and renal failure were greater with an increased dose of medicine. In view of this, the authors therein suggested the importance of a careful up-titration method such that adverse effects may be monitored closely. *Id.*

Desai observed the similar adverse effects with higher doses of another heart failure medicine, candesartan:

> Heart failure patients are particularly susceptible to **hyperkalemia, since the reduction in renal function associated with HF**, older age, and comorbidities such as diabetes mellitus hampers baseline

> potassium excretion.

Desai at 1959 (emphasis added).

> Although these groups derive incremental clinical benefit from
> candesartan, careful surveillance of serum potassium and creatinine
> is particularly important.

*Id.*

> Study drug was dosed according to an incremental, biweekly, forced
> titration scheme. At randomization, study drug was initiated at 4 mg
> once daily (or at 8 mg once daily at the investigator's discretion).
> **The dose was then doubled every 2 weeks as tolerated** up to a
> maximum target dose of 32 mg candesartan (or matching placebo)
> once daily. Visits were scheduled at 2, 4, and 6 weeks; 6 months;
> and then every 4 months until study end. Investigators were
> instructed to assess serum creatinine and potassium before drug
> initiation, within 2 weeks of dose escalation or completion of dose
> titration, yearly thereafter, and at their discretion.

*Id.* at 1960 (emphasis added).

> Reassuringly, many hyperkalemia events in the CHARM Program
> could be adequately addressed by dose adjustment or
> discontinuation of the study drug, with the minority progressing to
> hospitalization or death. We conclude that **periodic surveillance of
> serum potassium and creatinine** (e.g., at baseline, within 1 to 2
> weeks of a change in drug dosing, and at least annually thereafter)
> **is critically important to limiting adverse events**. The subset of
> older HF patients who have moderate or severe renal dysfunction
> (stage III chronic kidney disease or worse, many of whom were not
> eligible for the CHARM Program), those with high serum potassium
> at baseline, and those who receive combination RAAS antagonists
> are particularly vulnerable, **necessitating even closer monitoring.**

*Id.* at 1965 (emphasis added).

Thus, Desai observed that heart failure patients who were given incremental doses of

medicine were susceptible to hyperkalemia due to the reduction of renal function. *See id.* at 1960-

65. Desai employed an incremental, forced titration scheme that was initiated at a low amount and

doubled on a biweekly basis. *Id.* Desai suggested monitoring for adverse effects during the drug

titration period and even closer monitoring for particularly vulnerable patients. *Id.*

Furthermore, the prior art taught that slow titrations were advantageous over more rapid

titrations because they can lead to fewer side effects. For example, Flack disclosed "Slower dose escalation of [quinapril] provides higher BP control and fewer serious adverse events than more rapid dose escalation." Flack at 1842.

**B.      Claims 1 and 7 of the '667 Patent Are Anticipated by, or Obvious over, Either NCT'089 Pub. 2013 or NCT'089 Prior Use**

First, NCT'089 Pub. 2013 disclosed administering LCZ696 for treating chronic heart failure with reduced ejection fraction (HF-rEF) in human patients. NCT'089 Pub. 2013 at Title and Study Description. As evidenced by Schumacher, LCZ696 of NCT'089 Pub. 2013 is the sacubitril-valsartan complex of the '667 patent, which fact is inherent in NCT'089 Pub. 2013. Schumacher at 31-32.[4] NCT'089 Pub. 2013 also taught a target dose of LCZ696 that is 200 mg bid for treating the HF-rEF in human patients. NCT'089 Pub. 2013 at Arms and Intervention.

Second, the conservative arm of the study in NCT'089 Pub. 2013 involved up-titration to LCZ696 200 mg bid over 6 weeks using the drug LCZ696 – starting at 50 mg, followed by 100 mg, followed by 200 mg bid thereafter. *Id.* A POSA would understand that the 6 weeks titration period to LCZ696 200 mg bid may be reached by starting with 50 mg for 1-5 weeks, followed by 100 mg for 1-5 weeks, to reach 200 mg bid at the end of 6 weeks. *See id.* Thus, a POSA would understand that NCT'089 Pub. discloses, e.g., titration period of 2 weeks, 3 weeks, or 4 weeks at 50 mg and 2 weeks, 3 weeks, or 4 weeks at 100 mg, such that the combined titration period is 6 weeks.

Thus, the claimed dosage regimen of "50 mg of sacubitril and valsartan in a 1:1 molar ratio for from about 2-3 weeks to about 4 weeks, followed by a twice daily dose of 100 mg of sacubitril and valsartan in a 1:1 molar ratio for from about 2-3 weeks to about 4 weeks, followed thereafter

---

[4] Schumacher is not being relied upon here as a secondary reference. It is simply evidence of how a POSA would understand what is disclosed in NCT'089 Pub. 2013.

by the twice daily target dose of 200 mg of sacubitril and valsartan in a 1:1 molar ratio" reads on the prior art dosage regimen disclosed in NCT'089 Pub. 2013. *See id.* As with *Titanium Metals,* 778 F.2d at 781-82 (citing *In re Petering,* 301 F.2d at 682) where claims to a titanium (Ti) alloy with 0.6-0.9% nickel (Ni) and 0.2-0.4% molybdenum (Mo) were anticipated by prior art alloy containing 0.75% Ni and 0.25% Mo, the claimed up-titration periods of about 2-3 weeks to about 4 weeks of 50 mg/100 mg bid is anticipated by the recited period in NCT'089 Pub. 2013.

Third, NCT'089 Pub. 2013 at least inherently teaches administering the above dosage regimen to patients not taking an ARB/ACEI or taking a low dose thereof. Notably, where being "on beta blockers" is a listed inclusion criteria, there is no similar criteria that a patient has been taking enalapril or any ARB/ACEI. Nor is there any exclusion of patients who have ***not*** been taking enalapril or any ARB/ACEI. Therefore, NCT'089 encompasses administering its dosage regimen to patients not taking an ARB/ACEI.

To the extent that NCT'089 Prior Use is the anticipation reference, rather than only NCT'089 Pub. 2013, NCT'089 Pub. 2015 (which described the prior use) teaches measuring the effects such as hypotension, renal dysfunction, hyperkalemia, and angioedema and comparing those effects in high v. low RAAS stratum patients over a period of 12 weeks. NCT'089 Pub. 2015 at Outcome Measures. Low RAAS stratum includes patients receiving ≤ 160 mg of valsartan or ≤ 10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs, respectively, at screening, i.e., low doses thereof. *Id.* Notably, the low RAAS stratum included patients who were not on an ACEI or ARB four weeks prior to screening (i.e., ACEI/ARB-naïve patients). *Id.* Thus, the NCT'089 Pub. 2015 explicitly teaches a patient population that is neither taking an ACEI nor ARB and a patient population taking less than 10 mg of ACEI/ARB such as enalapril, i.e., a low dose thereof. *Id.*

In summary, NCT'089 Pub. 2013 and NCT'089 Prior Use each contains all elements of

claim 1 and claim 7: a regimen for treating chronic heart failure with reduced ejection fraction, which comprises administering to a human patient in need thereof a twice-daily target dose of 200 mg of LCZ696, wherein the target dose is reached after a titration with a twice daily starting dose of 50 mg of LCZ696 for about 2-3 weeks to about 4 weeks, followed by a twice daily dose of 100 mg for about 2-3 weeks to about 4 weeks, followed thereafter by the twice daily target dose of 200 mg of LCZ696; administering said regimen to a patient not on an ACEI/ARB or taking an ACEI/ARB that is less than 10 mg, for example a patient receiving less than 10 mg of enalapril. With respect to claim 7, NCT'089 Pub. 2013 teaches a total titration period of 6 weeks to reach the target dose of 200 mg bid.

Thus, claims 1 and 7 are anticipated by either NCT'089 Pub. 2013 or NCT'089 Prior Use. Defendants expect to uncover additional discovery evidencing the anticipatory nature of the NCT'089 Prior Use during discovery.

To the extent that claims 1 and 7 are not anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use, such claims are obvious over either such reference. For example, to the extent a court determines that either such reference does not disclose an ACEI/ARB naïve patient population or a patient population taking a low dose ARB/ACEI, such sub-populations are obvious over the same disclosures because NCT'089 Pub 2013 and NCT'089 Prior Use disclose the use of LCZ696, along with the claimed up-titration regimen, in a broader patient population encompassing those sub-populations. *See Prometheus Lab'ys, Inc. v. Roxane Lab'ys, Inc.*, 805 F.3d 1092, 1097-98 (Fed. Cir. 2015) (teaching that a later patent claiming treatment of certain female IBS-D patients with alosetron is obvious over an earlier patent disclosing treatment of IBS patients with alosetron).

Similarly, to the extent that either such reference does not disclose a weekly interval for the titration interval, the prior art taught that it was routine to select a weekly interval when up-titrating the dose of a drug for treating heart failure. *See, e.g.*, Cohn at 1668; Schumacher at 31;

McMurray 2013 at 1064; Desai at 1960; and Diovan label. Thus, it would have been obvious to a POSA to select a weekly titration interval when titrating the dose of LCZ696 as taught in NCT'089 Pub. 2013.

### C. Claims 2, 3, 6, 8, and 11-19 of the '667 Patent Are Anticipated by, or Obvious Over, Either NCT'089 Pub. 2013 or NCT'089 Prior Use[5]

#### 1. Claims 2 and 8

Claim 2 is dependent on claim 1 and includes the further limitation that the twice daily target dose of 200 mg is reached after the titration with the twice daily target dose of 50 mg for about 3 weeks, followed by the twice daily starting dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter. Claim 8 is dependent on claim 7 and includes the further limitation that the twice daily target dose of 200 mg is reached after the titration with the twice daily target dose of 50 mg for about 3 weeks, followed by the twice daily starting dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter.

As discussed above, independent claims 1 and 7 are anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use. The conservative arm disclosed in NCT'089 Pub. 2013 involved up-titration to LCZ696 200 mg bid over 6 weeks using the drug LCZ696 – starting at 50 mg, followed by 100 mg, followed by 200 mg bid thereafter. NCT'089 Pub. 2013 at Arms and Intervention. As discussed above, a POSA would understand NCT'089 Pub. 2013's teaching of a 6-week titration period to LCZ696 200 mg bid to disclose starting with 50 mg for 3 weeks, followed by 100 mg for 3 weeks, to reach 200 mg bid at the end of 6 weeks. *See id.* Thus, NCT'089 Pub. 2013 discloses every element of claims 2 and 7. For the same reasons, NCT'089 Prior Use does as well.

---

[5] To the extent that such claims are not anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use, such claims are obvious over either such reference at least for the reasons articulated in *Prometheus Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d at 1097-98.

### 2. Claims 3 and 12

Claim 3 is dependent on claim 1 and includes the further limitation that the human patient has to stop taking the ARB or ACEI at least 36 hours before initiating the treatment with LCZ696. Claim 12 is dependent on claim 7 and includes the further limitation that the human patient has to stop taking the ARB or ACEI at least 36 hours before initiating the treatment with LCZ696.

As discussed above, independent claims 1 and 7 are anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use. NCT'089 Prior Use discloses administering the regimen to low RAAS stratum patients, which include patients who were not on an ACEI or ARB 4 weeks prior to screening (i.e., ACEI/ARB-naïve patients). *Id.* at Outcome Measures. The set of patients who are not on ACEI or ARB for 4 weeks prior to screening are necessarily patients who are not and will not be on ARB/ACEI for at least 36 hours before initiating the treatment with LCZ696. *See id.* Thus, NCT'089 Prior Use discloses every element of claims 3 and 12. For the same reasons, NCT'089 Prior Use does as well.

To the extent that claims 3 and 12 are not anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use, such claims are obvious over either such reference. For example, to the extent a court determines that either such reference does not disclose an ACEI/ARB naïve patient population or a patient population taking a low dose of an ARB/ACEI, such sub-populations are obvious over the same disclosures because NCT'089 Pub 2013 discloses the use of LCZ696, along with the claimed up-titration regimen, in a broader patient population encompassing those sub-populations. *See Prometheus Lab'ys*, 805 F.3d at 1097-98.

### 3. Claims 6 and 11

Claim 6 is dependent on claim 1 and includes the further limitation that the human patient has a reduced left ventricular ejection fraction of ≤35%. Claim 11 is dependent on claim 7 and includes the further limitation that the human patient has a reduced left ventricular ejection fraction

of $\leq$35%.

As discussed above, independent claims 1 and 7 are anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use. NCT'089 Pub. 2013 discloses that the patients in the study had chronic heart failure with New York Heart Association (NYHA) class II-IV, left ventricular ejection fraction (LVEF) of $\leq$ 35%. NCT'089 Pub. 2013 at Eligibility Criteria. Thus, NCT'089 Pub. 2013 discloses every element of claims 6 and 11. For the same reasons, NCT'089 Prior Use does as well.

### 4. Claims 13 and 15

Claim 13 is dependent on claim 1 with the further limitation that the twice daily dose of 50 mg is for use in the human patient taking the low dose of the ACEI or the low dose of the ARB before initiating the treatment with LCZ696. Claim 15 is dependent on claim 7 with the further limitation that the twice daily dose of 50 mg is for use in the human patient taking the low dose of the ACEI or the low dose of the ARB before initiating the treatment with LCZ696.

As discussed above, independent claims 1 and 7 are anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use. As discussed above in connection with claims 1 and 7, NCT'089 Pub. 2013 at least inherently discloses giving its treatment regimen to patients not taking an ACEI or ARB or taking a low dose of an ACEI or ARB. To the extent that the anticipating reference is NCT'089 Prior Use, NCT'089 Pub. 2015 discloses a patient population that is "low RAAS stratum patients," which patients are receiving $\leq$ 10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs, respectively, at screening as opposed to the high RAAS stratum patients receiving > 10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs. NCT'089 Pub. 2015 at Outcome Measures. Thus, NCT'089 Pub. 2013 or NCT'089 Prior Use discloses every element of claims 13 and 15.

### 5. Claims 14 and 16

Claim 14 is dependent on claim 13 with the further limitation that the low dose of the ACEI

or the low dose of the ARB is equivalent to < 10 mg enalapril. Claim 16 is dependent on claim 15 with the further limitation that the low dose of the ACEI or the low dose of the ARB is equivalent to < 10 mg enalapril.

As discussed above, dependent claims 13 and 15 are anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use. NCT'089 Pub. 2013 at least inherently discloses giving its treatment regimen to patients taking a low dose of an ACEI or ARB, where that low dose is equivalent to < 10 mg enalapril. To the extent that the anticipating reference is NCT'089 Prior Use, NCT'089 Pub. 2015 discloses a patient population that is "low RAAS stratum patients," which patients are receiving ≤ 10 mg total daily dose of enalapril, or equivalent doses of ARBs/ACEIs. Thus, NCT'089 2013 or NCT'089 Prior Use discloses every element of claims 14 and 16.

### 6. Claim 17

Claim 17 is dependent on claim 7 with the further limitation that "a first week of the at least about 6 weeks is $5\pm2$ days." As discussed above, independent claim 7 is anticipated by NCT'089 Pub. 2013. Claim 17 is also anticipated because the first week of the weeks disclosed in NCT'089 Pub. 2013 at least inherently has 7 days. Thus, NCT'089 Pub. 2013 discloses expressly or inherently every element of claim 17. For the same reasons, NCT'089 Prior Use does as well.

### 7. Claims 18 and 19

Claim 18 is dependent on claim 1 with the further limitation that the "sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof are provided to the human patient in a 1:1 molar ratio by administering to the human patient a compound trisodium [3-((1S,3R)-1-bipheny1-4-ylmethy1-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2''-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate (LCZ696)." Claim 19 is dependent on claim 7 with the further limitation that the "sacubitril or the pharmaceutically acceptable salt thereof together

with valsartan or the pharmaceutically acceptable salt thereof are provided to the human patient in a 1:1 molar ratio by administering to the human patient a compound trisodium [3-((1S,3R)-1-bipheny1-4-ylmethy1-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2''-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate]       hemipentahydrate (LCZ696)."

As discussed above, independent claims 1 and 7 are anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use. NCT'089 Pub. 2013 discloses that the compound administered in the disclosed regimen is LCZ696. As evidenced by Schumacher, LCZ696 is trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2''-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate]   hemipentahydrate,   the same compound as recited in claims 18 and 19. Thus, NCT'089 Pub. 2013 recites every element of claims 18 and 19. For the same reasons, NCT'089 Prior Use does as well.

*        *        *

In view of the foregoing, since NCT'089 Pub. 2013 and NCT'089 Prior Use each discloses every element of claims 2, 3, 6-8, and 11-19, said claims are anticipated by NCT'089 Pub. 2013 and by NCT'089 Prior Use. Defendants expect to uncover additional evidence of the anticipatory nature of NCT'089 Prior Use during discovery.

## D.     Claims 4, 5, 9, and 10 Are Obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use, Optionally in View of McMurray 2013

Although Defendants expect to uncover evidence during discovery that at least NCT'089 Prior Use anticipates claims 4, 5, 9, and 10 of the '667 patent, and/or that NCT'089 Pub. 2013 inherently anticipates such claims, such claims are, at minimum, obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use, optionally in view of McMurray 2013.

Claim 4 is dependent on claim 1 and recites a further limitation that the human patient has an elevated plasma BNP $\geq$ 100 pg/ml or NT-proBNP of $\geq$ 400 pg/ml. Claim 5 is dependent on

80

claim 1 and recites a further limitation that the human patient has an elevated plasma BNP $\geq$ 150 pg/ml or NT-proBNP of $\geq$ 600 pg/ml. Claim 9 is dependent on claim 7 and recites a further limitation that the human patient has an elevated plasma BNP $\geq$ 100 pg/ml or NT-proBNP of $\geq$ 400 pg/ml. Claim 10 is dependent on claim 7 and recites a further limitation that the human patient has an elevated plasma BNP $\geq$ 150 pg/ml or NT-proBNP of $\geq$ 600 pg/ml.

As discussed above, independent claims 1 and 7 are anticipated by NCT'089 Pub. 2013 or NCT'089 Prior Use. Claims 4, 5, 9, and 10 claim sub-populations of the patients treated in claims 1 and 7. Therefore, such claims are obvious over either NCT'089 Pub. 2013 or NCT'089 Prior Use at least for the reasons articulated in *Prometheus*, 805 F.3d at 1097-98.

In addition, claims 4, 5, 9, and 10 are also obvious over either primary reference in view of McMurray 2013. NCT'089 Pub. 2013 further discloses that the patients in the study had chronic heart failure with New York Heart Association (NYHA) class II-IV, left ventricular ejection fraction (LVEF) of $\leq$ 35%. NCT'089 Pub. 2013 at Eligibility Criteria. McMurray 2013 describes a related clinical trial where LCZ696 was evaluated as an alternative to ACEIs like enalapril in patients with HF-rEF. McMurray 2013 at 1062. McMurray 2013's study sets the entry criteria limited to patients with NYHA class II-IV, LVEF $\leq$ 35%, and additionally requires that patients have a plasma BNP $\geq$150 pg/mL or NT-proBNP $\geq$600 pg/mL at the screening visit; or a BNP $\geq$100 pg/mL or NT-proBNP $\geq$400 pg/mL. McMurray at 1063. A POSA in view of McMurray 2013 would find it obvious to include patients with the specified amounts of elevated BNP that is plasma BNP $\geq$150 pg/mL or NT-proBNP $\geq$600 pg/mL and BNP $\geq$100 pg/mL or NT-proBNP $\geq$400 pg/mL as recited in claims 4, 5, 9, and 10 in the study disclosed by NCT'089 Pub. 2013. *See id.*

Thus, claims 4, 5, 9, and 10 are obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use, alone or in view of McMurray 2013.

### E.   Claims 1 and 7 Are Obvious over NCT'089 Pub. 2013 or NCT'089 Prior Use in View of McMurray 2013

First, the NCT'089 Pub. 2013 disclosed administering LCZ696 for treating chronic heart failure with reduced ejection fraction (HF-rEF) in human patients. NCT'089 Pub. 2013 at Title and Study Description. As evidenced by Schumacher, LCZ696 is the sacubitril-valsartan complex of the '667 patent. Schumacher at 31-32. NCT01922089 also taught a target dose of LCZ696 that is 200 mg bid for treating HF-rEF in human patients. NCT'089 Pub. 2013 at Arms and Intervention.

Second, the conservative arm of the study described in NCT'089 Pub. 2013 involved up-titration to LCZ696 200 mg bid over 6 weeks using the drug LCZ696 – starting at 50 mg, followed by 100 mg, followed by 200 mg bid thereafter. *Id.* A POSA would understand that the 6-week titration period to LCZ696 200 mg bid may be reached by starting with 50 mg for 1-5 weeks, followed by 100 mg for 1-5 weeks, to reach 200 mg bid at the end of 6 weeks. *See id.* Thus, NCT'089 Pub. 2013 discloses titration period of 2 weeks, 3 weeks, or 4 weeks at 50 mg and 2 weeks, 3 weeks, or 4 weeks at 100 mg, such that the combined titration period is 6 weeks.

Third, McMurray 2013 discloses pre-study doses of ACE inhibitors and ARBs that are equivalent to a dose of <10 mg of enalapril per day, e.g., doses of olmesartan or candesartan lower than the standard doses. McMurray 2013 at 1064, Table 1. In addition, McMurray 2013's disclosure of a 5 mg bid, or a 10 mg/day, enalapril run-in is also equivalent to less than 10 mg/day enalapril. *Id.* at 1064, Table 1, Fig. 1.

Alternatively, McMurray described in the PARADIGM-HF trial a potential risk of angioedema due to over-lapping ACE inhibition and NEP inhibition during step iii and step v of the clinical trial. McMurray 2013 at 1068. In order to minimize such an overlap, the study comprised two washout periods. *Id.* The washout period after step ii consisting of stopping enalapril a day prior to starting LCZ696. *Id.* Similarly, the washout period before step iv involved

stopping of LCZ696 a day prior to possible start of enalapril. *Id.*

> For safety reasons, there are also two short washout periods during the run-in. **These washout periods are designed to minimize concomitant neprilysin and ACE inhibition which is likely to increase the risk of angioedema.**

*Id.* at 1068 (emphasis added); *see also* McMurray 2014 at 995-97; Schumacher at 31-32 (teaching that ACE inhibitors and angiotensin receptor blockers are required to be discontinued 24 hours prior to randomization); Minguet at 439-440 (teaching a wash-out period of 36 hours).

Thus, a POSA looking at NCT'089 Pub. 2013 in view of McMurray 2013 would not design a dosage regimen with LCZ696 (which dosage regimen starts with 50 mg LCZ696) while concomitantly administering an ACE inhibitor. In other words, in view of McMurray 2013, a POSA would stop using an ACE inhibitor before starting the 50 mg initial starting dose of LCZ696, or use an ACE inhibitor dose that is minimal (less than the 10 mg target dose of enalapril). McMurray 2013 at 1064.

In summary, NCT'089 Pub. 2013 teaches a regimen for treating chronic heart failure with reduced ejection fraction, which regimen comprises administering to a human patient in need thereof a twice-daily target dose of 200 mg of LCZ696, wherein the target dose is reached after a titration with a twice-daily starting dose of 50 mg of LCZ696 for 2-3 weeks to about 4 weeks, followed by a twice-daily dose of 100 mg of LCZ696 for 2-3 weeks to about 4 weeks, followed thereafter by the twice-daily target dose of 200 mg of LCZ696. *See* generally NCT'089 Pub. 2013. McMurray 2013 suggests stopping enalapril/ACEI inhibitor before initiating a LCZ696 treatment regimen for patients with HF-rEF for safety reasons – to avoid angioedema due to overlap of ACE inhibition and NEP inhibition. McMurray 2013 at 1064. In view of McMurray 2013, in order to avoid such adverse effects, a POSA would use the dosage regimen as taught by NCT'089 Pub. 2013 for administration to patients not on ACEI/ARB or taking a low dose of an ACEI/ARB of less than 10 mg/day or less enalapril (or equivalent).

In view of the foregoing, the claimed regimen is obvious over the references of NCT'089 Pub. 2013 or NCT'089 Prior Use in view of McMurray 2013.

### F.   Claims 1 and 7 Are Obvious over Schumacher in View of (McMurray 2013 and/or Konstam) and, Optionally, Further in View of (Dickstein and/or Dungen)

Schumacher describes a clinical trial administering LCZ696 for treating chronic heart failure with reduced ejection fraction in human patients. Schumacher at 11, 31-32, 35-36. Schumacher discloses that LCZ696 is the sacubitril-valsartan complex of the '667 patent. *Id.* at 30. LCZ696 is a complex consisting of three sodium cations and 2.5 water molecules per molecule of sacubitril and valsartan, and thus is a composition comprising sacubitril and valsartan in a 1:1 molar ratio. Schumacher also teaches a target dose of LCZ696 that is 200 mg bid for treating chronic heart failure with reduced ejection fraction in human patients. *Id.* Regarding the up-titration regimen, Schumacher teaches starting with 50 mg bid of LCZ696 and up-titrating to 100 mg bid LCZ696 and reaching the target dose of 200 mg bid over a period of 2-4 weeks. *Id.* Thus, Schumacher teaches 50 mg bid at 2 weeks and 100 mg bid at 2 weeks, reaching 200 mg bid at the end of 4 weeks. However, notably, Schumacher teaches that "[a]t the investigator's discretion, patients are allowed to stay on each titration dose for an additional week." *Id.* Thus, Schumacher also teaches 50 mg bid at 3 weeks and 100 mg bid at 3 weeks, for a total of 6 weeks. *See id.* Thus, Schumacher teaches a titration period that is encompassed by the claimed titration range of about 2-3 to about 4 weeks of 50 mg, followed by about 2-3 to about 4 weeks.

Alternately, a POSA considering Schumacher's dosage regimen of starting with 50 mg bid of LCZ696 and up-titrating to 100 mg bid reaching the target dose of 200 mg bid over a period of 2-4 weeks could also have arrived at the claimed titration period by routine optimization. Based on Schumacher and the knowledge of a POSA alone, a POSA would have been motivated to optimize Schumacher's regimen in order to monitor for patient tolerability and mitigate adverse

effects. *See* Schumacher at 31-32, 35-36. For example, by suggesting that "those not tolerating the maximum dose of study medication could be down-titrated to a lower dose at the Investigator's discretion and then re-challenged to the maximum dose of study medication, or remain on the lower dose," Schumacher teaches adjusting the dose depending on the toleration limit of the patients. *See* Schumacher at 31-32. A POSA also could have relied on McMurray 2013 and/or Konstam. McMurray 2013 describes a gradual enalapril run-in, where patients are up-titrated from a lower dose of enalapril to 10 mg bid after 2 weeks in order to avoid adverse effects like hypotension, renal dysfunction, and/or hyperkalemia. *See* McMurray 2013 at 1064. Konstam describes an increased risk of the adverse effects at higher doses of LCZ696 and other heart failure medicines, which may be controlled by a slow up-titration regimen with careful monitoring. *See* Konstam at 1845, 1847. Although unnecessary, other references disclosing ARB-dosing regimens provide additional bases for a POSA to have reached the claimed up-titration regimen. *See* Diovan (valsartan) capsules FDA label at 2.3 (teaching valsartan titration periods of 40mg bid/160 mg bid/320 mg bid); Dickstein at 954 (teaching valsartan titration periods of 40 mg bid for 2-4 weeks/80 mg bid for 2-4 weeks/160 mg bid); Dungen at 672 (teaching starting with low dose of bisoprolol and moving to a target dose over 6 weeks by doubling the dose every 2 weeks). Because the titration periods of 2-4 weeks overlap with the claim 1 titration periods of "about 3 weeks to about 4 weeks," these claim elements are prima facie obvious.

Thus, it would have been obvious for a POSA to adjust the dose regimen of Schumacher to reach the claimed regimen because Schumacher taught that its dose regimen may be modified based on patient tolerability, and McMurray 2013/Konstam taught slow gradual up-titration to avoid adverse effects like hypotension, renal dysfunction, and/or hyperkalemia. *See* Schumacher 31-32; McMurray 2013 at 1064; Konstam at 1845, 1847. Moreover, in view of Dickstein, it would have been obvious for a POSA to start with Schumacher's starting titration dose of 50 mg bid for

2-4 weeks, followed by doubling it to 100 mg for 2-4 weeks, reaching 200 mg bid. *See* Dickstein at 954. And, in view of Dungen, it would have been obvious for a POSA to start with Schumacher's starting dose of 50 mg bid to reach 200 mg within 6 weeks, meaning starting with the 50 mg bid for 2 weeks, 3 weeks, or 4 weeks, followed by doubling to 100 mg for 4 weeks, 3 weeks, or 2 weeks, respectively, to reach the target dose of 200 mg bid at the end of 6 weeks. *See* Dungen at 672.

With respect to the patient population, it would have been obvious to treat the claimed sub-population of patients that Schumacher already discloses treating. *Prometheus*, 805 F.3d at 1097-98. Whereas Example 1 in **Schumacher** refers to treatment of patients with chronic heart failure and *preserved* ejection fraction, a skilled artisan would nevertheless be motivated from this disclosure to also require discontinuation of ACE inhibitors or ARBs at least 24 hours prior to treatment in patients with chronic heart failure and *reduced* ejection fraction. Both are serious heart conditions. Reading Example 1 of **Schumacher**, a skilled artisan would want to ease a patient with *reduced* ejection fraction into treatment in the same way: by discontinuing ACE inhibitors and ARBs at least 24 hours prior to treatment with the lower 50 mg twice daily dose of LCZ696, before uptitrating to the target dose of 200 mg LCZ696 over the course of multiple weeks.

Schumacher further discloses a clinical trial in Example 2. *Id*. at 35-36. For the study details and rationale, Example 2 includes the following:

> Detailed study design and procedures can be found under www.clinicaltrials.gov, study number NCT01035255, and as published in The European Journal of Heart Failure by McMurray et al (18th April 2013) titled "Dual angiotensin receptor and neprilysin inhibition as an alternative to angiotensin converting enzyme inhibition in patients with chronic systolic heart failure: rationale for and design of the Prospective comparison of ARNI with ACEI to Determine Impact on Global Mortality and morbidity in Heart Failure trial (PARADIGM-HF)".

*Id.* at 36.

The McMurray 2013 reference is the same reference raised by the Examiner in the first Office Action for the '667 patent. A diagram of the clinical trial parameters disclosed in Example 2 of **Schumacher** is presented as Figure 1 of McMurray 2013, and is reproduced below.



As Example 2 discloses, prior to treatment there were two run-in periods in the clinical trial, where patients received 10 mg enalapril in the first run-in period, then received LCZ696 in the second run-in period. *Id.* at 36. A skilled artisan would be directed by the explicit disclosure of **Schumacher** (shown above) to review the study details published in McMurray 2013. McMurray 2013 explains that "[o]ther heart failure medication (except for an ACE inhibitor or ARB) was continued during the run-in periods." McMurray 2013 at 3. Therefore, Example 2 of **Schumacher** requires discontinuation of ACE inhibitors other than enalapril, and ARBs during the LCZ696 run-in periods, followed by a treatment phase.

In the first run-in period, patients receive 10 mg twice daily enalapril: "Patients enter a single blind enalapril run-in period (titrated to 10 mg bid) which, depending on tolerability, is followed by an LCZ696 run-in period (100 mg titrated to 200 mg bid)." *Id.* at 36. However, enalapril is itself an ACE inhibitor. Taken together, patients receive 10 mg twice daily enalapril, then enalapril and all other ACE inhibitors and ARBs are discontinued while the patient receives

LCZ696 beginning in the second run-in period. Accordingly, Example 2 discloses administration of LCZ696 to patients who have received 10 mg twice daily enalapril prior to treatment.

A skilled artisan would understand that the claim elements requiring either (i) discontinuation of ACE inhibitors and ARBs, or (ii) very low doses of ACE inhibitors or ARBs, are intended to avoid potential toxicity associated with co-administration of ACE inhibitors or ARBs with sacubitril and valsartan. Because Example 2 discloses administration of 10 mg twice daily enalapril prior to LCZ696 administration, a skilled artisan would be motivated to administer sacubitril and valsartan to patients taking that same amount of enalapril or less, to ensure patient safety. Claim 1, subsection (ii) directs treatment with sacubitril and valsartan in patients taking the ACE inhibitor and ARB equivalent of less than 10 mg enalapril per day, which is less than 10 mg twice daily. As described above, Schumacher discloses administration of 50 mg twice daily LCZ696 to patients taking no ACE inhibitors or ARBs. A skilled artisan would therefore administer the same 50 mg twice daily initial dose to patients taking ACE inhibitors or ARBs at a level *less than* the equivalent of 10 mg twice daily enalapril (i.e., less than 10 mg daily enalapril).

Alternatively or additionally, a POSA in view of McMurray 2013 would not have designed a dosage regimen with LCZ696 (which dosage regimen starts with 50 mg LCZ696) while concomitantly administering an ACE inhibitor. In other words, in view of McMurray 2013, a POSA would stop using an ACE inhibitor before starting the 50 mg initial starting dose of LCZ696, or use a dose that is minimal (less than the 10 mg target dose of enalapril). McMurray 2013 at 1064.

In summary, Schumacher teaches a regimen for treating chronic heart failure with reduced ejection fraction, which comprises administering to a human patient in need thereof a twice-daily target dose of 200 mg of LCZ696. Schumacher at 31-32, 35-36. In view of McMurray 2013 and/or Konstam, a POSA would try to optimize the titration period of Schumacher to the claimed titration

88

period of 50 mg for 2-3 to 4 weeks/100 mg for 2-3 to 4 weeks/200 mg bid. *See* McMurray 2013 at 1064; Konstam at 1845, 1847. To the extent the patient sub-population is not obvious under *Prometheus*, 805 F.3d at 1097-98, a POSA in view McMurray 2013, in order to avoid adverse effects, would use the dosage regimen as taught by Schumacher and modify it for administration to patients not on ACEI/ARB or taking a low dose ACEI/ARB, such as less than 10 mg enalapril (less than single target dose). McMurray 2013 at 1064.

Thus, the claimed regimen is obvious over the references of Schumacher in view of McMurray 2013 and/or Konstam. Alternately, the claimed regimen is also obvious over the references of Schumacher in view of (McMurray 2013 and/or Konstam) and further in view of (Dickstein and/or Dungen).

### G. Dependent Claims 2-6 and 8-19 Are Invalid as Obvious

As discussed above, claims 1 and 7 are obvious over the references of NCT'089 Pub. 2013 or NCT'089 Prior Use and McMurray 2013. *Supra* § VIII.E. The additional limitations of claims 2-3, 6-8, and 11-19, as discussed in detail in § VIII.C, and of claims 4, 5, 9, and 10, as discussed in detail in § VIII.D, are also taught by the same references of NCT'089 Pub. 2013 or NCT'089 Prior Use and McMurray 2013. Thus, dependent claims 2-6 and 8-19 are obvious over the references of NCT'089 Pub. 2013 or NCT'089 Prior Use in view of McMurray 2013.

In addition, as discussed above, claims 1 and 7 are obvious over Schumacher in view of McMurray 2013 and/or Konstam and, optionally, further in view of Dickstein and/or Dungen. And, as discussed above, the additional limitations of claims 2-3, 6, 8, and 11-19, as discussed in detail in § VIII.C, and of claims 4, 5, 9, and 10, as discussed in detail in § VIII.D, are taught by NCT'089 Pub. 2013 or NCT'089 Prior Use and McMurray 2013. Thus, dependent claims 2-6 and 8-19 are obvious over Schumacher in view of (McMurray 2013 and/or Konstam), further in view of NCT'089 Pub. 2013 or NCT'089 Prior Use, and, optionally, further in view of Dickstein and/or

Dungen.

### 1.  Claim 2

Claim 2 depends from claim 1, and specifies that the titration period from 50 mg to 100 mg is about 3 weeks, and the titration period from 100 mg to 200 mg is about 3 weeks. As described above, Schumacher, in view of Dickstein, teaches up-titration from 50 mg to 100 mg over 2-4 weeks (a range covering about 3-4 weeks), and up-titration from 100 mg to the target dose of 200 mg over 2-4 weeks (a range covering about 3-4 weeks). Because about 3 weeks is merely a subset of the recited "about 3-4 weeks" of claim 1, claim 2 is *prima facie* obvious over Schumacher in view of the Dickstein, for the same reasons as claim 1.

### 2.  Claim 3

Claim 3 depends from claim 1, and specifies that the human patient has to stop taking the ARB or ACE inhibitor at least 36 hours before initiating treatment with sacubitril and valsartan. As described above, it would have been obvious to a skilled artisan to discontinue treatment with an ACE inhibitor or ARB prior to administration of sacubitril and valsartan, in light of Schumacher. Example 1 discloses discontinuation of ACE inhibitors or ARBs at 24 hours prior to administration of sacubitril and valsartan. A skilled artisan would understand this disclosure to indicate that ACE inhibitors and ARBs should be discontinued for at least 24 hours prior to administration of sacubitril and valsartan, such that ACE inhibitors and ARBs are substantially cleared from the body prior to treatment with sacubitril and valsartan. Discontinuation for 36 hours, as required by claim 3, is a period of time that overlaps with at least 24 hours. Therefore, claim 3 is *prima facie* obvious over Schumacher in view of Dickstein, for the same reasons as claim 1.

### 3.  Claim 4

Claim 4 depends from claim 1, and specifies that the human patient has an elevated plasma

BNP of ≥100 pg/mL or NT-proBNP of ≥400 pg/mL. As described above, Schumacher explains

that the experimental parameters of the clinical trial in Example 2 are described in McMurray

2013. McMurray 2013 explains, under the subheader "Patients":

> Entry criteria were as follows: ... (iii) LVEF ≤ 35% (initially this was ≤ 40% but changed in a protocol amendment dated 15 December 2010); (iv) plasma BNP ≥150 pg/mL (or NT-proBNP ≥600 pg/mL) at the screening visit (Visit 1, Figure 1) or a BNP ≥100 pg/mL (or NT-proBNP ≥400 pg/mL) and a hospitalization for heart failure within the last 12 months...

McMurray 2013 at 4.

Therefore, Example 2 of **Schumacher**, in light of the Example 2 study details referred to in

McMurray 2013, explicitly teaches that sacubitril and valsartan are administered to human patients

with an elevated plasma BNP of ≥100 pg/mL or NT-pro BNP of ≥400 pg/mL. Accordingly, claim

4 is *prima facie* obvious over Schumacher in view of Dickstein.

### 4.    Claim 5

Claim 5 depends from claim 1, and specifies that the human patient has an elevated plasma

BNP of ≥150 pg/mL or NT-proBNP of ≥600 pg/mL. As described above, Schumacher explains

that the experimental parameters of the clinical trial in Example 2 are described in McMurray

2013. McMurray 2013 explains, under the subheader "Patients":

> Entry criteria were as follows: ... (iii) LVEF ≤ 35% (initially this was ≤ 40% but changed in a protocol amendment dated 15 December 2010); (iv) plasma BNP ≥150 pg/mL (or NT-proBNP ≥600 pg/mL) at the screening visit (Visit 1, Figure 1) or a BNP ≥100 pg/mL (or NT-pro BNP ≥400 pg/mL) and a hospitalization for heart failure within the last 12 months ...

McMurray 2013 at 4.

Therefore, Example 2 of **Schumacher**, in light of the Example 2 study details referred to in

McMurray 2013, explicitly teaches that sacubitril and valsartan are administered to human patients

with an elevated plasma BNP of ≥150 pg/mL or NT-proBNP of ≥600 pg/mL. Accordingly, claim

5 is *prima facie* obvious over **Schumacher** in view of Dickstein.

### 5.    Claim 6

Claim 6 depends from claim 1, and specifies that the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%. As described above, **Schumacher** explains that the experimental **parameters** of the clinical trial in Example 2 are described in McMurray 2013. McMurray 2013 explains, under the subheader "Patients":

> Entry criteria were as follows: ... (iii) L VEF ≤ 35% (initially this was ≤ 40% but changed in a protocol amendment dated 15 December 2010); (iv) plasma BNP ≥150 pg/mL (or NT-proBNP ≥600 pg/mL) at the screening visit (Visit 1, Figure 1) or a BNP ≥100 pg/mL (or NT-pro BNP ≥400 pg/mL) and a hospitalization for heart failure within the last 12 months...

McMurray 2013 at 4.

Therefore, Example 2 of **Schumacher**, in light of the Example 2 study details referred to in McMurray 2013, explicitly teaches that sacubitril and valsartan are administered to human patients with a reduced left **ventricular** ejection fraction (LVEF) of ≤35%. Accordingly, claim 6 is *prima facie* obvious over **Schumacher** in view of Dickstein.

### 6.    Claim 13

Claim 13 depends from claim 1, and specifies that the initial dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the **treatment** with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof. For the same reasons discussed above for claim 1, this claim is *prima facie* obvious over the **Schumacher** in view of Dickstein.

### 7.    Claim 14

Claim 14 depends from claim 13, and specifies that the low dose of the ACE inhibitor or the low dose of the **ARB** is equivalent to the dose of <10 mg of enalapril per day. For the same reasons discussed above for claim 1, claim 14 is *prima facie* obvious **Schumacher** in view of

Dickstein.

### 8.    Claim 18

Claim 18 depends from claim 1, and specifies that sacubitril and valsartan are administered to the human patient in a 1:1 molar ratio by administering LCZ696. For the same reasons discussed above for claim 1, claim 18 is *prima facie* obvious Schumacher in view of Dickstein.

### 9.    Claim 8

Claim 8 depends from claim 7, and specifies that the titration period from 50 mg to 100 mg is about 3 weeks, and the titration period from 100 mg to 200 mg is about 3 weeks. As described above, Schumacher, in view of Dickstein, teaches up-titration from 50 mg to 100 mg over 2-4 weeks (a range covering about 3-4 weeks), and up-titration from 100 mg to the target dose of 200 mg over 2-4 weeks (a range covering about 3-4 weeks). Because 3 weeks is merely a subset of 3-4 weeks, claim 8 is *prima facie* obvious over Schumacher in view of Dickstein, for the same reasons as claim 7.

### 10.    Claims 9-12, 15, 16, and 19

Claim 9 depends from claim 7 rather than claim 1, but is otherwise identical to claim 4. Claim 10 depends from claim 7 rather than claim 1, but is otherwise identical to claim 5. Claim 11 depends from claim 7 rather than claim 1, but is otherwise identical to claim 6. Claim 12 depends from claim 7 rather than claim 1, but is otherwise identical to claim 3. Claim 15 depends from Claim 7 rather than claim 1, but is otherwise identical to claim 13. Claim 16 depends from claim 15 rather than claim 1, but is otherwise identical to claim 14. Claim 19 depends from claim 7, but is otherwise identical to claim 18. Thus, for the same reasons described above for claims 3-6, 13, 14, and 18, claims 9-12, 15, 16, and 19 are *prima facie* obvious over Schumacher in view of Dickstein.

### 11.    Claim 17

Claim 17 depends from claim 7, and specifies that a first week of the at least about 6 weeks

is 5±2 days. Because the first up-titration period is "initially administering 50 mg twice daily for

about 2-4 weeks" the first week referred to in claim 17 necessarily refers to the initial treatment

with 50 mg of sacubitril and valsartan. As described above, Schumacher includes Example 1,

which includes a titration schedule involving a first treatment period with 50 mg LCZ696:

> Patients are started on LCZ696 50 mg twice daily or valsartan 40
> mg twice daily and are titrated to their final medication doses of
> LCZ696 200 mg twice daily or valsartan 160 mg twice daily over a
> period of 2 to 4 weeks. Patients are on their starting dose for 1 week
> and titrated up to either LCZ696 100 mg twice daily or valsartan 80
> mg twice daily for 1 week.

Therefore, Schumacher teaches administration of twice daily 50 mg sacubitril and

valsartan, with the starting dose administered for 1 week. A week is seven days. Therefore,

Schumacher teaches the 50 mg twice daily initial dose is administered for 7 days, which is a subset

of 5±2 days. Accordingly, claim 17 is *prima facie* obvious over Schumacher in view of Dickstein.

The above obviousness combinations are exemplary. Defendants reserve the right to rely

on other combinations of the references discussed herein or later identified. Defendants also

reserve the right to rely on the reasoning of *Prometheus*, 805 F.3d at 1097-98, with respect to

patient populations in addition to, or instead of, any reference teaching a claimed patient

population.

### H.    Claims 14, 16, and 17 Are Improper Dependent Claims

Claims 14, 16, and 17 do not specify a further limitation of the subject matter of the claims

to which they refer and therefore are invalid under 35 U.S.C. § 112(d). *See Pfizer Inc., v. Ranbaxy

Laboratories Limited,* 457 F.3d 1284 (Fed. Cir. 2006) (holding that a dependent claim that does

not specify a further limitation of the subject matter of the claim to which it refers is invalid).

Claim 14 is dependent on claim 13 with the further limitation that the low dose of the ACEI

or the low dose of the ARB is equivalent to < 10 mg enalapril. Claim 13 is dependent on claim 1, which already discloses the limitation that the low dose of ACEI/ARB is a dose equivalent to a dose of ≤ 10 mg of enalapril per day. Thus, since claim 14 does not specify a further limitation of claim 13, it is invalid under 35 U.S.C. § 112(d).

Claim 16 is dependent on claim 15 with the further limitation that the low dose of the ACEI or the low dose of the ARB is equivalent to < 10 mg enalapril. Claim 15 is dependent on claim 7, which already discloses the limitation that the low dose of ACEI/ARB is a dose equivalent to a dose of < 10 mg of enalapril per day. Thus, since claim 16 does not specify a further limitation of claim 15, it is invalid under 35 U.S.C. § 112(d).

Claim 17 is dependent on claim 7, with the further limitation that "a first week of the at least about 6 weeks is 5±2 days." However, the first week of treatment disclosed in claim 7 inherently has 7 days. Thus, since claim 17 does not specify a further limitation of claim 7, it is invalid under 35 U.S.C. § 112(d).

### I.   Claims 1-3 and 7-19 Are Obvious Over the Teachings of the LCZ696 Study and McMurray In View of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, and the Medscape Interview

#### 1.   Claims 1 and 7

A POSA would have been motivated to combine the LCZ696 Study with McMurray to achieve the claimed subject matter of claim 1 in view of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, and the Medscape Interview. O'Meara teaches that the PARADIGM-HF trial suggests that it "will likely result in the replacement of angiotensin-converting enzyme inhibitors and angiotensin II receptor blockers as a first-line therapy in patients with HFrEF." O'Meara at S447. A POSA would recognize that O'Meara teaches that up-titration regimens of LCZ696, such as those in the PARADIGM-HF study or disclosed in the LCZ696 Study, would be appropriate for ACEI/ARB-naïve patients. The VASOTEC Label teaches an initial starting dose of 2.5 mg

enalapril b.i.d. (5 mg daily) to be up-titrated as needed. Jessup teaches that "[a]lthough heart-failure guidelines suggest a target twice-daily administration of either 10 mg of enalapril or 160 mg of valsartan, numerous registries acknowledge that lower doses are commonly used in clinical practice." Jessup at 2. The Medscape Interview teaches the difficulties in patients tolerating non-low doses of ACE inhibitors, such as enalapril, and that a majority of patients could not tolerate 10 mg b.i.d. daily of enalapril and in a more recent trial with a forced titration of enalapril the average achieved dose of enalapril was only about 15 mg. Medscape Interview. Further, Jandeleit-Dahm teaches the additive effects of ACE inhibitors with neprilysin inhibitor in bradykinin breakdown and resulting angioedema as a side effect, such that it teaches away from the use of higher doses of ACE inhibitors. Jandeleit-Dahm at 3, ll. 13-15. Therefore, a POSA would be motivated to combine the published regimen of the LCZ696 Study with McMurray, and in view of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, and the Medscape Interview, to achieve a regimen using the lowest tolerated dose of enalapril (or none at all, such as for ACEI/ARB-naïve patients) when initiating treatment and up-titrating with LCZ696 to maximize the therapeutic efficacy and to minimize the possible side effects (i.e. angioedema) to patients. A POSA would have a reasonable expectation of success in arriving at the claimed subject matter of claim 1 for a regimen for treating chronic heart failure with reduced ejection fraction.

Thus, claim 1 is obvious over the teachings of the LCZ696 Study and McMurray in view of one or more combinations of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, and the Medscape Interview.

Claim 7 recites all the elements of claim 1 but differs from claim 1 in that the period of the titration with a twice daily starting dose of 50 mg is from about 2 to 4 weeks (instead of about 3 to 4 weeks), the period of the titration with a twice daily dose of 100 mg is about 2 to 4 weeks (instead of about 3 to 4 weeks), and the titration to the target dose occurs over a period of at least about 6

96

weeks.

The ranges of dosages and arms of the up-titration are within the ranges taught and disclosed by the LCZ696 Study, of LCZ696 200 mg twice daily over 6 weeks with 50 mg/100 mg/200 mg bid administration. Thus, for the same reasons as claim 1 of the '667 patent above, claim 7 is obvious over the teachings of the LCZ696 Study and McMurray in view of one or more combinations of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, and the Medscape Interview.

### 2.     Claims 2 and 8

Claim 2, which depends from claim 1, and claim 8, which depends from claim 7, specifically require that the twice daily target dose of 200 mg is reached after the titration with the twice daily starting dose of 50 mg for about 3 weeks, followed by the twice daily dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter. These elements are taught by the prior art, and a POSA would have been motivated to combine such teachings to arrive at the claimed invention. The LCZ696 Study discloses regimens of up-titration of LCZ696 200 mg twice daily over 3 weeks and over 6 weeks with 50 mg/100 mg/200 mg bid administration.

Thus, claims 2 and 8 are also obvious over the teachings of LCZ696 Study and McMurray in view of one or more combinations of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, and the Medscape Interview.

### 3.     Claims 3 and 12

Claim 3, which depends from claim 1, and claim 12, which depends from claim 7, specifically require that the human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof. These elements are taught by the prior art, and a POSA would have been motivated to combine such teachings to arrive at the

claimed invention. McMurray teaches to stop taking enalapril "a day" prior to starting LCZ696 at Visit 3. Further, McMurray teaches that the entry criteria included "treatment with a stable dose of an ACE inhibitor or an ARB equivalent to enalapril 10 mg/day (see Table 1) for at least 4 weeks before the screening visit" and a "lower dose of enalapril" was allowed for those currently treated with an ARB and for those taking a low dose of ACE inhibitor" and "if the investigator was concerned that switching directly to enalapril" would not be tolerated. McMurray at 1064. The First Report Managed Care discloses participants moved on from the run-in periods only if no unacceptable side effects occurred. A minimum of 36 hours had to elapse between treatment with enalapril and LCZ696 during the run-in periods to protect patients from being exposed to both mechanisms of action. First Report Managed Care at 7. Accordingly, the ARB or the ACE inhibitor taken before switching directly to enalapril was also stopped before initiating treatment with LCZ696. Thus, claims 3 and 12 are also obvious over the teachings of LCZ696 Study and McMurray in view of one or more combinations of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, the Medscape Interview and the First Report Managed Care.

### 4.  Claims 9, 10 and 11

Claim 9 depends from claim 7 and specifically requires that the human patient has an elevated plasma BNP of $\geq 100$ pg/mL or NT-proBNP of $\geq 400$ pg/mL. Claim 10 also depends from claim 7 wherein the human patient has an elevated plasma BNP of $\geq 150$ pg/mL or NT-proBNP of $\geq 600$ pg/mL. Claim 11 depends from claim 7 and requires that the human patient has a reduced left ventricular ejection fraction (LVEF) of $\leq 35\%$. These elements are taught by the prior art, and a POSA would have been motivated to combine such teachings to arrive at the claimed invention. McMurray discloses the PARADIGM-HF study had a "BNP entry threshold of $\geq 150$ pg/mL (or NT-proBNP $\geq 600$ pg/mL) at Visit 1 or a BNP $\geq 100$ pg/mL (or NT-proBNP $\geq 400$ pg/mL) if the patient was hospitalized for heart failure within the last 12 months. McMurray at 1067. McMurray

also discloses "[t]he patients included in PARADIGM-HF are similar to those enrolled in SOLVD-Treatment, i.e. in NYHA class II–IV and with an LVEF ≤ 35% (in most cases)." *Id.*

Thus, claims 9, 10, and 11 are also obvious over the teachings of LCZ696 Study and McMurray in view of one or more combinations of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, and the Medscape Interview.

### 5.      Claims 13-16

Claim 13 depends from claim 1 and specifically requires that the twice daily starting dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof. Claim 14 depends from claim 13 and specifically requires that the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to the dose of <10 mg of enalapril per day. Claim 15 depends from claim 7 and specifically requires that the twice daily starting dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof. Claim 16 depends from claim 15 and specifically requires that the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to the dose of <10 mg of enalapril per day.

These elements are taught by the prior art, and a POSA would have been motivated to combine such teachings to arrive at the claimed invention. McMurray discloses taking "[a] lower dose of enalapril (5 mg b.i.d.) was allowed for patients currently treated with an ARB and for those taking a low dose of ACE inhibitor (see Table 1) if the investigator was concerned that switching directly to enalapril 10 mg b.i.d. might not be tolerated (e.g. because of hypotension, renal dysfunction, and/or hyperkalaemia)." McMurray at 1064. Table I teaches a "minimum required

pre-study daily dose[] of commonly prescribed [ACE] inhibitors and [ARBs]" where enalapril is identified with a "minimum daily dose" of 10 mg. *Id.* at 1064, Table I. McMurray further teaches that regimens beginning with lower doses of enalapril (such as 5 mg b.i.d.) before up-titration to 200 mg b.i.d. of LCZ696 may be beneficial to lessen concerns related to hypotension, renal dysfunction, and/or hyperkalemia. *Id.* McMurray also teaches that patients would stop taking enalapril a day prior to being provided with a starting dose of LCZ696 at Visit 3. *Id.*

A POSA would recognize that the VASOTEC Label teaches an initial starting dose of 2.5 mg enalapril b.i.d. (5 mg daily) to be up-titrated as needed. Jessup teaches that "[a]lthough heart-failure guidelines suggest a target twice-daily administration of either 10 mg of enalapril or 160 mg of valsartan, numerous registries acknowledge that lower doses are commonly used in clinical practice." Jessup at 2. Further, Jandeleit-Dahm teaches the additive effects of ACE inhibitors with neprilysin inhibitor in bradykinin breakdown and resulting angioedema as side effect, such that it teaches away from the use of higher doses of ACE inhibitors. Jandeleit-Dahm at 3, ll. 13-15. Therefore, a POSA would be motivated to combine the published regimen of the LCZ696 Study with McMurray, and in view of the VASOTEC Label, Jandeleit-Dahm, and Jessup to achieve a regimen using the lowest tolerated dose of enalapril when initiating treatment and up-titrating with LCZ696 to maximize the therapeutic efficacy and to minimize the possible side effects (i.e. angioedema) to patients. A POSA would have a reasonable expectation of success in arriving at the claimed subject matter of claims 13-16 for a regimen for treating chronic heart failure with a low dose of the ACE inhibitor or ARB (including the equivalent to the dose of <10 mg of enalapril) before initiating treatment.

Thus, claims 13-16 are also obvious over the teachings of LCZ696 Study and McMurray in view of one or more combinations of the VASOTEC Label, Jandeleit-Dahm, and Jessup.

### 6. Claim 17

Claim 17 depends from claim 7 and specifically requires that a first week of the at least about 6 weeks is 5 ± 2 days. These elements are taught by the prior art, and a POSA would have been motivated to combine such teachings to arrive at the claimed invention. McMurray teaches up-titration of LCZ696 after 1 week. McMurray at 1064. Thus, claim 17 is also obvious over the teachings of LCZ696 Study and McMurray in view of one or more combinations of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, and the Medscape Interview.

### 7. Claims 18 and 19

Claim 18 depends from claim 1 and specifically requires that sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof are provided to the human patient in a 1:1 molar ratio by administering to the human patient LCZ696. Claim 19 depends from claim 7 and specifically requires that the sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof are provided to the human patient in a 1:1 molar ratio by administering to the human patient LCZ696.

These elements are taught by the prior art, and a POSA would have been motivated to combine such teachings to arrive at the claimed invention. The LCZ696 Study and McMurray each disclose regimens for treating chronic heart failure with LCZ696. Thus, claims 18 and 19 are also obvious over the teachings of LCZ696 Study and McMurray in view of one or more combinations of the VASOTEC Label, Jandeleit-Dahm, O'Meara, Jessup, and the Medscape Interview.

### J. Claims 1-19 are Obvious over the teachings of ACCF/AHA Guideline in view of McMurray 2013, NCT01922089 and Gu

A POSA would also be motivated to combine ACCF/AHA Guideline with McMurray 2013, NCT01922089, and Gu.

### 1.     Independent Claims 1 and 7

Independent claims 1 and 7 of the '667 patent are directed to methods of treating chronic heart failure with reduced ejection fraction, with the most substantive difference between the two claims being the following:

- Claim 1 recites that the time period at each dosage is "from about <u>3 weeks</u> to about 4 weeks" and claim 7 recites that the time period at each dosage is "from about <u>2 weeks</u> to about 4 weeks" (emphasis added).

- Claim 7 further recites that "said titration to the target dose occurs over a period of at least about 6 weeks," and this limitation is not recited in claim 1.

### a.     ACCF/AHA Guideline Teaches the Treatment of Heart Failure With Reduced Ejection Fraction in Patients Taking No ACE Inhibitors or Taking ≤ 10 mg of Enalapril Daily

ACCF/AHA Guideline discloses the use of ARBs, including valsartan, in patients taking no ACE inhibitors or ≤ 10 mg of enalapril daily before initiating treatment with ARBs.

First, ACCF/AHA Guideline provides clinical practice guidelines set forth by the American College of Cardiology Foundation and the American Heart Association Task Force for the treatment of heart failure in humans, including heart failure with reduced ejection fraction (HF*r*EF). *See* ACCF/AHA Guideline at e245. ACCF/AHA Guideline provides pharmacological treatment guidelines for this patient population, and discloses that "[r]andomized controlled trials (RCTs) in patients with HF have mainly enrolled patients with HF*r*EF with an [ejection fraction] ≤35% or ≤40%, and it is only in these patients that efficacious therapies have been demonstrated to date." *See id.* at e247. *See* ACCF/AHA Guideline at e247. ACCF/AHA Guideline describes HF*r*EF as referring to heart failure with an ejection fraction ≤40%:

**Table 3.   Definitions of HF*r*EF and HF*p*EF**

| Classification | EF (%) | Description |
|---|---|---|
| I. Heart failure with reduced ejection fraction (HF*r*EF) | ≤40 | Also referred to as systolic HF. Randomized controlled trials have mainly enrolled patients with HF*r*EF, and it is only in these patients that efficacious therapies have been demonstrated to date. |
| II. Heart failure with preserved ejection fraction (HF*p*EF) | ≥50 | Also referred to as diastolic HF. Several different criteria have been used to further define HF*p*EF. The diagnosis of HF*p*EF is challenging because it is largely one of excluding other potential noncardiac causes of symptoms suggestive of HF. To date, efficacious therapies have not been identified. |
| a. HF*p*EF, borderline | 41 to 49 | These patients fall into a borderline or intermediate group. Their characteristics, treatment patterns, and outcomes appear similar to those of patients with HF*p*EF. |
| b. HF*p*EF, improved | >40 | It has been recognized that a subset of patients with HF*p*EF previously had HF*r*EF. These patients with improvement or recovery in EF may be clinically distinct from those with persistently preserved or reduced EF. Further research is needed to better characterize these patients. |

EF indicates ejection fraction; HF, heart failure; HF*p*EF, heart failure with preserved ejection fraction; and HF*r*EF, heart failure with reduced ejection fraction.

*See id.*, Table 3 (emphasis added).

ACCF/AHA Guideline discloses that angiotensin receptor blockers may be useful pharmacological treatments for patients with HF*r*EF, as first line therapy in the treatment of HF*r*EF. In particular, ACCF/AHA Guideline discloses the following treatment protocol, wherein patients are initially treated with an ACE inhibitor <u>or</u> ARB, and a beta blocker:



**Figure 1.** Stage C HF*r*EF: evidence-based, guideline-directed medical therapy. ACEI indicates angiotensin-converting enzyme inhibitor; ARB, angiotensin-receptor blocker; HF*r*EF, heart failure with reduced ejection fraction; Hydral-Nitrates, hydralazine and isosorbide dinitrate; LOE, Level of Evidence; and NYHA, New York Heart Association.

103

*See id.* at e264.

Second, ACCF/AHA Guideline discloses the use of valsartan, an angiotensin receptor blocker, as a pharmacological treatment for human patients with HF*r*EF. ACCF/AHA Guideline discloses that "ARBs are reasonable to reduce morbidity and mortality as alternatives to ACE inhibitors as first-line therapy for patients with HF*r*EF..." *See id.* at e267. Valsartan is disclosed as an exemplary ARB, with a recommended initial daily doses of 20 to 40 mg twice daily to a maximum daily dose of 160 mg twice daily. *See id.* at Table 15.

**Table 15.   Drugs Commonly Used for Stage C HF*r*EF**

| Drug | Initial Daily Dose(s) | Maximum Dose(s) | Mean Doses Achieved in Clinical Trials |
|---|---|---|---|
| ACE inhibitors | | | |
| Captopril | 6.25 mg 3 times | 50 mg 3 times | 122.7 mg/d[422] |
| Enalapril | 2.5 mg twice | 10 to 20 mg twice | 16.6 mg/d[413] |
| Fosinopril | 5 to 10 mg once | 40 mg once | N/A |
| Lisinopril | 2.5 to 5 mg once | 20 to 40 mg once | 32.5 to 35.0 mg/d[445] |
| Perindopril | 2 mg once | 8 to 16 mg once | N/A |
| Quinapril | 5 mg twice | 20 mg twice | N/A |
| Ramipril | 1.25 to 2.5 mg once | 10 mg once | N/A |
| Trandolapril | 1 mg once | 4 mg once | N/A |
| ARBs | | | |
| Candesartan | 4 to 8 mg once | 32 mg once | 24 mg/d[420] |
| Losartan | 25 to 50 mg once | 50 to 150 mg once | 129 mg/d[421] |
| Valsartan | 20 to 40 mg twice | 160 mg twice | 254 mg/d[198] |
| Aldosterone antagonists | | | |
| Spironolactone | 12.5 to 25.0 mg once | 25 mg once or twice | 26 mg/d[425] |
| Eplerenone | 25 mg once | 50 mg once | 42.6 mg/d[446] |
| Beta blockers | | | |
| Bisoprolol | 1.25 mg once | 10 mg once | 8.6 mg/d[117] |
| Carvedilol | 3.125 mg twice | 50 mg twice | 37 mg/d[447] |
| Carvedilol CR | 10 mg once | 80 mg once | N/A |
| Metoprolol succinate extended release (metoprolol CR/XL) | 12.5 to 25 mg once | 200 mg once | 159 mg/d[448] |
| Hydralazine and isosorbide dinitrate | | | |
| Fixed-dose combination[424] | 37.5 mg hydralazine/20 mg isosorbide dinitrate 3 times daily | 75 mg hydralazine/40 mg isosorbide dinitrate 3 times daily | ~175 mg hydralazine/90 mg isosorbide dinitrate daily |
| Hydralazine and isosorbide dinitrate[449] | Hydralazine: 25 to 50 mg, 3 or 4 times daily and isosorbide dinitrate: 20 to 30 mg 3 or 4 times daily | Hydralazine: 300 mg daily in divided doses and isosorbide dinitrate: 120 mg daily in divided doses | N/A |

ACE indicates angiotensin-converting enzyme; ARB, angiotensin-receptor blocker; CR, controlled release; CR/XL, controlled release/extended release; HF*r*EF, heart failure with reduced ejection fraction; and N/A, not applicable.

Third, ACCF/AHA Guideline suggests that valsartan can be used as first-line therapy or in

patients taking no ACE inhibitors or ≤ 10 mg of enalapril daily before initiating treatment with valsartan. As discussed above, ACCF/AHA Guideline discloses that "ARBs are reasonable to reduce morbidity and mortality as alternatives to ACE inhibitors as first-line therapy for patients with HF*r*EF..." *See id.* at e267. Further, ACCF/AHA Guideline discloses that "ARBs are recommended in patients with HF*r*EF with current or prior symptoms who are ACE inhibitor intolerant, unless contraindicated, to reduce morbidity and mortality…" *See id.* at *7.3.2.3. ARBs: Recommendations*. Therefore, ACCF/AHA Guideline envisions the initiation of valsartan therapy in a patient who is not taking an ACE inhibitor or another ARB.

Fourth, ACCF/AHA Guideline discloses that "[t]reatment with an ACE inhibitor should be initiated at low doses (Table 15), followed by gradual dose increments if lower doses have been well tolerated" and that "[i]f these target doses [shown to reduce the risk of cardiovascular events in clinical trials] cannot be used or are poorly tolerated, intermediate doses should be used with the expectation that there are likely to be only small differences in efficacy between low and high doses." *See id.* at e266. As Table 15 discloses a recommended initial daily dose of enalapril 2.5 mg twice daily (or 5 mg/day), and a mean enalapril daily dose achieved in clinical trials of 16.6 mg/day, ACCF/AHA Guideline envisions the initiation of valsartan therapy in a patient who is taking enalapril at a dose of ≤10 mg per day.

Therefore, based on the prior art, it would have been obvious for a POSA to treat HF*r*EF by administering valsartan (an ARB) to a "human patient neither taking an angiotensin-converting enzyme (ACE) inhibitor nor taking an angiotensin II receptor blocker (ARB)" or a human patient taking "a dose of ≤10 mg per day" before initiation of valsartan therapy.

> **b.   McMurray 2013 and Gu Suggest the Use of LCZ696 as a Possible Treatment for HF*r*EF**

It would have been obvious for a POSA to administer LCZ696 instead of valsartan in the above-mentioned human patient population, for the treatment of HF*r*EF, at the starting dose and

titration schedule recited in the '667 patent claims, based on the further teachings of McMurray 2013, NCT01922089, and Gu. A POSA would have known that LCZ696 is sacubitril with valsartan in a 1:1 molar ratio, wherein: (1) 50 mg LCZ696 corresponds to 24 mg sacubitril and 26 mg valsartan; (2) 100 mg of LCZ696 corresponds to 49 mg sacubitril and 51 mg valsartan; and (3) 200 mg of LCZ696 corresponds to 97 mg of sacubitril and 103 mg valsartan.

Based on the teachings of at least McMurray 2013,[6] a POSA would have been motivated to use LCZ696 as a treatment for HF*r*EF and an alternative to ARBs such as valsartan. McMurray 2013 discloses a study involving LCZ696, which it describes as being a first-in-class angiotensin receptor neprilysin inhibitor (ARNI) that, upon ingestion, delivers systemic exposure to AHU377 (a neprilysin inhibitor pro-drug), and valsartan (an angiotensin receptor blocker or ARB). *See* McMurray 2013 at 1067. McMurray 2013 discloses that the study was conducted in human patients with HF*r*EF, and in particular, patients with a left ventricular ejection fraction (LVEF) of $\leq 35\%$, and plasma BNP $\geq 150$ pg/mL (or NT-proBNP $\geq 600$ pg/mL) at screening visit or a BNP $\geq 100$ pg/mL (or NT-proBNP $\geq 400$ pg/mL) and a hospitalization for heart failure within the last 12 months. *See id.* at 1063.

Based at least on the teachings of Gu, a POSA would also have known that LCZ696 contains sacubitril with valsartan in a 1:1 molar ratio, and that inherently (1) 50 mg LCZ696 corresponds to 24 mg sacubitril and 26 mg valsartan; (2) 100 mg of LCZ696 corresponds to 49 mg sacubitril and 51 mg valsartan; and (3) 200 mg of LCZ696 corresponds to 97 mg of sacubitril and 103 mg valsartan.[7] Further, based on the teachings of Gu, a POSA would have understood that

---

[6] NCT01922089 also discloses the use of LCZ696 as a possible treatment of HF*r*EF, as it discloses a study conducted to assess the safety and tolerability of initiating LCZ696 in heart failure patients with reduced ejection fraction. *See* NCT01922089, under Study Description.

[7] The '667 patent admits that "a 200 mg dose of LCZ696 corresponds approximately to 103 mg valsartan and 97 mg of sacubitril." *See* the '667 patent at 15:65-67.

LCZ696 can provide bioequivalent systemic exposure to valsartan compared to valsartan alone, while providing an added benefit of NEP inhibition. In particular, McMurray 2013 discloses that "[i]n healthy volunteers and patients with heart failure, a total daily dose of 400 mg of LCZ696 gives systemic exposure to valsartan similar to Diovan® 320 mg daily." *See* McMurray 2013 at 1067. Further, Gu discloses that "[t]he concurrent effects of LCZ696 on NEP inhibition and $AT_1$ receptor blockade may have benefits for clinical efficacy," and "[a]ntihypertensive efficacy of LCZ696 was demonstrated in a renin-angiotensin-driven genetic rat model of fulminant hypertension. These results support further development of LCZ696, a novel dual-acting angiotensin receptor−NEP inhibitor, for the treatment of hypertension and heart failure." *See* Gu at 413.

Therefore, a POSA would have been motivated to use LCZ696 as an alternative to valsartan in the treatment of HF*r*EF, as it would have been known that LCZ696 can provide bioequivalent systemic exposure to valsartan compared to valsartan alone, while providing an additional benefit not found with valsartan alone (i.e., NEP inhibition).[8]

        c.    <u>The Recited Starting Dose and Titration Schedule Would Have Been Obvious and Any Results From Utilizing the Titration Regimen in the Recited Patient Population Would Not Have Been Unexpected</u>

It would have been obvious to a POSA to administer LCZ696 with the titration regimen recited in the '667 patent claims, in a patient taking no ACE inhibitors or ARBs or in patients taking ≤ 10 mg of enalapril daily. In addition, any benefits resulting from this titration regimen

---

[8] A POSA would also have been aware of Voors, which discloses a Phase II trial comparing LCZ696 to valsartan and describes the superior hypertensive effect of LCZ696 compared to valsartan. Voors discloses "LCZ696, the combination of a neprilysin inhibitor and an angiotensin receptor blocker, is an interesting novel drug for the treatment of hypertension and heart failure. Its blood pressure-lowering effects are superior to the angiotensin receptor blocker valsartan alone…" *See* Voors at 1045.

would not have been unexpected.

First, based on the teachings of ACCF/AHA Guideline, Gu, and McMurray 2013, and optionally further in view of NCT01922089, a POSA would have been motivated to treat a patient taking no ACE inhibitors or ARBs or a patient taking ≤ 10 mg of enalapril daily with LCZ696, at a starting dose of 50 mg twice daily, then 100 mg twice daily, and then a target dose of 200 mg twice daily.

ACCF/AHA Guideline discloses that valsartan should be administered at an initial dose of 20 to 40 mg twice daily, to a maximum dose of 160 mg twice daily. *See* ACCF/AHA Guideline at e266, Table 15. As discussed above, a POSA would have been motivated to select LCZ696 as an alternative to valsartan. Based on the teachings of Gu, a POSA would have understood that the mean plasma concentration-time profile of valsartan after administration of 40 mg valsartan would be similar that after administration of about 50 mg LCZ696. In particular, Gu discloses "[m]ean plasma concentration-time profiles for valsartan were similar following the administration of a single oral dose of LCZ696 400 mg or valsartan 320 mg," and that "[a]nalysis of dose-normalized values for systemic exposure showed that a 40% higher valsartan exposure was achieved following LCZ696 administration than after administration of valsartan alone." *See* Gu at 408. Therefore, it would have been obvious to replace a starting dose of 40 mg twice daily of valsartan, with a starting dose of LCZ696 of 50 mg twice daily. In addition, a POSA would have been motivated to use a starting daily dose of 50 mg twice daily based on the teachings of NCT01922089, which discloses a titration study utilizing a starting dose of 50 mg LCZ696 twice daily:

| Arms | Assigned Interventions |
|---|---|
| Experimental: Condensed up-titration<br>    Up-titration to LCZ696 200 mg twice daily (bid) over 3 weeks | Drug: LCZ696<br>    LCZ696 50 mg/100 mg/200 mg bid |
| Experimental: Conservative up-titration<br>    Up-titration to LCZ696 200 mg bid over 6 weeks | Drug: LCZ696<br>    LCZ696 50 mg/100 mg/200 mg bid |

*See* NCT01922089 under "Arms and Interventions." In addition, it would have been obvious to titrate the dosage of LCZ696 to 100 mg twice daily, and then to a target dose of 200 mg twice daily, based on the teachings of ACCF/AHA Guideline and McMurray 2013. ACCF/AHA Guideline teaches that "[t]itration is generally achieved by doubling doses" and McMurray 2013 discloses the administration of LCZ696 of 100 mg twice daily to a target dose of 200 mg twice daily. *See* ACCF/AHA Guideline at e267; McMurray 2013 at 1065. Further, NCT01922089 discloses a titration study wherein the dosing increases from 50 mg twice daily to 100 mg twice daily to 200 mg twice daily.

Second, it would have been obvious to titrate the dose at the recited time periods, based on the teachings of NCT01922089, and optionally McMurray 2013 and ACCF/AHA Guideline. In particular, it would have been obvious to increase the dose from a starting dose of 50 mg twice daily to 100 mg twice daily in the time period of "from about 3 weeks to about 4 weeks" and from 100 mg twice daily to 200 mg twice daily in the time period of "from about 3 weeks to about 4 weeks" (as recited in claim 1 of the '667 patent). A POSA would have found obvious the time periods of "about 3 weeks to about 4 weeks" (as recited in claim 1 of the '667 patent) as NCT01922089 teaches a titration regimen "reaching target dose over 6 weeks" with 3 doses (50 mg twice daily, 100 mg twice daily, and 200 mg twice daily). *See* NCT01922089, under "Study Description" and "Arms and Interventions." Further, the time period of "about 3 weeks to about 4 weeks" would have been obvious, as McMurray 2013 teaches an up-titration period of "1-2 weeks" and ACCF/AHA Guideline teaches that to achieve "optimal guideline-directed medical therapy," one should consider that "[c]ertain patients… may require more frequent visits and laboratory monitoring during dose titration <u>and more gradual dose changes</u>." *See* McMurray 2013 at 1065; ACCF/AHA Guideline at e276, Table 20 (emphasis added).

Similarly, it would have been obvious to increase the dose from a starting dose of 50 mg

twice daily to 100 mg twice daily "from about 2 weeks to about 4 weeks" and from 100 mg twice daily to 200 mg twice daily "from about 2 weeks to about 4 weeks" and with "titration to the target dose [occurring] over a period of at least about 6 weeks" (as recited in claim 7 of the '667 patent), in view of McMurray 2013, and optionally NCT01922089. As discussed above, McMurray 2013 teaches an up-titration period of "1-2 weeks" and NCT01922089 discloses a titration regimen "reaching target dose over 6 weeks" with 3 doses (50 mg twice daily, 100 mg twice daily, and 200 mg twice daily). *See* McMurray 2013 at 1065; NCT01922089, under "Study Description" and "Arms and Interventions." Therefore the recited titration regimen (including the recited doses and time periods) would have been obvious and could have been achieved through routine optimization.

Third, any beneficial results from the claimed titration regimen could not be considered unexpected, in light of the teachings of the prior art. During prosecution of the '667 patent, Applicant argued that the claimed treatment regimen resulted in higher treatment success (10% higher success rate for patients given gradual titration over 6 weeks compared to condensed titration over 3 weeks). *See* Prosecution History of the '399 application, Jan. 25, 2019 Amendment in Response to Non-final Office Action at 11-12. Further, the Examiner's Statement of Reasons for Allowance stated "[t]his improvement, specifically the combination resulting in the 10% higher success rate due to hypotension, hyperkalemia and renal dysfunction adverse events, which the instant inventors discovered via experimentation, would not have been readily predictable and thus are not obvious over the prior art." *See id.,* June 22, 2020 Notice of Allowance at 2-3. However, the '667 patent defined treatment failure of the study as follows:

> Patients who were deemed by the investigator to require **dose reduction** or **interruption in study medication** dosing at any post-randomization visit (despite modification of concomitant medications) were considered as **treatment failures**.

*See* the '667 patent at 18:57-60 (emphasis added). The '667 patent further discloses that "[t]he

most common reasons for dose adjustment/interruption or permanent discontinuation were AEs related to hypotension, renal dysfunction or hyperkalemia." *See id.* at 20:8-11.

Based on the teachings of ACCF/AHA Guideline, it would have been expected and obvious that a titration regimen over 6 weeks would have resulted in less dose reduction or interruption in study medication (i.e., due to hypotension, renal dysfunction, or hyperkalemia), compared to a titration regimen over a shorter period of 3 weeks. ACCF/AHA Guideline specifically discloses that certain patients, such as the elderly and patients with chronic kidney disease, may require more gradual dose changes than the suggested 1-2 week titration periods.[9] Further, ACCF/AHA Guideline notes that certain patients cannot tolerate recommended full doses of medications, such as patients with low baseline heart rate or blood pressure or with a tendency to postural symptoms, and would benefit from a revised up-titration regimen. *See* ACCF/AHA Guideline at e276, Table 20. Based on these disclosures, a POSA would have understood that gradual dose changes are recommended to avoid adverse effects that could require dose adjustments, discontinuation of treatment and/or other interruptions in treatment.

Further, based on general knowledge in the art, a POSA would have understood that patients with low blood pressure or with a tendency to postural symptoms are more likely to experience hypotension, and that patients with chronic kidney disease are more likely to experience renal dysfunction symptoms. As the study described in the '667 patent did not appear to eliminate or discontinue elderly subjects or all subjects having chronic kidney disease, it would have been expected that a shorter up-titration period would have resulted in more adverse events

---

[9] *See* ACCF/AHA Guideline at e276, Table 20 ("Certain patients (eg, the elderly, patients with chronic kidney disease) may require . . . more gradual dose changes") and at e267, Section 7.3.2.3.2 ("Blood pressure (including postural blood pressure changes), renal function, and potassium should be reassessed within 1 to 2 weeks after initiation and followed closely after changes in dose.").

and "treatment failures" compared to a longer up-titration period.

Therefore, independent claims 1 and 7 of the '667 patent are obvious over ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu.

### 2. Dependent Claims 2 and 8

Dependent claims 2 and 8 depend from independent claims 1 and 7, respectively, and recite the following:

> 2. The regimen for treating chronic heart failure according to claim 1, wherein the twice daily target dose of 200 mg is reached after the titration with the twice daily starting dose of 50 mg for about 3 weeks, followed by the twice daily dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter.

> 8. The regimen for treating chronic heart failure according to claim 7, wherein the twice daily target dose is reached after the titration with the twice daily starting dose of 50 mg for about 3 weeks, followed by the twice daily dose of 100 mg for about 3 weeks, followed by the twice daily target dose of 200 mg thereafter.

As discussed above, independent claims 1 and 7 are obvious over ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu. Similarly, the dosing and titration regimen recited in claims 2 and 8 are obvious over the teachings of ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu as dependent claims 2 and 8 merely refine the already obvious graduated titration schedule of a starting dose of 50 mg twice daily to 100 mg twice daily "from about 2 weeks to about 4 weeks" and from 100 mg twice daily to 200 mg twice daily "from about 2 weeks to about 4 weeks" to "about 3 weeks" for each titrated dosage amount. Therefore, the recited titration regimen (including the recited doses and time periods) of dependent claims 2 and 8 would have been obvious for the same reasons and could have been achieved through routine optimization.

### 3. Dependent Claims 3 and 12

Dependent claims 3 and 12 depend from independent claims 1 and 7, respectively, and

recite the following:

> 3. The regimen for treating chronic heart failure according to claim 1, wherein the human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

> 12. The regimen for treating chronic heart failure according to claim 7, wherein the human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

As discussed above, independent claims 1 and 7 are obvious over ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu. The recited limitation of claims 3 and 12 are obvious in view of McMurray 2013, which discloses that [p]atients in the study were initially treated with enalapril 10 mg twice daily (b.i.d.) and that "enalapril was stopped a day prior to starting LCZ696." *See* McMurray 2013 at 1064. A POSA would have achieved the time period of "at least 36 hours" with routine optimization. Further, there is no evidence of unexpected results achieved with the recited "at least 36 hour" period. Therefore, claims 3 and 12 of the '667 patent are obvious over the teachings of ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu.

### 4.    Dependent Claims 4-6 and 9-11

Dependent claims 4-6 depend from independent claim 1, and dependent claims 9-11 depend from independent claim 7. These claims recite the following:

> 4. The regimen for treating chronic heart failure according to claim 1, wherein the human patient has an elevated plasma BNP of $\geq 100$ pg/mL or NT-proBNP of $\geq 400$ pg/mL.

> 5. The regimen for treating chronic heart failure according to claim 1, wherein the human patient has an elevated plasma BNP of $\geq 150$ pg/mL or NT-proBNP of $\geq 600$ pg/mL.

6. The regimen for treating chronic heart failure according to claim 1, wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

9. The regimen for treating chronic heart failure according to claim 7, wherein the human patient has an elevated plasma BNP of ≥100 pg/mL or NT-proBNP of ≥400 pg/mL.

10. The regimen for treating chronic heart failure according to claim 7, wherein the human patient has an elevated plasma BNP of ≥150 pg/mL or NT-proBNP of ≥600 pg/mL.

11. The regimen for treating chronic heart failure according to claim 7, wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%.

As discussed above, independent claims 1 and 7 are obvious over ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu. The recited limitation of claims 4-6 and 9-11 are obvious in view of McMurray 2013, which discloses the use of LCZ696 in patients having a left ventricular ejection fraction (LVEF) of ≤ 35% and a plasma BNP ≥ 150 pg/mL (or NT-proBNP ≥ 600 pg/mL) at screening visit or a BNP ≥ 100 pg/mL (or NT-proBNP ≥ 400 pg/mL) and a hospitalization for heart failure within the last 12 months. *See* McMurray 2013 at 1063. Therefore, claims 4-6 and 9-11 are obvious over the teachings of ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu.

### 5. Dependent Claims 13-16

Dependent claim 13 depends from independent claim 1, and dependent claim 14 depends from claim 13. Dependent claim 15 depends from independent claim 7, and dependent claim 16 depends from claim 15. Dependent claims 13-16 recite the following:

13. The regimen for treating chronic heart failure according to claim 1, wherein the twice daily starting dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

14. The regimen for treating chronic heart failure according to claim 13,

114

wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to the dose of <10 mg of enalapril per day.

15. The regimen for treating chronic heart failure according to claim 7, wherein the twice daily starting dose of 50 mg is for use in the human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof.

16. The regimen for treating chronic heart failure according to claim 15, wherein the low dose of the ACE inhibitor or the low dose of the ARB is equivalent to the dose of <10 mg of enalapril per day.

As discussed above, independent claims 1 and 7 are obvious over ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu. In addition, as discussed above, the patient population limitation ("human patient taking the low dose of the ACE inhibitor or the low dose of the ARB before initiating the treatment") and "≤10 mg of enalapril per day" limitation are also obvious in view of ACCF/AHA Guideline. Therefore, claims 13-16 are similarly obvious in view of the teachings of ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu for the same reasons discussed above.

### 6.    Dependent Claim 17

Dependent claim 17 depends from claim 7 and recites the following:

17. The regimen for treating chronic heart failure according to claim 7, wherein a first week of the at least about 6 weeks is 5±2 days.

As discussed above, independent claim 7 is obvious over ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu. As further discussed above, the 6-week titration period limitation is obvious in view of at least NCT01922089. As a first week of a period of 6 weeks is within the range of 5±2 days, claim 17 would have been obvious over ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu.

### 7.    Dependent Claims 18-19

Dependent claims 18 and 19 depend from independent claims 1 and 7, respectively.

Dependent claims 18 and 19 recite the following:

> 18. The regimen for treating chronic heart failure according to claim 1, wherein sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof are provided to the human patient in a 1:1 molar ratio by administering to the human patient a compound trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate (LCZ696).

> 19. The regimen for treating chronic heart failure according to claim 7, wherein sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the pharmaceutically acceptable salt thereof are provided to the human patient in a 1:1 molar ratio by administering to the human patient a compound trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate (LCZ696).

As discussed above, independent claim 7 is obvious over ACCF/AHA Guideline, in view of McMurray 2013, NCT01922089, and Gu. Further, as discussed above, at least McMurray 2013 and NCT01922089 disclose the use of LCZ696, and Gu teaches that LCZ696 is the compound trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate, which is sacubitril and valsartan in a 1:1 molar ratio. *See* Gu at 401. Therefore, for at least the reasons discussed here and above, claims 18 and 19 are obvious over ACCF/AHA Guideline, in view of McMurray 2012, NCT01922089, and Gu.

### K.      Claims 1-19 are invalid as obvious over NCT'089 Pub. 2013 in view of Vardeny and Schumacher, optionally in view of FDA IND Guidance and/or Flack and the knowledge of a POSA

#### 1.      Claims 1, 2, 7, 8, and 13-17

As of the earliest priority date to which the claims of the '667 patent are entitled, regimens for treating chronic heart failure with reduced ejection fraction using sacubitril and valsartan were known in the art. NCT'089 Pub. 2013 discloses a study "to assess the safety and tolerability of

116

initiating LCZ696 [(sacubitril/valsartan)] in heart failure patients with reduced ejection fraction (HF-rEF) using conservative (reaching target dose over 6 weeks) and condensed (reaching target dose over 3 weeks) up-titration regimens." NCT'089 Pub. 2013 at 2.

> Moreover, Vardeny discloses:
>
> LCZ696 (sacubitril valsartan) is a first-in-class angiotensin receptor neprilysin inhibitor that has been developed for use in heart failure. This compound is composed of 2 molecular moieties in a single crystalline complex—the angiotensin receptor blocker valsartan and a neprilysin inhibitor prodrug—and has now been tested in hypertension, in a phase 2 trial in heart failure with preserved ejection fraction, and has demonstrated greater efficacy than enalapril in a phase 3 trial in heart failure with reduced ejection fraction.

Vardeny at Abstract.

Additionally, Schumacher discloses "the NEP inhibitor pro-drug N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid ethyl ester, or a pharmaceutically acceptable salt thereof; or the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid, or a pharmaceutically acceptable salt thereof" "for use in the treatment, prevention or delay of progression of a disease characterized and/or manifested by atrial enlargement and/or remodeling," including "heart failure with reduced ejection fraction (HF-REF)." Schumacher at Abstract; 3, l. 31 – 4, l. 9; claim 3. A POSA would have been motivated with a reasonable expectation of success to combine the disclosures of NCT'089 Pub. 2013 with the disclosures of Vardeny and Schumacher because they each disclose the use of LCZ696 (sacubitril/valsartan) for treating heart failure with reduced ejection fraction.

As of the earliest priority date to which the claims of the '667 patent are entitled, a POSA would have been motivated with a reasonable expectation of success to titrate sacubitril/valsartan to a targeted dose of 200 mg using doses of 50 mg and 100 mg twice daily over the claimed time periods. NCT'089 Pub. 2013 discloses up-titration regimens that comprise administering LCZ696 to human patients at a starting dose of 50 mg twice daily, followed by 100 mg twice daily, and

117

followed by 200 mg twice daily, over 3 weeks (condensed regimen) and over 6 weeks (conservative regimen). NCT'089 Pub. 2013 at 3.

Moreover, Schumacher discloses that when taking LCZ696, patients are titrated to their final dose of 200 mg twice daily over a period of 2-4 weeks. Schumacher at 31, ll. 16-24. Schumacher further discloses that patients were started on 50 mg twice daily for one week, titrated up to 100 mg twice daily for one week, and then titrated to a final dose of 200 mg twice daily. *Id*. Schumacher further discloses that "[a]t the investigator's discretion, patients are allowed to stay on each titration dose for an additional week." *Id*.

Additionally, FDA IND Guidance discloses that "[i]n assessing dose-response, it is important to allow adequate duration at a given drug dose to allow full effect of the specific drug to be manifested, a potential problem for titration designs." FDA IND Guidance at 22. A POSA would have identified appropriate time periods during which 50 mg twice daily and 100 mg twice daily doses of LCZ696 should be administered before switching to 200 mg twice daily, based on the prior art teachings and would have made adjustments, if needed, through routine optimization.

As of the earliest priority date to which the claims of the '667 patent are entitled, administering sacubitril and valsartan in a 1:1 molar ratio was known in the art. For example, Schumacher discloses a pharmaceutical composition that "comprises the NEP inhibitor pro-drug N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid ethyl ester or the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid, or pharmaceutically acceptable salts thereof, and the Angiotensin Receptor Blocker valsartan or a pharmaceutically acceptable salt thereof, in a 1:1 molar ratio." Schumacher at 22, ll. 5-10.

A POSA would have been motivated with a reasonable expectation of success to use the described dosing regimen in human patients either not taking an ACE inhibitor or ARB or taking

a low dose of an ACE inhibitor or ARB that is equivalent to a dose of ≤10 mg of enalapril per day before initiating treatment to mitigate adverse effects. NCT'089 Pub. 2013 discloses that the study included "patients experiencing specified adverse events." NCT'089 Pub. 2013 at 4. *See* '667 patent prosecution history, Jan. 25, 2019 Amendment at 11 (applicants noting that NCT'089 Pub. 2013 encompassed "patients not taking an ACEI or an ARB and patients taking any dose (i.e., low and high dose) of an ACEI or an ARB."; *see also* NCT'089 Pub. 2013 2015 at 4 (confirming that the study, which was completed in August 2014, "included patients who were not on an ACEI or an ARB 4 weeks prior to screening (i.e., ACEI/ARB-naïve patients)" and patients in the "[l]ow RAAS [Renin–Angiotensin–Aldosterone System] stratum" who at screening were "receiving ≤ 160 mg of valsartan or ≤ 10 mg total daily dose of enalapril, or equivalent doses of other ARBs/ACEIs, respectively."

Schumacher discloses that the active run-in periods "can be shorter for patients previously exposed to standard doses of RAAS blockade; longer for patients with no prior exposure or on low doses of ACEIs or ARBs." Schumacher at 37, ll. 28-30.

FDA IND Guidance discloses "[a] lower starting dose can be used when the drug has significant first dose effects (e.g., alpha blockers for hypertension), serious dose-related adverse effects, and adverse effects that decrease with continued use or that are decreased by titration." FDA IND Guidance at 24. FDA IND Guidance further discloses that "adequate knowledge of exposure-response can allow assessment of the appropriateness of proposed doses and/or dosing regimens." *Id*.

Flack discloses a study to determine whether quinapril, a long-acting ACE inhibitor, would result in greater hypertension control rates as well as fewer adverse effects in patients with JNC VI stage 1 to 2 hypertension when dose escalation was undertaken at a slower pace. Flack at 1842-43. Flack concluded that "[s]lower dose escalation [(drug titration every 6 weeks)] of the

angiotensin-converting enzyme inhibitor quinapril provides higher BP control rates and fewer serious adverse events than more rapid drug dose escalation [(drug titration every 2 weeks)]." *Id.* at Abstract.

A POSA would have been motivated with a reasonable expectation of success to combine the disclosures of NCT'089 Pub. 2013, Vardeny, and Schumacher with the disclosures of FDA IND Guidance and Flack because they each are directed to the safety and efficacy of pharmaceuticals.

As of the earliest priority date to which the claims of the '667 patent are entitled, a POSA would have been motivated with a reasonable expectation of success to use a dosing regimen to treat chronic heart failure with reduced ejection fraction in a human patient by administering sacubitril and valsartan in a 1:1 molar ratio wherein a twice daily target dose of 200 mg (97 mg/103 mg sacubitril/valsartan) is reached after titration with a twice daily starting dose of 50 mg (24 mg /26 mg sacubitril/valsartan) for about 3-4 weeks (claim 1), about 3 weeks (claims 2 and 8), or about 2-4 weeks (claim 7), followed by a twice daily dose of 100 mg (49 mg/51 mg sacubitril/valsartan) for about 3-4 weeks (claim 1), about 3 weeks (claims 2 and 8), or about 2-4 weeks (claim 7), followed by the target dose, over a period of at least about 6 weeks (claim 7) or a first week of $5\pm2$ days (claim 17), and wherein the starting dose is for use in a patient not taking an ACE inhibitor or ARB or taking low doses of an ACE inhibitor or ARB (claims 1, 7, 13, and 15) that is equivalent to ≤10 or <10 mg of enalapril per day before initiating treatment (claims 1, 7, 14, and 16).

For at least these reasons, claims 1, 2, 7, 8, and 13-17 are invalid under 35 U.S.C. § 103 as obvious over NCT'089 Pub. 2013 in view of Vardeny and Schumacher, optionally in view of FDA IND Guidance and/or Flack and the knowledge of a POSA.

### 2.    Claims 3 and 12

Claims 3 and 12 depend directly from claims 1 and 7, respectively, and add the limitation "wherein the human patient has to stop taking the ARB or the ACE inhibitor at least 36 hours before initiating the treatment with sacubitril or the pharmaceutically acceptable salt thereof and valsartan or the pharmaceutically acceptable salt thereof."

The NCT'089 Pub. 2013 "included patients who were not on an ACEI or an ARB 4 weeks prior to screening (i.e., ACEI/ARB-naïve patients)." NCT'089 Pub. 2013 2015 at 4; *see also* NCT'089 Pub. 2013 at 4 (disclosing that the study included "patients experiencing specified adverse events"); '667 patent prosecution history, Jan. 25, 2019 Amendment at 11 (applicants noting that NCT'089 Pub. 2013 encompassed "patients not taking an ACEI or an ARB and patients taking any dose (i.e., low and high dose) of an ACEI or an ARB.").

Schumacher discloses that in the study, "ACE inhibitors and angiotensin receptor blockers are required to be discontinued 24 hours prior to randomization." Schumacher at 31, ll. 12-13.

As described above with respect to claims 1, 2, 7, 8, and 14-17, a POSA would have been motivated with a reasonable expectation of success to use the described dosing regimen in human patients either not taking an ACE inhibitor or ARB or taking a low dose of an ACE inhibitor or ARB that is equivalent to a dose of ≤10 or <10 mg of enalapril per day before initiating treatment to mitigate adverse effects. A POSA would have been further motivated with a reasonable expectation of success to require that a patient stop taking an ARB or ACE inhibitor at least 36 hours before initiating treatment based on the prior art teachings and routine optimization.

For at least these reasons, and the reasons stated above with respect to claims 1 and 7, claims 3 and 12 are invalid under 35 U.S.C. § 103 as obvious over NCT'089 Pub. 2013 in view of Vardeny and Schumacher, optionally in view of FDA IND Guidance and/or Flack and the knowledge of a POSA.

### 3. Claims 4-6 and 9-11

Claims 4 and 9 depend directly from claims 1 and 7, respectively, and add the limitation "wherein the human patient has an elevated plasma BNP of ≥100 pg/mL or NT-proBNP of ≥400 pg/mL."

Claims 5 and 10 depend directly from claims 1 and 7, respectively, and add the limitation "wherein the human patient has an elevated plasma BNP of ≥150 pg/mL or NT-proBNP of ≥600 pg/mL."

Claims 6 and 11 depend directly from claims 1 and 7, respectively, and add the limitation "wherein the human patient has a reduced left ventricular ejection fraction (LVEF) of ≤35%."

Vardeny discloses that in the PARADIGM-HF trial, "[i]nclusion criteria were NYHA functional class II to IV, LVEF ≤40%, plasma BNP ≥150 pg/ml (or NT-proBNP ≥600 pg/ml), or BNP ≥100 pg/ml (or NT-proBNP ≥400 pg/ml) if the patient was previously hospitalized for HF within the past 12 months." Vardeny at 668.

Schumacher discloses a study where at screening, patients were "required to have an NT-proBNP > 400 pg/mL." Schumacher at 30, l. 33 – 31, l. 1.  Schumacher further discloses that in the PARAGON-HF trial, eligible patients were those with "an elevated plasma B-type natriuretic peptide (BNP) or NT-proBNP level and, initially, a left ventricular ejection fraction of ≤40% (later amended to ≤35%)." *Id*. at 35, l. 32 – 36, l. 2; 36, ll. 9-19.

For at least these reasons, and the reasons stated above with respect to claims 1 and 7, claims 4-6 and 9-11 are invalid under 35 U.S.C. § 103 as obvious over NCT'089 Pub. 2013 in view of Vardeny and Schumacher, optionally in view of FDA IND Guidance and/or Flack and the knowledge of a POSA.

### 4.    Claims 18 and 19

Claims 18 and 19 depend directly from claims 1 and 7, respectively, and add the limitation "wherein sacubitril or the pharmaceutically acceptable salt thereof together with valsartan or the

pharmaceutically acceptable salt thereof are provided to the human patient in a 1:1 molar ratio by administering to the human patient a compound trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate (LCZ696)."

As described above with respect to claims 1, 2, 7, 8, and 13-17, as of the earliest priority date to which the claims of the '667 patent are entitled, administering sacubitril and valsartan in a 1:1 molar ratio was known in the art. For example, Schumacher discloses a pharmaceutical composition that "comprises the NEP inhibitor pro-drug N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid ethyl ester or the NEP inhibitor N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-(2R)-methylbutanoic acid, or pharmaceutically acceptable salts thereof, and the Angiotensin Receptor Blocker valsartan or a pharmaceutically acceptable salt thereof, in a 1:1 molar ratio." Schumacher at 22, ll. 5-10. Schumacher further discloses that "the NEP inhibitor pro-drug is administered in the form of LCZ696, i.e. as trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate]hemipentahydrate." *Id*. at 6, ll. 14-17.

For at least these reasons, and the reasons stated above with respect to claims 1 and 7, claims 18 and 19 are invalid under 35 U.S.C. § 103 as obvious over NCT'089 Pub. 2013 in view of Vardeny and Schumacher, optionally in view of FDA IND Guidance and/or Flack and the knowledge of a POSA.

## L.     No Secondary Considerations Support Non-Obviousness of the '659 Patent

While secondary considerations of nonobviousness must be considered in an obviousness determination, they do not necessarily control. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006); *Newell Cos. v.*

*Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988). A strong case of obviousness cannot be overcome by secondary considerations of nonobviousness, *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1372 (Fed. Cir. 2007); where the differences between the claimed invention and the prior art are minimal, "weak evidence of secondary considerations … simply cannot overcome [a] strong showing of obviousness." *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1375 (Fed. Cir. 2018); *see also Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) ("[W]here a claimed invention represents no more than the predictable use of prior art elements according to established functions … evidence of secondary indicia are frequently deemed inadequate to establish non-obviousness."). "[O]nce the challenger has presented a *prima facie* case of invalidity, the patent owner has the burden of going forward with rebuttal evidence." *Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.*, 719 F.3d 1346, 1352 (Fed. Cir. 2013). Defendants are presently unaware of any secondary considerations sufficient to overcome the strong case of obviousness of the above claims of the '667 patent. To the extent Plaintiff asserts any secondary considerations, Defendants reserve the right to address and respond to any such arguments.[10] Specifically, unexpected results cannot support Plaintiff's claims of validity.

### 1.   Treatment Success Due to Gradual Up-Titration Periods and Administering to ARB/ACEI Naïve/Low Dose Patients Is Not Unexpected

During the prosecution of the '339 application, the examiner allowed the application with the statement that the applicant has demonstrated unexpected results of treatment success:

> [W]hile the prior art recognized that the instant composition was useful to treat heart failure with reduced ejection fraction in an up-titration scheme, the prior art does not specifically disclose all of the particular details of the instantly claimed method. The Applicant has

---

[10] Further, a showing of "copying in the ANDA context where a showing of bioequivalence is required for FDA approval" is not compelling evidence of nonobviousness. *Purdue Pharma Prods. L.P. v. Par Pharm., Inc*., 377 F. App'x 978, 983 (Fed. Cir. 2010). Thus, any argument by Plaintiff that ANDA submissions suggest nonobviousness because of copying is without merit.

argued that "**It has been unexpectedly found that the above-mentioned titration mitigates a risk from hypotension, hyperkalemia, and/or renal adverse events as compared to titration over a shorter time period**" and shown in the instant disclosure that **the treatment success rate was even more improved if patients taking lower doses of ACEIs/ARBs (i.e., the low RAAS stratum) were up-titrated more gradually than patients who were taking higher doses of ACEIs/ARBs**.

NOA at 2-3 (emphasis added). Thus, the examiner allowed the '399 application in large part because of the patent applicant's claim of the claimed regimen leading to an "improved" "treatment success rate." *Id.* More specifically, the improved treatment success rate was attributed to 1) claimed longer titration periods as opposed to other shorter titration periods of the prior art, which "mitigates a risk from hypotension, hyperkalemia, and/or renal adverse events"; 2) said longer or more gradual titration periods administered to ACEI/ARB naïve patients or patients who were taking low doses of ACEI/ARBs. *See id.*

However, the prior art as a whole at the time of filing the '399 application does not support the claim that the alleged superior treatment success as described above was unexpected to a POSA. As discussed in various sections above, it was well-known in the art, at the time of filing the '399 application that (1) adverse effects such as angioedema, hypotension, hyperkalemia, and renal dysfunction occur due to concomitant administration of neprilysin with ARB/ACEI. *See* McMurray 2013 at 1064, 1068 (teaching wash-out periods to avoid overlap of LCZ696 and enalapril). It was also known that there is an increased risk of adverse effects at higher doses of LCZ696 and other heart failure medicines, which risk may be controlled by a slow up-titration regimen with careful monitoring. *See* Konstam at 1845, 1847; Desai at 1960-65.

Thus, in view of Konstam and Desai, it would have been obvious for a POSA to slowly increase the dose of LCZ696 up to the target dose of 200 mg while watching for adverse effects of hypotension, hyperkalaemia, and renal failure. *Id.* In view of McMurray 2013, it would have been obvious for a POSA to minimize adverse effects by avoiding concomitant administration of

125

LCZ696 with enalapril. *See* McMurray 2013 at 1064, 1068.

Furthermore, the prior art taught that slow titrations were advantageous over more rapid titrations because they can lead to fewer side effects. For example, Flack disclosed "Slower dose escalation of [quinapril] provides higher BP control and fewer serious adverse events than more rapid dose escalation." Flack at 1842.

Therefore, contrary to the applicant's arguments, it is not surprising or unexpected that such a closely monitored gradual up-titration regimen along with administering to ARB/ACEI naïve patients or patients taking a low dose ARB/ACEI, such as less than 10 mg/day of enalapril or equivalent, would lead to reduced adverse effects and therefore superior treatment success. *See* McMurray 2013 at 1064, 1068; Konstam at 1845, 1847.

In fact, there is a reasonable expectation of success that a POSA in view of Konstam, McMurray 2013, and Desai would know that the steps of slow gradual titrations and administering the claimed regimen to ARB/ACEI naïve or ARB/ACEI low dose patients would lead to fewer adverse events and a higher treatment success. *See* McMurray 2013 at 1064, 1068; Konstam at 1845, 1847; Desai at 1960-65. Thus, any claims of alleged improved treatment success described by the patentee during the '667 prosecution cannot rebut the showing of reasonable expectation of success as evidenced in the art. *See Hoffmann-La Roche Inc. v. Apotex Inc.,* (holding that even superior efficacy does not rebut a showing of reasonable expectation of success).

## VII.  CLAIMS 1-19 OF THE '667 PATENT ARE INVALID UNDER 35 U.S.C. § 112

### A.  Claims 1-17 Are Invalid Under 35 U.S.C. § 112(a) for Lack of Enablement and Written Description

Claims 1 and 7 both recite "administering to a human patient in need thereof a twice-daily target dose of 200 mg of sacubitril or a pharmaceutically acceptable salt thereof with valsartan or a pharmaceutically acceptable salt thereof . . .wherein the twice daily target dose 200 mg is reached after a titration . . . ."

126

HEYMAN ENERIO GATTUSO & HIRZEL
LLP

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (#3630)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

Scott A. Cunning, II
Elizabeth M. Crompton
PARKER POE ADAMS & BERNSTEIN,
LLP
1400 K St., NW, Suite 1000
Washington, DC 20005
(202) 434-9100
scottcunning@parkerpoe.com
elizabethcrompton@parkerpoe.com

C. Kyle Musgrove
PARKER POE ADAMS & BERNSTEIN,
LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
(704) 372-9000
kylemusgrove@parkerpoe.com

*Attorneys for Defendant Crystal
Pharmaceutical (Suzhou) Co., Ltd.*

SMITH, KATZENSTEIN & JENKINS LLP

*/s/ Daniel Taylor*
Neal C. Belgam (#2721)
Daniel Taylor (#6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

Dmitry V. Shelhoff
Kenneth S. Canfield
Edward D. Pergament
PERGAMENT & CEPEDA LLP
25A Hanover Road, Suite 104
Florham Park, NJ 07932

POTTER ANDERSON & CORROON, LLP

*/s/ David Ellis Moore*
David Ellis Moore (#3983)
Bindu Ann George Palapura (#5370)
1313 N. Market St., Hercules Plaza, 6th Flr.
Wilmington, DE 19899-0951
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

Robert L. Florence
PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, N.E., Suite 1500
Atlanta, GA 30309
(678) 690-5704
robertflorence@parkerpoe.com

Tasneem A. Dharamsi
PARKER POE ADAMS & BERNSTEIN LLP
110 East Court Street
Suite 200
Greenville, SC 29601
(864) 577-6370
tasneemdharamsi@parkerpoe.com

*Attorneys for Defendant Mylan Pharmaceuticals
Inc.*

(973) 998-7722
dshelhoff@pergamentcepeda.com
kcanfield@pergamentcepeda.com
epergament@pergamentcepeda.com

*Attorneys for Defendants Hetero USA Inc.,*
*Hetero Labs Limited, Hetero Labs Limited*
*Unit III, Torrent Pharma Inc. and Torrent*
*Pharmaceuticals Ltd.*

Dated: May 19, 2023

# EXHIBIT D

**PERGAMENT & CEPEDA LLP** *Serving the Change. Protecting Your Creations.*

25A Hanover Road, Suite 104 • Florham Park, NJ 07932 • T 973.998.7722 • F 973.998.7720 • www.pergamentcepeda.com

Julia S. Kim
jkim@pergamentcepeda.com

June 2, 2023

VIA EMAIL (jlstringham@venable.com)

Re: ***Novartis v. Hetero/Torrent/Mylan***, **C.A. Nos. 20-2930, 21-1760, 21-1794, 22-451-RGA (D. Del.) ('667 Patent Litigation)**
**Novartis's Objections and Responses to Defendants' Notice of**
**Deposition Pursuant to Fed. R. Civ. P. 30(b)(6)**

Dear Jared:

We write regarding Novartis's May 22, 2023 Objections and Responses to Defendants' Notice of Deposition to Novartis Pursuant to Fed. R. Civ. P. 30(b)(6) in the '667 patent litigation. While we continue to review Novartis's objections and responses, we note that many of Novartis's objections and limitations on testimony are improper. Please confirm by June 8, 2023, that Novartis agrees to provide testimony in accordance with the below. To the extent you are unwilling to do so, please provide your availability for a meet-and-confer on June 9, 2023.

**Topic 1**

Topic 1 generally requests testimony relating to Novartis's IND, NDA, referenced DMFs, and related communications. Novartis states it will consider producing one or more witnesses, provided defendants narrow the topic "*e.g.*, by limiting the scope or examination to a reasonable number of Novartis's produced documents." Although Defendants disagree with Novartis's attempt to limit this topic, for purposes of compromise, Defendants will narrow the topic as follows:

Portions of Novartis's IND, Novartis's NDA, and all DMFs referenced therein relating to sacubitril and/or valsartan relating to:

(a) dosing, including labeling, packaging, and clinical study reports or data;

(b) the form of the active ingredient(s);[1]

(c) alternative forms of active ingredients(s);

(d) comparisons between or among forms of the active ingredients; and

---

[1] E.g., whether the active ingredient(s) exist as a complex or physical mixture, and whether the active ingredients(s) are in crystalline or amorphous form

Patents • Trademarks • Copyrights • Licensing • Litigation

Jared L. Stringham
June 2, 2023
Page 2 of 6

(e)  subject matter claimed in the '667 patent.

Please confirm that Novartis will produce a witness on narrowed Topic 1.

**Topic 3**

Topic 3 generally requests testimony relating to the facts and circumstances surrounding the alleged conception and reduction to practice of the alleged invention.  Novartis refuses to produce a witness because it is relying on the May 11, 2015 priority date.  However, the requested testimony is relevant.  Whether and when the claimed invention was reduced to practice is relevant to whether the invention was ready for patenting more than one year before such priority date, including when Novartis disseminated consent forms for TITRATION, publicly used the claimed invention, and otherwise made the claimed invention public during TITRATION.  And whether and when the inventors conceived and reduced to practice the claimed subject matter is relevant to Defendants' invalidity defenses under 35 U.S.C. § 112 and whether the '667 patent is entitled to the alleged May 11, 2015 priority date.  *See, e.g., Nuvo Pharma. Co. v. Dr. Reddy's Labs, Inc.*, 923 F.3d 1368, 1381 (Fed. Cir. 2019) ("Although inventor testimony cannot establish written description support where none exists in the four corners of the specification, it [can] illuminate[] the absence of critical description … ."); *Mendenhall v. Cedarapids*, 5 F.3d 1557, 1565 (Fed. Cir. 1993) (Patent not entitled to earlier priority date of parent applications that failed to describe the claimed invention where inventor testified that he did not have any invention directed to a recited limitation until after the claimed earlier priority date and thus he "could not convey that he possessed an invention" in the earlier application.); *Langer v. Kaufman*, 465 F.2d 915, 920 (C.C.P.A. 1972) ("[W]hile the interpretation of the X-ray diffraction patterns at trial does show that appellants did in fact prepare the gamma form, it is not evidence of appreciation at the time those patterns were generated that any new form had been made.").  Please confirm that Novartis will produce a witness on Topic 3.

**Topics 5-6**

Topic 5 generally requests testimony relating to research, development, and testing of any alleged invention claimed in the '667 patent.  Topic 6 generally requests testimony relating to research and development of dosing regimens of valsartan and sacubitril and/or sacubitril/valsartan involving dose titration, including (but not limited to) clinical trial study numbers NCT01922089 (TITRATION) and NCT0887588 (PARAMOUNT).  Novartis appears to agree to produce a witness only with respect to the TITRATION study.  To the extent Novartis is imposing such a limitation on the scope of these topics, such a limitation is improper. Before TITRATION, Novartis had already started other clinical trials (e.g., PARAMOUNT) using the same dosage regimen recited in the '667 patent claims and the same target 200 mg bid LCZ696 dosage for the same patient population (e.g., NCT01035255 (PARADIGM)). Defendants are entitled to all research and development relating to the '667 patent claims and/or dosing regimens involving dose titration, including any such research and development occurring before the TITRATION study.

Novartis has designated Dr. Rizkala for Topics 5-6.  Please confirm that Novartis will prepare Dr. Rizkala to testify on the full scope of these topics or produce another witness to testify on the full scope of these topics.

Jared L. Stringham
June 2, 2023
Page 3 of 6

**Topic 7**

Topic 7 generally requests testimony relating to clinical studies, including titration studies, in which sacubitril and valsartan (or their salts or complexes) were administered other than as LCZ696.  Novartis states it will consider producing one or more witnesses on titration studies involving the study and/or treatment of HFrEF patients in which sacubitril and valsartan (or their salts or complexes) were administered, provided that defendants narrow the subject "*e.g.*, by identifying which 'titration studies' Defendants are seeking information about and whether Defendants are seeking a witness on clinical or chemistry aspects of those studies."  Novartis's attempted limitation is improper.

First, Novartis's attempt to force Defendants to identify particular clinical studies is improper because Novartis knows better than Defendants which clinical studies Novartis conducted.  Moreover, Defendants doubt that there is a vast number of clinical studies (if there are any at all) in which a combination of sacubitril and valsartan was administered in a form other than LCZ696 so as to render this topic overly broad or unduly burdensome.  Defendants expect that this topic at most covers a handful of studies easily identifiable by Novartis.

Second, Novartis's attempt to limit this topic to "titration studies" is improper.  The '667 patent claims are directed to a specific active complex (LCZ696) and a physical mixture of valsartan and sacubitril, and Defendants are entitled to testimony about that aspect of the claim, independent from the claimed titration regimen.

Third, both "clinical" and "chemistry" aspects of any studies are relevant.  Clinical aspects are relevant because the dosing regimen, including any titration regimen, used in the study is relevant.  Chemistry aspects are relevant because the '667 claims are limited to LCZ696 or a physical mixture of valsartan and sacubitril, thus Novartis must provide testimony as to the form of the active ingredient in any clinical study within the scope of the topic.

If Novartis did not conduct or have conducted any clinical trials of sacubitril and valsartan combinations other than LCZ696, please provide a witness to so testify; otherwise, please confirm that Novartis will provide a witness to testify on the full scope of Topic 7.

**Topics 8-9**

Topics 8-9 generally request testimony on the characteristics of LCZ696 and comparing LCZ696 to other forms of sacubitril and valsartan.  Novartis has refused to produce a witness on these topics.  Novartis's purported inventors chose to claim LCZ696 (and physical mixtures) rather than any other complexes of sacubitril and valsartan.  Defendants are entitled to testimony as to why the inventors chose LCZ696, what the inventors meant by LCZ696, and how the inventors distinguished LCZ696 from any other complexes.  Please confirm that Novartis will produce a witness to testify on the full scope of Topics 8-9.

**Topic 10**

Topic 10 generally requests testimony relating to complexes of sacubitril and valsartan

Jared L. Stringham
June 2, 2023
Page 4 of 6

known to Novartis as of the filing date of the '667 patent. Novartis states it will consider producing one or more witnesses, provided defendants narrow the topic. Although Defendants disagree with Novartis's attempt to limit this topic, for purposes of compromise, Defendants will narrow the topic as follows:

> The identification, analysis, testing, and characteristics of all sacubitril and valsartan complexes known to Novartis as of the filing date of the '667 patent, including comparisons between or among such complexes.

Please confirm that Novartis will produce a witness on the narrowed Topic 10.

## Topics 11-12

Topics 11-12 generally request testimony relating to complexes of sacubitril and valsartan known to Novartis now. These are factual topics and do not seek expert discovery. Although Defendants disagree with Novartis's attempt to limit these topics, for purposes of compromise, Defendants will narrow the topics as follows:

> The identification, analysis, testing, and characteristics of all sacubitril and valsartan complexes currently known to Novartis, including comparisons between or among such complexes.

Please confirm that Novartis will produce a witness to testify on narrowed Topics 11-12.

## Topic 13

Topic 13 generally requests testimony relating to Novartis's Citizen Petition FDA-2019-P-1893-0001. Novartis states it will consider producing one or more witnesses, provided JDG narrow the topic "*e.g.*, by identifying which portions of Novartis's Citizen Petition FDA-2019-P-1893-0001 Defendants are seeking information about." This topic narrowly relates to a single, 26-page document prepared by Novartis. The Citizen Petition is relevant because it relates to the LCZ696, an active ingredient claimed in the '667 patent's claimed dosage regimens, and whether other APIs are to be considered the "same[]" for regulatory purposes. This question is especially relevant given Novartis's assertion that at least certain Defendants infringe the '667 patent only under the doctrine of equivalents.

Please confirm that Novartis will produce a witness on the full scope of Topic 13.

## Topic 14

Topic 14 generally requests testimony relating to the date of first public use and date of first disclosure for any product embodying the subject matter of any '667 patent claim. Novartis refuses to produce a witness because the claimed regimens were allegedly not in public use and not disclosed until Entresto was approved by the FDA. Defendants contend that Novartis disclosed and publicly used the claimed invention before the priority date, including through the TITRATION trial. Please confirm that Novartis will produce a witness on Topic 14.

Jared L. Stringham
June 2, 2023
Page 5 of 6

**<u>Topic 19</u>**

Topic 19 generally requests testimony relating to agreements, including agreements relating to sacubitril/valsartan, Entresto, and the '667 patent.  Novartis refuses to produce a witness.  However, agreements with institutions, clinical trial investigators, and patients relating to clinical trials (e.g., TITRATION) are relevant to whether and when Novartis publicly used the claimed invention and/or otherwise made it publicly available.  *See*, *e.g.*, NPC-VS-667-000018955-18963; NPC-VS-667-000037690-37724; NPC-VS-667-000036901-36935; NPC-VS-667-000037259-37293.  Although Defendants disagree with Novartis's attempt to limit this topic, for purposes of compromise, Defendants will narrow the topic as follows:

> The facts, circumstances, and correspondence concerning any agreements relating to any clinical trials involving combinations of valsartan and sacubitril, sacubitril/valsartan, LCZ696, Entresto, and/or subject matter claimed in the '667 patent (e.g., TITRATION).

Please confirm that Novartis will produce a witness on the narrowed Topic 19.

**<u>Topic 22:</u>**

Topic 22 generally requests testimony relating to communications with third parties concerning dosages and administration of a combination of valsartan and sacubitril and/or sacubitril/valsartan, including but not limited to Entresto.  Novartis states it will consider producing one or more witnesses, provided defendants narrow the topic "*e.g.*, by identifying what communications and what third parties Defendants are seeking information about."  Although Defendants disagree with Novartis's attempt to limit these topics, for purposes of compromise, Defendants will narrow the topics as follows:

> Communications with medical professionals or institutions (including clinical investigators, physicians, nurses, pharmacists, hospitals, institutional review boards), patients, or patients' families or caregivers on or before May 11, 2015, concerning the administration and dosages of a combination of valsartan and sacubitril and/or sacubitril/valsartan (e.g., Entresto or LCZ696).

Please confirm that Novartis will produce a witness on narrowed Topic 22.

Best regards,

*/s/ Julia S. Kim*

Julia S. Kim

cc:   Katie Ford (kford@mccarter.com)
        Nicholas N. Kallas (nkallas@venable.com)

Jared L. Stringham
June 2, 2023
Page 6 of 6

Alexandra M. Joyce (ajoyce@mccarter.com)
Christopher E. Loh (cloh@venable.com)
Gregory J. Manas (GJManas@venable.com)
Carrie S. Park (CSPark@Venable.com)
Christina Schwarz (cschwarz@venable.com)
Daniel M. Silver (dsilver@mccarter.com)
Counsel for '667 patent litigation defendants

# EXHIBIT E

**From:** Flanders, Susanne L.
**Sent:** Wednesday, January 18, 2023 5:00 PM
**To:** kdorsney@morrisjames.com; chitch@morrisjames.com; Steven.Moore@withersworldwide.com; James.Nealon@withersworldwide.com; Pickett, Walter <Walter.Pickett@withersworldwide.com>; [contact] Dominick Gattuso <dgattuso@hegh.law>; Crompton, Elizabeth M. <elizabethcrompton@parkerpoe.com>; Cunning, II, Scott A. <scottcunning@parkerpoe.com>; Musgrove, C. Kyle <kylemusgrove@parkerpoe.com>; nbelgam@skjlaw.com; eormerod@skjlaw.com; kcanfield@pergamentcepeda.com; dshelhoff@pergamentcepeda.com; epergament@pergamentcepeda.com; [contact] David Moore <dmoore@potteranderson.com>; [contact] Bindu Palapura <bpalapura@potteranderson.com>; Florence, Robert L. <robertflorence@parkerpoe.com>; Dharamsi, Tasneem A. <tasneemdharamsi@parkerpoe.com>; stamoulis@swdelaw.com; weinblatt@swdelaw.com; ANero@perkinscoie.com; CDJones@perkinscoie.com; BBeel@perkinscoie.com
**Cc:** Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Silver, Daniel <DSilver@McCarter.com>; Joyce, Alexandra <ajoyce@mccarter.com>
**Subject:** MDL No. 20-2930 ('667 Patent) - Document Production

Counsel,

Novartis is hereby producing in the above-captioned litigation documents stamped with Bates Nos. NPC-VS-667-000000893 – NPC-VS-667-000036723.  Portions of Novartis's production have been designated "Highly Confidential Information Under Protective Order – Attorneys' Eyes Only" and "Special Protected Data" in accordance with the stipulated protective order entered in this case (D.I. 80).

The password to access this production will follow in a separate email.

URL: https://ftp-emn.kldiscovery.com
User Name: NP6187058_667 Patent
Password: sent separately

Regards,
Susanne

Susanne L. Flanders, Esq.
Venable | Fitzpatrick
t 212.218.2236
Venable LLP, 1290 Avenue of the Americas, 20th Floor
New York, NY 10019

SLFlanders@Venable.com | www.Venable.com

1

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | C.A. No. 20-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> CRYSTAL PHARMACEUTICAL (SUZHOU) CO., LTD., <br><br> Defendant. | C.A. No. 21-1452-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> HETERO USA INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT III, <br><br> Defendants. | C.A. No. 21-1760-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MYLAN PHARMACEUTICALS INC., <br><br> Defendant. | C.A. No. 22-451-RGA |

|  |  |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>      Plaintiff,<br><br>      v.<br><br>TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD.,<br><br>      Defendants. | C.A. No. 21-1794-RGA |

### DEFENDANTS' NOTICE OF DEPOSITION TO PLAINTIFF NOVARTIS PHARMACEUTICALS CORPORATION PURSUANT TO FED. R. CIV. P. 30(b)(6)

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the applicable Local Civil Rules of the United States District Court for the District of Delaware, and the Court's Scheduling Order (ECF No. 749 in C.A. No. 20-2930), Defendants Crystal Pharmaceutical (Suzhou) Co., Ltd. ("Crystal Pharma"); Hetero USA Inc., Hetero Labs Limited, and Hetero Labs Limited Unit III (collectively, "Hetero"); Mylan Pharmaceuticals Inc. ("Mylan"); and Torrent Pharma Inc. and Torrent Pharmaceuticals Ltd. (collectively, "Torrent" and collectively with Crystal Pharma, Hetero, and Mylan "Defendants") by and through their attorneys, will take the deposition upon oral examination of Plaintiff Novartis Pharmaceuticals Corporation ("Novartis") at a mutually agreed upon date, time, and location by the parties and continuing from day to day thereafter until completed. The deposition will be recorded by stenographic means, videotaped, and transcribed using real time interactive transcription such as LiveNote. The deposition will be taken for the purposes of discovery, for use at trial in these actions, and for any

purposes permitted under the Federal Rules of Civil Procedure. You are invited to attend and participate as provided by the Federal Rules of Civil Procedure.

Pursuant to Fed. R. Civ. P. 30(b)(6), Novartis shall designate one or more knowledgeable persons to testify on its behalf with respect to the matters set forth in Schedule A attached hereto, and the person(s) so designated shall be required to testify as to those matters known or reasonably available to Novartis. Novartis shall identify in writing each deponent who shall be designated to testify on its behalf at least ten (10) business days in advance of the deposition, including which portion(s) of this Notice each deponent is prepared to address.

Dated: May 5, 2023

/s/ Dominick T. Gattuso
Dominick T. Gattuso (#3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

OF COUNSEL:

Elizabeth M. Crompton
Scott A. Cunning, II
PARKER POE ADAMS & BERNSTEIN, LLP
1400 K Street, NW
Suite 1000
Washington, DC 20005
(202) 434-9100
elizabethcrompton@parkerpoe.com
scottcunning@parkerpoe.com

C. Kyle Musgrove
PARKER POE ADAMS & BERNSTEIN, LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
(704) 372-9000
kylemusgrove@parkerpoe.com

/s/ David A. Taylor
Neal C. Belgam (#2721)
Daniel A. Taylor (# 6934)
SMITH, KATZENSTEIN, & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

OF COUNSEL:

Dmitry V. Shelhoff
Kenneth S. Canfield
Edward D. Pergament
PERGAMENT & CEPEDA LLP
89 Headquarters Plaza
North Tower, 14th Floor
Morristown, NJ 07960
(973) 998-7722
kcanfield@pergamentcepeda.com
dshelhoff@pergamentcepeda.com
epergament@pergamentcepeda.com

*Attorneys for Defendants Hetero USA Inc.,
Hetero Labs Limited, Hetero Labs Limited*

3

*Attorneys for Defendant Crystal
Pharmaceutical (Suzhou) Co., Ltd.*

*Unit III, Torrent Pharma Inc. and Torrent
Pharmaceuticals Ltd.*

*/s/ David Ellis Moore* _____
David Ellis Moore (#3983)
Bindu Ann George Palapura (#5370)
POTTER ANDERSON & CORROON, LLP
1313 N. Market St., Hercules Plaza, 6th Flr.
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

OF COUNSEL:

Robert L. Florence
PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, N.E.
Suite 1800
Atlanta, GA 30309
(678) 690-5750
robertflorence@parkerpoe.com

Tasneem A. Dharamsi
PARKER POE ADAMS & BERNSTEIN LLP
110 East Street, Suite 200
Greenville, SC 29601 (864) 577-6370
tasneemdharamsi@parkerpoe.com

*Attorneys for Defendant Mylan
Pharmaceuticals Inc.*

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | C.A. No. 20-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, Plaintiff, v. CRYSTAL PHARMACEUTICAL (SUZHOU) CO., LTD., Defendant. | C.A. No. 21-1452-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, Plaintiff, v. HETERO USA INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT III, Defendants. | C.A. No. 21-1760-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, Plaintiff, v. MYLAN PHARMACEUTICALS INC., Defendant. | C.A. No. 22-451-RGA |

NOVARTIS PHARMACEUTICALS
CORPORATION,

     Plaintiff,

     v.

TORRENT PHARMA INC., TORRENT
PHARMACEUTICALS LTD.,

     Defendants.

C.A. No. 21-1794-RGA

## **DEFENDANTS' NOTICE OF DEPOSITION OF ADEL REMOND RIZKALA**

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil

Procedure and the applicable Local Civil Rules of the United States District Court for the District

of Delaware, Defendants Crystal Pharmaceutical (Suzhou) Co., Ltd. ("Crystal Pharma"); Hetero

USA Inc., Hetero Labs Limited, and Hetero Labs Limited Unit III (collectively, "Hetero");

Mylan Pharmaceuticals Inc. ("Mylan"); and Torrent Pharma Inc. and Torrent Pharmaceuticals

Ltd. (collectively, "Torrent" and collectively with Crystal Pharma, Hetero, Mylan, and Torrent

"Defendants") by and through their attorneys, will take the deposition upon oral examination of

Adel Remond Rizkala, in person and/or remotely via videoconference, at a date, time, and/or

location to be determined, and continuing from day to day thereafter until completed. The

deposition will take place in person and/or remotely before a court reporter, notary public, or

other officer duly authorized to administer oaths and take testimony, and will be recorded by

stenographic, audio, audiovisual, video, and/or transcribed using real time interactive

transcription such as LiveNote.

All counsel of record are invited to attend the deposition in person or by videoconference

or telephonic means and examine the deponent in accordance with applicable Rules.

Dated: May 5, 2023

/s/ Dominick T. Gattuso
Dominick T. Gattuso (#3630)
Heyman Enerio Gattuso & Hirzel LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7311
dgattuso@hegh.law

OF COUNSEL:

Elizabeth M. Crompton
Scott A. Cunning, II
Parker Poe Adams & Bernstein, LLP
1400 K Street, NW
Suite 1000
Washington, DC 20005
(202) 434-9100
elizabethcrompton@parkerpoe.com
scottcunning@parkerpoe.com

C. Kyle Musgrove
Parker Poe Adams & Bernstein, LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
(704) 372-9000
kylemusgrove@parkerpoe.com

*Attorneys for Defendant Crystal
Pharmaceutical (Suzhou) Co., Ltd.*

/s/ David Ellis Moore
David Ellis Moore (#3983)
Bindu Ann George Palapura (#5370)
Potter Anderson & Corroon, LLP
1313 N. Market St., Hercules Plaza, 6th Flr.
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

/s/  Daniel A. Taylor
Neal C. Belgam (#2721)
Daniel A. Taylor (# 6934)
Smith, Katzenstein, & Jenkins LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

OF COUNSEL:

Dmitry V. Shelhoff
Kenneth S. Canfield
Edward D. Pergament
Pergament & Cepeda LLP
89 Headquarters Plaza
North Tower, 14th Floor
Morristown, NJ 07960
(973) 998-7722
kcanfield@pergamentcepeda.com
dshelhoff@pergamentcepeda.com
epergament@pergamentcepeda.com

*Attorneys for Defendants Hetero USA Inc.,
Hetero Labs Limited, Hetero Labs Limited
Unit III, Torrent Pharma Inc. and Torrent
Pharmaceuticals Ltd.*

OF COUNSEL:

Robert L. Florence
Parker Poe Adams & Bernstein LLP
1075 Peachtree Street, N.E.
Suite 1800
Atlanta, GA 30309
(678) 690-5750
robertflorence@parkerpoe.com

Tasneem A. Dharamsi
Parker Poe Adams & Bernstein LLP
110 East Street, Suite 200
Greenville, SC 29601 (864) 577-6370
tasneemdharamsi@parkerpoe.com

*Attorneys for Defendant Mylan*
*Pharmaceuticals Inc.*

# EXHIBIT H

**From:** Stringham, Jared L. <JLStringham@Venable.com>
**Sent:** May 12, 2023 4:19 PM
**To:** Kenneth Canfield <kcanfield@pergamentcepeda.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Park, Carrie S. <CSPark@Venable.com>; 'Daniel M. Silver' <dsilver@mccarter.com>; 'Alexandra M. Joyce' <ajoyce@mccarter.com>; 'Ford, Katie' <kford@mccarter.com>
**Cc:** 'Ed Pergament' <epergament@pergamentcepeda.com>; 'Dmitry Shelhoff' <dshelhoff@pergamentcepeda.com>; 'Julia Kim' <jkim@pergamentcepeda.com>; 'Oliver Rogers' <orogers@pergamentcepeda.com>; nbelgam@skjlaw.com; 'Daniel A. Taylor' <DAT@skjlaw.com>; 'Morgan M. Daughton' <mdaughton@skjlaw.com>; 'Weinstein, Corey' <CWeinstein@wiley.law>; nseth@wiley.law; seaman@abramsbayliss.com; ferraro@abramsbayliss.com
**Subject:** RE: In re Entresto (20-2930-RGA; 21-1330-RGA) ('918 patent) - Plaintiff's discovery responses

Counsel,

We are conferring with Dr. Motto and Mr. Waibel about the start times for their depositions and will provide you with a response soon.  We will also provide you with a proposed stipulation to extend the fact discovery schedule for the purpose of taking Dr. Motto's deposition.  However, we disagree that Defendants can withhold their supplemental invalidity contentions until two weeks after Dr. Motto's deposition and four weeks *after* the close of fact discovery.  Defendants agreed in the scheduling order that final supplementation of invalidity contentions would occur on May 19, 2023—four weeks *before* the close of fact discovery.  The scheduling order in MDL No. 20-2930 likewise required final supplementation of invalidity contentions one month before the close of fact discovery, and Defendants were able to comply with that deadline despite taking all depositions of Novartis's fact witnesses after that date.

To resolve this dispute, Novartis is willing to allow Defendants to further supplement their final invalidity contentions based only on testimony from Mr. Waibel's and Dr. Motto's depositions by July 7, 2023, provided that Defendants comply with the deadline in the scheduling order of supplementing their invalidity contentions not based on such deposition testimony by May 19, 2023.

With respect to Interrogatory No. 8, Defendants continue to evade identifying which § 112 defense, if any, this interrogatory relates to.  If Defendants had asserted a § 112 defense that relates to Interrogatory No. 8, it would be a simple matter to identify that issue.

Novartis is willing to meet and confer on May 15 at 2:00 pm provided that Defendants identify where in their invalidity contentions they have asserted a § 112 defense that relates to Interrogatory No. 8, and after addressing Interrogatory No. 8, counsel for Hetero and Torrent remain on the line to address the issues raised in Christopher Loh's April 5, 2023 letter, May 2, 2023 email, and May 11, 2023 email to which we have not received any response.  Please provide a number for the call.

Kind regards,
Jared

*__Please note our new street address effective March 27, 2023. All other information is the same.__*

**Jared L. Stringham, Esq. | Venable LLP**

t 212.218.2523 | f 212.307.5598
151 W. 42nd Street, 49th Floor, New York, NY 10036

JLStringham@Venable.com | www.Venable.com

# EXHIBIT I

**From:** Kenneth Canfield <kcanfield@pergamentcepeda.com>
**Sent:** Tuesday, May 30, 2023 4:40 PM
**To:** Roberts, Melinda R. <MRRoberts@Venable.com>; 'Rachel Marshall' <RMarshall@hegh.law>; 'Daniel Silver' <dsilver@mccarter.com>; 'A Joyce' <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Clark, Shannon K. <SKClark@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>
**Cc:** 'Neal C. Belgam' <nbelgam@skjlaw.com>; 'Dmitry V. Shelhoff' <dshelhoff@pergamentcepeda.com>; 'Edward D. Pergament' <epergament@pergamentcepeda.com>; 'David E. Moore' <dmoore@potteranderson.com>; 'Bindu A. Palapura' <bpalapura@potteranderson.com>; 'Robert L. Florence' <robertflorence@parkerpoe.com>; tasneemdharamsi@parkerpoe.com; dtaylor@skjlaw.com
**Subject:** RE: TIME SENSITIVE RE: Activity in Case . Novartis Pharmaceuticals Corporation v. Hetero USA Inc. et al Notice to Take Deposition Notice to Take Deposition

**Caution: External Email**

Counsel,

Defendants accept June 14 for Mr. Waibel's deposition.

Based on Novartis's representation that it will not bring Drs. Chen, Shi, and Kayath to trial, and that Dr. Kayath presently has no knowledge of the contents of the 2019 Citizen Petition or the TITRATION-HF study, Defendants will withdraw the notices of their depositions.  However, should any Novartis 30(b)(6) witness not be prepared, or should a 30(b)(6) witness identify Drs. Chen, Shi, and/or Kayath as knowledgeable about any of the topics for which the witness is designated, Defendants reserve the right to reinstate those notices.

Defendants are unavailable for Adel Rizkala's on June 7.  Please provide a date the week of June 12 or June 19.

Best,
Ken

Ken Canfield
Senior Counsel | PERGAMENT & CEPEDA LLP
25A Hanover Road, Suite 104
Florham Park, NJ 07932
973-998-7722 x106 | kcanfield@pergamentcepeda.com

---

**From:** Roberts, Melinda R. <MRRoberts@Venable.com>
**Sent:** Tuesday, May 30, 2023 10:57 AM
**To:** Rachel Marshall <RMarshall@hegh.law>; Daniel Silver <dsilver@mccarter.com>; A Joyce <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Clark, Shannon K. <SKClark@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>

**Cc:** Neal C. Belgam <nbelgam@skjlaw.com>; Dmitry V. Shelhoff <dshelhoff@pergamentcepeda.com>; Kenneth S. Canfield <kcanfield@pergamentcepeda.com>; Edward D. Pergament <epergament@pergamentcepeda.com>; David E. Moore <dmoore@potteranderson.com>; Bindu A. Palapura <bpalapura@potteranderson.com>; Robert L. Florence <robertflorence@parkerpoe.com>; tasneemdharamsi@parkerpoe.com; dtaylor@skjlaw.com
**Subject:** TIME SENSITIVE RE: Activity in Case . Novartis Pharmaceuticals Corporation v. Hetero USA Inc. et al Notice to Take Deposition Notice to Take Deposition
**Importance:** High

Counsel,

Despite our numerous emails regarding the depositions of Drs. Chen, Shi and Kayath, we have not received any response. Nor have we received confirmation that Defendants plan to proceed with Mr. Rizkala's deposition on June 7 or Mr. Waibel's deposition on June 14.  The window for fact discovery is closing and Mr. Rizkala, Mr. Waibel, Dr. Chen and Dr. Kayath have very limited availability. To date, we have been unable to reach Dr. Shi.

If we do not hear back from Defendants by close of business today, we will understand Defendants' silence to mean that Defendants no longer wish to take these depositions.

Best,
Melinda

---

**From:** Roberts, Melinda R.
**Sent:** Saturday, May 27, 2023 2:22 PM
**To:** 'Rachel Marshall' <RMarshall@hegh.law>; 'Daniel Silver' <dsilver@mccarter.com>; 'A Joyce' <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Clark, Shannon K. <SKClark@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>
**Cc:** 'Neal C. Belgam' <nbelgam@skjlaw.com>; 'Dmitry V. Shelhoff' <dshelhoff@pergamentcepeda.com>; 'Kenneth S. Canfield' <kcanfield@pergamentcepeda.com>; 'Edward D. Pergament' <epergament@pergamentcepeda.com>; 'David E. Moore' <dmoore@potteranderson.com>; 'Bindu A. Palapura' <bpalapura@potteranderson.com>; 'Robert L. Florence' <robertflorence@parkerpoe.com>; 'tasneemdharamsi@parkerpoe.com' <tasneemdharamsi@parkerpoe.com>; 'dtaylor@skjlaw.com' <dtaylor@skjlaw.com>
**Subject:** RE: Activity in Case . Novartis Pharmaceuticals Corporation v. Hetero USA Inc. et al Notice to Take Deposition Notice to Take Deposition

Counsel,

Further to my email below and my emails on May 17, May 22 and May 25, please confirm you will proceed with Adel Rizkala's deposition on June 7. Please also confirm you will with Peter Waibel's deposition regarding Topic No. 2 on June 14, 2023 after the conclusion of his deposition in the cases involving the '918 patent.

Additionally, subject to Novartis's objections, Novartis designates Adel Rizkala to testify on Topic Nos. 4, 5, 6, 15, 20 and 36.

Best,
Melinda

---

**From:** Roberts, Melinda R.
**Sent:** Friday, May 26, 2023 10:14 AM
**To:** 'Rachel Marshall' <RMarshall@hegh.law>; 'Daniel Silver' <dsilver@mccarter.com>; 'A Joyce' <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Clark, Shannon K. <SKClark@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>
**Cc:** 'Dominick Gattuso' <dgattuso@hegh.law>; 'Crompton, Elizabeth M.' <elizabethcrompton@parkerpoe.com>; 'kylemusgrove@parkerpoe.com' <kylemusgrove@parkerpoe.com>; 'scottcunning@parkerpoe.com' <scottcunning@parkerpoe.com>; 'Neal C. Belgam' <nbelgam@skjlaw.com>; 'Dmitry V. Shelhoff' <dshelhoff@pergamentcepeda.com>; 'Kenneth S. Canfield' <kcanfield@pergamentcepeda.com>; 'Edward D. Pergament' <epergament@pergamentcepeda.com>; 'David E. Moore' <dmoore@potteranderson.com>; 'Bindu A. Palapura' <bpalapura@potteranderson.com>; 'Robert L. Florence' <robertflorence@parkerpoe.com>; 'tasneemdharamsi@parkerpoe.com' <tasneemdharamsi@parkerpoe.com>; 'dtaylor@skjlaw.com' <dtaylor@skjlaw.com>
**Subject:** RE: Activity in Case . Novartis Pharmaceuticals Corporation v. Hetero USA Inc. et al Notice to Take Deposition Notice to Take Deposition

Counsel,

In view of the fact that fact discovery is closing soon, we would appreciate the courtesy of a response today regarding the depositions of Drs. Kayath, Chen and Shi.

Best,
Melinda

---

**From:** Roberts, Melinda R.
**Sent:** Thursday, May 25, 2023 10:05 AM
**To:** 'Rachel Marshall' <RMarshall@hegh.law>; 'Daniel Silver' <dsilver@mccarter.com>; 'A Joyce' <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Clark, Shannon K. <SKClark@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>
**Cc:** 'Dominick Gattuso' <dgattuso@hegh.law>; 'Crompton, Elizabeth M.' <elizabethcrompton@parkerpoe.com>; 'kylemusgrove@parkerpoe.com' <kylemusgrove@parkerpoe.com>; 'scottcunning@parkerpoe.com' <scottcunning@parkerpoe.com>; 'Neal C. Belgam' <nbelgam@skjlaw.com>; 'Dmitry V. Shelhoff' <dshelhoff@pergamentcepeda.com>; 'Kenneth S. Canfield' <kcanfield@pergamentcepeda.com>; 'Edward D. Pergament'

<epergament@pergamentcepeda.com>; 'David E. Moore' <dmoore@potteranderson.com>; 'Bindu A. Palapura' <bpalapura@potteranderson.com>; 'Robert L. Florence' <robertflorence@parkerpoe.com>; 'tasneemdharamsi@parkerpoe.com' <tasneemdharamsi@parkerpoe.com>; 'dtaylor@skjlaw.com' <dtaylor@skjlaw.com>
**Subject:** RE: Activity in Case . Novartis Pharmaceuticals Corporation v. Hetero USA Inc. et al Notice to Take Deposition Notice to Take Deposition

Counsel,

Please confirm you will proceed with Adel Rizkala's deposition on June 7 and that you will proceed with Peter Waibel's deposition regarding Topic No. 2 on June 14, 2023 after the conclusion of his deposition in the cases involving the '918 patent. Please also let us know if Defendants will agree to withdraw the deposition notices for Fabian Chen, Marcia Kayath and Victor Shi in view of Novartis's representation that none of these individuals, who are all now former Novartis employees, will appear at trial, and Novartis's further representations that Dr. Kayath presently has no knowledge of the contents of the 2019 Citizen Petition or the TITRATION-HF study.

Best,
Melinda

---

**From:** Roberts, Melinda R.
**Sent:** Wednesday, May 17, 2023 11:56 AM
**To:** 'Rachel Marshall' <RMarshall@hegh.law>; Daniel Silver <dsilver@mccarter.com>; A Joyce <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Clark, Shannon K. <SKClark@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>
**Cc:** Dominick Gattuso <dgattuso@hegh.law>; Crompton, Elizabeth M. <elizabethcrompton@parkerpoe.com>; kylemusgrove@parkerpoe.com; scottcunning@parkerpoe.com; Neal C. Belgam <nbelgam@skjlaw.com>; Dmitry V. Shelhoff <dshelhoff@pergamentcepeda.com>; Kenneth S. Canfield <kcanfield@pergamentcepeda.com>; Edward D. Pergament <epergament@pergamentcepeda.com>; David E. Moore <dmoore@potteranderson.com>; Bindu A. Palapura <bpalapura@potteranderson.com>; Robert L. Florence <robertflorence@parkerpoe.com>; tasneemdharamsi@parkerpoe.com; dtaylor@skjlaw.com
**Subject:** RE: Activity in Case . Novartis Pharmaceuticals Corporation v. Hetero USA Inc. et al Notice to Take Deposition Notice to Take Deposition

Counsel,

We confirm that we accept service of the deposition notices for Adel Rizkala, Fabian Chen and Marcia Kayath. We are attempting to reach Victor Shi, who is no longer employed at Novartis, to confirm whether we can accept his deposition notice and will provide an update once we hear from him.

Fabian Chen, Marcia Kayath and Victor Shi are all former employees of Novartis. Regarding Marcia Kayath, she was not involved in preparing the 2019 Citizen Petition relating to Entresto and was not involved in the TITRATION-HF study. She presently has no knowledge of the contents of the 2019 Citizen

Petition or the TITRATION-HF study. If Defendants will forgo the depositions of Drs. Chen, Kayath and Shi, we will agree not to bring them to trial.

Regarding Adel Rizkala, he is available for a remote deposition on June 7. Please confirm Defendants will proceed on this date.

Best,
Melinda

---

**From:** Rachel Marshall <RMarshall@hegh.law>
**Sent:** Friday, May 5, 2023 1:52 PM
**To:** Daniel Silver <dsilver@mccarter.com>; A Joyce <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Clark, Shannon K. <SKClark@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>
**Cc:** Dominick Gattuso <dgattuso@hegh.law>; Crompton, Elizabeth M. <elizabethcrompton@parkerpoe.com>; kylemusgrove@parkerpoe.com; scottcunning@parkerpoe.com; Neal C. Belgam <nbelgam@skjlaw.com>; Dmitry V. Shelhoff <dshelhoff@pergamentcepeda.com>; Kenneth S. Canfield <kcanfield@pergamentcepeda.com>; Edward D. Pergament <epergament@pergamentcepeda.com>; David E. Moore <dmoore@potteranderson.com>; Bindu A. Palapura <bpalapura@potteranderson.com>; Robert L. Florence <robertflorence@parkerpoe.com>; tasneemdharamsi@parkerpoe.com; dtaylor@skjlaw.com
**Subject:** Activity in Case . Novartis Pharmaceuticals Corporation v. Hetero USA Inc. et al Notice to Take Deposition Notice to Take Deposition

**Caution: External Email**

Dear Counsel,

Please find attached the Notices of Deposition filed in these matters today. Plaintiff's initial disclosures indicated that the inventors should be contacted through counsel for Plaintiff. Accordingly, Defendants are serving copies of the as-filed Notice of Deposition on Novartis. Please confirm that you are accepting service of the Notices of Deposition directed to Chen, Shi and Rizkala consistent with Plaintiff's initial disclosures. Additionally, please confirm that you represent Kayath and, if so, that you will accept service of the Notice of Deposition directed to Kayath.

Thank you,



Rachel A. Marshall
Legal Assistant to Dominick T. Gattuso

Melissa N. Donimirski and Kelly E. Rowe
Heyman Enerio Gattuso & Hirzel LLP
300 Delaware Ave., Suite 200
Wilmington, DE 19801
Office: (302) 472-7305
rmarshall@hegh.law

The following transaction was entered by Gattuso, Dominick on 5/5/2023 at 1:37 PM EDT and filed on 5/5/2023

**Case Name:**        In re: Entresto (Sacubitril/Valsartan) Patent Litigation

**Case Number:**      1:20-md-02930-RGA

**Filer:**            Crystal Pharmaceutical (Suzhou) Co., Ltd.

**Document Number:** 1009

**Docket Text:**
**NOTICE to Take Deposition of Adel Remond Rizkala on at a date, time, and/or location to be determined filed by Crystal Pharmaceutical (Suzhou) Co., Ltd..(Gattuso, Dominick)**
**Notice of Electronic Filing**

The following transaction was entered by Gattuso, Dominick on 5/5/2023 at 1:39 PM EDT and filed on 5/5/2023

**Case Name:**        In re: Entresto (Sacubitril/Valsartan) Patent Litigation

**Case Number:**      1:20-md-02930-RGA

**Filer:**            Crystal Pharmaceutical (Suzhou) Co., Ltd.

**Document Number:** 1010

**Docket Text:**
**NOTICE to Take Deposition of Marcia Kayath on date, time, and/or location to be determined filed by Crystal Pharmaceutical (Suzhou) Co., Ltd..(Gattuso, Dominick)**

The following transaction was entered by Gattuso, Dominick on 5/5/2023 at 1:40 PM EDT and filed on 5/5/2023

**Case Name:**        In re: Entresto (Sacubitril/Valsartan) Patent Litigation

**Case Number:**      1:20-md-02930-RGA

**Filer:**            Crystal Pharmaceutical (Suzhou) Co., Ltd.

**Document Number:** 1011

**Docket Text:**
**NOTICE to Take Deposition of Victor Chengwei Shi on date, time, and/or location to be determined filed by Crystal Pharmaceutical (Suzhou) Co., Ltd..(Gattuso, Dominick)**
**Notice of Electronic Filing**

The following transaction was entered by Gattuso, Dominick on 5/5/2023 at 1:42 PM EDT and filed on 5/5/2023

**Case Name:**        In re: Entresto (Sacubitril/Valsartan) Patent Litigation

**Case Number:** 1:20-md-02930-RGA
**Filer:** Crystal Pharmaceutical (Suzhou) Co., Ltd.
**Document Number:** 1012
**Docket Text:**
**NOTICE to Take Deposition of Fabian Chen on date, time, and/or location to be determined filed by Crystal Pharmaceutical (Suzhou) Co., Ltd..(Gattuso, Dominick)**
**Notice of Electronic Filing**

The following transaction was entered by Gattuso, Dominick on 5/5/2023 at 1:45 PM EDT and filed on 5/5/2023
**Case Name:** In re: Entresto (Sacubitril/Valsartan) Patent Litigation
**Case Number:** 1:20-md-02930-RGA
**Filer:** Crystal Pharmaceutical (Suzhou) Co., Ltd.
**Document Number:** 1013
**Docket Text:**
**NOTICE to Take Deposition of Plaintiff Novartis Pharmaceuticals Corporation on date, time, and/or location to be determined filed by Crystal Pharmaceutical (Suzhou) Co., Ltd..(Gattuso, Dominick)**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
=

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | ) ) ) ) | C.A. No. 20-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 21-1760-RGA |
| HETERO USA INC., HETERO LABS LIMITED, and HETERO LABS LIMITED UNIT III, | ) ) ) ) | |
| Defendants. | ) ) ) ) | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 22-451-RGA |
| MYLAN PHARMACEUTICALS INC., | ) ) ) | |
| Defendant. | ) ) ) | |

NOVARTIS PHARMACEUTICALS
CORPORATION,

        Plaintiff,

        v.

TORRENT PHARMA INC. and
TORRENT PHARMACEUTICALS LTD.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 21-1794-RGA

## PLAINTIFF'S SUPPLEMENTAL RULE 26(A)(1) INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), and the Local Rules for the District of Delaware, based upon the information presently available to it, Plaintiff Novartis Pharmaceuticals Corporation ("Plaintiff"), hereby provides its Supplemental Initial Disclosures in the above-captioned actions to Hetero USA Inc., Hetero Labs Limited, and Hetero Labs Limited Unit III (collectively "Hetero"), Mylan Pharmaceuticals Inc. ("Mylan"), and Torrent Pharma Inc. and Torrent Pharmaceuticals Ltd. (collectively "Torrent"). The foregoing list of defendant entities are collectively referred to as "Defendants".

Plaintiff makes these Supplemental Initial Disclosures based on information available and obtained to date, without the benefit of complete discovery from Defendants or from third parties, with respect to Defendants' Abbreviated New Drug Applications ("ANDAs") for generic sacubitril/valsartan tablets, 24 mg/26 mg, 49 mg/51 mg, and 97 mg/103 mg dosage strengths ("Defendants' ANDA Products") concerning infringement of U.S. Patent No. 11,058,667.

Plaintiff's investigation concerning this case is continuing, and Plaintiff reserves the right to revise, correct, supplement or clarify any of these Initial Disclosures at any time based on information developed in the course of this lawsuit through discovery or additional factual investigation. By making the below disclosures, Plaintiff does not represent that it has identified every document, tangible thing or witness relevant to this lawsuit. Nor does Plaintiff waive its right to object to production of any document or tangible thing described in these disclosures on the basis of privilege, the work product doctrine, relevance, undue burden or any other valid objection.

1

    k.    One or more expert witnesses, who will be disclosed pursuant to the schedule set by the Court.

**C.    Plaintiff's Defense to Defendants' Claims of Patent Invalidity**

Plaintiff believes that the following individuals are likely to have knowledge of

discoverable facts that Plaintiff may use to defend against Defendants' contentions that certain

claims of the '667 patent are invalid:

    a.    One or more expert witnesses, who will be disclosed pursuant to the schedule set by the Court;

    b.    Dr. Adel Remond Rizkala, c/o undersigned counsel for Novartis. Dr. Rizkala is a named inventor of the '667 patent;

    c.    Dr. Fabian Chen, c/o undersigned counsel for Novartis. Dr. Chen is a named inventor of the '667 patent;

    d.    Dr. Victor Chengwei Shi. Dr. Shi is a named inventor of the '667 patent; and

    e.    Ms. Nicole Twisk, c/o undersigned counsel for Novartis.  Ms. Twisk is a Clinical Research Associate Manager for Novartis with knowledge of Novartis's confidentiality practices with respect to clinical trials.

**II.    <u>Identification of Documents</u>**

**A.    Plaintiff's Claims of Direct Infringement**

Plaintiff believes that the following documents and things may support its claims of

infringement:

    a.    Defendants' ANDAs;

    b.    Documents and things from Defendants or third parties relating to Defendants' ANDAs;

    c.    Documents and things from Defendants or third parties relating to the activities undertaken in connection with, or in anticipation of, the preparation, filing, or amendment of Defendants' ANDAs;

    d.    The DMF for the API in Defendants' ANDA Products;

    e.    Documents and things from Defendants or third parties relating to the DMF for the API in Defendants' ANDA Products;

Dated:  June 12, 2023                      VENABLE LLP

                                           By: /s/ Nicholas N. Kallas
                                               Nicholas N. Kallas
                                               Christina Schwarz
                                               Christopher E. Loh
                                               Jared Stringham
                                               VENABLE LLP
                                               151 W. 42nd Street, 49th Floor
                                               New York, New York 10036
                                               (212) 218-2100
                                               *nkallas@venable.com*
                                               *cschwarz@venable.com*
                                               *cloh@venable.com*
                                               *jlstringham@venable.com*

                                               Daniel M. Silver (#4758)
                                               Alexandra M. Joyce (#6423)
                                               Renaissance Centre
                                               405 N. King Street, 8th Floor
                                               Wilmington, Delaware 19801
                                               (302) 984-6300
                                               *dsilver@mccarter.com*
                                               *ajoyce@mccarter.com*

                                               *Attorneys for Plaintiff Novartis*
                                               *Pharmaceuticals Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of Plaintiff's Rule 26(a)(1) Initial

Disclosures was caused to be served by email this 12th day of June 2023, upon the following:

Neal C. Belgam
Daniel A. Taylor
SMITH, KATZENSTEIN, & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

Kenneth S. Canfield
Dmitry V. Shelhoff
Edward D. Pergament
Julia S. Kim
PERGAMENT & CEPEDA LLP
25A Hanover Road, Suite 104Florham Park, NJ 07932
(973) 998-7722
kcanfield@pergamentcepeda.com
dshelhoff@pergamentcepeda.com
epergament@pergamentcepeda.com
jkim@pergamentcepdea.com

*Attorneys for Defendants Hetero USA Inc., Hetero Labs Limited, Hetero Labs Limited Unit III, Torrent Pharma Inc., and Torrent Pharmaceuticals Ltd.*

Robert L. Florence
PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, N.E., Suite 1500
(678) 690-5750
robertflorence@parkerpoe.com

Tasneem Dharamsi
PARKER POE ADAMS & BERNSTEIN LLP
110 East Court Street, Suite 200
Greenville, SC 29601
(864) 577-6370
tasneemdharamsi@parkerpoe.com

David E. Moore
Bindu A. Palapura
Andrew L. Brown

POTTER ANDERSON & CORROON LLP
1313 N. Market St. Hercules Plaza, 6th Floor
Wilmington, DE 119801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Mylan Pharmaceuticals Inc.*

/s/ Nicholas N. Kallas_____
Nicholas N. Kallas

# EXHIBIT K

**From:** Kenneth Canfield <kcanfield@pergamentcepeda.com>
**Sent:** June 20, 2023 10:28 AM
**To:** Clark, Shannon K. <SKClark@Venable.com>; 'Florence, Robert L.' <robertflorence@parkerpoe.com>; '[contact] Julia Kim' <jkim@pergamentcepeda.com>; '[contact] Dmitry Shelhoff' <dshelhoff@pergamentcepeda.com>; '[contact] Edward Pergament' <epergament@pergamentcepeda.com>; dtaylor@skjlaw.com; '[contact] Neal Belgam' <nbelgam@skjlaw.com>; 'Dharamsi, Tasneem A.' <tasneemdharamsi@parkerpoe.com>; '[contact] David Moore' <dmoore@potteranderson.com>; '[contact] Bindu Palapura' <bpalapura@potteranderson.com>; abrown@potteranderson.com; 'Regan, Crystal L.' <crystalregan@parkerpoe.com>
**Cc:** dsilver@mccarter.com; 'Joyce, Alexandra' <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Roberts, Melinda R. <MRRoberts@Venable.com>; Flanders, Susanne L. <SLFlanders@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>
**Subject:** RE: In re Entresto (20-2930-RGA; 21-1760, 21-1794, 22-451-RGA) ('667 patent) - Plaintiff's Responses & Objections to Defendants' 30(b)(6) Notice

**Caution: External Email**

Counsel,

Defendants (Hetero, Torrent, and Mylan) confirm Nicole Twisk's remote deposition on June 30th at 10am ET. Please send the list of attendees that we can provide to our vendor.

Regarding Topics 19 and 22, the above defendants propose the following:

Non-privileged, factual matters regarding agreements or communications with medical professionals or institutions (including clinical investigators, physicians, nurses, pharmacists, hospitals, institutional review boards), patients, or patients' families or caregivers regarding confidentiality measures used or proposed by Novartis in conducting the TITRATION trial.

Because the Dr. Motto deposition also involves Macleods, we will respond regarding Dr. Motto on a separate chain.

Best,
Ken

Ken Canfield
Senior Counsel | Pᴇʀɢᴀᴍᴇɴᴛ & Cᴇᴘᴇᴅᴀ LLP
25A Hanover Road, Suite 104
Florham Park, NJ 07932
973-998-7722 x106 | kcanfield@pergamentcepeda.com

---

**From:** Clark, Shannon K. <SKClark@Venable.com>
**Sent:** Tuesday, June 20, 2023 9:20 AM

**To:** Kenneth Canfield <kcanfield@pergamentcepeda.com>; 'Florence, Robert L.' <robertflorence@parkerpoe.com>; '[contact] Julia Kim' <jkim@pergamentcepeda.com>; '[contact] Dmitry Shelhoff' <dshelhoff@pergamentcepeda.com>; '[contact] Edward Pergament' <epergament@pergamentcepeda.com>; dtaylor@skjlaw.com; '[contact] Neal Belgam' <nbelgam@skjlaw.com>; 'Dharamsi, Tasneem A.' <tasneemdharamsi@parkerpoe.com>; '[contact] David Moore' <dmoore@potteranderson.com>; '[contact] Bindu Palapura' <bpalapura@potteranderson.com>; abrown@potteranderson.com; 'Regan, Crystal L.' <crystalregan@parkerpoe.com>
**Cc:** dsilver@mccarter.com; 'Joyce, Alexandra' <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Roberts, Melinda R. <MRRoberts@Venable.com>; Flanders, Susanne L. <SLFlanders@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>
**Subject:** RE: In re Entresto (20-2930-RGA; 21-1760, 21-1794, 22-451-RGA) ('667 patent) - Plaintiff's Responses & Objections to Defendants' 30(b)(6) Notice

Counsel,

Mike Motto is available for a remote deposition on the '918 and '667 patents on June 29th.  Please confirm Defendants will proceed on that date.

Please also confirm that Defendants will proceed with Nicole Twisk's remote deposition on June 30th at 10 AM ET and that Defendants accept revised Topics 19 and 22.

Best regards,
Shannon

*__Please note our new street address effective March 27, 2023. All other information is the same.__*

Shannon K. Clark, Esq. | Venable LLP
t 212.218.2311 | f 212.307.5598
151 W. 42nd Street, 49th Floor, New York, NY 10036

SKClark@Venable.com |
https://linklock.titanhq.com/analyse?url=http%3A%2F%2Fwww.Venable.com&data=eJxLtjUzTk4zNUizMDQyMk1VS7EtSC1KT8xNzStJTi1ITUnUS87PVcu1LUktsAzWDUovrPAIViu2Lc5OzkksyIY1MShLzUtMykkFKyuyzU5OzEvLTM1JAcpgM6jUNqOkpEDV2FHVyA2IysvL9cIQBgAAU9wwug%%

**From:** Clark, Shannon K.
**Sent:** June 15, 2023 5:13 PM
**To:** 'Kenneth Canfield' <kcanfield@pergamentcepeda.com>; 'Florence, Robert L.' <robertflorence@parkerpoe.com>; '[contact] Julia Kim' <jkim@pergamentcepeda.com>; '[contact] Dmitry Shelhoff' <dshelhoff@pergamentcepeda.com>; '[contact] Edward Pergament' <epergament@pergamentcepeda.com>; 'dtaylor@skjlaw.com' <dtaylor@skjlaw.com>; '[contact] Neal Belgam' <nbelgam@skjlaw.com>; 'Dharamsi, Tasneem A.' <tasneemdharamsi@parkerpoe.com>; '[contact] David Moore' <dmoore@potteranderson.com>; '[contact] Bindu Palapura' <bpalapura@potteranderson.com>; 'abrown@potteranderson.com' <abrown@potteranderson.com>; 'Regan, Crystal L.' <crystalregan@parkerpoe.com>

**Cc:** 'dsilver@mccarter.com' <dsilver@mccarter.com>; 'Joyce, Alexandra' <ajoyce@mccarter.com>; Kallas, Nicholas N. <NKallas@Venable.com>; Schwarz, Christina <CSchwarz@Venable.com>; Stringham, Jared L. <JLStringham@Venable.com>; Loh, Christopher E. <CLoh@Venable.com>; Roberts, Melinda R. <MRRoberts@Venable.com>; Flanders, Susanne L. <SLFlanders@Venable.com>; Manas, Gregory J. <GJManas@Venable.com>; Fishwick, Laura K. <LFishwick@Venable.com>
**Subject:** RE: In re Entresto (20-2930-RGA; 21-1760, 21-1794, 22-451-RGA) ('667 patent) - Plaintiff's Responses & Objections to Defendants' 30(b)(6) Notice

Counsel,

Regarding Topics 19 and 22, Novartis proposes the following: non-privileged, factual matters regarding agreements or representative communications with clinical trial subjects and clinical investigators regarding confidentiality measures used by Novartis in conducting the TITRATION trial.

Assuming Novartis's proposal is acceptable to Defendants, Novartis will designate Nicole Twisk to testify on Topics 19 and 22.  She is available for a remote deposition on June 30 beginning at 10 AM ET.  Please confirm Defendants will proceed on this date.

Best regards,
Shannon

_**Please note our new street address effective March 27, 2023. All other information is the same.**_

**Shannon K. Clark, Esq. | Venable LLP**
**t** 212.218.2311 | **f** 212.307.5598
151 W. 42nd Street, 49th Floor, New York, NY 10036

SKClark@Venable.com |
https://linklock.titanhq.com/analyse?url=http%3A%2F%2Fwww.Venable.com&data=eJxLtjUzTk4zNUizMDQyMk1VS7EtSC1KT8
xNzStJTi1ITUnUS87PVcu1LUktsAzWDUovrPAIViu2Lc5OzkksyIY1MShLzUtMykkFKyuyzU5OzEvLTM1JAcpgM6jUNqOkpEDV2
FHVyA2IysvL9cIQBgAAU9wwug%%

*****************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
*****************************************************************

*****************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
*****************************************************************

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | ) ) ) ) | C.A. No. 20-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>HETERO USA INC., HETERO LABS LIMITED, HETERO LABS LIMITED UNIT III,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 21-1760-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LTD.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 21-1794-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MYLAN PHARMACEUTICALS INC.,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 22-451-RGA |

## [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION TO STRIKE

WHEREAS, Plaintiff Novartis Pharmaceuticals Corporation's ("Plaintiff") having moved to strike evidence and invalidity theories from the Opening Expert Report of Dan Fintel, M.D. on the Invalidity of U.S. Patent No, 11,058,667 ("the '667 Patent"); and

WHEREAS, the Court having considered the motion and the papers submitted in connection therewith;

IT IS HEREBY ORDERED that:

1.     Defendants are precluded from relying on (1) Trial Patients (as defined in paragraphs 174–178 of the opening expert report of Opening Expert Report of Dan Fintel, M.D.), and (2) VA Consent Forms (bearing production numbers NPC-VS-667-000018955–963, NPC-VS-667-000018964–972, and NPC-VS-667-000018973–981) as prior art under 35 U.S.C. 102.

2.     Defendants are precluded from presenting the invalidity theories that (a) any claim of the '667 patent is anticipated by Trial Patients (as defined in paragraphs 174–178 of the opening expert report of Opening Expert Report of Dan Fintel, M.D.); (b) any claim of the '667 Patent would have been obvious over Trial Patients (as defined in paragraphs 174–178 of the opening expert report of Opening Expert Report of Dan Fintel, M.D.) alone or in combination with other references; (c) any claim of the '667 patent is anticipated by the VA Consent Forms; (d) any claim of the '667 Patent would have been obvious over the VA Consent Forms alone or in combination with other references; and

3.     Paragraphs 158–164, 174–178, and 272–369 of the opening expert report of Opening Expert Report of Dan Fintel, M.D. on the Invalidity of the '667 Patent are stricken from the record;

4.     The portions of paragraphs 370–384 of the Opening Expert Report of Dan Fintel, M.D. relying on the VA Consent Form and/or Trial Patients (as defined in paragraphs 174–178

of the opening expert report of Opening Expert Report of Dan Fintel, M.D.) are stricken from the record.

SO ORDERED this _____ day of _____, 2023.


_____
The Honorable Richard G. Andrews
United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the

foregoing document were caused to be served on September 18, 2023 on the following counsel

in the manner indicated below.

### <u>VIA EMAIL:</u>

Neal C. Belgam
Daniel A. Taylor
SMITH, KATZENSTEIN, & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dat@skjlaw.com

Dmitry V. Shelhoff
Kenneth S. Canfield
Edward D. Pergament
Julia Kim
PERGAMENT & CEPEDA LLP
89 Headquarters Plaza
North Tower, 14th Flr.
Morristown, NJ 07960
(973) 998-7722
dshelhoff@pergamentcepeda.com
kcanfield@pergamentcepeda.com
epergament@pergamentcepeda.com
jkim@pergamentcepeda.com

*Attorneys for Defendants Hetero USA, Inc.,*
*Hetero Labs Ltd., and Hetero Labs Ltd. Unit III, Torrent Pharma, Inc.*
*and Torrent Pharmaceuticals, Ltd.*

**VIA EMAIL:**

David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON, LLP
1313 N. Market St., Hercules Plaza, 6th Flr.
Wilmington, DE 19899-0951
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

Robert L. Florence
PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, N.E., Suite 1500
Atlanta, GA 30309
(678) 690-5704
robertflorence@parkerpoe.com

Tasneem A. Dharamsi
PARKER POE ADAMS & BERNSTEIN LLP
110 East Court Street, Suite 200
Greenville, SC 29601
tasneemdharamsi@parkerpoe.com

*Attorneys for Defendant Mylan Pharmaceuticals Inc.*

Dated: September 18, 2023

/s/ *Daniel M. Silver*
Daniel M. Silver (#4758)